# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEPHEN MIDDLEBROOKS,          :
                               :
            Plaintiff,         :
                               :
    v.                         :    Case No.:  17 00412
                               :
TEVA PHARMACEUTICALS USA, INC. :
and  TEVA PHARMACEUTICAL       :
INDUSTRIES, LTD.,              :
                               :
            Defendants.        :

---

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

---

STEVENS & LEE
*Larry J. Rappoport, Esquire*
Attorney ID No. 26922
1818 Market Street
29th Floor
Philadelphia, PA  19103
Phone:  (215) 496-3839
Email:  ljr@stevenslee.com

*Jennifer A. Ermilio, Esquire*
Attorney ID No. 82062
620 Freedom Business Center, Suite 200
King of Prussia, PA  19406
Phone:  (610) 205-6044
Email:  jae@stevenslee.com

*Attorneys for Defendants, Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries, Ltd.*

1

## **TABLE OF CONTENTS**

Page

I. STATEMENT OF FACTS ...........................................................................................7

II. ARGUMENT ............................................................................................................7

    A.    Summary of Argument ...................................................................................7

    B.    Summary Judgment Standard .........................................................................9

    C.    Plaintiff Cannot Support His Claims that Teva Retaliated Against Him in Violation of the ADEA, Title VII or the PHRA as Alleged in Counts I, II and III in his Second Amended Complaint............................................10

    D.    Plaintiff Cannot Support His Age or National Origin Discrimination Claims As Alleged In Counts I and III Of His Complaint. ...................................27

        1.    Standards for Establishing Age and National Origin Discrimination Claims...................................................................................................27

        2.    Plaintiff's PIP And Poor Performance Reviews Are Not Adverse Actions...................................................................................................29

        3.    Plaintiff Cannot Establish that the Reasons for Terminating Plaintiff Were Pretextual. ..................................................................................31

III. CONCLUSION..........................................................................................................39

## TABLE OF AUTHORITIES

CASES

*Andersen v. Mack Trucks, Inc.*,
    118 F.Supp.3d 723, 750 (E.D. Pa. 2015), *aff'd*, 647 F. App'x 130 (3d Cir.
    2016) ..................................................................................................................33

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..........................................................................................9, 10

*Armbruster v. Unisys Corp.*,
    32 F.3d 768 (3d Cir. 1994)...................................................................................10

*Arnold v. AutoZone, Inc.*,
    No. CV 13-1329, 2016 WL 807805 (E.D. Pa. Mar. 2, 2016), *appeal dismissed*
    (July 5, 2016) ...................................................................................................27, 28

*Barber v. CSX Distribution Servs.*,
    68 F.3d 694 (3d Cir. 1995)....................................................................................11

*Bhatt v. Brownsville Gen. Hosp.*,
    236 F. App'x 764 (3d Cir. 2007) ..........................................................................36

*Blakney v. City of Philadelphia*,
    559 F. App'x 183 (3d Cir. 2014) .............................................................17, 18, 19

*Brokenbaugh v. Exel Logistics North America, Inc.*,
    174 Fed. App'x. 39 (3d Cir. Mar. 9, 2006) ..........................................................33

*Brown v. Vanguard Grp., Inc.*,
    No. CV 16-946, 2017 WL 412802 (E.D. Pa. Jan. 30, 2017), *dismissed*, No.
    17-1461, 2017 WL 3911584 (3d Cir. Apr. 13, 2017).......................................20, 30

*Carter v. Mid-Atl. Healthcare, LLC*,
    228 F. Supp. 3d 495, 506 (E.D. Pa. 2017) ............................................................33

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).................................................................................................9

*Clark Cty. Sch. Dist. v. Breeden*,
    532 U.S. 268, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001).....................................25

*Daniels v. Sch. Dist. of Philadelphia*,
    776 F.3d 181 (3d Cir. 2015)......................................................................10, 17, 18

3

*E.E.O.C. v. MCI Int'l, Inc.*,
  829 F. Supp. 1438 (D.N.J. 1993) ..................................................................39

*Ezold v. Wolf, Block, Schorr & Solis-Cohen*,
  983 F.2d 509 (3d Cir. 1992) .......................................................................36

*Fogleman v. Mercy Hosp., Inc.*,
  283 F.3d 561 (3d Cir.2002) ........................................................................11

*Fuentes v. Perskie*,
  32 F.3d 759 (3d Cir. 1994) .........................................................................32

*Gairloch v. Pennsylvania State Univ.*,
  84 F. Supp. 3d 407, 419–20 (M.D. Pa. 2015) ........................................17, 18, 20, 25

*Gladysiewski v. Allegheny Energy*,
  398 F. App'x 721 (3d Cir. 2010) ....................................................................25

*Greene v. Virgin Islands Water & Power Auth.*,
  557 F. App'x 189 (3d Cir. 2014) ....................................................................27

*Gross v. FBL Financial Services*,
  557 U.S. 167 (2009) .................................................................................28

*Gutknecht v. SmithKline Beecham Clinical Labs., Inc.*,
  950 F. Supp. 667 (E.D. Pa. 1996), aff'd, 135 F.3d 764 (3d Cir. 1997) ......................39

*Jones v. Sch. Dist. of Philadelphia*,
  198 F.3d 403 (3d Cir. 1999) ........................................................................28

*Kachmar v. Sungard Data Sys., Inc.*,
  109 F.3d 173 (3d Cir. 1997) ........................................................................17

*Keller v. Orix Credit All., Inc.*,
  130 F.3d 1101 (3d Cir. 1997) .......................................................................28

*Kopko v. Lehigh Valley Health Network*,
  No. CV 14-1290, 2016 WL 6442062 (E.D. Pa. Oct. 31, 2016) ..............................28

*LeBlanc v. Hill Sch.*,
  No. CIV.A. 14-1674, 2015 WL 144135 (E.D. Pa. Jan. 12, 2015) ............................27

*LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*,
  503 F.3d 217 (3d Cir.2007) ......................................................................17, 18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) .................................................................................10

4

*Mease v. Wilmington Tr. Co.,*
   726 F. Supp. 2d 429 (D. Del. 2010) ................................................................34

*Miller v. Weinstein,*
   2008 WL 4279817 (W.D. Pa. Sept. 12, 2008) ..............................................17

*Moore v. City of Philadelphia,*
   461 F.3d 331 (3d Cir. 2006), *as amended* (Sept. 13, 2006) .......................12, 16

*Palmer v. Britton Indus., Inc.,*
   662 F. App'x 147 (3d Cir. 2016) ...................................................................29

*Parasco v. Pacific Indemnity Co.,*
   920 F. Supp. 647 (E.D. Pa. 1996) ................................................................10

*Pivirotto v. Innovative Systems, Inc.,*
   191 F.3d 344 (3d Cir. 1999) ..........................................................................27

*Proudfoot v. Arnold Logistics, LLC,*
   No. 14-4703, 2015 WL 5881530 (3d Cir. Oct. 8, 2015) ..............................11

*Raffaele v. Potter,*
   No. CIV.A. 09-3622, 2012 WL 33035 (E.D. Pa. Jan. 6, 2012) ...................16

*Reeves v. Sanderson Plumbing Prods., Inc.,*
   530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ............................11

*Reynolds v. Dep't of Army,*
   439 F. App'x 150 (3d Cir. 2011) ..............................................................16, 29

*Riley v. Shinseki,*
   No. 09-4345, 2011 WL 18760 (3d Cir. Jan. 5, 2011) ..................................27

*Ruiz v. Posadas de San Juan Assocs.,*
   124 F.3d 243 (1st Cir. 1997) .........................................................................38

*Salkovitz v. Pioneer Elecs. (USA) Inc.,*
   188 F. App'x 90 (3d Cir. 2006) .....................................................................38

*Sarullo v. U.S. Postal Serv.,*
   352 F.3d 789 (3d Cir. 2003) .....................................................................27, 28

*Silver v. Am. Inst. of Certified Pub. Accountants,*
   212 F. App'x 82 (3d Cir. 2006) .....................................................................36

*Slagle v. Cnty. of Clarion,*
   435 F.3d 262 (3d Cir.2006) ...........................................................................11

07/25/2018 SL1 1533575v1 030421.00641

*Solomon v. Caritas*,
    No. CV 15-4050, 2016 WL 4493193 (E.D. Pa. Aug. 26, 2016)..............................30

