## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEPHEN MIDDLEBROOKS,             :
                                  :
      Plaintiff,                  :
                                  :
    v.                              :   Case No.: 17 00412
                                  :
TEVA PHARMACEUTICALS USA, INC.    :
and  TEVA PHARMACEUTICAL          :
INDUSTRIES, LTD.,                 :
                                  :
      Defendants.                 :

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL
## FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants, Teva Pharmaceuticals USA, Inc. ("TUSA") and Teva Pharmaceutical

Industries, Ltd. ("TPI") (collectively "Defendants" or "Teva"), submit the following Statement

of Undisputed Facts for purposes of Defendants' Motion for Summary Judgment:

**Plaintiff's National Origin and Age**

     **1.** The national origin of Plaintiff Stephen Middlebrooks' (hereinafter sometimes

referred to as "Plaintiff" or "Mr. Middlebrooks") is American.  (Exhs. 1 and 2 - Plaintiff's

Second Amended Complaint and Defendants' Answer and Affirmative Defenses to Plaintiff's

Second Amended Complaint at ¶ 3).

     **2.** Plaintiff was 58 years old as of February 29, 2016, the date his employment

was terminated.  (Exhs. 1 and 2 - Plaintiff's Second Amended Complaint and Defendants'

Answer and Affirmative Defenses to Plaintiff's Second Amended Complaint at ¶¶ 2 and 59).

**General Employment Information**

     **3.** On or about April 30, 2001, Plaintiff was hired to work as a Director,

Facilities Engineering by Defendant Teva Pharmaceuticals USA, Inc.  (Exhs. 1 and 2 - Plaintiff's

Second Amended Complaint and Defendants' Answer and Affirmative Defenses to Plaintiff's

1

Second Amended Complaint at ¶¶ 2 and 59; Exh. 3 – Stephen Middlebrooks Dep. Pages 14-15, Lines 19-1).

4.   At all relevant times, Plaintiff was based at Teva Pharmaceuticals USA, Inc.'s offices in North Wales, Pennsylvania.  (Exhs. 1 and 2 - Plaintiff's Second Amended Complaint and Defendants' Answer and Affirmative Defenses to Plaintiff's Second Amended Complaint at ¶ 29).

5.   In 2013, Plaintiff's position was North American Director of Facilities. (Exh. 3 - Middlebrooks Dep. Pages 28, Lines 11-17).

6.   At that time, he managed a team of approximately thirty (30) people in Pennsylvania and other states, including about a half a dozen direct reports in Pennsylvania and New Jersey and possibly one in New York.  (Exh. 3 - Middlebrooks Dep. Pages 28-29, Lines 24-18).

**The Establishment of Global Facilities Management (GFM) and Plaintiff's
Promotion to Head of North American Facilities Management (NAFM)**

7.   In or around September 2013, Nir Aharoni (Mr. Aharoni") was selected to head Teva's newly created Global Facilities Management Group ("GFM").  (Exh. 4 - Aharoni Dep. Page 72, Lines 12-21).

8.   Mr. Aharoni's national origin is Israeli, and all times material hereto, his employment was based in Israel.  (Exhs. 1 and 2 - Plaintiff's Second Amended Complaint and Defendants' Answer and Affirmative Defenses to Plaintiff's Second Amended Complaint at ¶ 30).

9.   Mr. Aharoni was born in May 1970 and is currently 48 years old. (Exh. 4 - Aharoni Dep. Page 11, Lines 19-22).

10. In or around November 2013, Mr. Aharoni traveled to the United States to tour the North American facilities in conjunction with the establishment of GFM. (Exh. 4 - Aharoni Dep. Page 73, Lines 13-17; *see also* Exh. 3 – Middlebrooks Dep. Page 37, Lines 11-18).

11. Mr. Aharoni asked Plaintiff to accompany him on his tour of the facilities sites in the United States, which Plaintiff did. Plaintiff described this as a seventeen day job interview. (Exh. 4 - Aharoni Dep. Page 73, Lines 18-21; Exh. 3 – Middlebrooks Dep. Page 37, Lines 19-21; Page 46, Lines 15-16).

12. After this visit, Mr. Aharoni selected Plaintiff to head the newly created North American Facilities Management Group ("NAFM") (Exh. 4 - Aharoni Dep. Page 73, Lines 17-21 and Page 74, Lines 14-16).

13. Mr. Aharoni made the decision to appoint Plaintiff to this role based on his interactions with Plaintiff during this visit and on the fact that Plaintiff was already managing some of the sites in the United States which would be included within the scope of responsibilities of this new role. (Exh. 4 - Aharoni Dep. Pages 74-75, Lines 17-10).

14. Mr. Aharoni did not consider other candidates or rely on outside feedback on Plaintiff prior to selecting him to become Head of NAFM. (*See* Exh. 5 – Herminia "Mini" Rodriguez Dep. Pages 35-36, Lines 12-5; Exh. 4 – Aharoni Dep. Pages 74-76, Lines 17-1).

15. In this new position, the scope of Plaintiff's responsibilities dramatically increased. He would be managing approximately seventy-three (73) people providing a number of different services at over fifty (50) facilities in the United States and Canada. (*See* Exh. 6 – D19 at TEVA(SM) 00587).

16.   While Plaintiff had responsibility for some soft services prior to his promotion to Head of NAFM, he was generally unfamiliar with the terms hard and soft services (which are well known terms in the facilities industry) until Mr. Aharoni raised them with him.  (Exh. 3 -- Middlebrooks Dep. Pages 39-40, Lines 11-14).

17.   Plaintiff also had limited experience working with the TGO sites (manufacturing), as he previously handled only capital work for the facilities portion of these sites, but not process work.  (Exh. 3 -- Middlebrooks Dep. Page 31, Lines 4-24).

18.   On one occasion, during site visits and before he was asked to head NAFM, Plaintiff was asked and told Mr. Aharoni his age (56) and that he planned to retire in twelve years.  (Exh. 3 -- Middlebrooks Dep. Pages 51-52, Lines 14-2;  Exh. 4 - Aharoni Dep. Pages 77-78, Lines 3-3).

19.   Notwithstanding the fact that Plaintiff shared his age and plans when to retire, Mr. Aharoni selected him to become the new North American Facilities Director position. Plaintiff testified as follows:

> Q:  Were you concerned when he asked the question that he might rely upon that information as it relates to the interview and the hiring process?
>
> A:  Absolutely.
>
> Q:  Okay.  And did it have any impact on the hiring process?
>
> MS. GURMANKIN:  Objection to form.  You can answer.
>
> THE WITNESS:  I don't know how to answer that question.
>
> BY MR. RAPPOPORT:
>
> Q:  Well let me ask it to you this way.  Were you hired by Nir?
>
> A:  Yes, I was.

4

Q: Okay. After he had asked you how old you were?

A: Yes.

Q: And after he had asked you how long you intended to work there?

A: Yes.

(Exh. 3 – Middlebrooks Dep. Pages 54-55, Lines 14-11).

    **20.** Furthermore, prior to selecting Plaintiff to head the NAFM Group, Mr. Aharoni was well aware that Plaintiff's national origin was American. (*See* Exh. 3 – Middlebrooks Dep. Page 46, Lines 15-21, Pages 58-59, Lines 17-20; *see also* Exh. 4 – Aharoni Dep. Pages 62-63, Lines 24-9; Pages 73, Lines 13-21).

**Concerns About Plaintiff's Selection to Head of NAFM**

    **21.** Prior to his selection, former Teva USA Senior Vice President of the Americas and European Sterile Operations Karin Shanahan, had interactions with Plaintiff that caused her to form a negative opinion of him, which she testified was also shared by others. Ms. Shanahan testified as follows:

Q: What was your opinion of him?

A: I thought Steve didn't really proactively manage his organization. He didn't try to drive any type of cost savings initiatives or anything of that nature.

I - - basically, my impression of him was that he spent a lot of time chitchatting in the hallway and very little time interacting with his client base or actually doing work. And that was the impression of his entire organization, frankly. Not just mine, but that of others, as well.

Q: Who are the others?

A: People on the OLP, people on, you know, the leadership team of the Americas organization, under Siggi. It was just generally held that he spent a lot of time chitchatting and not a lot of time managing his organization.

5

> Q: How about getting things done?
>
> A: He would get things done in his own time, put it that way.

(Exh. 7 – Shanahan Dep. Pages 7-10, Lines 12-14; specifically quoting Pages 8-9, Lines 25-21).

    **22.** Ms. Shanahan shared her opinion with Mr. Aharoni when he told her he was looking to select Plaintiff to become the new head of the North American Global Americas Facilities Management. The following week it was announced that Mr. Aharoni chose to appoint Plaintiff to the position. (Exh. 7 – Shanahan Dep. Page 12, Lines 15-24).

    **23.** Ms. Shanahan shared with Mr. Aharoni "that if he wanted his organization to have any credibility, he would have to look for somebody that had more credibility than [Plaintiff]." (Exh. 7 – Shanahan Dep. Pages 12-13, Lines 25-4).

    **24.** Mr. Aharoni, however, disagreed with Ms. Shanahan's advice:

> Q: And how did he respond?
>
> A: He felt that Steve had the relationships that would be
> necessary, and he - - he basically didn't take seriously the feedback
> I had on Steve.

(Exh. 7 – Shanahan Dep. Page 13, Lines 5-9).

    **25.** Ms. Shanahan also shared with Plaintiff her perception of him which she attributed to others as well, testifying in part:

> A: I told him that the perception of him was that he was not very
> strategic in the way he managed his team, that in general, he didn't
> do a whole lot to instill good behaviors in people, Ellen [Cicak]
> being case in point. And that also, in general, the perception of his
> team was that they had too much headcount, based on the fact that
> they spent a lot of time chitchatting in the hallways.

(Exh. 7 – Shanahan Dep. Pages 15-16, Lines 20-10, and quoting Page 16, Lines 13-22).

26.  She provided that same feedback regarding Plaintiff to Mr. Aharoni to support her opinion as to why Plaintiff lacked the credibility to lead the newly formed NAFM.  (Exh. 7 – Shanahan Dep. Page 17, Lines 6-16).

27.  Based on the opinions Ms. Shanahan shared, she believed that a search for a candidate to head NAFM should have been conducted.  (Exh. 7 – Shanahan Dep. Page 17, Lines 6-16).

28.  Former Teva HR Senior Manager Herminia "Mini" Rodriguez had also heard the same type of negative things relating to Plaintiff and the facilities group he managed. Specifically, Ms. Rodriguez testified:

> From a facilities standpoint, I don't know how much credibility he had in terms of whether his group was doing things the way that they would have done it or should have done it.  There were question marks around the service.  At times you would hear folks talk about facilities was supposed to do X, but they didn't, that type of thing.

(Exh. 5 – Rodriguez Dep. Pages 22-23, Lines 20-4; *see also* Pages 6-7, Lines 20-4).

**IFM and Deficiencies in Plaintiff's Performance Revealed as of June 2014**

29.  In June 2014, Plaintiff, Mr. Aharoni, Ms. Shanahan, Ms. Martin, Ms. Flaisher, Ms. Rodriguez and others participated in a meeting regarding IFM (Integrated Facilities Management). (Exh. 7 – Shanahan Dep. Pages 38-39, Lines 21-1; Pages 39-40, Lines 25-16).

30.  IFM involves outsourcing facilities management functions as a cost savings measure, and a team was convened to investigate its feasibility at Teva.  (*See* Exh. 3 – Middlebrooks Dep. Pages 92-94, Lines 4-15).

31.  Ms. Shanahan and Ms. Martin were in favor of moving to an IFM model. (Exh. 7 – Shanahan Dep. Pages 38-39, Lines 21-16, *see specifically* Page 39, Line 12).

**32.** Plaintiff was opposed to IFM and had expressed his opposition to Mr. Aharoni, who was aligned with him and similarly opposed bringing IFM to Teva prior to their meeting.  (Exh. 3 – Middlebrooks Dep. Pages 93-94, Lines 24-18; Page 107, Lines 5-22).