*St. Mary's Honor Ctr. v. Hicks*,
    509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)..........................................36

*T.I. Construction Co., Inc. v. Kiewit Eastern Co.*,
    1992 WL 382306 (E.D. Pa. Dec. 10, 1992), *aff'd*, 26 F.3d 123 (3d Cir. 1994),
    *cert. denied*, 513 U.S. 813 (1994)....................................................................10

*Tahiliani v. Bayer Corp.*,
    170 F. App'x 215 (3d Cir. 2006) ......................................................................20

*Theriault v. Dollar Gen.*,
    336 F. App'x 172 (3d Cir. 2009) ......................................................................12

*Tourtellotte v. Eli Lilly & Co.*,
    No. CIV.A. 09-0774, 2013 WL 1628603 (E.D. Pa. Apr. 16, 2013), *aff'd*, 636
    F. App'x 831 (3d Cir. 2016) ............................................................................30

*Tucker v. Merck & Co.*,
    131 F. App'x 852 (3d Cir. 2005) ..........................................................16, 30, 31

*Univ. of Texas Sw. Med. Ctr. v. Nassar*,
    133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013)......................................................18

*Verma v. Univ. of Pennsylvania*,
    533 Fed.Appx. 115 (3d Cir.2013)......................................................................20

*Wurtz v. Day & Zimmerman, Inc.*,
    No. CIV. A. 08-3503, 2009 WL 5178013 (E.D. Pa. Dec. 28, 2009)................34, 37

## STATUTES, RULES & REGULATIONS

ADA...........................................................................................................................11

Age Discrimination in Employment Act ("ADEA") .............................................7, 10, 11, 27, 28

Title VII .........................................................................................................7, 10, 11

Federal Rule of Civil Procedure 56 ..................................................................................7, 9

Pennsylvania Human Relations Act ("PHRA")...........................................................10, 11

Defendants, Teva Pharmaceuticals USA, Inc. ("TUSA") and Teva Pharmaceutical

Industries, Ltd. ("TPI") (collectively "Defendants" or "Teva"), pursuant to Rule 56 of the

Federal Rules of Civil Procedure, move for summary judgment and dismissal with prejudice of

Plaintiff's claims, on the grounds set forth below.

## I. STATEMENT OF FACTS

Teva incorporates by reference its Statement of Material Undisputed Facts filed in

conjunction with the Defendants' Motion for Summary Judgment.

## II. ARGUMENT

### A. Summary of Argument

To address and correct an employment decision is not a violation of Title VII or the Age

Discrimination in Employment Act ("ADEA"). Pennsylvania, like most states, is an at-will state

and Plaintiff was always an at-will employee. A decision was made to terminate Plaintiff after

just two years in a new global position, made by the very same person who selected him to

become the Head of the new North America Facilities Management organization being formed,

Nir Aharoni – a decision which in retrospect clearly should not have been made. Nir Aharoni

was tasked by Teva with forming a global facilities management organization. This meant that

rather than have separate organizations throughout the many continents where Teva has

businesses, a new global organization based in Israel would be formed to be managed by

Mr. Aharoni.

The first task and arguably most important one was for Mr. Aharoni to identify someone

to run the North American Facilities Management (NAFM) organization, by far the largest and

most significant business unit. Mr. Aharoni was accompanied by Plaintiff in November 2013

7

during a site tour throughout the U.S. and Mr. Aharoni very much liked Plaintiff and thought him to be an obvious choice. Upon return to Israel in January 2014, without considering any other candidate he selected Plaintiff. At the time Mr. Aharoni knew that Plaintiff was 56 and intended to work another 10-12 years based on a conversation they had; he also knew Plaintiff was American. This was, of course, of no consequence.

Mr. Aharoni's decision was not well received by others, including key stakeholders in the U.S. who had interacted with Plaintiff previously in his much smaller regional role and would continue to do so in an expanded role in this new global organization. Mr. Aharoni was advised by key stakeholders that he had made a hasty and wrong decision as Plaintiff was neither a leader nor a strategic thinker. Within that first year (2014), Mr. Aharoni came to realize the basis for these concerns. He had picked the wrong guy which others knew and shared but he was not entirely ready to accept that it couldn't be fixed. Mr. Aharoni first considered, only to later reject, an executive coach because at Teva these coaches are reserved only for high potential employees and not used for remedial purposes. He later reviewed and provided Plaintiff with a below average annual performance review in January 2015 and by March 2015 when things still weren't improving, he began recruiting candidates to replace Plaintiff. Others had suggested that he might first consider placing Plaintiff on a performance plan and Mr. Aharoni agreed that made sense and possibly help Plaintiff succeed.

This case is almost entirely about retaliation which is why we have chosen to address the retaliation claims in the beginning of this Memorandum of Law rather than to first consider the claims of age or national origin discrimination as his protected status both age and national origin had not mattered two years before when Plaintiff was selected. Plaintiff, whose

8

performance deficiencies were never adequately addressed by him, argues that this performance plan followed by his termination when he did not meet the objectives of the plan were retaliatory and in response to an exercise of protected activity; either a complaint of a hostile work environment actually made not by him, but rather by a team member or to his charge of discrimination made after the performance plan was instituted but before he was terminated. Plaintiff argues that this exercise of protected activities of discrimination caused Teva, but really Mr. Aharoni, to retaliate against him.  Teva terminated a manager who was not a good pick and that's not against the law.

### B. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) requires entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  A fact is "material" if it might affect the outcome of the suit under relevant substantive law. *Anderson*, 477 U.S. at 256.  Where a non-movant will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some

07/25/2018 SL1 1533575v1 030421.00641

metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must identify specific facts showing that there is a triable issue, as "[t]he mere existence of a scintilla of evidence" will not defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252. In so doing, the plaintiff cannot simply restate the complaint allegations, rely on self-serving conclusions unsupported by specific facts in the record or rely on "conclusory allegations or mere suspicions" to avoid summary judgment. *T.I. Construction Co., Inc. v. Kiewit Eastern Co.*, 1992 WL 382306, *2 (E.D. Pa. Dec. 10, 1992), *aff'd*, 26 F.3d 123 (3d Cir. 1994), *cert. denied*, 513 U.S. 813 (1994); *Parasco v. Pacific Indemnity Co.*, 920 F. Supp. 647, 652 (E.D. Pa. 1996). If the non-moving party's evidence in opposition to the motion for summary judgment is "merely colorable" or "not significantly probative," the court should grant summary judgment. *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994).

## C. Plaintiff Cannot Support His Claims that Teva Retaliated Against Him in Violation of the ADEA, Title VII or the PHRA as Alleged in Counts I, II and III in his Second Amended Complaint

Under the *McDonnell Douglas* framework, a plaintiff who asserts a retaliation claim under the ADEA, Title VII, or the Pennsylvania Human Relations Act ("PHRA") first must establish a *prima facie* case by showing that (1) he engaged in protected activity; (2) his employer took an adverse action either after or contemporaneous with his protected activity; and (3) a causal link between his protected activity and his employer's adverse action. *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181 (3d Cir. 2015). If the plaintiff establishes a *prima facie* case, the burden of production of evidence moves to the defendant employer to present a legitimate, non-retaliatory reason for having taken the adverse action. *Id.* If the defendant

10

produces such a reason, the burden moves back to the plaintiff to show that the defendant's explanation was false, and that retaliation was the true reason for the adverse employment action. *Id.* While the burden of production of evidence shifts back and forth, the plaintiff at all times retains the ultimate burden of persuasion. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000).

Because the anti-retaliation provisions of the ADEA, Title VII and the ADA are nearly identical, precedent interpreting any of these statutes is equally relevant to interpretation of the others. *See Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir.2002). *Proudfoot v. Arnold Logistics, LLC*, No. 14-4703, 2015 WL 5881530 (3d Cir. Oct. 8, 2015). PHRA retaliation claims are likewise analyzed consistent with these federal statutes. *See Id.*

In this matter, Plaintiff first engaged in protected activity on November 12, 2015 when he emailed Ms. Flaisher, Mr. Aharoni, Eli Aharoni, and Ms. Rodriguez alleging his October 29, 2015 PIP was discriminatory based on his age and national origin (American) and retaliatory in response to his team's June 2015 complaints of a "hostile work environment" which resulted in an internal investigation. (SMF ¶¶ 202, 203). Plaintiff then filed a charge with the EEOC (and PHRC) on November 25, 2015, alleging age and national origin discrimination and retaliation based on being placed on a PIP. (SMF ¶ 204).