**33.** Plaintiff perceived that IFM could be a threat to his job security and that of his team and to the GFM group as a whole, testifying:

> A:  He [Mr. Aharoni] became aware of the IFM process.  He was not in favor of the IFM process . . . .He also, I think understood – – if I read him correctly – he knew that IFM was in direct conflict with GFM and if IFM were to move forward most if his team would disappear.
>
> Q:  Would that include you?
>
> A:  It's very possible, yes.
>
> Q:  And would that include your direct reports?
>
> A:  Yes.
>
> Q:  So to some extent you had a self interest with regard to your position with regard to IFM and its success?
>
> A:  Yes, as did Nir [Aharoni ].

(Exh. 3 – Middlebrooks Dep. Pages 107-108, Lines 13-7).

**34.** During this meeting there was a discussion that they needed to identify someone with credibility and leadership skills to take the project forward and to determine whether IFM was a feasible alternative.  (Exh. 7 – Shanahan Dep. Page 42, Lines 16-24).

**35.** At the meeting, Mr. Aharoni alluded to the fact that he thought Plaintiff should lead the IFM project.  (Exh. 7 – Shanahan Dep. Page 43, Lines 3-6).

**36.** Ms. Shanahan did not agree that Plaintiff should lead the project because Plaintiff was not a strong leader and unable to get a group of people around the table to do something, not persuasive, not someone who people would follow, and not data driven, and that

8

site people in the Americas had shared with her that they had no confidence in him. (Exh. 7 –
Shanahan Dep. Pages 43-44, Lines 7-12).

      **37.** Ms. Shanahan shared her observations of Plaintiff during the meeting,
including his failure to speak up for himself and his leaving the meeting while it was still being
conducted, testifying as follows:

> Steve didn't say a whole lot during the meeting; in fact, left a
> couple of times during the meeting including [sic] end of the
> meeting, he left for a period of time. But, even when he was in the
> room, he didn't really add anything to the conversation, and Nir
> who – and in his defense, again English is not his first language, he
> was doing his best to try to defend the position they thought they
> had, and I think he felt a bit overwhelmed by the number of people
> that were in the room that were kind of proponents of IFM . . .
>
> Q: Do you know why Steven didn't advocate?
>
> A: I think it's in Steve's nature to want to get along with people. I
> think in his nature – – in my experience with Steve, he has never
> been someone to happily enter into conflict, I think he tried to
> avoid conflict where possible, so I think that might have been why
> he didn't say a lot.
>
> Q: Did Nir look to Steve during the meeting for support?
>
> A: I think he did a couple of times, but then, like I said, Steve left
> the meeting a couple of times. I mean every time I look – the way
> we were sitting, I was on the same side of the table with Nir, and
> Steve was at the other end. And every once in a while, I would
> look down and I would not see him. But I don't know if he went
> to the bathroom or what, but he was often not there, but then he
> was there, then he wouldn't be. As I said, even when he was there,
> he wasn't saying anything.

(Exh. 7 - Shanahan Dep. Pages 41-42, Lines 6-15).

      **38.** Ms. Rodriguez also was present at the IFM meeting and noticed that
Plaintiff's involvement was negatively viewed. She was concerned that plaintiff did not speak
up during the meeting when people were discussing him as a possible candidate to lead the IFM
project. She was also concerned because important stakeholders like Ms. Shanahan and

Ms. Martin openly expressed that they didn't believe that Plaintiff was the right person to lead an

IFM project and did not trust him to do so.  (Exh 5 - Rodriguez Dep. Pages 26-30, Lines 17-4).

    **39.**  After the meeting, Ms. Shanahan let Mr. Aharoni know that she did not think

that Plaintiff should lead IFM, and if IFM was to happen she didn't think Plaintiff would be the

right person for the job.  (Exh. 7 – Shanahan Dep. Pages 45-46, Lines 15-5).

    **40.**  Mr. Aharoni, however, was insistent that Plaintiff have at least some role if

not as the leader, at least as co-leader of the IFM project.  (Exh. 7 – Shanahan Dep. Page 51,

Lines 12-18).

    **41.**  Plaintiff was ultimately selected to be co-leader of the IFM project because it

made Mr. Aharoni more comfortable with the output of a team if somebody from his

organization was involved in driving the recommendation.  (Exh. 7 – Shanahan Dep. Page 44,

Lines 13-25).

    **42.**  Plaintiff was well aware that Ms. Shanahan and others believed that he lacked

the leadership capabilities necessary to lead the IFM project and emailed Mr. Aharoni shortly

after the June 2014 meeting to question his future at Teva if Teva were to implement IFM and

not select him to oversee it.  (*See* Exh. 8 – Exh. D-7; Exh. 7 – Shanahan Dep. Page 57,

Lines 5-9).  Plaintiff's email to Mr. Aharoni stated:

> Can you give me some guidance regarding the IFM program.  Will
> the IFM program be rolled out to all NA facilities, or will it be
> isolated to TGO manufacturing sites?  The reason I am asking is
> quite simply.  If we do a full IFM roll out at all NA sites, and Karin
> [Shanahan] and company do not see me as the correct person to
> oversee the IFM process, then I don't see much of a future here for
> me at Teva . . . .
>
> This confirms that I will not even be considered for the second
> level position.

(Exh. 8 – Exh. D-7).

**43.** In that same email, Plaintiff acknowledged IFM's threat not only to his own job security, but also to that of his staff, writing to Mr. Aharoni "[a] full IFM roll out will directly affect everyone who currently works for me including Ellen, Ray, John, Kristin and Troy. If we are moving down this path, I need to begin conversations with my staff." (Exh. 8 – Exh. D-7; Exh. 3 - Middlebrooks Dep. Pages 139-140, Lines 8-3).

**44.** Although Ms. Shanahan never directly shared this with Plaintiff, she believed that he clearly saw the writing on the wall and that others lacked confidence in him and was fishing for information from Mr. Aharoni regarding this. (*See* Exh. 8 – Exh. D-7; Exh. 7 – Shanahan Dep. Pages 58-59, Lines 21-10).

**45.** Early in the IFM project discussion, Ms. Shanahan gave Jennifer Flaisher, the Senior Director of HR and a business partner for facilities management at the time (later promoted to Vice President of HR for the U.S.), feedback about Plaintiff's deficiencies and expressed concern that Plaintiff as the leader of NAFM was not supportive of the IFM project and had expressed his opposition in a manner that was not constructive. (Exh. 9 – Jennifer Flaisher Dep. Pages 62-64, Lines 24-12; Pages 11-12, Lines 6-11).

**46.** In mid-year 2014, Ms. Flaisher also received similar negative feedback from the Head of Procurement, Lisa Martin who expressed concern about Plaintiff's ability to lead the IFM project because Plaintiff did not possess the necessary leadership skills, and Ms. Flaisher shared their feedback with Mr. Aharoni. (Exh. 9 –Flaisher Dep. Pages 67-68, Lines 4-8).

**47.** When Ms. Shanahan or Ms. Martin asked the IFM team why progress wasn't being made, they would point to Plaintiff as not providing data, changing the scope of the project and similar things of that nature. (Exh. 7 – Shanahan Dep. Page 114, Lines 3-10).

**48.** Mr. Aharoni, despite having selected Plaintiff, now became concerned that Plaintiff did not have the support of key stakeholders but still believed at that time that Plaintiff was the best person to lead the IFM project as head of NAFM. (Exh. 9 –Flaisher Dep. Pages 68-69, Lines 12-3).

**49.** By June 2014, Ms. Rodriguez had shared with Ms. Flaisher other concerns regarding Plaintiff (unrelated to IFM) pointing to deficiencies identified in Plaintiff's performance, specifically his inability to define the roles and responsibilities of his team and how he was going about selecting talent. He was not effectively leading the process and was being too passive in his approach. (Exh. 9 – Flaisher Dep. Pages 84-85, Lines 9-7; Pages 85-86, Lines 18-1).

**50.** Ms. Flaisher believed that Mr. Aharoni was quickly losing confidence in Plaintiff who he had selected for the position, testifying:

> Q: Up to a certain time period, Nir [Aharoni] was supportive of Steve [Middlebrooks]; correct?
> A: Oh, very much, very.
>
> Q: At some point that changed?
>
> A: Yes.
>
> Q: When?
>
> A: When he started to become more familiar with his performance.
>
> Q: Can you pinpoint a time period?
>
> A: This meeting in June. I guess, was probably - - it could have – I don't know, he could have been developing a concern prior and it wasn't shared with me until then. It wasn't until this meeting that it was shared with me. But maybe he had a concern prior to that.
> …
>
> Q: All right, but as of June 2014, in your opinion, it had changed?

12

A: Yes, yeah.

(Exh. 9 – Flaisher Dep. Page 75, Lines 1-15; Pages 75-76, Lines 23-1).

**51.** Ms. Flaisher who was present at the workshop had come to the same

conclusion, testifying:

> A: In this meeting, this meeting that I referred to, the workshop last Friday, I was, I was in that workshop and I was very concerned about him being successful and his credibility with key stakeholders.

> Q: What led you to conclude in that workshop that Steve [Middlebrooks] was

> not credible?

> A: Because he didn't offer much in that workshop. He didn't say much.

· (Exh. 9 – Flaisher Dep. Pages 76-77, Lines 19-3).

**52.** On June 13, 2014, Ms. Flaisher prepared a list of development areas for

Plaintiff based on her own observations and what Ms. Rodriguez, Ms. Shanahan, Ms. Martin and

Mr. Aharoni had shared. She identified Plaintiff's deficiencies as follows:

> 1) building org capabilities aligned to the new operating model – Steve has struggled to articulate new roles and responsibilities in his team that are required for the future.

> 2) building a strong team

> his priority has been finding spots for his current team rather than objectively evaluating the business needs and talent needs which may require bringing in external talent to close gaps – I do not think he is a good judge of talent.

> 3) driving change

> He has not articulated a vision for the GFM organization the others are aligned with [sic] He has to be pushed to take the next steps in building his org and does not seen [sic] to be taking ownership [sic] it feels like he is a participant vs. being a driver.

> 4) influencing others

> Steve does not have credibility with any important stakeholders on
> [sic] the business [sic] He does not take proactive states to build
> alignment across stakeholders.

(Exh. 10 - P-40; Exh. 9 –Flaisher Dep. Pages 84-85, Lines 9-17).

53. Shortly thereafter, on June 18, 2014, Ms. Flaisher summarized the concerns

regarding Plaintiff in an email to Ms. Shtrouchler and Ms. Rodriguez as follows:

> The biggest challenge we have is around Steve
> [Middlebrooks]. The three executive sponsors (Karin
> Shanahan, Lisa Martin and Nir [Aharoni]) agree that this [IFM]
> initiative should absolutely be led by GFM. But, Steve is not
> the right person to do it. He has many strengths but he does
> not have the strengths that are required for such a critical role --
> leading the cross-functional project. Specific gaps that were
> cited by Lisa and Karen include: lack of credibility with key
> stakeholders, lack of influencing skills, change leadership,
> communication, being proactive. Nir says he has seen a lot of
> growth out of Steve, but acknowledged that these are gaps.

(Exh. 11– P-39; Exh. 9 Flaisher Dep. Pages 69-71, Lines 12-18).

**Plaintiff's Relationship with Mr. Aharoni**

54. After Plaintiff was appointed as Head of NAFM, he sought out

Ms. Shanahan's advice on how to build a relationship with Mr. Aharoni. (Exh. 7 - Shanahan

Dep. Page 53, Lines 8-22; Page 55, Lines10-16).