Plaintiff's likely assertion that he engaged in protected activity in June 2015 is simply wrong. General complaints of unfair treatment do not constitute protected activity. *See Barber v. CSX Distribution Servs.*, 68 F.3d 694, 701–02 (3d Cir. 1995). To constitute protected activity, the complaint must allege that the opposition was to discrimination based on a protected category. *See Slagle v. Cnty. of Clarion*, 435 F.3d 262, 266–67 (3d Cir.2006); *Barber*, 68 F.3d at

11

702. "[T]he employee's "opposition" to unlawful discrimination must not be equivocal." *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006), *as amended* (Sept. 13, 2006). The employee further must have acted under an objectively reasonable good faith belief that unlawful discrimination had occurred. *Moore*, 461 F.3d at 341; *see also Theriault v. Dollar Gen.*, 336 F. App'x 172, 174–75 (3d Cir. 2009).

Plaintiff himself made no complaints nor otherwise engage in protected activity in June 2015. The June 2015 complaints were made by other members of the NAFM group particularly his direct report, Troy Gaugler, who complained of a "hostile work environment," which spurred Teva's internal investigation of his (and later his colleagues') complaints. (*See* SMF ¶¶ 91-94; 99-101). These complaints were made shortly after a visit by Ms. Shemtov and Mr. Kafre to the United States on June 1, 2015, at which members of the team felt they were treated rudely and Ms. Shemtov made certain inappropriate comments. (*See* SMF ¶¶ 87-92). These complaints of another Teva employee cannot and does not constitute Plaintiff's own protected activity in this matter.

As Mr. Gaugler explained, he was the person who used the term "hostile work environment" during a June 10, 2015 team meeting with HR Manager Ms. Rodriguez. When Mr. Gaugler said "hostile work environment," he was not familiar with the legal definition of that term; he did not mean that the work environment was hostile based on age or national origin discrimination and did not testify that it was. (SMF ¶¶ 95-98). With regard to complaining of a "hostile work environment," Mr. Gaugler explained what he actually meant:

12

Q: And then the next one, which is perhaps the most important one says, Troy said environment is hostile. Do you recall making that comment to Mini [Rodriguez] at the June 10 meeting?

A: Yes.

Q: Had you ever used that terminology before?

A: No.

Q: Did you know what it meant?

A: Yes.

Q: Had you looked it up before you used the term?

A: No. Because after I did look it up, I used - I was using the term hostile as being a difficult place to work.

Q: Okay.

A: A difficult group of people to work.

Q: That's what you meant by it?

A: That's what I meant by it. And I also knew that hostile was a word - and I never did look up the definition before that day of what hostile truly meant in the words of an H – in HR, the business world.

. . .

Q: Right. And what you wanted to convey, as I understood your testimony, was that it was a difficult place to work?

A: Difficult environment. Very difficult environment.

. . .

Q: Were you trying to suggest that it was hostile because of discrimination?

A: At that time, not – no, I was saying it was hostile due - I meant mostly lack of trust and lack of understanding.

13

(SMF ¶ 95; see also SMF ¶¶ 96, 97). Mr. Gaugler further testified that he did not feel the work environment to be hostile based on age or national origin discrimination and could not say that there was age or national origin discrimination. (SMF ¶ 98). Mr. Gaugler testified that he never complained that he (or others) was treated differently based on his age or national origin because he couldn't say that he was:

> Q: At any time during your employment with Teva after it acquired Cephalon up through your termination this year, did you ever make a complaint that you felt that you were being treated differently based on age or national origin?
>
> A: I couldn't say that I was.

(SMF ¶ 98). Mr. Gaugler's and the other team members' concerns raised at the June 10, 2015 team meeting with Ms. Rodriguez included: their laptops being closed at the June 1 meeting with Ms. Shemtov and Mr. Kafre; that the Israeli team did not operate with transparency but expected transparency in return; micromanagement; lack of trust; public criticism of Plaintiff's leadership; failure to recognize the team's good work; and the stray comments attributed to Ms. Shemtov. (SMF ¶¶ 91, 92).

Teva's internal investigation of the team's complaint concluded: "[a]lthough there are managerial issues that impacts [sic] negatively on the work environment and a few things that fall into the Legal arena as issues, it appears there isn't enough evidence on the Legal side that points to a hostile work environment." (SMF ¶¶ 124, 125). The NAFM team's comments as a whole clearly centered on the strained working relationship and cultural differences between NAFM team members and their GFM managers in Israel. (See SMF ¶¶ 91, 92, 94-98, 106, 116). The team generally felt that they were being treated unfairly (not discriminatorily) by the Israelis. NAFM team members when interviewed raised everything they could think of to show

14

essentially why they didn't like being managed globally by "outsiders" based in Israel.  The

complaints that followed demonstrate that the NAFM team "piled on" when dredging up stray

remarks made by their Israeli colleagues even when these remarks did not lead to complaints of

discrimination at the times they occurred.  For example, NAFM team members disclosed that

some of the Israelis had previously asked individuals their age (raised by them to put the Israelis

in a bad light with an "everything but the kitchen sink" approach), although such inquiries had,

by every account, stopped long before the team's complaints in June 2015.  (*See* SMF ¶¶ 112,

114, 115, 119).  Ms. Shemtov's comment offering to find Mr. Eppley a nice Jewish bride did not

offend him and had occurred long before Mr. Kafre's and Ms. Shemtov's June 1, 2015 visit.

(SMF ¶¶ 111-113).  Likewise, while Ms. Wilton and others mentioned that Ms. Shemtov had

made a comment while visiting the U.S. about Ms. Wilton having children out of wedlock and

Plaintiff needing to fix this, Ms. Wilton did not believe that Ms. Shemtov intended this in a mean

spirited way.  (SMF ¶¶ 92, 117-118).  As explained above, the NAFM team's issues were not in

opposition to discrimination based on a protected class, and neither Mr. Gaugler (as he

acknowledged) nor the other NAFM team members possessed or could have possessed an

objectively reasonable good faith belief that discrimination had occurred.

Moreover, even if the NAFM team members' complaint is to be considered protected

activity, Plaintiff's retaliation claims still fail for the numerous reasons set forth below, including

the fact that it was other NAFM team members, not Plaintiff, who raised complaints at the team

meeting with Ms. Rodriguez, and it was Plaintiff who responded not by agreeing and

complaining himself but by stopping the meeting after he heard Mr. Gaugler mention a "hostile

work environment."  (SMF ¶ 99; *see also* ¶¶ 92-94).  Plaintiff neither raised an issue of hostile

work environment nor engaged in any protected activities in June 2015. He was simply in the

room. Moreover, Plaintiff's PIP and 2015 mid-year review are not adverse actions so as to

constitute retaliation. To constitute an adverse action for purposes of a retaliation claim, the

plaintiff must establish "that a reasonable employee would have found the alleged retaliatory

actions 'materially adverse" in that they "well might have dissuaded a reasonable worker from

making or supporting a charge of discrimination.'" *Moore* , 461 F.3d at 341, quoting

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415, 165 L. Ed.

2d 345 (2006); *see also Raffaele v. Potter*, No. CIV.A. 09-3622, 2012 WL 33035, at *8 (E.D. Pa.

Jan. 6, 2012). The mid-year review and the PIP would not have dissuaded a reasonable person

from complaining of discrimination or retaliation, and indeed, they did not dissuade Plaintiff as

he complained of discrimination and retaliation after his placement on the PIP. (SMF ¶¶ 168,

202, 204). Moreover, placement on a PIP is not even an adverse action unless accompanied by

some corresponding decrease in pay, benefits or employment status. *See Reynolds v. Dep't of

Army*, 439 F. App'x 150, 153–54 (3d Cir. 2011). Likewise, "[a] negative evaluation, by itself, is

not an adverse employment action. Indeed, even a negative evaluation that leads to a lower than

expected merit wage increase or bonus probably does not constitute an adverse employment

action." *Tucker v. Merck & Co.*, 131 F. App'x 852, 857 (3d Cir. 2005). Plaintiff cannot show

that his compensation, benefits or employment status changed as a result of the mid-year review

or PIP. At his mid-year review, he was provided feedback on his performance as he was when

presented with his PIP and was given the opportunity to improve. (*See* SMF ¶¶ 158, 168-171 ).