55. Later in 2014, sometime after the June IFM meeting, Plaintiff expressed his

concern to Ms. Shanahan over what he perceived to be a change in his relationship with

Mr. Aharoni, and Ms. Shanahan encouraged him to speak with Mr. Aharoni. Ms. Shanahan

testified:

> Q: When did Steve first approach you to suggest that he -- he might need
> some help or advice with regard to dealing with Nir?
>
> A: Well, the first time was just when we initially started building a
> relationship. I think it would have been later in 2014 because I think he
> started to feel that the relationship with Nir – and – and again, I want to be
> clear timing-wise, I could be a little off because there was a lot happening

14

in the organization at that time. But it definitely would have been after the June meeting, later in 2014, when he popped into my office and expressed concern over the relationship with Nir because he felt it had shifted somehow.

Q: And did he describe what caused it to shift?

A: No, he said he felt that he didn't know why it had shifted. So, he basically said I don't know what happened, but I think it's shifted. Then he started with, have you heard anything? And I hadn't. And all I could do was to encourage him to have the conversation with Nir.

(Exh. 7 - Shanahan Dep. Pages 55-56, Lines 12-11).

56. Plaintiff never once stated to Ms. Shanahan that he felt he was being treated differently because he was American or because of his age or anything else that was related to discrimination. (Exh. 7 – Shanahan Dep. Pages 56-57, Lines 18-4).

**Retention of a Coach for Plaintiff**

57. In July 2014, Human Resources began taking steps to provide Plaintiff with an executive coach at Mr. Aharoni's direction because he wanted to provide Plaintiff with support to give him more of a chance to be successful in his role. (*See* Exh. 12 – P-42; Exh. 13 – P-44).

58. Ms. Rodriguez expressed concern to Ms. Flaisher that Mr. Aharoni's decision to provide an executive coach for Plaintiff was misplaced because Plaintiff had not displayed high potential in his new role which is what Teva considers in providing an executive coach. (Exh. 9 – Flaisher Dep. Page 104, Lines 10 17; Exh. 13 – P 44).

59. Ms. Flaisher agreed with that assessment, writing "they are asking us to invest $ in coaching for Steve Middlebrooks, who based on our coaching philosophy is not a strong candidate for an executive coach. He is not top talent who we want to develop for the future." (Exh. 14 - P-46 at TEVA(SM) 001389).

**60.** Typically, HR encourages managers to only identify employees with the highest potential for greater leadership roles as candidates for executive coaching. (Exh. 9 – Flaisher Dep. Page 99, Lines 1-13).

**61.** However, despite being advised to the contrary ,Mr. Aharoni decided to retain an executive coach for Plaintiff "[b]ecause he wanted to give Steve support to be successful in the role and felt that an executive coach could help." (Exh. 9 – Flaisher Dep. Page 98, Lines 3-13; *see also* Pages 104-105, Lines 18-2).

**62.** Ms. Rodriguez advised Plaintiff in August 2014 that he would be provided with a coach to assist him with his development identifying the same areas for development that were raised in Jennifer Flaisher's June 13, 2014 email regarding Plaintiff's deficiencies. (Exh. 15 – P-104 at TEVA(SM) 001101; Exh. 5 – Rodriguez Dep. Page 100, Lines 7-16; Exh. 10 - P-40; Exh. 9 –Flaisher Dep. Pages 84- 85, Lines 9-17).

**63.** Plaintiff was sent a coaching assignment agreement on September 12, 2014, that again listed the same areas for development that were raised in Jennifer Flaisher's June 13, 2014 email regarding Plaintiff's deficiencies, and Plaintiff signed the agreement. (*See* Exh. 10 - P-40; Exh. 16 - P-105; Exh. 17 - P-107; Exh. 9 –Flaisher Dep. Pages 84-85, Lines 9-17).

**64.** Plaintiff did not start working with the coach until 2015 because it took time to go through the process of selecting a coach and there were related delays in signing off on the forms and Mr. Aharoni's delay in getting back to Ms. Rodriguez. (Exh. 5 – Rodriguez Dep. Page 108, Lines 6-19).

16

**65.** Plaintiff and his coach held a kick off meeting in March 11, 2015 but later had difficulty obtaining Mr. Aharoni's input on the process. (Exh. 18 – P-113; see Exh. 5 - Rodriguez Dep. Pages 72-73, Lines 16-8).

**66.** By March 18, 2015, Ms. Rodriguez believed Plaintiff was looking for an executive coach to help broker his relationship with Mr. Aharoni, testifying:

> I think by this point [Plaintiff's] already feeling some of the tension of conversations with not delivering things the way that he's being expected to. And in his mind, I think he thinks he's delivering, but there's always something that it wasn't quite the way it should have been. And I think he thought he was going to be able to leverage this to build a better relationship with Nir [Aharoni] at that point.

(See Exh. 5  Rodriguez Dep. Page 60, Lines 1-4; Pages 60-61, Lines 23-14).

**67.** As of May 5, 2015, Ms. Rodriguez expressed to Shannon Phillips of Teva's US Leadership & Development that "Confidentially, his [Plaintiff's] manager is not pleased with his performance and did not understand that the coach isn't for remedial purposes." (Exh. 19 – P-110 at TEVA(SM) 001314).

**68.** By June 2015, Mr. Aharoni had changed his mind about having a coach, and continued to delay in responding to requests for input necessary to continue the coaching process. (See Exh. 19 - P-110; Exh. 5 – Rodriguez Dep. Pages 110-111, Lines 6-15; *see also* Exh. 20 – Shtrouchler Dep. Page 78, Lines 5-22).

**69.** The coaching relationship was terminated in June 2015 because Mr. Aharoni failed to respond to requests for input regarding the coaching process and had changed his mind and no longer convinced that a coach would be helpful and also because Ms. Flaisher had never believed that it was worthwhile to invest money in a coach for someone who was not performing well. (*See* Exh. 19 - P-110; Exh. 5 – Rodriguez Dep. Pages 110-111, Lines 6-15; Exh. 20 – Shtrouchler Dep. Pages 78-80, Lines 5-6).

17

**70.** Ms. Rodriguez also explained the reason the coaching stalled:

Q: Is there a connection between the suggestion that an executive coach be assigned to Steve [Middlebrooks] and the criticism you had testified was coming previously from key stakeholders?

. . .

A: I believe yes.

Q: What was that connection?

A: I believe Nir [Aharoni] was becoming aware that there was skepticism about Steve's ability to perform the role led him to think that a development plan and coach could help him be successful in that role.

Q: Do you know whether Jennifer Flaisher expressed the concerns about using an executive coach for Steve Middlebrooks given the email that you are looking at, which is P-44, and the fact that he was not identified as being high potential?

A: Yes, I believe she raised that to Nir.

Q: Did she raise it to you?

A: She did. And I subsequently raised it months later, or whatever it was timing wise, once we had just undergone to him and Ilanit [Shtrouchler] trying to help him understand that an executive coach generally was used for true development of high potential employees and not for remedial purposes or for performance concerns that the manager would need to address with the employee.

Q: Did either you or Jennifer try to talk Nir out of the decision to engage an executive coach for Steve?

A: I think yes, that we tried to tell him this is not how we generally use the executive coach.

Q: Was it ultimately his decision?

A: Yes.

18

Q:  And do you know why after choosing an executive coach and resisting your concerns about the reasons for the executive he ultimately decided not to proceed with the executive coach?

A:  No.  He knew that Steve had the performance issues or had become aware that there were performance issues, and wasn't, I think, as invested in the executive coach then.

(Exh. 5 – Rodriguez Dep. Pages 200-203, Lines 20-1).

**Plaintiff's 2014 "Mostly Meets" Review**

**71.**  Plaintiff received his 2014 annual review in or around January 2015. Mr. Aharoni gave Plaintiff an overall performance rating of "Mostly Meets" on his 2014 annual review and individual "Mostly Meets" ratings in six performance areas;  GFM Implementation in NA, People Development, Personal Goals, Excellence in Execution, Strategic Vision and Team Leadership.  (Exh. 3 - Middlebrooks Dep. Pages 134-135, Lines 20-11; Exh. 21 - D-8).

**72.**  In Plaintiff's 2014 annual review, Mr. Aharoni acknowledged what he perceived to be Plaintiff's strengths and accomplishments at that time and gave him ratings of Meets, Exceeds and even an Exceptional in other areas of his review.  (Exh. 21 - D-8).

**73.**  Among Plaintiff's demonstrated shortcomings and areas of development for his new role, Mr. Aharoni stated the following, with regard to GFM Implementation:

The establishment of the organization took too long and too slow (more than a year and hasn't finished yet).  Canada manager was appointed a few days ago.  West Coast manager was appointed four months ago, the involvement on soft services [for] the manufacturing sites hardly exists.  The transfer of responsibility from Allen and Troy took a long time and had not been completed.

(Exh. 21 - D-8 at TEVA(SM) 000668-000669; Exh. 3 – Middlebrooks Dep. Pages 151-152, Lines 7-4).

19

**74.** Regarding People Development, Mr. Aharoni's comments included:

> Allen's and Crystal's development was not carried out at the required level and their progress is too slow and affects the ability of the organization to achieve its goals.

(Exh. 21 - D-8 at TEVA(SM) 000669-000670; Exh. 3 – Middlebrooks Dep. Pages 152-153,

Lines 24-17).

**75.** In Mr. Aharoni's comments with regard to Plaintiff's Personal Goals and

Excellence in Execution, in both of which he was rated as not meeting expectations, Mr. Aharoni

noted the following areas for improvement:

> Steve is a very professional manager in the fields of maintenance, engineering (HARD SERVICES). At these fields Steve feels comfortable but he must get out of the comfort zone and learn more about the SOFT services.

> Steve must improve his managerial skills, become more assertive, more proactive and implement tasks more quickly.

> He must work on communicating the organization's activities and achievements. It is important to learn how to work in a multicultural organization and not to hesitate to ask questions or ask for clarifications whenever needed. It is very important to express your own opinion without hesitation while convincing and harnessing senior managers at your side (don't be a yes man).

> Steve did not participate at Karin management meetings although Karin suggested it. He had to insist and participate at those meetings as well as other BUs meetings and global unites [sic] management meetings. This will allow Steve to stand out, to take his place at TEVA NA, affect the process in advance and not post factum (as happened in renovation NW, contract Micro-doz, etc.)

> Steve must drill down to details in order to avoid the transfer of misinformation (HR Report IFM).

> Should ensure the transfer of information from the GFM headquarter managers to his staff.

> He must get clarifications on each request from the management that are not clear (work plans, MASTER PLAN).

20

(Exh. 21 - D-8 at TEVA(SM) 000670-000671; Exh. 3 – Middlebrooks Dep. Pages 153-155, Lines 18-24; Pages 158-159, Lines 19-1; Page 159, Lines 13-24).

76. When Mr. Aharoni commented in Plaintiff's 2014 annual review that "[i]t is very important to express your opinion without hesitation while convincing and harnessing senior managers at your side (don't be a yes man)" he was referring to Plaintiff's conduct at the June 2014 IFM meeting.  (Exh. 3 – Middlebrooks Dep. Page 155, Lines 9-21).

77. Mr. Aharoni further addressed this in his overall comments stating "[a]t the beginning of the [IFM] project Steve strongly expressed his opinion despite the push-back and lack of appreciation from the Procurement department and TGO.  Unfortunately, with time, he refrained from expressing his opinion – I felt that during the meeting held on Friday [June] 13 in the mid-year) [sic]."  (Exh. 21 – D-8 at TEVA(SM) 000676).

78. With regard to Strategic Vision, where he was also not meeting expectations, Mr. Aharoni noted the need for Plaintiff to improve his strategic leadership abilities, while giving Plaintiff credit for his ability to lead tactical activities:

> Steve is strong in leading tactical activities and he must improve his strategic skills.  Steve must learn to identify strategic opportunities in order to implement his work plan and to establish his organization.
>
> Appointing Canada CFM and West Coast CFM were strategic move [sic] but it took too long.
>
> In 2015, Steve have [sic] to plan strategic moves across-functional and businesses in order to emphasize the advantage of the NA FM organization.

(Exh. 21 - D-8 at TEVA(SM) 000672; Exh. 3 – Middlebrooks Dep. Pages 161-152, Lines 10-24).