As described below, the negative feedback was largely the same feedback that had been

16

consistently provided to Plaintiff by Mr. Aharoni, all well before any exercise of protected activity.

Regardless, even if Plaintiff's mid-year review and PIP are to be considered adverse actions, the timing of these actions and Plaintiff's termination are not "unusually suggestive" of retaliatory animus nor do the circumstances as a whole suggest the same. To establish the requisite causal link, a plaintiff may rely on the temporal proximity between the complaint and the adverse action if it is "unusually suggestive." *Daniels*, 776 F.3d at 196. Simply because a complaint preceded an adverse action, temporal proximity alone is insufficient to prove causation. *Kachmar v. Sungard Data Sys., Inc.,* 109 F.3d 173, 177 (3d Cir. 1997). "It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's *prima facie* case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn." *Id.*; *Miller v. Weinstein*, 2008 WL 4279817, at *21 (W.D. Pa. Sept. 12, 2008). As the Third Circuit has explained

> We have found that a temporal proximity of two days is unusually suggestive of causation, *see Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir.1989) (reversing summary judgment for the defendant when plaintiff was fired two days after his employer received notice of his EEOC complaint), but have held that a temporal proximity greater than ten days requires supplementary evidence of retaliatory motive, *see Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir.2000) (finding that "where the temporal proximity is not so close as to be unduly suggestive," the appropriate test is "timing plus other evidence"); *see also Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir.2004) (two months is not unusually suggestive); *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir.2007) (three months is not unusually suggestive).

*Blakney v. City of Philadelphia*, 559 F. App'x 183, 186 (3d Cir. 2014); *see also Gairloch v. Pennsylvania State Univ.*,84 F. Supp. 3d 407, 417–18 (M.D. Pa. 2015).

17

When temporal proximity proves insufficient, courts consider "the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." *Daniels*, 776 F.3d at 196. However, the ultimate burden at all times rests with the plaintiff to prove that his protected activity was the **but-for** cause of the alleged adverse employment action. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534, 186 L. Ed. 2d 503 (2013).

The timing of Plaintiff's termination itself is clearly not unusually suggestive as it occurred more than three months after Plaintiff emailed to HR allegations of discrimination and retaliation and subsequently filed administrative charges. (SMF ¶¶ 202, 204, 210). Time and again courts have concluded that a three month lapse of time is not unusually suggestive of a discriminatory animus. *See Blakney*, 559 F. App'x at 186; *Gairloch*, 84 F. Supp. 3d at 417–18; *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) (finding that "three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment," and discounting plaintiff's evidence of a strained relationship between her and her supervisor as the strained relationship existed prior to her protected activity). Moreover, while the Defendants assert that the NAFM team members' complaints are not Plaintiff's own protected activity, the temporal proximity between these complaints and Plaintiff's termination is similarly not unusually suggestive because Plaintiff's employment was terminated approximately eight months after the NAFM team's complaint in June 2015 and four months after the final results of the investigation were provided to Mr. Aharoni. (SMF ¶¶ 91, 123, 210). Therefore, there is nothing unusually suggestive.

18

Although Plaintiff's mid-year review and PIP occurred prior to any protected activity by Plaintiff, even if the court were to consider the NAFM team complaint as Plaintiff's own protected activity, the timing of Plaintiff's 2015 mid-year review and PIP relative to the team's complaint is not unusually suggestive. The complaints were first made at a June 10, 2015 team meeting. (SMF ¶ 91). Mr. Aharoni was made aware of the June 10 complaint shortly after it was made. (*See* SMF ¶¶ 102, 105, 107, 108). Mr. Jones completed his investigation by September 28, 2015. (SMF ¶ 122). The results were provided to Mr. Aharoni on October 14, 2015. (SMF ¶ 123). Plaintiff's PIP occurred two weeks after Mr. Aharoni was made aware of the final investigation report, (SMF ¶¶ 123, 168). Moreover, Mr. Aharoni had become aware of the initial team complaint and the investigation four months prior to giving Plaintiff his mid-year review and placing him on a PIP. (SMF ¶¶ 102, 105, 107, 108, 120, 144, 168). Therefore, these lapses of time are not unusually suggestive. *See Blakney*, 559 F. App'x at 186.

Most importantly, Plaintiff's performance issues were already discussed and documented prior to any of Plaintiff's claimed protected activity, which precludes a finding of the requisite causal link. (*See e.g.* SMF ¶¶ 21-23; 25, 26, 37-39, 42, 44-46, 49, 53, 66, 67, 71, 73-79, 149-160, 169-172). This is not a situation where the employee had performed successfully until he exercised protected activity, at which time his fortunes reversed. Plaintiff was the subject of considerable criticism including a poor rating on his 2014 annual performance review and an ongoing effort to find his replacement well before he engaged in protected activity. (*See* SMF ¶¶ 71, 73-82). Where a plaintiff begins receiving negative evaluations <u>prior</u> to engaging in protected activity, this precludes the possibility of inferring causation because of the temporal proximity between his complaint and the adverse action and would prevent the plaintiff from

19

showing that that discrimination was the but-for cause of the adverse action. *See Verma v. Univ. of Pennsylvania,* 533 Fed.Appx. 115, 119 (3d Cir.2013); *Gairloch,* 84 F. Supp. 3d at 419–420, *citing Verma,* 533 at 119 ("When negative performance evaluations pre-date any protected activity, courts should not infer a causal link between any subsequent protected activity and an employee's eventual termination."); *Brown v. Vanguard Grp., Inc.,* No. CV 16-946, 2017 WL 412802, at *18 (E.D. Pa. Jan. 30, 2017), *dismissed,* No. 17-1461, 2017 WL 3911584 (3d Cir. Apr. 13, 2017) (noting that the Third Circuit has declined to infer a causal link between protected activity and subsequent adverse action where the employee's negative performance evaluations pre-dated his protected activity) *citing Verma,* 533 Fed.Appx. at 119; *see also Tahiliani v. Bayer Corp.,* 170 F. App'x 215, 217 (3d Cir. 2006) (finding that, in addition to insufficient timing, the "other evidence" did not support a causal link where Plaintiff's "evaluation was a regularly-scheduled evaluation, and her negative rating was based in part on a failure to address issues raised in prior evaluations").

The law is clear that a Plaintiff's history of performance issues undermines a claim that temporal proximity bolsters an inference of age discrimination. *Brown,* 2017 WL 412802, at *18. Likewise, where "ongoing discipline – whether expressed to Plaintiff during meetings, or in writing through performance evaluations, written warnings or formal warnings – was merely a response to performance concerns that had arisen prior to any protected activity," no pattern of antagonism can be shown based on the totality of the circumstances. *Id.* at * 19.