21

**79.** With regard to Team Leadership, Mr. Aharoni described that Plaintiff's loyalty to his team as compromising the ability to meet goals and how his lack of communication slows down his ability to accomplish his goals:

> Steve leads his team with great sensitivity to his employees.
>
> It is very important to manage people with sensitivity and understanding, but at the end, it is necessary to meet the goals.
>
> Steve took tasks on himself and hardly delivered it to his Subordinates managers. As well information from GFM HQ hardly communicate to his reporting managers
>
> working in line instead of in parallel slow down the organization and the achievements of its goals.
>
> It is important to speed up processes whenever you recognize an opportunities.

(Exh. 21 - D-8 at TEVA(SM) 000673; Exh. 3 – Middlebrooks Dep. Pages 162-163, Lines 10-2).

## Search for Plaintiff's Replacement

**80.** Even before the 2014 Performance Review, in the fall of 2014 Mr. Aharoni shared with Ms. Shanahan that he was considering looking for someone to replace Plaintiff. (Exh. 7 – Shanahan Dep. Pages 65-66, Lines 7-3).

**81.** A confidential search for Plaintiff's replacement was initiated on March 16, 2015 with an outside recruiting agency. (Exh. 22 - P-100 at TEVA(SM) 000557, 000567; Exh. 23 – Swartz Dep. Pages 151-152, Lines 15-6).

**82.** The search was to prepare for Plaintiff being terminated or possibly moved into another role. (Exh. 20 – Shtrouchler Dep. Pages 129-130, Lines 14-2).

**83.** The search was started prior to initiating any Performance Improvement Plan ("PIP") with Plaintiff because one of Mr. Aharoni's concerns was that it would take a long time

22

to find a replacement for Plaintiff if things ended up going in that direction. (Exh. 20 –
Shtrouchler Dep. Pages 130-133, Lines 3-2).

84. During the course of the confidential search, "17 candidates were presented,
12 were interviewed by HR, 7 interviewed by Nir [Aharoni], 5 completed on-site interviews,
6 were reviewed as not a fit, 6 candidates withdrew." (Exh. 22 – P-100 at TEVA(SM) 000567).

85. The confidential search continued throughout 2015 until after Plaintiff was
terminated when a non-confidential search was initiated. (*See* Exh. 22 – P-100 at TEVA(SM)
000568, 000570; Exhs. 1 and 2 - Plaintiff's Second Amended Complaint and Defendants'
Answer and Affirmative Defenses to Plaintiff's Second Amended Complaint at ¶ 59).

86. All of the candidates under consideration to replace Plaintiff were American.
(Exh. 9 – Flaisher Dep. Pages 256-257, Lines 22-2).

**NAFM Team Members' Complaints and Teva's Resulting Investigation**

87. On June 1, 2015, Israeli members of GFM Roni Kafre and Shimrit Shemtov
traveled to North Wales, Pennsylvania for a two day meeting with members of the NAFM team.
(Exh. 24 – Eppley Dep. Page 42, Lines 6-14, Page 43, Lines 10-13; Exh. 25 – D-60).

88. The purpose of the meeting was to discuss the 2016 Annual Operating Plan
(AOP) process and to review lessons learned from the 2015 AOP process. (Exh. 25 – D-60).

89. During the meeting, NAFM team members were working on their laptops, and
Mr. Kafre and Ms. Shemtov asked them to close their laptops to pay attention to the presentation.
(Exh. 24 - Eppley Dep. Page 43, Lines 11-20).

90. Mr. Kafre and Ms. Shemtov then went around the room and closed the NAFM
team members' laptops. (Exh. 26 - D-62; Exh. 24 - Eppley Dep. Page 44, Lines 19-4).

23

**91.** On June 10, 2015, during a team meeting with Ms. Rodriguez, their HR business partner, NAFM team members complained about their laptops being closed as well as other perceived inappropriate behavior occurring at the meeting and even prior to their visit. (Exh. 26 - D-62).

**92.** The team's other complaints included complaints that the Israeli team did not operate with transparency but expected transparency from the NAFM group; micromanagement; lack of trust; public criticism of Plaintiff's leadership; failure to recognize the team's good work; Ms. Shemtov making a comment about Ms. Wilton having children out of wedlock; and Ms. Shemtov offering to help find Mr. Eppley a nice Jewish bride. (Exh. 27 – Gaugler Dep. Pages 98-103, Lines 5-14; Exh. 26 - D-62).

**93.** During the June 10 meeting, Mr. Gaugler used the term "hostile work environment" to describe this situation. (Exh. 28 – P-17 at TEVA(SM) 000252).

**94.** Mr. Gaugler was the only employee who used the "hostile work environment" term. He used it only once at the June 2015 meeting with Ms. Rodriguez. (Exh. 27 – Gaugler Dep. at Page 35, Lines 8-18; Page 103, Lines 15-19; see also Exh. 26 – D-62).

**95.** Mr. Gaugler was not referring to a legally hostile work environment, but to a difficult place to work, testifying as follows:

> Q: Okay. And then the next one, which is perhaps the most important one says, Troy said environment is hostile. Okay. Do you recall making that comment to Mini at the June 10 meeting?
>
> A: Yes.
>
> Q: Okay. Had you ever used that terminology before?
>
> A: No.
>
> Q: Did you know what it meant?
>
> A: Yes.

24

Q: Okay. Had you looked it up before you used the term?

A: No. Because after I did look it up, I used - - I was using the term hostile as being a difficult place to work.

Q: Okay.

A: A difficult group of people to work.

Q: That's what you meant by it?

A: That's what I meant by it. And I also knew that hostile was a word - - and I never did look up the definition before that day of what hostile truly meant in the words of an H – in HR, the business world.

. . .

Q: You didn't know that it had a special HR meaning?

A: I knew it had a special HR meaning, but I didn't know the definition of the HR meaning.

Q: Right. And what you wanted to convey, as I understood your testimony, was that it was a difficult place to work?

A: Difficult environment. Very difficult environment.

. . .

Q: Were you trying to suggest that it was hostile because of discrimination?

A: At that time, not – no, I was saying it was hostile due – – I meant mostly lack of trust and lack of understanding.

Q: Okay.

A: And because if it, it was breeding and just getting worse.

(Exh. 27 – Gaugler Dep. Pages 103-104, Lines 15-10; Page 105, Lines 2-9; Pages 105-106,

Lines 25-7; *see also* Page 128, Lines 11-14; Pages 129-130, Lines 6-1).

07/25/2018 SL1 1533692v1 030421.00641

**96.** Mr. Gaugler explained that the difficulty with getting Mr. Aharoni's approval for head counts was but one example of the hostile work environment he was referring to because it made the team feel that they were not supported.  In this regard, he testified:

> Q:  Were there problems getting Nir's approval?
>
> A:  Head count approval as replacement head count?
>
> Q:  Yes.
>
> A:  Yes, It took a little bit, yes.
>
> Q:  Was that a cause of concern?
>
> A:  Yes.
>
> Q:  Was that another example as to why the environment had become hostile?
>
> A:  I think speaking to hostile is then making it [sic] the rest of the team feel we weren't being supported, yes.

(Exh. 27 – Gaugler Dep. Page 128, Lines 5-14).

**97.** He further explained his perception of the work environment when discussing delays in approvals for requisitions, testifying as follows:

> Q:  Were there problems with Nir sitting on requests?
>
> A:  Did that create a hostile work environment?
>
> A:  It created a difficult environment because we were getting – – as in our group was getting feedback from our customers that we weren't getting this stuff done,
>
> Q:  Is there a difference between a difficult work environment and a hostile work environment as you used the terms?
>
> A:  Yes.  So difficult and hostile, yes.
>
> Q:  What's the difference?
>
> A:  So, in my opinion, was there it's always some kind of little beratic (sic) battle all the time.

Q:  You mean bureaucratic?

A:  Or yes, bureaucratic.  Hostile, I believe we were being – – everything we were doing was either wrong, we weren't trusted, everything – – we couldn't do anything right.

Q:  Were you getting second guessed?

A:  Yes.  Or not – – or one thing not being trusted to the point of just not doing the rec or the purchase order or whatever we needed approved and just sitting on it and not getting feedback on why.

Q:  Was Roni [Kafre] slamming your laptop shut, was that the straw the broke the camel's back?

A:  Probably for me.

(Exh. 27 – Gaugler Dep. Pages 128-130, Lines 23-1).

**98.**  Mr. Gaugler did not recall ever raising that he felt the work environment was hostile based on age or national origin discrimination and he could not say that there was age or national origin discrimination.  (Exh. 27 – Gaugler Dep. Pages 130-131, Lines 15-13).  In this regard, he testified:

Q:  When you were in the June 2014 meeting with Mini [Rodriguez] and the rest of your group, when you said the environment was hostile, did you say something along the lines of it's hostile because of age or national origin or – – or anything along those lines?

A:  Not that I recall.

Q:  When Leander [Jones] interviewed you by phone, did you tell Leander that you believe that it was a hostile environment based on age or national origin?

A:  I don't remember if I did, but I – –

**Q:  At any time during your employment with Teva after it acquired Cephalon up through your termination this year, did you ever make a complaint that you felt that you were being treated differently based on age or national origin?**

**A:  I couldn't say that I was.**

Q: In the conversation that you had with Mini including the one where you told her it was getting worse, did you tell her in that conversation that you felt that Nir or Shimrit or Roni or anyone on the Israeli team were acting in a way that was discriminatory based on age or national origin?

A: Not that I recall that I said it like that.

(Exh. 27 – Gaugler Dep. Pages 130-131, Lines 15-13) (emphasis added).

99. Members of Plaintiff's team were the ones who complained at the meeting with Ms. Rodriguez. While Plaintiff was also present when Mr. Gaugler used the words "hostile work environment," Plaintiff testified that he stopped the meeting which was ending anyway. (Exh. 9 – Flaisher Dep. Pages 108-109, Lines 18-2; Exh. 3 – Middlebrooks Dep. Pages 229-230, Lines 2-15).

100. After this meeting, Ms. Rodriguez advised Ms. Flaisher that following the June meeting with the two GFM employees from Israel, employees of the NAFM group complained to her that the meeting had not gone well and used the term hostile work environment to describe it. (Exh. 9 – Flaisher Dep. Pages 106-107, Lines 5-7).

101. As a result of such an allegation, Ms. Flaisher and Ms. Rodriguez advised Mr. Aharoni and his supervisor Eli Aharoni that an investigation would be conducted to determine whether a hostile work environment had been created. (Exh. 9 – Flaisher Dep. Pages 107-108, Lines 15-17).

102. Mr. Aharoni first became aware of the NAFM team members complaints when he received a call from Ms. Rodriguez at which time she shared that Mr. Gaugler had expressed some morale issues and later shared with him that there were other complaints made about morale issues from Plaintiff's team members. (Exh. 4 – Aharoni Dep. Page 108, Lines 15-20; Page 109, Lines 5-9; Page 111, Lines 3-9).

28

**103.** These complaints included complaints about Roni Kafre and Shimrit Shemtov, IFM, the procurement process, and delays in approval of headcounts. (Exh. 4 – Aharoni Dep. Pages 107-108, Lines 6-15).

**104.** Mr. Aharoni was neither told that the complaints were made about him or came from Plaintiff. The complaints were not about Mr. Aharoni and were not made by Mr. Middlebrooks. (Exh. 4 – Aharoni Dep. Pages 105-106, Lines 16-8; Pages 108-110, Lines 15-11).

**105.** Mr. Aharoni began to interview selected members of Plaintiff's team to understand the problems and take further action to handle the situation. (Exh. 4 – Aharoni Dep. Page 113, Lines 2-22; Pages 114-115, Lines 17-7).

**106.** Mr. Aharoni understood, based on his interviews, that some of the complaints related to work, others to culture and some to a misunderstanding of managerial issues and decisions. (Exh. 4 – Aharoni Dep. Pages 109-110, Lines 20-4).