Here, concerns over Plaintiff's performance started in 2014, well before his 2015 mid-year review, his subsequent PIP, and, ultimately, his termination. (*See e.g.* SMF ¶¶ *See e.g.* SMF ¶¶ 21-23; 25, 26, 36-39, 42, 44-46, 49, 53, 71, 73-79, 159, 160). In fact, concerns over

20

Plaintiff's ability to manage and lead the newly formed NAFM group were first raised by former

Teva USA Senior Vice President of the Americas and European Sterile Operations Karin

Shanahan based on her observations of and interactions with Plaintiff even prior to his selection

as Head of NAFM.  (SMF ¶¶ 21-23).  Ms. Shanahan cautioned Mr. Aharoni against selecting

Plaintiff because she believed that he had not proactively managed his team (which was smaller

than the NAFM team he would become responsible for) and had not been strategic in the way he

managed that team, spending little time interacting with his client base and actually doing work,

and as such did not have the credibility to lead the NAFM.  (SMF ¶¶ 6, 15, 21-23).  While

Mr. Aharoni disregarded her comments at the time, Plaintiff's performance deficiencies in his

new NAFM role quickly became evident, even to Mr. Aharoni who both championed Plaintiff's

suitability for the NAFM role and also had a personal stake in Plaintiff's success because he did

not want to be castigated over his first major decision as the leader of GFM, *i.e.*, his choice to

select Plaintiff to head NAFM.  (*See* SMF ¶ 12, 14, 22-24 and *see e.g.* SMF ¶¶ 50, 53, 67-70, 80,

159-162).  For example, at the IFM meeting in June 2014, Plaintiff remained silent while

Ms. Shanahan and others discussed in his presence his lack of leadership capabilities and

credibility to run the IFM project.  (SMF ¶¶ 37-39, 42).  HR Manager Mini Rodriguez, who was

present at the meeting, was concerned that Plaintiff did not speak up for himself during the

meeting and that important stakeholders like Ms. Shanahan and Head of Procurement Lisa

Martin openly expressed in his presence that Plaintiff was not the right person to lead the

important IFM project, and they did not trust him to do so.  (SMF ¶¶ 38, 47).  Plaintiff, who was

clearly aware that his position was at some risk as a result of this extremely negative feedback

from Ms. Shanahan and Ms. Martin, emailed Mr. Aharoni on June 18, 2014 to express his

concern and ask for advice.  Plaintiff's email to Mr. Aharoni stated:

> Can you give me some guidance regarding the IFM program.  Will the
> IFM program be rolled out to all NA facilities, or will it be isolated to
> TGO manufacturing sites?  The reason I am asking is quite simply.  If we
> do a full IFM roll out at all NA sites, and Karin [Shanahan] and company
> do not see me as the correct person to oversee the IFM process, then I
> don't see much of a future here for me at Teva . . . .

> This confirms that yet again that Karin does not think I can run the IFM
> project, but even further, it confirms I will not even be considered for the
> second level position.

(SMF ¶ 42) (emphasis added).

Ms. Shanahan and Ms. Martin had previously shared their negative feedback on Plaintiff with

Teva's Senior Director of HR Jennifer Flaisher.  (SMF ¶ 45, 46).  On June 13, 2014 (just days

after the IFM meeting that she attended), Ms. Flaisher prepared her own list of development

areas for Plaintiff based on her observations and what Ms. Rodriguez, Ms. Shanahan, Ms. Martin

and Mr. Aharoni all described. (SMF ¶ 52).  On June 18, 2014, Ms. Flaisher summarized the

concerns regarding Plaintiff in an email to Ms. Shtrouchler and Ms. Rodriguez as follows:

> **The biggest challenge we have is around Steve [Middlebrooks].**
> **The three executive sponsors (Karin Shanahan, Lisa Martin**
> **and Nir [Aharoni]) agree that this [IFM] initiative should**
> **absolutely be led by GFM.  But, Steve is not the right person to**
> **do it.  He has many strengths but he does not have the**
> **strengths that are required for such a critical role – leading the**
> **cross-functional project.  Specific gaps that were cited by Lisa**
> **and Karen include: lack of credibility with key stakeholders,**
> **lack of influencing skills, change leadership, communication,**
> **being proactive.  Nir says he has seen a lot of growth out of**
> **Steve, but acknowledged that these are gaps.**

(SMF ¶ 53) (Emphasis added.)

22

A process was put into place to consider an executive coach for Plaintiff because Mr. Aharoni hoped to provide remedial support to Plaintiff to assist with his development. (SMF ¶¶ 57, 61). Contrary to Plaintiff's assertions, he cannot show that a coach was provided to him because he was a "high potential" employee. To the contrary, the evidence is clear that this was an attempt to help Plaintiff improve his performance deficiencies, and that this effort was later abandoned by Mr. Aharoni based on Plaintiff's ongoing performance issues and after it was explained to Mr. Aharoni (and finally understood by him) that Plaintiff did not meet the criteria for a coach and for Teva to engage a coach in the U.S. was not for purposes of remediating an employee with performance issues. (SMF ¶¶ 58-62, 67-70).

By the time of his 2014 annual performance review, which was provided to him in January 2015, Plaintiff's performance deficiencies were clearly evident and memorialized in his review. Plaintiff received an overall negative rating of "mostly meets" as well as individual ratings of "mostly meets" in six specific categories. (SMF ¶ 71). The 2014 annual performance review included numerous comments on specific areas for improvement and also noted some areas in which he had performed well. (SMF ¶¶ 72-79). By way of example, his conduct at the IFM meeting was specifically mentioned as evidence of the need for him to be more assertive and become a leader. (SMF ¶ 77). Likewise, Plaintiff's 2015 mid-year review specifically referred to the same deficiencies that were raised in his annual review. (*See* SMF ¶¶ 150, 153-158).

Perhaps the strongest evidence that Plaintiff was not performing well <u>prior</u> to any protected activity is that Mr. Aharoni began a confidential search for Plaintiff's replacement in March 2015, months before any protected activity occurred in this matter. (SMF ¶ 81). The

confidential search reflected Mr. Aharoni's realization that Plaintiff would not succeed in the

NAFM role, based in part on Plaintiff's lack of improvement after receiving a poor annual

performance review for 2014. (*See* SMF ¶ 82). Clearly, concerns about Plaintiff's performance

had arisen long before any exercise of protected activity by the Plaintiff or his NAFM

colleagues.

In fact, Ms. Shanahan in response to Mr. Aharoni's statement that he was going to look

externally for Plaintiff's replacement raised with Mr. Aharoni the possibility of placing Plaintiff

on a PIP as far back as the fall of 2014 and discussed it again after Christmas 2014. (SMF ¶¶

161, 162). Mr. Aharoni also discussed the use of a PIP and his decision to proceed with it with

Ms. Flaisher prior to the NAFM team members' June 2015 complaint. (SMF ¶ 163,164, 166).

Ms. Flaisher testified that the PIP could not have been retaliatory because these concerns over

Plaintiff's performance that had been raised in the PIP were raised and discussed well before the

NAFM team members' complaint, testifying that:

> Q:  Did you do anything to make sure that the placement, Steve being
> placed on the PIP was not retaliatory in any way?
>
> A:  I didn't feel that it was retaliatory because it had been, the concern
> over Steve's performance had been raised, as a result he received the
> mostly meets rating for 2014.  Nir had shared his intention to put him on a
> PIP.  So if those things hadn't happened prior to the allegation being
> raised, yeah, I would have been concerned.  But because I knew that the
> performance concern existed before the team raised the concern, I didn't
> think it was retaliatory.  It wasn't new information.

(SMF ¶ 167).

Ms. Flaisher suggested to Mr. Aharoni that he hold off in delivering the PIP to Plaintiff

until after the investigation concluded. (SMF ¶ 164). Ms. Flaisher, in light of the allegation of a

hostile work environment, wanted to know more about the investigation before placing Plaintiff

24

on the PIP. (SMF ¶ 164). After the investigation concluded, Mr. Aharoni moved forward with the PIP. (SMF ¶¶ 122, 123, 168). The Supreme Court has made clear that employers need not suspend previously planned actions upon discovering protected activity, and "proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272, 121 S. Ct. 1508, 1510–11, 149 L. Ed. 2d 509 (2001); *Gairloch v. Pennsylvania State Univ.*, 84 F. Supp. 3d 407, 419–20 (M.D. Pa. 2015) (finding where the performance failures cited by plaintiff's employer for his eventual placement on a PIP and later termination are similar activities that were documented as problematic before [plaintiff] engaged in protected activity, his employer's "proceeding along lines contemplated prior to any protected activity" which began by issuing him a poor performance review, and continued after his protected activity, defeated his attempt to establish causation); *Gladysiewski v. Allegheny Energy*, 398 F. App'x 721, 724 (3d Cir. 2010) (citing *Breeden* and finding no causal connection between plaintiff's complaint and his termination where plaintiff had been placed on a PIP prior to his termination because the existence of the PIP suggested that defendant was "proceeding along lines previously contemplated" when it terminated plaintiff). In the instant case, Defendants were "proceeding along lines previously contemplated," when they gave Plaintiff his 2015 mid-year review, later placed him on a PIP, and then terminated his employment when his performance did not improve while on the PIP.