**107.** Ms. Rodriguez advised Mr. Aharoni that a decision was made to conduct a formal investigation in response to the complaint of a hostile work environment. (Exh. 4 – Aharoni Dep. Page 110, Lines 6-9).

**108.** This neither upset nor annoyed Mr. Aharoni. He stopped trying to solve the issue himself in order to allow an investigation to take place which he considered a necessary process to resolve the issue. (Exh. 4 – Aharoni Dep. Pages 124-125, Lines 24-18; Pages 127-129, Lines 15-20; see also Pages 140-142, Lines 14-8).

**109.** Mr. Aharoni was never told that any complaints were made about his own conduct and is not aware of any complaints made about him by the team. (Exh. 4 – Aharoni Dep. Pages 127-128, Lines 19-6).

29

**110.**  Mr. Aharoni did not blame Plaintiff for the investigation, and testified as follows:

> Q:  You were asked yesterday by counsel, in a variety of different ways, whether or not you were mad, upset, disappointed – she used every word that she could think of – when you head that there was going to be an investigation.
>
> I am going to ask it a little bit more simply because she didn't ask this question.
>
> Did you blame Steve Middlebrooks for the investigation?
>
> MS. GURMANKIN:  Objection to form in that it mischaracterizes that question - - the questions that were asked.
>
> But go ahead.
>
> THE WITNESS:  No, I didn't.
>
> Q:  BY MR. RAPPOPORT:  Did you blame Steve - -
>
> A:  No.
>
> Q:  Go ahead.
>
> A:  No, I didn't.

(Exh. 4 – Aharoni Dep. Page 277, Lines 7-24).

**111.**  During the investigation it was reported by Mr. Eppley and others that Ms. Shemtov had once said to him that she would find him a nice Jewish girl to marry.  (*See* Exh. 29 – D-25[1] at TEVA(SM) 000252; *see also* Exh. 24 – Eppley Dep. Page 51, Lines 21-24; Page 105, Lines 2-19).

**112.**  Ms. Shemtov's comment to Mr. Eppley about finding him a nice Jewish girl to marry was not made during the June 2015 visit but had been made over the telephone to him several months prior to the meeting but nonetheless brought up by him during the investigation.

---

[1] D-25 and P-17 are identical copies of the Investigative Report.

(Exh. 24 – Eppley Dep. Pages 50-52, Lines 22-9; Pages 53-54, Lines 16-1; Page 105, Lines 2-19; Exh. 29 – D-25 at TEVA(SM) 000252).

113. Mr. Eppley was not offended by what Ms. Shemtov said, but more how she went about it which he thought was awkward. (Exh. 29 – D-25 at TEVA(SM) 000252 and 000255; Exh. 24 - Eppley Dep. Page 105, Lines 9-22; Page 107, Lines 12-24).

114. During the same telephone call, Ms. Shemtov had asked Mr. Eppley's his age. He sidestepped the answer by making a joke about it and doesn't believe she ever asked him again. (Exh. 24 – Eppley Dep. Pages 35-36, Lines 16-13; Pages 50-51, Lines 22-10).

115. Mr. Eppley does not recall ever being asked his age after June 2014. (Exh. 24 – Eppley Dep. Page 40, Lines 16-13).

116. Mr. Eppley described how there were cultural differences with the global management based in Israel describing how "the Israelis are in general more people oriented, where–depending on where you are in the States, there's people that are all business and no play, right, there's different acceptable boundaries for those two worlds to relate," and this issue and others were discussed in the cultural training session. (Exh. 24 – Eppley Dep. at Pages 103-104, Lines 15-13).

117. Ms. Wilton, another member of the North American team, based in Canada, reported that Ms. Shemtov had questioned her as to why she had children but was not married and then asked Mr. Middlebrooks to fix this. (*See* Exh. 28 – P-17 at TEVA(SM) 000255; Exh. 23 - Swartz Dep. Page 115, Lines 18-21).

118. Ms. Wilton told the investigator that: "I was going out to dinner with the team and was told that I should not have kids and not be married by Shimrit. I did not think she was being mean spirited with her comments, but it did embarrass me when it was said in front of

31

everyone.  Steve was asked to fix it because he was my manager.  I think he handled it well at the time it was said."  (Exh. 28 – P-17 at TEVA(SM) 000255).

**119.**  After Mr. Middlebrooks raised with Mr. Aharoni that age information was being solicited, this stopped as of the summer of 2014.  (Exh. 24 – Eppley Dep. at Pages 39-40, Lines 16-16).

**Investigation Conclusions and Recommendations**

**120.**  On July 31, 2015, Ms. Rodriguez asked Teva Director of Human Resources Leander Jones, based in Virginia to conduct an investigation of the NAFM team's complaints. Mr. Jones was chosen to conduct the investigation because he was an objective third party who had no knowledge of the team. He had conducted many other investigations during his thirty-three years in human resources. (Exh. 30 – Jones Dep. Page 7, Lines 11-15; Pages 8-9, Lines 12-13; Pages 19-20, Lines 11-10; Exh. 5 – Rodriguez Dep. Pages 121-122, Lines 24-22; Exh. 9 – Flaisher Dep. Pages 123-124, Lines 17-6 and Flaisher Errata Sheet; *see also* Exh. 28 - P-17 at TEVA(SM) 000246).

**121.**  Upon agreeing on who should be interviewed and an overall end goal, Mr. Jones established an interview schedule.  Mr. Jones interviewed various members of Plaintiff's team, Mr. Kafre, Ms. Shemtov, Plaintiff and Mr. Aharoni as part of the investigation from September 3, 2015 through September 24, 2015.  (Exh. 28 - P-17 at TEVA(SM) 000246 and TEVA(SM) 000260).

**122.**  Mr. Jones sent his investigation report to Ms. Flaisher, Ms. Rodriguez and Ms. Shtrouchler on September 28, 2015. (Exh. 31 – P-81 at TEVA(SM) 001483).

**123.**  A condensed investigation report was later sent to Mr. Aharoni on October 14, 2015.  (Exh. 32 – P-16; *see also* Exh. 4 Aharoni Dep. Page 222, Lines 16-19).

32

**124.** In the investigation report, Mr. Jones concluded that there was no legally hostile work environment and made recommendations to improve the working relationship between the two teams.  (Exh. 28 - P-17 at TEVA(SM) 000275-000276).

**125.** Regarding the work environment, Mr. Jones concluded:

> Although there are managerial issues that impacts [sic] negatively on the work environment and a few things that fall into the Legal arena as issues, it appears there isn't enough evidence on the Legal side that points to a hostile work environment.

(Exh. 28 - P-17 at TEVA(SM) 000275).

**126.** Mr. Jones' recommendations included:

1. Provide Nir, Roni, and Shimrit with cultural and sensitivity training for Managers.  Especially on US practices/law, culture, and ways of working. Also address topic of retaliation.

   - **Training session on harassment and hostile work environment coming 2016 – will determine if it can/will be extended in Israel in 2016.**

2. Provide counseling to Shimrit and Roni regarding their behavior and interaction with the team and the need for adherence to US laws and statutes.  Express need for accountability and sincere desired to change.

   - **Ilanit Shtrouchler to meet with Shimrit and Roni and deliver counseling in format for Israel.**

3. Have the team capitalize on more purposeful and productive interactions intended to gain understanding and synergies as a way of working to better the team/group overall.

   - **Mini and Ilanit will organize a training session on team effectiveness and cross cultural workings.**

4. Suggest HR provide follow-up session with Steve and/or GFM Team on outcomes of investigation and steps agreed upon going forward.

   - **Mini will follow up with Steve and team and focus on recommendations and outcomes.**

5. Provide the GFM team with refresher training on harassment and hostile work environment for clarify and baseline understanding. Cover also the topic of retaliation.

- **Mini to check on training to occur across Teva for 2016 and ensure team is scheduled.**

6. Conduct a management alignment session on expectations with Nir, Shimrit, Roni and Steve.

- **Ilanit Shtrouchler to facilitate the session.**

7. Have HR Team address follow up items from investigation to improve work environment and customer satisfaction.

- Survey data was collected and analyze but nothing came of it and perceived as not being used

- **Mini will work with Steve Middlebrooks to cover with Team**.

(Exh. 28 - P-17 at TEVA(SM) 000275 – 000276 (emphasis supplied)).

**127.** HR business partner Ilanit Shtrouchler, counseled Ms. Shemtov and Mr. Kafre per the recommendation made in the report. (Exh. 20 – Shtrouchler Dep. Page 102, Lines 2-13; see also Page 7, Lines 19-23).

**128.** Defendants held a two day "Global Mindset Workshop" for members of NAFM and GFM management in North Wales, Pennsylvania in early February 2016. (Exh. 33 – P-22; Exh. 4 – Aharoni Dep. Pages 221-222, Lines 20-10).

**129.** The purpose of the workshop was to discuss the issues mentioned in the investigation and to implement the formal training recommendations in the report. (Exh. 4 – Aharoni Dep. Pages 221-222, Lines 20-10; Exh. 33 – P-22; Exh. 32 – P-16 at TEVA(SM) 000693; *see also* Exh. 23 – Swartz Dep. Pages 120-121, Lines 15-5).

**130.** The workshop included educating the global team on U.S. employment laws which was identified as the "Risky Business" training delivered by Morgan Lewis. (Exh. 23 – Swartz Dep. Pages 120-121, Lines 15-12; Exh. 33 – P-22).

34

**131.** The workshop also included a session on "Working Globally" training delivered by Aperion Global. (Exh. 33 – P 22; *see also* Exh. 23 – Swartz Dep. Pages 120-121, Lines 15-5).

**132.** Other action items in the report were implemented and took place prior to the workshop. (Exh. 4 – Aharoni Dep. Page 223, Lines 8-15).

**Mr. Aharoni's Comments Made About Americans and Related Conduct**

**133.** Plaintiff testified that Mr. Aharoni made two comments to him and another to team member Carolyn Tousius that led him to believe that Mr. Aharoni had a bias towards Americans. (*See* Exh. 3 – Middlebrooks Dep. Pages 59-67, Lines 20-22).

**134.** The first comment Plaintiff testified to was that Mr. Aharoni made was sometime in 2014 in which Mr. Aharoni expressed an opinion that the United States did not provide enough military support to Israel with regard to a conflict with Syria at the time. Not having any military experience himself, Plaintiff did not know if Mr. Aharoni's comments were correct. (Exh. 3 – Middlebrooks Dep. Pages 60-61, Lines 4-19).

**135.** The second comment Plaintiff testified to was Mr. Aharoni made was in either 2014 or 2015 when Mr. Aharoni was critical of the American media's portrayal of an altercation where Israel was being rocketed by its neighbors, and in defending itself, innocent bystanders were killed. (Exh. 3 – Middlebrooks Dep. Pages 61-62, Lines 20-20).

**136.** Regarding the comment made to Ms. Tousius, Plaintiff testified that in early 2015, Ms. Tousius traveled to Israel, and thanked Mr. Aharoni for the opportunity to visit Israel for Teva and told him how beautiful the country was and how nice the people had been to her. Plaintiff testified that Mr. Aharoni responded that Americans do not realize(or are just beginning to realize) that Israelis are not all just a bunch of towel-headed camel jockeys or something to

35

that effect, and that this upset her so much she cried. (Exh. 3 – Middlebrooks Dep. Pages 63-64, Lines 1-3; Page 65, Lines 14-18).

137. Ms. Tousius described that when she spoke with Mr. Aharoni she told him how much she liked Israel and the people there, his response was that Israel's "not like what you see on CNN." She attested Mr. Aharoni did not refer to Americans as not understanding Israel or believing that Israelis wore towels around their heads and still rode around on camels. The only the comment he made concerned CNN, and he was not disparaging about Americans' perceptions of Israel or of Israelis. Furthermore, she attested that Mr. Aharoni did not bring her to tears or upset her; there was no incident on her part and no emotion to speak of. (Exh. 34 -Tousius Affidavit at ¶¶ 4-7).