Finally, there is simply no evidence that "**but for**" Plaintiff's protected activity he would not have been given a poor mid-year review, been placed on a PIP or been terminated. As Mr. Aharoni testified, Plaintiff was terminated because he had not performed well as Head of NAFM since 2014 as was clearly documented in his 2014 annual performance review. (SMF ¶¶

25

71, 73-79, 209). This continued into 2015 where it still took too long for Plaintiff to perform certain tasks, often giving pushback and resistance, and where he still did not perform other tasks well. (SMF ¶ 209). This was raised in the October 2015 mid-year review and then again in the PIP that followed. (SMF ¶¶ 144, 149-158, 169-172). With regard to most of the PIP items, Plaintiff did not perform well or did not accomplish the reasonable objectives set for him. (SMF ¶¶ 186, 189-190, 192, 209). Although Plaintiff disagrees with the assessment, his disagreement is not enough to sustain his retaliation claim. He must show an underlying retaliatory motive, which he cannot do. *See Riley v. Shinseki*, No. 09-4345, 2011 WL 18760, at *5 (3d Cir. Jan. 5, 2011) (the fact that plaintiff asserted that the decision to terminate his employment was incorrect and a jury may very well conclude that the defendant terminated the wrong man is not enough for a retaliation to withstand summary judgment, as plaintiff must show there was an underlying retaliatory motive). His managerial and leadership skills were lacking as were his ability to lead the NAFM region and capability to accept the responsibility commensurate with his role. His relationship with stakeholders and his approach to leading the region were never effective and projects were not performed properly. (SMF ¶ 209; *see e.g.* 53, 66). Mr. Aharoni clearly liked Plaintiff personally and believed Plaintiff could be successful in other roles. (SMF ¶¶ 187, 188, 191, 199, 201). After Plaintiff filed his agency charges, Mr. Aharoni and others made efforts to find another role in the organization for Plaintiff, including one to be established within Mr. Aharoni's group but to no avail based on a variety of reasons. (SMF ¶¶ 187, 195-201, 204). This effort to find another position is not indicative of someone bent on retaliation. Therefore, there is no way Plaintiff can prove that but for his protected activity, he would not have been terminated, been placed on a PIP or received the critical mid-year review.

26

For these reasons, Plaintiff cannot establish his retaliation claims, and these claims should be dismissed on summary judgment.

**D. Plaintiff Cannot Support His Age or National Origin Discrimination Claims As Alleged In Counts I and III Of His Complaint.**

**1.  Standards for Establishing Age and National Origin Discrimination Claims**

The same *McDonnell Douglas* burden shifting framework applies to each of Plaintiff's state and federal age and national origin discrimination claims where, as here, there is no direct evidence of age or national origin discrimination. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003); *Arnold v. AutoZone, Inc.*, No. CV 13-1329, 2016 WL 807805, at *6 (E.D. Pa. Mar. 2, 2016), *appeal dismissed* (July 5, 2016). Under this analysis, Plaintiff bears the initial burden of establishing a *prima facie* case of employment discrimination by a preponderance of the evidence. *Sarullo*, 352 F.3d. at 797. To establish a *prima facie* case, the Plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action, and (4) "the adverse employment action occurred under circumstances that could give rise to an inference of intentional discrimination." *Greene v. Virgin Islands Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014); *LeBlanc v. Hill Sch.*, No. CIV.A. 14-1674, 2015 WL 144135, at *8 (E.D. Pa. Jan. 12, 2015) (With respect to the ADEA age claims, the fourth prong requires that plaintiff was replaced by someone sufficiently younger to support an inference of discriminatory animus.). The central focus of decisions applying the *prima facie* test remains the same; whether the employer is treating some employees less favorably because of their membership in a protected class. *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 352 (3d Cir. 1999).

27

If the Plaintiff is successful in establishing a *prima facie* case, the burden of production shifts to the Defendants to articulate some legitimate, nondiscriminatory reason for the adverse action. *See Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997); *Sarullo*, 352 F.3d. at 797; *Arnold*, 2016 WL 807805, at *7. If the Defendants meet this burden, then they have rebutted the presumption of discrimination raised by the *prima facie* case. "The plaintiff then must establish by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination, and not the real motivation for the unfavorable job action." *Sarullo*, 352 at 797; *Arnold*, 2016 WL 807805, at *7. . To show pretext,

> the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence.

*Keller*, 130 F.3d at 1108–09; *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 413 (3d Cir. 1999). Further, ADEA claims require in addition that age play not only a determinative role, but the determinative role, meaning that a plaintiff must prove that "but-for" age the employment decision would not have been made. *Gross v. FBL Financial Services*, 557 U.S. 167, 176-178 (2009); *Palmer v. Britton Indus., Inc.*, 662 F. App'x 147, 151 (3d Cir. 2016) (where the comment by plaintiff's supervisor relating to his age showed at most evidence that plaintiff's age was a secondary reason for the supervisor's decision to fire him, plaintiff could not meet his but-for causation burden on his ADEA claim.); *see also Kopko v. Lehigh Valley Health Network*, No. CV 14-1290, 2016 WL 6442062, at *4 (E.D. Pa. Oct. 31, 2016).

**2.   Plaintiff's PIP And Poor Performance Reviews Are Not Adverse Actions.**

Neither Plaintiff's PIP nor reviews constitute adverse actions in the context of his

discrimination claims for the same reasons that is addressed above with regard to his retaliation

claims.  With regard to Plaintiff's PIP, in *Reynolds*, 439 F. App'x 150, 153–541), the Third

Circuit joined with other circuit courts in finding that being placed on a PIP is not an adverse

employment action absent an accompanying change to pay, benefits, or employment status.

439 F. App'x  at 153 (holding that Plaintiff's placement on a PIP where he put forth no evidence

of a corresponding decrease in pay was not an adverse action)  With respect to that PIP, the

Court of Appeals explained:

> We see no reason to deviate from our sister Courts of Appeal.  A PIP
> differs significantly from the types of employment actions that qualify as
> adverse.   As illustrated by this case, PIPs are typically comprised of
> directives relating to an employee's pre-existing responsibilities.  In other
> words, far from working a change in employment status, a PIP is a method
> of conveying to an employee the ways in which that employee can better
> perform the duties that he or she already has.   We note that a likely
> consequence of allowing suits to proceed on the basis of a PIP would be
> more naked claims of discrimination and greater frustration for employers
> seeking to improve employees' performance.

*Id*. Here, Plaintiff's PIP raised a number of areas in which Plaintiff needed to improve upon in

his current role and set goals for him to accomplish. These were largely the same issues

discussed with Plaintiff since 2014 and raised specifically in his 2014 annual performance

review and then again in the 2015 mid-year review.  The PIP was not accompanied by any

change to his pay, benefits or employment status.  Therefore, Plaintiff's PIP does not constitute

an adverse action.  *See Id*. (an adverse action requires a "significant change in employment

status, such as hiring, firing, failing to promote, reassignment with significantly different

29

responsibilities, or a decision causing a significant change in benefits." ) (quoting *Burlington*

*Indus. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)).

Plaintiff's 2014 "mostly meets" annual performance review and his critical

2015 mid-year review similarly cannot be considered adverse actions. "A negative evaluation,

by itself, is not an adverse employment action. Indeed, even a negative evaluation that leads to a

lower than expected merit wage increase or bonus probably does not constitute an adverse

employment action." *Tucker,* 131 F. App'x at 857 (citations omitted); see also *Brown,* 2017 WL

412802, at *11 (finding a defendant's decisions to issue, negative performance evaluations,

written warnings or discipline do not constitute adverse employment actions). In the instant

case, Plaintiff suffered no change to his pay, benefits or employment status as a result of his

2014 annual performance review or 2015 mid-year review. That his 2015 mid-year review was

given in October while awaiting Mr. Aharoni to be in North America (it occurred in Canada

rather than the U.S.), (SMF ¶¶ 144, 145), is simply of no consequence. *Solomon v. Caritas,*

No. CV 15-4050, 2016 WL 4493193, at *5 (E.D. Pa. Aug. 26, 2016) (a three month delay in a

performance evaluation does not constitute an adverse action). With regard to Plaintiff's 2014

annual review, while he may have received a lower than expected merit increase as a result of his

2014 "mostly meets" review, he still received a merit increase. Quite simply, he cannot show

that he suffered a "significant change in employment status" necessary to constitute an adverse

action. *Solomon v. Caritas,* No. CV 15-4050, 2016 WL 4493193, at *5 (E.D. Pa. Aug. 26, 2016)

("[A]n employer's decision to not give an employee a wage increase or bonus generally does not

constitute an adverse employment action."); *Tourtellotte v. Eli Lilly & Co.,* No. CIV.A. 09-0774,

2013 WL 1628603, at *10 (E.D. Pa. Apr. 16, 2013), *aff'd,* 636 F. App'x 831 (3d Cir. 2016)

30

(finding a less than expected merit increase or bonus does not constitute an adverse action for purposes of a discrimination claim).