138. Plaintiff also testified that certain conduct displayed by Ms. Shemtov during the June 1, 2015 meeting with the NAFM team members showed an anti-American bias and that this is evidence of Mr. Aharoni's bias against Americans because the conduct of Mr. Aharoni's team is reflective of Mr. Aharoni. (Exh. 3 – Middlebrooks Dep. Pages 67-71, Lines 19-16; Exh. 25 – D-60 at TEVA(SM) 002525).

139. Plaintiff described that Ms. Shemtov put her hand up in the face of Scott Hoyt, a member of Plaintiff's team, and shushed him, telling him he was not allowed to ask questions about the rest of the world, and then went around the room and shut the team members laptops telling them that it was rude to have them open during a meeting (when it was common practice for laptops to be open and phones to be out at meetings in Israel) and Ms. Shemtov was herself among the worst offenders for this. Plaintiff inferred that this showed disrespect for Americans and that they were not on the same level as the Israelis. (Exh. 3 – Middlebrooks Dep. Pages 67-70, Lines 23-21).

36

**140.** Ms. Shemtov's conduct at this meeting is the only other conduct Plaintiff can think of that led him to conclude that Mr. Aharoni holds a bias against Americans. (Exh. 3 – Middlebrooks Dep. Page 71, Lines 12-16).

**141.** Ms. Shemtov did not even report to Mr. Aharoni.  She was the Finance Business Partner for GFM.  Business partners are assigned to support various groups by their business unit.  Mr. Aharoni did not choose her to support his group.  (Exh. 4 – Aharoni Dep. Pages 81-82, Lines 7-20; Exh. 24 – Eppley Dep. Page 53, Lines 12-15).

**142.** Plaintiff also raised in his EEOC charge that he was asked by Mr. Aharoni to come up with an additional $700,000 in cost savings to make up for the shortfalls of the other four regional directors ( those outside North America).  He asserted that this request also showed a bias against Americans.  However, Plaintiff admitted at his deposition that Mr. Aharoni's request was made only to him and not to Dan Ramirez, who is also American and was the head of Latin America facilities management for GFM and therefore not all Americans were actually treated as he was. (Exh. 3 – Middlebrooks Dep. Pages 301-304, Lines 20-2).

**143.** In this regard, Plaintiff  testified,

> A: I believe that I just said that Nir told me that I was making up for moneys that my four peers had not completed.  Okay so as a result of that, you were able to conclude that only you were held to this standard?
>
> A: Yes.
>
> Q: And you surmised that it had to do with the fact that you were an American and you weren't [sic], correct?
>
> A: Certainly a true statement, yes.
>
> Q: Okay.  And who was the facilities manager for Latin America who was being treated more favorably?  Dan Ramirez, right?
>
> A: Dan Ramirez.

07/25/2018 SL1 1533692v1 030421.00641

Q: He's American, isn't he?

A: Yes, he is.

Q: Okay. So Nir wasn't going after all the Americans just you when he decided to acquire cost savings?

      MS. GURMANKIN: Objection to form.

BY MR. RAPPOPORT:

Q: You can answer.

A: He was only going after me.

Q: But if Ramirez was also American, isn't it fair to say that not all of the Americans were treated unfavorably as you were – just you?

A: Okay, yes.

Q: You agree?

A: Yes.

(Exh. 3 – Middlebrooks Dep. Pages 302-304, Lines 20-2).

## 2015 Mid-Year Review

    **144.** Mr. Aharoni conducted Plaintiff's mid-year review on October 21, 2015 in person during a quarterly meeting in Canada. (Exh. 5 – Rodriguez Dep. Page 180, Lines 12-19; Exh. 35 – P-31).

    **145.** Although mid-year reviews are more typically conducted during the summer months, Plaintiff's was conducted later in 2015 because Mr. Aharoni wanted to conduct it in person which would have required him arrange for a time when he would be travelling to the United States or in this case, Canada. (*See* Exh. 9 – Flaisher Dep. Pages 135-136, Lines 12-1; Exh. 5 – Rodriguez Dep. Pages 175-176, Lines 22-1; Exh. 3 - Middlebrooks Dep. Page 246, Lines 15-24).

**146.** Ms. Rodriguez, Ms. Flaisher and Ms. Shtrouchler encouraged Mr. Aharoni to place Plaintiff on the PIP at the same time as his mid-year review. (Exh. 36 – P-26).

**147.** Mr. Aharoni thought it would be more fair to hear Plaintiff's comments to his mid-year review before placing him on the PIP. (Exh. 4 –Aharoni Dep. Pages 232-233, Lines 7-11).

**148.** Mr. Aharoni found Plaintiff's responses to his concerns raised at the mid-year review unsatisfactory and determined a PIP would be the right course to pursue. (Exh. 4 – Aharoni Dep. Pages 233-234, Lines 12-1).

**149.** Mr. Aharoni had planned to discuss Plaintiff's ongoing performance deficiencies at his mid-year review, many of which were the very same as had been brought to Plaintiff's attention early in 2015 when discussing the 2014 Performance Review. (*See* Exh. 37 – P-55; Exh. 38 - P-14; *see also* **"Plaintiff's 2014 "Mostly Meets" Review"** Section herein).

**150.** By way of example, Mr. Aharoni described in his notes for the mid-year review meeting that in Plaintiff's 2014 Performance Review, he had written "[m]y expectation [sic] were that the NA organization will use its [sic] economy of scale and achieve [sic] more savings from activities carried out across the BUs and at the Canadian sites and at the soft services and manufacturing sites," and since that time, Plaintiff had had not shown improvement. He had been "[r]epeating [the] same mistakes from 2014," had not displayed leadership, and required micro-management as evidenced by significant involvement by Mr. Kafre with regard to savings goals and plans, and even after Plaintiff was given more independence at his request, not much progress was made. (*See* Exh. 37 - P-55 at TEVA(SM) 001496; Exh. 38 - P-14 at TEVA(SM) 000667).

07/25/2018 SL1 1533692v1 030421.00641

**151.** In his notes for the mid-year review, Mr. Aharoni documented that he sent Mr.

Kafre to North America on a number of occasions to assist Plaintiff in reaching his savings

goals:

> At the end of Q1 15' I understood that no savings had been
> achieved in NA, I decided to send Roni to NA and support Steve to
> achieve the savings . . . . At every visit Roni returned back with
> savings of 500-100K$ [sic] After a few times Steve ask [sic] me
> not to send Roni and I gave him the chance in Canada and
> Pomona. No significant savings has been achieved. I decided to
> send Roni again.

(Exh. 37 - P-55 at TEVA(SM) 001496).

**152.** Ms. Flaisher added her own comments in this regard and in preparation for the

meeting, stating:

> As I read Steve's comments below, he clearly feels that his [savings] goal
> was achieved b/c of his team's efforts. I understand your view is that you
> and Roni had to be actively involved in this to get these results. Did Steve
> ever present a holistic plan for how he intended to achieve the savings and
> what method he would follow to do this, what stakeholders needed to be
> consulted and over what time frame? This is what I would expect from a
> Senior Director and if he has done that, you would not have felt it was
> necessary to be so closely involved (either yourself personally or through
> Roni).

(Exh. 37 - P-55 at TEVA(SM) 001496).

**153.** Furthermore, with regard to Plaintiff's goals for safety, Mr. Aharoni included

in his notes for their mid-year review meeting that he had previously included in Plaintiff's 2014

Performance Review: "I am expacting [sic] to see a proactive activities [sic] and clear work plan

for safety with accordance to EH&S standards and benchmark with other facilities," yet as of

October 2015, "no plan has been presented. No proactivity has been shown." (*See* Exh. 37 –

P-55 at TEVA(SM) 001497; Exh. 38 - P-14 at TEVA(SM) 000667).

**154.** Mr. Aharoni notes prepared for the mid-year review meeting repeated that he

had advised Plaintiff during his 2014 performance review that Plaintiff "must work on

40

communicating the organization's activities and achievements.  It is important to learn how to work in a multi-cultural organization and not hesitate to ask questions or ask for clarification whenever needed," and noted that Plaintiff's approach had still not changed as of his mid-year review.  As of Plaintiff's mid-year review, Plaintiff had still "not taken proactive steps to be a change champion for the GFM organization.  Examples of this are Steve quoting his management rather than stating his own view and that fact that Steve's team are [sic] not committed to the GFM organization."  (See Exh. 37 – P-55 at TEVA(SM) 001498; Exh. 38 - P-14 at TEVA(SM) 000671).

**155.**  Moreover, he described how in the Teva Global Operations (TGO) sites (Teva's manufacturing sites), were "still not getting the right attention and management time," and Plaintiff had continued to demonstrate an ongoing lack of proactivity and over-affiliation with his team causing a lack of objectivity.  These same shortcomings had been mentioned in Plaintiff's 2014 Performance Review.  (*See* Exh. 37 – P-55 at TEVA(SM) 001498; Exh. 38 - P-14 at TEVA(SM) 000668, 000671; Exh. 3 – Middlebrooks Dep. Page 31, Lines 16-19).

**156.**  Mr. Aharoni's notes prepared for the 2015 mid-year review also documented ongoing concerns with Plaintiff people management skills because of Plaintiff's continued disproportionate focus on his relationships among his team members in the United States, rather than between his team and other stakeholders, and Plaintiff's failure to effectively manage the development of his team and create development plans, which too had been previously raised with Plaintiff in his 2014 annual performance review.  (*See* Exh. 37 – P-55 at TEVA(SM) 001499; Exh. 38 - P-14 at TEVA(SM) 000668-000671).

**157.**  Mr. Aharoni also emphasized the need to focus more on soft services as he had during Plaintiff's 2014 annual review, and as of his mid-year review, Plaintiff was

41

"supporting TGO – only for few hard service.  Soft is not manage [sic]." (*See* Exh. 37 – P-55 at

TEVA(SM) 001500; Exh. 38 - P-14 at TEVA(SM) 000670-0006711; *see also* Exh. 3

Middlebrooks Dep. Pages 153-154, Lines 18-19).

  **158.**  Plaintiff testified that at the mid-year review Mr. Aharoni brought up both

positive and negative things, and that some of the negative things were the same themes that

Mr. Aharoni had discussed with him previously.  In this regard, Plaintiff testified as follows:

> Q:  Did he say some positive things?
>
> A:  Yes, he did.
>
> Q:  Did he say any negative things?
>
> A:  Yes, he did.
>
> Q:  What did he say of a negative nature during the review?
>
> A:  I would think that it has to do with – it would have to had to do with –
>
> Q:  I don't want to ask you to think.  I'm asking you about what you recall him saying to you –
>
> A:  I don't remember the specifics.
>
> Q:  What do you believe it was about?
>
> A:  It would, I believe have been about things like being more assertive with upper management, with TGO management, being more proactive.  Those same comments – – they were themes. Themes.
>
> Q:  And had some of those themes been discussed during videoconferencing or phone conversations that you had with him during 2015?
>
> A:  Not in terms of a review of a midterm or otherwise.
>
> Q:  No, but I am saying were these the same subjects that he had discussed with you over the course of the year before the meeting with you in Toronto?

> A: Some of them had been discussed and some of them had not
> been discussed.

(Exh. 3 – Plaintiff's Dep. Pages 253-254, Lines 5-9).

**Plaintiff's Performance Improvement Plan ("PIP")**

159.   By June 17, 2014, Plaintiff testified that he was already aware that Mr.
Aharoni was critical of him with regard to his handling of the June IFM meeting and that he did
not believe that criticism had anything to do with his age or national origin. (Exh. 3 –
Middlebrooks Dep. Page 115, Lines 3-17, Pages 116-117, Lines 16-19; Exh.39 - Exh. D-5).

160.   Throughout 2014, Mr. Aharoni had also raised with Plaintiff that he was not
sufficiently proactive and was critical of his leadership skills and the time it took him to fill
certain positions in his organization  (Exh. 3 – Middlebrooks Dep. Page 117, Lines 6-15; Page
118, Lines 1-11).