Moreover, even if a "mostly meets" rating is determined to constitute an adverse action, any discrimination claim based on the evaluation cannot succeed where the employee fails to present evidence that anyone similarly situated has been treated more favorably with regard to their evaluations. *Tucker*, 131 F. App'x at 858 (citations omitted) (finding that "[w]here all the employee has offered is his belief that his ratings should have been higher and the employer has offered detailed explanations for the evaluations, Plaintiff's discrimination claims will fail," and noting that the evaluations contain specific criticisms of the plaintiff's "timeliness, responsiveness, thoroughness, and depth of knowledge" and that defendants "found numerous errors in his spreadsheets and criticized him for taking a passive and minor role in various projects.")  Here, Plaintiff has not pointed to any similarly situated employees who received more favorable evaluations, and the reviews at issue contain specific criticisms of Plaintiff that were observed by Mr. Aharoni and by others.  Therefore, even if these events constituted adverse actions, which Defendants deny, his discrimination claims with respect to his PIP and reviews still fail.

### 3. Plaintiff Cannot Establish that the Reasons for Terminating Plaintiff Were Pretextual.

The case is really not really about the 2014 annual review, the 2015 mid-year review or the PIP but about Plaintiff's employment termination.  As described, the termination did not occur in a vacuum.  It was Teva's response to a manager who did not perform up to expectations. Plaintiff cannot establish that the reasons he was terminated, let alone put on a PIP and given less

31

than satisfactory reviews[1], were pretextual. As Mr. Aharoni explained at his deposition, he

terminated Plaintiff because Plaintiff did not successfully complete the terms of his PIP, and had

not performed well in his new role since 2014. (SMF ¶ 209). Plaintiff's performances issues

were raised in 2014 and then documented in his 2014 year-end performance review. (*See e.g.*

SMF ¶¶ 71, 73-79, 159, 160). Mr. Aharoni testified that these deficiencies continued into 2015

where Plaintiff took too long to perform certain tasks, often giving pushback and resistance, and

did not perform other aspects of his job well. (SMF ¶ 209; *see also* 149-158). With regard to

most of the PIP items, he did not perform well to accomplish the mission. (SMF ¶ 176, 186,

189, 209). Mr. Aharoni testified that Plaintiff's managerial and leadership skills were lacking as

well as his ability to lead the region and take on more responsibility. His reasons for terminating

Plaintiff included "his managerial and leadership abilities to lead the - - the region and to take

more responsibility." (SMF ¶ 209). Plaintiff's relationship with stakeholders and his approach

to leading the region were never what was expected and some projects were not performed

properly. (*see e.g.* SMF ¶¶ 38, 48, 51-53, 75-77, 156, 158). These performance issues were not

based on Mr. Aharoni's observations alone, but also on feedback received from other important

stakeholders going back even before Plaintiff was selected as the Head of NAFM. (SMF ¶¶ 21-

24; *see also* ¶ 53).

Even if the decision to terminate Plaintiff, or the other decisions leading up thereto, were

somehow flawed, there is still no material issue of fact with respect to pretext. In *Fuentes* v.

*Perskie,* 32 F.3d 759, 765 (3d Cir. 1994), the Third Circuit held that once an employer provides a

nondiscriminatory reason for an adverse employment decision, "the plaintiff cannot simply show

---

[1] While Defendants dispute that Plaintiff's PIP and performance reviews constitute adverse actions, they are
referenced here for the sake of argument in response to claims made within the Complaint.

32

that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.* at 765; *see also Brokenbaugh v. Exel Logistics North America, Inc.*, 174 Fed. App'x. 39, 45 (3d Cir. Mar. 9, 2006) (holding that the relevant issue is not whether the employer actually had cause to terminate an employee, "but rather whether it believed it had such cause and acted upon that belief."). A court ruling on a discrimination case is not to act as a "super-personnel" department that reexamines an employer's business decisions. *Andersen v. Mack Trucks, Inc.*, 118 F.Supp.3d 723, 750 (E.D. Pa. 2015), *aff'd*, 647 F. App'x 130 (3d Cir. 2016); *Carter v. Mid-Atl. Healthcare, LLC*, 228 F. Supp. 3d 495, 506 (E.D. Pa. 2017) (where an employer relies on certain criticisms of the plaintiff for the adverse action, the issue is not whether the criticisms are valid or substantiated, but whether the employer actually relied upon the criticisms and believed they were accurate). Plaintiff may believe that he was doing well or as best he could given difficult circumstances, but his belief, even if firmly held, doesn't show pretext. Accordingly, even if the decisions relating to Plaintiff's 2014 annual performance review, PIP and ultimate separation were somehow wrong or based on incorrect information (which Defendants strongly deny), this is not sufficient to overcome Plaintiff's burden of proof. Rather, to maintain his discrimination claims, Plaintiff must demonstrate that it was his national origin that was a determinative factor in any of Defendants' decisions or that <u>but</u> <u>for</u> his age, he would not have been terminated, placed on a PIP or given critical reviews, which he has clearly not done in this matter.

First of all, there is no evidence that Mr. Aharoni made any decision that considered Mr. Middlebrooks' age or national origin. It was Mr. Aharoni who identified and selected

33

Mr. Middlebrooks to head NAFM, covering both the United States and Canada, knowing full-well Mr. Middlebrooks age and national origin (American) (SMF ¶¶ 12, 18-20).  There is no suggestion that Plaintiff's age or national origin influenced the hiring decision and the same logic necessarily applies to Mr. Aharoni's subsequent decisions concerning Plaintiff's performance, including the ultimate decision to terminate his employment.  To be clear, Mr. Aharoni was not influenced whatsoever by national origin or age when Plaintiff was terminated just as these considerations did not impact the decision to advance him to Head of NAFM two years before. (*See* SMF ¶ 209; *see also* 191, 206).  Mr. Aharoni held his ground with respect to his decision to hire Plaintiff as Head of NAFM despite resistance that arose shortly after his selection, further demonstrating that he had no bias towards Americans or to those in a protected age group.  (*See* SMF ¶¶ 23, 24, 39, 40, 50, 53, 57). He picked and championed Plaintiff until his performance cast doubt on Mr. Aharoni's hiring decision.  Later, Mr. Aharoni strongly advocated for finding another position for Plaintiff within the organization that better fit his skills and abilities, rather than terminating him.  (SMF ¶¶ 187, 193, 194, 199, 201).  The fact that "same actor" hired and terminated Plaintiff weighs heavily against any finding of pretext. *Mease v. Wilmington Tr. Co.*, 726 F. Supp. 2d 429, 441 n. 19 (D. Del. 2010) (where the person who terminated plaintiff was the same person who promoted him, this evidence supports a finding that no discrimination occurred) (citing *Waldron v. SL Indus., Inc.,* 56 F.3d 491, 496 n. 6 (3d Cir.1995) (noting that in some circumstances, it may be appropriate to apply the logic that a strong inference for non-discrimination exists where the same actor took both positive and adverse employment actions against plaintiff); *Wurtz v. Day & Zimmerman, Inc.*, No. CIV. A. 08-3503, 2009 WL 5178013, at *4 (E.D. Pa. Dec. 28, 2009) (acknowledging that "[m]any courts have recognized

34

that when an individual makes a favorable employment decision and then the same individual later makes an adverse employment decision, a strong inference arises that a non-discriminatory motive exists.")