161.   By the fall of 2014, Mr. Aharoni had shared with Ms. Shanahan that he was
beginning to see the same deficiencies in Plaintiff's performance that Ms. Shanahan warned
about, and she advised him that it might be more appropriate to put Plaintiff on a Performance
Improvement Plan ("PIP") before considering hiring a replacement for Plaintiff as he had
discussed, testifying:

> Q: Did Nir [Aharoni] ever express to you any reservations about
> him selecting Steve and whether - - that it was a good selection?
>
> A: Yeah, later on in 2014, I guess, it was, he had expressed to me
> that he was going to be looking for potentially a replacement for
> Steve [Middlebrooks]… And in that conversation, Nir shared with
> me that he was beginning to see some of the things that I had
> pointed out to them previously in terms of Steve's ability to lead
> the group. But that was a – that was a conversation I guess that
> took place sort of in the fall of 2014. And that was the only time
> we spoke about that directly.
>
> Q: Were you in favor of him looking outside the organization for a
> replacement for Steve?

A: I was, but again, from a management style standpoint. [sic] I don't believe Steve was on a performance plan at that point, and I'm you know, I think you should put somebody on a plan before you start looking for their replacement. But that's the only difference in our – our approach....

...

Q:: And did you share with Nir what you just testified to today, that at least from for management style, that he should have been put on a performance improvement plan before a replacement candidate was considered?

A: Yeah, I indicated I thought he had that cart before the horse on this one, but, you know, I trusted he knew what he was doing, and I would do what I could to support him to make GFM or IFM, but Facilities Management, successful because it was in my best interest to make sure it was successful.

(Exh. 7 – Shanahan Dep. Pages 65-66, Lines 8-13, Page 67, Lines 3-14).

162.  After Christmas 2014, Ms. Shanahan and Mr. Aharoni spoke again about putting Plaintiff on a PIP; Mr. Aharoni felt that it was at the point where it had to be done, and Ms. Shanahan pointed him in the direction of her replacement as she was moving into a new role as COO of Global Operations, testifying:

Q: And, did you ever have any other conversations with Nir as it relates to the possibility of putting Steve on a performance improvement plan?

A: Yeah. I want to say after Christmas sometime, we talked about Steve being put on a performance improvement plan; he felt that it was at that point where it had to... And it was right at the same time that I was now moving into a different role. So I then basically pointed him in the direction of Sergio who took over for me in the Americas.

(Exh. 7 – Shanahan Dep. Pages 67-68, Lines 21-10).

163.  Ms. Flaisher was made aware of Mr. Aharoni's intent to put Plaintiff on a PIP before she was made aware of the allegations made by the NAFM team members related to the

44

alleged hostile work environment, testifying "I was aware of it when the allegations came to my attention." (Exh. 9 – Flaisher Dep. Pages 133-134, Lines 1-5, quoting Page 134, Lines 3-5).

**164.** Ms. Flaisher advised Mr. Aharoni to hold off in delivering the PIP to Plaintiff until after the investigation because when she heard about the allegation of a hostile work environment, she was concerned and wanted to know more about what was discovered before pursuing Plaintiff's PIP.  (Exh. 9 – Flaisher Dep. Page 133, Lines 1-10).

**165.** On September 25, 2015, Ms. Rodriguez sent an email to Ms. Flaisher stating, *inter alia*, that she would provide a final summary regarding the results of the investigation to Mr. Aharoni next week and align on final recommendations and then close out the investigation once there was an agreement on final recommendations and that Mr. Aharoni would conduct Plaintiff's mid-year review the week of October 11 when he returned to the United States. (Exh. 40 – P-50; Exh. 9 – Flaisher Dep. Pages 169-170, Lines 21-13).

**166.** Ms. Flaisher had discussed placing Plaintiff on PIP with Mr. Aharoni prior to the investigation of the NAFM team members' complaint and prior to the complaints themselves, testifying:

> Q: And there's no mention in there that Steve is going to be placed on a performance improvement plan; correct?
>
> A: It is not mentioned in this e-mail, correct.
>
> Q: But according to your testimony, you had had that discussion with Nir prior to this time; correct?
>
> A: Yes.
>
> Q: All right.  And prior to the investigation?
>
> A: Yes.

> Q:  And prior to Mini raising to you the complaints that she's
> gotten from Steve's group about a hostile work environment?
>
> A:  Yes.
>
> Q:  You just can't remember, you can't pinpoint it in time prior to
> that; correct?
>
> A:  No.

(Exh. 40 - P-50; Exh. 9 – Flaisher Dep. Pages 169-170, Lines 21-2; Page 171, Lines 3-22).

     167.  Ms. Flaisher explained that the PIP could not be retaliatory because the

concerns over Plaintiff's performance already existed and had been raised and discussed before

the NAFM team members' complaint, testifying that:

> Q:  Did you do anything to make sure that the placement, Steve
> being placed on the PIP was not retaliatory in any way?
>
> A:  I didn't feel that it was retaliatory because it had been, the
> concern over Steve's performance had been raised, as a result he
> received the mostly meets rating for 2014.  Nir had shared his
> intention to put him on a PIP.  So if those things hadn't happened
> prior to the allegation being raised, yeah, I would have been
> concerned.  But because I knew that the performance concern
> existed before the team raised the concern, I didn't think it was
> retaliatory.  It wasn't new information.

(Exh. 9 – Flaisher Dep. Pages 198-199, Lines 16-6).

     168.  Mr. Aharoni presented Plaintiff with his PIP on October 29, 2015.

(Exh. 41 - P-28).

     169.  Plaintiff's PIP, raised many of the same concerns that were raised with

Plaintiff on his 2014 annual review and during the midyear which were still not addressed.  (*See*

Exh. 42 - P-27; Exh.38 – P-14)

     170.  For example, Plaintiff's PIP was focused on developing proactive plans and

solutions for his scope of responsibility, noting for example that "[s]oft services (mainly at TGO

sites) are not manage [sic] adequately," that he has displayed a "lack of creativity and

46

innovation to improve services and reduce costs by new technology and changing procedures (mainly for soft services)," and that "[t]he cost savings plans were not clearly outlined and required direct involvement from Roni [Kafre.]"  These comments refer to the same issues raised during his 2014 review where it was emphasized that Plaintiff "must get out of the comfort zone" and focus more on soft services, and that he was expected to "achieve more savings from activities carried out across the BUs [Business Units] and at the Canadian sites and at the soft service at the manufacturing sites."  (Exh. 42 – P-27 at TEVA(SM) 000703; Exh. 38 – P-14 at TEVA(SM) 000667, 000671, 00677).

171.  Plaintiff's PIP focused on improving stakeholder relationships, the same issue that was discussed in the aftermath of the June 2014 IFM discussions, then noted in his 2014 annual performance review and raised now again in his PIP; he was "not taking proactive steps to build relationships and solve challenges with BUs and Global Facilities colleagues," and was "not providing detailed updated including the what, when, and how to deal with the situation/problem/issue," was "staying in the comfort-zone," and continued to display a "lack of assertiveness, determination and proactivity," and did not drill down on the facts, but operated on rumors.  (Exh. 42 – P-27 at TEVA(SM) 000703; Exh. 38 - P-14 at TEVA(SM) 000671; *see also* the "**IFM and Deficiencies in Plaintiff's Performance Revealed as of June 2014**" Section herein at ¶¶ 42, 48, 49, and 51-53).

172.  Similarly, with regard to People Management, an issue also addressed in the 2014 annual performance review and again at the mid-year review, the PIP described that he continued to display an over-loyalty to his team which negatively impacted his objectivity, did not have development plans in place, and lacked proactivity.  (Exh. 42 – P-27 at TEVA(SM) 000703; Exh. 38 – P-14 at TEVA(SM) 000669-00670).

173.  Based on these shortcomings, the PIP outlined goals for Plaintiff to meet within 90 days to bring his performance up to a satisfactory level. (Exh. 42 – P-27).

174.  Mr. Aharoni worked with Ms. Flaisher and Ms. Rodriguez to prepare the PIP. Human Resources would not have allowed a PIP to go forward if they believed Plaintiff's age or national origin were factors in Mr. Aharoni's decision to place Plaintiff on a PIP.  (Exh. 4 – Aharoni Dep. Pages 245-246, Lines 3-1; *see also* Exh. 9 - Flaisher Dep. Page 198, Lines 2-11; Page 199, Lines 7-13; Exh. 5 – Rodriguez Dep. Page 175, Lines 3-10).

175.  In December 2015, Plaintiff felt he was making progress in achieving his PIP goals and asked Mr. Aharoni to provide him with written feedback on his PIP progress in December 2015.  (Exh. 4 – Aharoni Dep. Page 253, Lines 8-21; Page 254, Lines 12-20; Page 255, Lines 18-21).

176.  Mr. Aharoni disagreed with Plaintiff's assessment of his PIP progress at that time because much of it was not accurate and some tasks were not completed as expected, and Mr. Aharoni spoke with Plaintiff about this.  (Exh. 4 – Aharoni Dep. Pages 254-255, Lines 12-7).

177.  Mr. Aharoni gave Plaintiff oral feedback on his PIP progress during meetings with Plaintiff on November 3, 2015, November 9, 2015, November 19, 2015, November 30, 2015, December 1, 2015, December 2, 2015, December 21, 2015, January 7, 2015, January 11, 2015, January 20, 2015, the meeting dates listed in his PIP summary.  (Exh. 43 – P-35 at TEVA(SM) 000718; Exh. 4 - Aharoni Dep. Pages 253-254, Lines 8-3).

178.  Mr. Aharoni preferred to provide oral feedback to Plaintiff in response to his December 2015 requests because it is easier for him to speak English than to write it. (Exh. 4 – Aharoni Dep. Pages 284-285, Lines 16-2).

**179.** Mr. Aharoni did give Plaintiff written feedback on Plaintiff's PIP progress in the PIP summary presented to Plaintiff on February 10, 2016. (Exh. 43 – P-35; Exh. 4 - Aharoni Dep. Pages 258-259, Lines 11-2).

**180.** By January 14, 2016, a decision had been made to extend Plaintiff's PIP until the end of February 2016. (Exh. 44 – P-60).

**181.** On February 10, 2016, Mr. Aharoni let Plaintiff know that he decided to extend Plaintiff's PIP until the end of February. (Exh. 43 – P-35 at TEVA(SM) 000718; Exh. 4 - Aharoni Dep. Page 259, Lines 9-12).

**182.** Mr. Aharoni decided to extend Plaintiff's PIP to the end of February because of time lost during Christmas and to allow Plaintiff additional time to finish some of the tasks. (Exh. 4 – Aharoni Dep. Page 259, Lines 13-19).

**183.** Mr. Aharoni's PIP was also extended for the purpose of exploring alternative roles for Plaintiff within the organization. (Exh. 23 – Swartz Dep. Page 78, Lines 12 -22).

**184.** When Mr. Aharoni began to review Plaintiff's PIP with him, Plaintiff did not allow him to finish and stated that any additional time discussing it would be a waste of time. (Exh. 4 – Aharoni Dep. Page 263, Lines 4-8).

**185.** Mr. Aharoni did not terminate Plaintiff immediately because he still needed to consult with Human Resources and wanted to give Plaintiff the opportunity to change the situation. (Exh. 4 – Aharoni Dep. Page 263, Lines 4-10; Page 266, Lines 4-9).

**186.** At the time of the PIP summary, Mr. Aharoni had determined that Plaintiff had not met a number of his PIP goals and explained this in the summary through examples and noted consistent patterns which had been documented going back to his 2014 annual review and earlier. (*See* Exh. 43 – P-35; Exh. 38 - P-14).

**187.** Mr. Aharoni raised the issue of finding other opportunities for Plaintiff and was passionate about hoping to find a suitable role for him.  (Exh. 23 –Swartz Dep. Page 75, Lines 16-20; Page 79, Lines 1-2).