Plaintiff's national origin discrimination claim fails because he cannot show that it was the determinative factor in any of the decisions relating to his employment. Plaintiff points to several extraneous comments to support his claim of national origin discrimination. However, these comments were not made in the context of any employment decision concerning him, and amount to little more than Mr. Aharoni venting that Americans and the American media do not truly understand the difficulties Israel has surviving in the Middle East surrounded by hostile neighbors. The comments that Plaintiff relies upon were that Mr. Aharoni complained he did not believe that the United States provided enough military support to Israel with regard to a conflict with Syria. (SMF ¶ 134). On another occasion when Israel was defending itself after having been attacked, Mr. Aharoni expressed a similar concern about the way the American media had portrayed Israel. (SMF ¶ 135). Plaintiff also relies upon a visit made to Israel by one of his direct reports. Plaintiff claims that the visiting employee, Carolyn Tousius, was asked by Mr. Aharoni her impressions of Israel to which Mr. Aharoni stated something to the effect that Americans think Israelis are just a bunch of towel-headed camel jockeys and that Ms. Tousius was very upset by this. (SMF ¶ 136). Ms. Tousius attested, however, that Mr. Aharoni did not say this; he only said that Israel is not like what you see on CNN and she was not upset by this comment at all. (SMF ¶ 137). This is the essence of his national origin discrimination claim with the additional argument that Ms. Shemtov's conduct at the June 1, 2015 IFM meeting

35

showed an anti-American bias and that this is evidence of Mr. Aharoni's own anti-American bias because the conduct of Mr. Aharoni's team is reflective of Mr. Aharoni.[2] (SMF ¶¶ 138, 139).

The law is well established that stray remarks made by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) *abrogated, in part, on other grounds*, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *see also Silver v. Am. Inst. of Certified Pub. Accountants*, 212 F. App'x 82, 85 (3d Cir. 2006); *Bhatt v. Brownsville Gen. Hosp.*, 236 F. App'x 764, 766 (3d Cir. 2007) (finding that plaintiff physician in a national origin discrimination case failed to show that the reasons offered for suspending his hospital privileges were pretextual where the ethnically derogatory comments cited were stray remarks by non-decision makers and where plaintiff could not show that any non-Indian physicians were treated more favorably.) Here, Mr. Aharoni's stray remarks regarding America's response to Israeli military activities occurred months or years before Plaintiff's termination and have nothing to do with any decisions respecting Plaintiff's employment. (*See* SMF ¶¶ 134, 135). Taken at face value, they cannot even be interpreted as derogatory toward Americans. They are at best expressions of Mr. Aharoni's opinion with regard to military activities and the media and have nothing to do with Americans in general or with Plaintiff's performance, his PIP or his termination. Contrary to Plaintiff's hearsay assertions, Ms. Tousius has attested that Mr. Aharoni did not state that Americans perceive Israelis to be a bunch of towel-headed camel

---

[2] Ms. Shemtov did not even report to Mr. Aharoni. She was the Finance Business Partner for GFM. Business partners are assigned to support various groups by their business unit. Mr. Aharoni did not choose her to support his group. (SMF ¶ 141).

36

jockeys; he merely said that Israel is not like what you see on CNN.  (SMF ¶ 137).  Finally, Ms. Shemtov's conduct cannot be imputed to Mr. Aharoni.  Ms. Shemtov was not a decisionmaker in this case, and her alleged conduct, even if inappropriate, *i.e.* putting her hand up in a NAFM team member's face and shushing him and shutting the NAFM team members' laptops at the June 1, 2015 meeting, does not objectively show a bias towards Americans and took place months before Plaintiff's PIP and termination.  (*See* SMF ¶¶ 138, 139, 141).

Finally, this is not a situation where Teva wanted to replace Plaintiff with an Israeli as it was always clear that it would be replacing Plaintiff with someone else from North America and every candidate considered was actually American.  (SMF ¶ 86).  Mr. Aharoni eventually hired Dan Ramirez another American to replace Mr. Middlebrooks (SMF ¶ 211, 212), and this fact coupled with Plaintiff's failure to point to any differential treatment on the basis of his national origin, dooms his national origin discrimination claim.  *See Wurtz* 2009 WL 5178013, at *4 (in a national origin discrimination case, finding it noteworthy that the "same actor" hired and fired Plaintiff, and this coupled with the fact that another woman of the same national origin who reported to the same supervisor was not fired).[3]

Moreover, Plaintiff's team was not an American team but a North American team including Canada and the argument that Mr. Aharoni held the NAFM team to a higher standard falls apart on this basis.  It was not Americans being asked to do more, *i.e.*, find other savings, but a North American team with a Canadian director and Canadian sites.  (*See* SMF ¶¶ 12, 117).  North American is not a national origin.

---

[3]  To the extent that Plaintiff argues that his North American team was held to a higher standard than were other teams to support his national origin claim, there are too many differences as between the teams including operating in different parts of the world and that NAFM was established first and was by far the largest of the teams.

37

Plaintiff's age discrimination claims likewise fails because he cannot show that "but-for" his age he would not have been terminated, placed on a PIP or given poor performance reviews. The evidence that Plaintiff relies upon to show age discrimination begins with an age inquiry he attributes to Mr. Aharoni in late 2013 while Plaintiff accompanied Mr. Aharoni during a seventeen day site visit throughout the U.S. (SMF ¶¶ 18, 19). This was even before Plaintiff had been selected to head the NAFM organization and Plaintiff described the tour during his deposition as being like a 17-day job interview and claims that on one occasion he was asked by Mr. Aharoni how old he was and how long he intended to continue to work and answered that he was 56 and would be working at least 12 more years. (SMF ¶¶ 11, 18). This did not deter Plaintiff from being selected for the promotion to the new position; in other words, his age did not matter. (SMF ¶ 19).

Plaintiff and others similarly testified during their depositions that others in Israel including Mr. Aharoni had from time to time asked about ages during 2014 (there is some dispute if they asked for ages, birthdays or birth dates), but no one could testify to any decision ever having been made on the basis of age and these age inquiries stopped in 2014 once HR in the US became aware and made it clear that these questions shouldn't be asked. (*See* SMF ¶ 119). Making an age inquiry in and of itself is not age discrimination; in contrast to relying upon such information. *Ruiz v. Posadas de San Juan Assocs.*, 124 F.3d 243, 249-250 (1st Cir. 1997) (a supervisor's inquiry about the age of a co-worker, along with other conduct, was insufficient to show a general atmosphere of age based discrimination, let alone that plaintiff was terminated for any reason other than his poor performance); *Salkovitz v. Pioneer Elecs. (USA) Inc.*, 188 F. App'x 90, 93-94 (3d Cir. 2006) (finding that where at most the alleged comments would show

38

that defendants were aware of plaintiff's age and expected him to retire after the end of his six-month consultancy, this did not connect any employment decisions to any beliefs about Plaintiff's age, and that a handful of documented remarks about his age and retirement plans even taken together, do not suggest hidden motivations); *E.E.O.C. v. MCI Int'l, Inc.,* 829 F. Supp. 1438, 1465 (D.N.J. 1993) (Asking an employee if he plans to retire is not evidence of unlawful conduct.); *Gutknecht v. SmithKline Beecham Clinical Labs., Inc.,* 950 F. Supp. 667, 671 (E.D. Pa. 1996), *aff'd,* 135 F.3d 764 (3d Cir. 1997) ("Mere knowledge of an employee's age does not constitute discriminatory animus.")

For these reasons, Plaintiff cannot and does not establish his discrimination claims, and these claims should be dismissed on summary judgment.

## III. CONCLUSION

For the foregoing reasons, Defendants are entitled to summary judgment because Plaintiff has not met his evidentiary burden to sustain any of the claims in his Complaint. Accordingly, Defendants respectfully request that this Court grant them summary judgment on all of Plaintiff's claims, and dismiss Plaintiff's Complaint in its entirety.

STEVENS & LEE

Dated: July 25, 2018

By: /s/ Larry J. Rappoport
    *Larry J. Rappoport, Esquire*
    Attorney ID No. 26922
    1818 Market Street
    29th Floor
    Philadelphia, PA 19103
    Phone: (215) 496-3839
    Email: ljr@stevenslee.com

    *Jennifer A. Ermilio, Esquire*
    Attorney ID No. 82062

39

620 Freedom Business Center, Suite 200
King of Prussia, PA  19406
Phone:  (610) 205-6044
Email:  jae@stevenslee.com

*Attorneys for Defendants, Teva Pharmaceuticals*
*USA, Inc. and Teva Pharmaceutical Industries, Ltd.*

40