**188.** Mr. Aharoni did not want to terminate Plaintiff and preferred to find another position for him in the organization because he thought that in a different role that would fit his abilities and skills he would succeed, and he shared this with Plaintiff.  In this regard, Mr. Aharoni testified as follows:

> Q:  Did you want to terminate Mr. Middlebrooks? Or would you have preferred to have found another job for him?
>
> A:  I preferred to find something else for him.
>
> Q:  Why?
>
> A:  Because I think that in a different role that would fit to his abilities, managerial and - - abilities and his skills, I think he - - he would succeed.
>
> Q:  Did you share that with him?
>
> A: Yes.

(Exh. 4 – Aharoni Dep. Page 280, Lines 9-20).

**189.** Some of the ongoing gaps that are highlighted in the PIP summary include the following:

- All mentioned above, shows that you should be more assertive, more proactive, more independent, and to work with all local and regional stakeholders before you ask for global support.  As well I expect you to share knowledge with your staff, to update me and not to me asked for updates and to execute activities faster.  (Exh. 43 – P-35 at TEVA(SM) 000714-000715).

- All mentioned about shoes [sic] your pattern to do things but not to cover all it's [sic] aspects, not drilling down into the small details in order to verify that everything was covered and accomplished the task.  (Exh. 43 – P-35 at TEVA(SM) 000715).

50

- Sharing knowledge is still a gap. (Exh. 43 – P-35 at TEVA(SM) 000715).

- [Y]ou were asked to make some updates/changes on those presentations but you didn't cover/fixed [sic] all of them.  This is a pattern that happened in the past as well (AOPs etc.).  (Exh. 43 – P-35 at TEVA(SM) 000716).

190.  Mr. Aharoni further acknowledged, in the same PIP summary, Plaintiff's initial efforts to meet his PIP goals and then later his disengagement and abandonment of effort with regard to his PIP, stating "[e]arly in the PIP process, you made a great efforts and enthusiasm to succeed, to implement all PIP plan/goals.  However before and after Christmas time you showed less enthusiasm, you became less proactive in the meetings, I had to guide the meetings and the topics being discussed . . . ." (Exh. 43 – P-35 at TEVA(SM) 000717).

191.  Mr. Aharoni held no ill will towards Plaintiff and praised him stating "[y]ou are a very good person, a person of persons, with a big hart [sic], with great experience in the engineering area and good relationship [sic] with your staff." (Exh. 43 – P-35 at TEVA(SM) 000718).

192.  As Mr. Aharoni explained in the PIP Summary, Plaintiff had simply not displayed the necessary skills or temperament to succeed as the leader of NAFM, a position which had dramatically increased the size and scope of his responsibilities within the organization.  "The position as region manager and especially NA which is in different time zone [sic] requires independent leadership, ability to lead change, to work with all relevant stakeholders and to get their trust and support.  Now with the integration of Actavis into Teva, NA FM region will add 39 locations (17 sites from all Bus).  Due to your managerial and leadership gaps and additional complexity and TGO sites I think it might be difficult for you to lead the region and the changes." (Exh. 43 – P-35 at TEVA(SM) 000718).

193. Although Mr. Aharoni had trouble seeing Plaintiff as successful in his current role, he expressed to Plaintiff in the PIP summary, that he believed Plaintiff would be highly successful in a an operational or engineering role and one in which more management oversight would be available to him.  (Exh. 43 – P-35 at TEVA(SM) 000718).

**Alternative Roles for Plaintiff**

194. As of October 2, 2015, Mr. Aharoni and Ms. Flaisher had  discussed offering Plaintiff an alternative global role as Mr. Aharoni "was thinking about finding a way to keep Steve [Middlebrooks] in the organization, but in a different role where he thought he could be more successful and use his strengths."  While it had not yet been formalized, he was thinking about discussing it with Plaintiff. (Exh. 9 – Flaisher Dep. Pages 172-174, Lines 9-8, quoting Page 173, Lines 17-20).

195. In November or December 2015, Plaintiff told Ms. Flaisher that he was interested in staying at Teva, but only by moving into another role (Exh. 9 – Flaisher Dep. Page 240, Lines 13-22; *see also* Exh. 4 – Aharoni Dep. Page 278, Lines 1-7).

196. Plaintiff expressed an interest in a role in R&D and also suggested other alternative roles for himself, including to stay in the facilities organization in a different capacity which would have required a restructuring of the facilities organization.  (Exh. 9 – Flaisher Dep. Page 241, Lines 12-14; Page 243, Lines 1-4 and 9-13; *see also* Exh. 4 – Aharoni Dep. Page 278, Lines 1-7).

197. Ms. Flaisher inquired about a role in R&D for Plaintiff, but was told by the R&D HR business partner and another leader in R&D that this would not be a viable option due to cost-cutting and layoffs already scheduled within the R&D organization.  (Exh. 9 – Flaisher Dep. Pages 241-242, Lines 10-18; *see also* Exh. 4 – Aharoni Dep. Page 280, Lines 6-8).

**198.** Ms. Flaisher also discussed whether Plaintiff's proposed restructuring of the facilities organization was viable with Mr. Aharoni, and he did not think it was. (Exh. 9 – Flaisher Dep. Page 243, Lines 9-20).

**199.** Mr. Aharoni remained hopeful that Plaintiff could be placed in another role and was similarly exploring that option for Plaintiff. (Exh. 9 – Flaisher Dep. Page 251, Lines 7-21).

**200.** In early February 2016, Mr. Aharoni, Ms. Flaisher, Mr. Swartz and Ms. Shtrouchler met to discuss the status of Plaintiff's PIP and locating other positions for Plaintiff within the organization where they believed he could be successful. (Exh. 23 – Christopher Swartz Dep. Pages 74-75, Lines 15-15).

**201.** Mr. Swartz testified that as of the mid-February 2016 meeting, Mr. Aharoni did not want to terminate Plaintiff, testifying as follows:

> Q: Okay. So, is it fair to say as of that time, based on the discussions that you were involved in, you did not think that Nir wanted to terminate Steve?
>
> A: Correct.

(Exh. 23 – Swartz Dep. Pages 87-88, Lines 10-9).

**Plaintiff's Discrimination Complaint and EEOC Charge**

**202.** On November 12, 2015, Plaintiff emailed Mr. Aharoni, Eli Aharoni, Ms. Flaisher and Ms. Rodriguez alleging that his placement on the PIP was discriminatory based on his age and national origin and in retaliation for his team's complaints which resulted in the investigation. (Exh. 45 - D-13; Exh. 3 – Middlebrooks Dep. Page 266, Lines 19-24).

**203.** In response, Tara Flagg was appointed to investigate Plaintiff's claims. She contacted Plaintiff multiple times requesting to meet with him to discuss his concerns, but he refused to meet with her. Ms. Flagg advised Plaintiff that she could not complete a fair and

impartial investigation without his cooperation.  (Exh. 46 – D-14 at TEVA(SM) 000708 ("Please

understand that your decision not to participate means you are hindering the investigation and

therefore removing my ability to conduct a fair and impartial assessment and are not providing

Teva an opportunity to truly address your concerns.") Exh. 3 – Middlebrooks Dep. Page 268,

Lines 1-9; Page 269, Lines 19-24).

     **204.**  On November 25, 2015 Plaintiff filed charges with the Equal Employment

Opportunity Commission (EEOC) and Pennsylvania Human Relations Commissions formally

alleging age and national origin discrimination and retaliation in response to his being placed on

the PIP.  (Exh. 6 – D-19).

**Plaintiff's Termination**

     **205.**  Mr. Aharoni first considered terminating Plaintiff in 2016.  (Exh. 4 –Aharoni

Dep. Pages 15-16, Lines 19-12).

     **206.**  Despite his ongoing performance issues, Mr. Aharoni wanted to give Plaintiff

a fair chance with a chance to be successful.  (Exh. 4 –Aharoni Dep. Page 14, Lines 2-22;

Pages 18-19, Lines 18-5).

     **207.**  Mr. Aharoni made the final decision to terminate Plaintiff a few days prior to

his termination date.  (Exh. 4 –Aharoni Dep. Page 15, Lines 1-11).

     **208.**  Mr. Aharoni made the decision to terminate Plaintiff's employment  (Exh. 4 –

Aharoni Dep. Page 12, Lines 1-14).

     **209.**  Mr. Aharoni terminated Plaintiff because he had not performed well in his

new role since 2014 as was documented in his 2014 performance review.  This continued into

2015 where he took too long to perform certain tasks, often giving pushback and resistance, and

did not perform others well.  This is shown in the October 2015 mid-year review and the PIP.

With regard to most of the PIP items, he did not perform well or did not accomplish the mission. His managerial and leadership skills were lacking as well as his ability to lead the region and take more responsibility.  His relationship with stakeholders and his approach to leading the region were not effective and some projects were not performed properly.  (Exh. 4 –Aharoni Dep. Pages 24-27, Lines 9-11).

**210.**  Plaintiff's employment was terminated on February 29, 2016.  (Exhs. 1 and 2 - Plaintiff's Second Amended Complaint and Defendants' Answer and Affirmative Defenses to Plaintiff's Second Amended Complaint at ¶ 59).

**Hiring of Replacement**

**211.**  Mr. Aharoni made the decision to hire Dan Ramirez to replace Plaintiff. (Exh. 23 – Swartz Dep. Pages 144 – 145, Lines 18-10; Exh. 9 – Flaisher Dep. Pages 268-269, Lines 18-17).

**212.**  Mr. Ramirez is American and is 40 years old.  (Exh. 47 - Defendants' Second Amended Answers to Plaintiff's First Interrogatories, Answer to Interrogatory No. 9).

**213.**  At the time of Plaintiff's termination, Mr. Ramirez was working as the Latin American Facilities Management Region Director for GFM, reporting to Mr. Aharoni. (Exh. 47 - Defendants' Second Amended Answers to Plaintiff's First Interrogatories, Answer to Interrogatory No. 9; Exh. 9 – Flaisher Dep. Pages 268-269, Lines 18-11).

**214.**  Mr. Gaugler was first asked to assume Plaintiff's duties on an interim basis, but he declined, although he later submitted a resume asking to be considered to replace Plaintiff on a permanent basis.  (Exh. 27 - Gaugler Dep. Page 119, Lines 19-24; Pages 120-121, Lines 6-11; see also Exh. 23 - Swartz Dep. Page 119, Lines 13-17; Page 144, Lines 4-14).

55

**215.**  Mr. Aharoni selected Mr. Ramirez to assume Plaintiff's duties after his termination and later made the decision to combine the Latin American with North American Regions to form the Americas Region and hire Mr. Ramirez as the Americas Facilities Management Region Director.  (Exh. 47 - Defendants' Second Amended Answers to Plaintiff's First Interrogatories, Answer to Interrogatory No. 9; Exh. 9 – Flaisher Dep. Pages 268-269, Lines 18-17).

**216.**  Mr. Ramirez was selected because he had been doing an excellent job in his role at head of Latin American facilities and interviewed well.  (Exh. 23 – Swartz Dep. Pages 144-145, Lines 18-17).

**217.**  In his new role, Mr. Ramirez continued to report to Mr. Aharoni and has performed well with no Human Resources issues related to his work.  (Exh. 23 – Swartz Dep. Pages 144 – 147, Lines 18-5; *see also* Page 134, Lines 8-17; Exh. 47 - Defendants' Second Amended Answers to Plaintiff's First Interrogatories, Answer to Interrogatory No. 9).

STEVENS & LEE

Date:  July 25, 2018

By:  /s/ Larry J. Rappoport
*Larry J. Rappoport, Esquire*
Attorney ID No. 26922
1818 Market Street
29th Floor
Philadelphia, PA  19103
Phone:  (215) 496-3839
Email:  ljr@stevenslee.com
*Jennifer A. Ermilio, Esquire*
Attorney ID No. 82062
620 Freedom Business Center, Suite 200
King of Prussia, PA  19406
Phone:  (610) 205-6044
Email:  jae@stevenslee.com

*Attorneys for Defendants, Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries, Ltd.*

56