## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **STEPHEN MIDDLEBROOKS** | : | **CIVIL ACTION NO. 17-0412** |
|  | : |  |
| **Plaintiff,** | : |  |
| **v.** | : |  |
|  | : |  |
| **TEVA PHARMACEUTICALS** | : |  |
| **USA, INC.; TEVA PHARMACEUTICAL** | : |  |
| **INDUSTRIES LIMITED** | : |  |
|  | : |  |
| **Defendants.** | : |  |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

Plaintiff, Stephen Middlebrooks, through his undersigned counsel, hereby opposes the

Motion for Summary Judgment filed by Defendant on his claims that it discriminated against

him based on his age and his national origin, and retaliated against him based on his complaints

about the same, in violation of the Age Discrimination in Employment Act, 29 U.S.C. §621, *et*

*seq.* ("ADEA"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000, *et seq.*

("Title VII"), and the Pennsylvania Human Relations Act, as amended, 43 P.S. §951, *et seq.*

("PHRA").

Respectfully submitted,

Dated: August 17, 2018        BY:      /s/ Caren N. Gurmankin
                                       Caren N. Gurmankin, Esq.
                                       Console Mattiacci Law, LLC
                                       1525 Locust Street, 9th Floor
                                       Philadelphia, PA 19102

## TABLE OF CONTENTS

I.   INTRODUCTION…………………………………………………...….….2

II.  ARGUMENT……………………………………………………………...4

     **A.** Summary Judgment Standard of Review…………………………………...4

     **B.** Defendants' Motion For Summary Judgment Should Be Denied As There Are
         Material Facts In Dispute, Namely Whether Plaintiff Was Discriminated Against
         Based on His Age And/Or His National Origin, And Retaliated Against Based On
         His Complaints Regarding Defendants' Discriminatory Conduct………………….5

     **C.** Plaintiff Has Set Forth Compelling Evidence Of Bias In This Case From
         Which A Jury Could Conclude That Plaintiff Was Discriminated Against
         Based On His Age And/Or His National Origin……………………………...……..7

         **1.** Record evidence from *multiple* witnesses demonstrates the age bias of
             Defendants', including Nir Aharoni, Plaintiff's supervisor and the primary
             decision-maker regarding the adverse actions at issue…………………………..9

         **2.** Defendants replaced 58 year old Plaintiff with a 37 year old (and substantially
             less tenured) employee……………………………………………………….11

         **3.** Multiple witnesses have testified that Aharoni had a bias against
             Americans……………………………………………………………………....12

         **4.** Defendants tolerated and/or outright ignored inappropriate conduct that may
             have demonstrated a bias based on age and/or national origin………………13

         **5.** Defendants failed to ensure that their Israeli managers with responsibilities in
             the U.S. were trained on U.S. laws regarding
             discrimination..................................................................................................15

         **6.** Plaintiff's 13 years younger, Israeli supervisor was deficient in his
             performance yet he was never terminated, or disciplined, for the same……..15

         **7.** Israeli employees undisputedly engaged in inappropriate conduct, yet were
             not disciplined regarding the same………………………………………..16

         **8.** Defendants misstate the law to argue, inappropriately, that the Court should
             draw inferences in their favor ……………………………………………….17

         **9.** Defendants subjected Plaintiff to adverse employment actions based
             on his age and/or national origin………………………………………….20

**10.** Plaintiff has set forth sufficient evidence such that a reasonable jury could conclude that Defendants' asserted reasons for taking adverse actions against him are pretextual.................................................................................21

  a. Aharoni gave Plaintiff a negative mid-year review *months* late and without issuing him *any* performance-related documentation for the prior ten (10) months.........................................................21

  b. Record evidence demonstrates that the PIP was just a set-up to help Defendants justify subsequently terminating Plaintiff.................24

  c. Defendants used the PIP to manufacture a(n alleged) legitimate reason for Plaintiff's termination..............................................25

  d. Defendant has proffered inconsistent stories as to the identity of the decision-makers regarding Plaintiff's PIP and his termination......................................................................26

**D.** Plaintiff Has Set Forth Sufficient Evidence From Which A Jury Could Conclude That Defendants Retaliated Against Him.......................................27

  **1.** Plaintiff undisputedly engaged in protected activity *before* October 2015 (when Defendants gave him a negative review and placed him on a PIP)................29

  **2.** All of the retaliatory actions to which Defendants subjected Plaintiff are considered "materially adverse".............................................30

  **3.** Plaintiff has set forth sufficient evidence to support a causal connection between his complaints of discriminatory conduct and the adverse actions to which Defendants subjected him..........................................32

    **(a)** Defendants were hostile towards Plaintiff regarding the investigation and Plaintiff's subsequent complaints of discrimination.....................32

    **(b)** Defendants' adverse actions against Plaintiff occurred only *after* he engaged in protected activity .................................................33

  **4.** Plaintiff has set forth sufficient evidence such that a reasonable jury could conclude that Defendant's asserted reasons for their adverse employment actions against Plaintiff are pretextual...............................................36

**E.** Summary Judgment Cannot Be Granted When Defendants' Explanations For Their Adverse Actions Against Plaintiff Relies On The Testimony Of Witnesses Whose Motivations And Credibility Are Squarely At Issue.....................................36

**II.**    CONCLUSION..................................................................37

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                      **Page(s)**

*Abramson v. William Paterson College of New Jersey,*
   260 F.3d 265 (3d Cir. 2001) ................................................................. 28

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ........................................................................... 6

*Antol v. Perry,*
   82 F. 3d 1291 (3d Cir. 1996) ............................................................... 24

*Big Apple BMW v. BMW of North America, Inc.,*
   974 F.2d 1358 (3d Cir. 1992) ............................................................... 27

*Burlington Northern and Santa Fe Railway Company v. White,*
   126 S.Ct. 2405 (2006) ...................................................................... 27, 28

*Doe v. C.A.R.S. Protection Plus, Inc.,*
   527 F.3d 358 (3d Cir. 2008) ............................................................... 4, 6

*Downs v. Anapol Schwartz, PC,*
   2015 U.S. Dist. LEXIS 106147 (E.D.Pa. Aug. 12, 2015) ..................... 27

*E.E.O.C. v. Sears Roebuck & Co.,*
   2006 U. S. Dist LEXIS 26608 (D.N.J. April 24, 2006) .................... 23-24

*Eno v. Lumberman's Merchandising Corp.,*
   2012 U.S. Dist. LEXIS 54319 (E.D.Pa. Apr. 18, 2012) ....................... 24

*Ezold v. Wolf, Block, Schorr and Solis-Cohen,*
   983 F.2d 509 (3d Cir. 1992) ............................................................... 11

*Farrell v. Planters Lifesavers Company,*
   206 F.3d 271 (3d Cir. 2000) ............................................................... 28

*Fleck v. WILMAC Corp.,*
   2011 U.S. Dist. LEXIS 54039 (E.D.Pa. May 19, 2011) ...................... 31

*Fogelman v. Mercy Hosp., Inc.,*
   238 F.3d 561 (3d Cir. 2002) ............................................................... 27

*Frantz v. Ferguson Enters.,*
   2009 U.S. Dist. LEXIS 6241 (E.D.Pa. Jan. 28, 2009) .................. 18, 26-27

*Fuentes v. Perskie,*
   32 F.3d 759 (3d Cir. 1994) ......................................... 8, 14, 15, 17, 26

*Geltzer v. Virtua West Jersey Health Systems,*
   804 F.Supp.2d 241 (D.N.J., May 20, 2011) ........................................ 7

*Goosby v. Johnson & Johnson Med., Inc.,*
   228 F.3d 313 (3d Cir. 2000) ............................................................... 5-6

*Gross v. FBL Financial Services*,
    129 S. Ct. 2343 (2009) ................................................................. 7

*Hempfling v. United Ref. Co.*,
    2008 U.S. Dist. LEXIS 4895 (W.D. Pa. Jan. 23, 2008) ................ 31

*Jackson v. University of Pittsburgh*,
    826 F.2d 230 (3d Cir. 1987) ...................................................... 5

*Jalil v. Avdel Corporation*,
    873 F.2d 701 (3d Cir. 1988) ...................................................... 5

*Johnson v. McGraw Hill Cos.*,
    451 F.Supp.2d 681 (W.D.Pa. 2006) .......................................... 28

*Johnson v. Verizon Servs. Corp.*,
    2017 U.S. Dist. LEXIS 59472 (E.D.Pa. Apr. 18, 2017) ............... 24

*Jones v. School Dist. of Philadelphia*,
    198 F.3d 403 (3d Cir. 1995) ...................................................... 8

*Josey v. John R. Hollingsworth Corp.*,
    996 F.2d 632 (3d Cir. 1993) ...................................................... 8-9

*Krouse v. American Sterilizer Co.*,
    126 F.3d 494 (3d Cir. 1997) ...................................................... 27, 28

*Leone v. Air Products & Chemicals, Inc.*,
    2008 WL 1944104 (E.D.Pa. 2008) ............................................ 4-5

*Loeb v. Textron, Inc., et al.*,
    600 F.2d 1003 n. 9 (1st Cir. 1979) ............................................ 20

*Marra v. Phila. Housing Auth.*,
    497 F.3d 286 (3d Cir. 20007) ................................................... 33

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1983) ................................................................. 7

*Miller v. Keystone Blind Ass'n/TPM*,
    2013 U.S. Dist. LEXIS 2381 (W.D.Pa. Jan. 8. 2013) ................. 18, 37

*Mitchell v. Miller*,
    884 F.Supp.2d34 (W.D.Pa. Aug. 3, 2012) ................................ 31

*Ness v. Marshall*,
    660 F.2d 517 (3d Cir. 1981) ...................................................... 5

*Oakley v. Orthopaedic Associates of Allentown, Ltd. et al.*,
    2010 U.S. Dist. LEXIS 103230 (E.D.Pa.2010) ......................... 5, 7, 11, 31

*Pivirotto v. Innovative Sys., Inc.*,
    191 F.3d 344 (3d Cir. 1999) ...................................................... 19, 20

*Remp v. Alcon Labs.*,
   2016 U.S. Dist. LEXIS 38342 (E.D.Pa. Mar. 24, 2016) ..................................... 27

*Reynolds v. Dep't of Army*,
   439 Fed.Appx. 150 (3d Cir. 2011) ........................................................ 31

*Rivers v. Potter*,
   2007 U.S. Dist. LEXIS 92590 (D.N.J. Dec. 18, 2007) ........................................ 31

*Sarullo v. U.S. Postal Service*,
   352 F.3d 789 (3d Cir. 2003) ............................................................ 8, 9

*Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*,
   470 F.3d 535 (3d Cir. 2006) .............................................................. 7

*Sheridan v. E.I. Dupont de Nemours & Co.*,
   100 F.3d 1061 (3d Cir. 1996) ............................................................. 6

*Shimell v. De Lage Landen Financial Services*,
   2008 WL 1774129 (E.D.Pa. 2008) ......................................................... 5

*Simpson v. Kay Jewelers*,
   142 F.3d 639 n.5 (3d Cir. 1998) .......................................................... 8

*Sorba v. Pennsylvania Drilling Co.*,
   821 F.2d 200 (3d Cir. 1987) .............................................................. 8

*St. Mary's Honor Ctr v. Hicks*,
   509 U.S. 502 (1993) ................................................................... 7, 8

*Stewart v. Rutgers University*,
   120 F.3d 426 (3d Cir. 1997) ............................................................ 5, 6

*Storey v. Burns Int'l Sec. Servs.*,
   390 F.3d 760 (3d Cir. 2004) ............................................................. 20

*Tomasso v. Boeing Co.*,
   445 F.3d 702, 707 (3d Cir. 2006) ........................................................ 24

*Tucker v. Merck & Co.*,
   131 Fed.Appx. 852 (3d Cir. 2005) ....................................................... 31

*Vandegrift v. Atl. Envelope Co.*,
   2004 U.S. Dist. LEXIS 11359 (E.D.Pa. Apr. 12, 2004) ..................................... 12

*Waldron v. SL Industries, Inc.*,
   56 F.3d 491 (3d Cir. 1995) .............................................................. 17

*Williams v. Philadelphia Housing Authority Police Department*,
   380 F.3d 751 (3d Cir. 2004) ............................................................. 28

## I.  <u>INTRODUCTION</u>

Plaintiff, Director of North American Facilities Management ("NAFM") for Defendants, an Israeli-based company, and a fifty eight (58) year old American who was a fourteen (14) year employee with a long record of excellent performance and tremendous respect from his direct reports for his management and leadership skills, was terminated in February 2016.  In the few months prior to his termination, Plaintiff (and the group that he led) engaged in protected activity by complaining of discriminatory conduct (including that his Israeli supervisor was engaging in inappropriate conduct, such as asking about employees' dates of birth).  Shortly after that, Plaintiff was given a negative performance review and, within just a few days of receiving that review, placed on a Performance Improvement Plan ("PIP") (for the first time in his career with Defendants).  Plaintiff then filed an internal complaint of discrimination and retaliation and, shortly thereafter, a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").  Just three (3) months later, he was out; after almost fifteen (15) years, Plaintiff was given one hour to pack up his things, and escorted out of his office.

Defendants have now presented to this Court over *two hundred (200)* separate assertions that they say entitles them to judgment as a matter of law on all of Plaintiff's claims, despite record evidence that demonstrates Defendants' discriminatory bias towards Plaintiff on the basis of his age and his national origin, and their retaliatory bias based on his complaints about the same.  That evidence includes, but is not limited to, the following:

- *Multiple* witnesses have testified to an anti-American bias on the part of Nir Aharoni, Plaintiff's supervisor and the primary decision-maker regarding the adverse actions at issue;

- *Multiple* witnesses, including Plaintiff, have testified that Aharoni (and those employees with whom he worked in Israel) repeatedly questioned Plaintiff and his direct reports about their ages and told Plaintiff that they asked because, in Israel, they made employment decisions based on age);

- According to *Defendants'* witnesses, Aharoni, the primary decision-maker in this case, had a "serious credibility issue among the US leaders"[1];

- According to *Defendants'* witnesses, Aharoni had "some capability gaps" and was repeatedly counseled regarding his performance deficiencies (yet he was, undisputedly, never disciplined for the same during the course of his employment);

- Although it is undisputed that Israeli members of Aharoni's team engaged in inappropriate conduct towards Plaintiff's group (including asking questions about employees' ages), they were not disciplined at all;

- Aharoni was angry with Plaintiff for not "control[ling] his people" and letting complaints about inappropriate conduct on the part of Israeli team members lead to an investigation about the same;

- Plaintiff was universally and extremely well-regarded by every one of his direct reports;

- Defendants gave Plaintiff a negative mid-year review and placed him on a PIP (for the first time in his fourteen (14) year career with Defendants) shortly after he (and the group that he led) engaged in protected activity by complaining about discriminatory conduct;

- Defendants violated their own policy in placing Plaintiff on the PIP;

- Defendants did not conduct an investigation into Plaintiff's internal complaint of discrimination and retaliation and there is no evidence that they conducted an investigation into Plaintiff's EEOC Charge (which he filed shortly after he made his internal complaint);

- Plaintiff's replacement was twenty one (21) years younger than he was.

The material facts of this case are very much in dispute, as are the motivations and credibility of the witnesses upon whose testimony Defendants rely to explain their actions (not least of whom is Aharoni, whose credibility is at issue per *Defendants'* witnesses). As set forth below, in Plaintiff's Response to Defendants' Statement of Facts, and his Statement of

---

[1] Defendants' Vice President ("VP") of Human Resources ("HR") who worked with both Plaintiff and Aharoni (and the one who said that Aharoni had a "serious credibility issues among the US leaders," a statement with which other managers testified that they agreed) testified that she *never* concluded that Plaintiff was dishonest at any point up through his termination.

3

Additional Facts[2], he clearly meets his burden at this stage of presenting sufficient evidence from which a reasonable jury could conclude that Defendants discriminated against Plaintiff based on his age (fifty eight (58) at the time of his termination) and/or his national origin (American); and, retaliated against him based upon his complaints about discriminatory conduct by (1) denying him an equity award to which he was entitled; (2) subjecting him to a hostile work environment; (3) giving him a negative performance review; (4) placing him on a PIP; and, (5) terminating his employment.[3]   As such, Defendants' present Motion should be denied, and Plaintiff should be permitted to present his case to a jury.

## II.   **ARGUMENT**

### A.   **Summary Judgment Standard of Review**

Summary judgment is to be used sparingly in employment discrimination cases. *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 369 (3d Cir. 2008).   It may only be granted "…if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).   The employer retains the burden of persuading the Court that, "even if all of the inferences which could reasonably be drawn from the evidentiary materials of record were viewed in the light most favorable to the plaintiff, no reasonable jury could find in the plaintiff's favor."

At the summary judgment stage, the role of the trial judge is to determine whether or not there is a genuine issue, as "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Leone v.*

---

[2] Plaintiff has submitted a Response to Defendants' Statement of Undisputed Facts ("PRDF") and a separate Statement of Additional Facts that Preclude Summary Judgment ("SOAF"), which contain specific citations to supporting evidence in the record.

[3] Defendants did not move to dismiss Plaintiff's claims regarding Defendants' failure to award him equity and that he was subjected to a hostile work environment, both of which he alleged in his Second Amended Complaint (Docket No. 10, ¶¶45-46, 62-64).

*Air Products & Chemicals, Inc.*, 2008 WL 1944104, *1 (E.D.Pa. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). This standard is to be "applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Shimell v. De Lage Landen Financial Services*, 2008 WL 1774129, *1 (E.D.Pa. 2008), (quoting *Stewart v. Rutgers University*, 120 F.3d 426, 431 (3d Cir. 1997)).

"When the defendant's intent has been called into question, the matter is within the sole province of the factfinder." *Jalil v. Avdel Corporation*, 873 F.2d 701, 707 (3d Cir. 1988). As the Third Circuit has noted, "because intent is a substantive element of the cause of action—generally to be inferred from the facts and conduct of the parties—the principle is particularly apt that courts should not draw factual inferences in favor of the moving party and should not resolve any genuine issues of credibility." *Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir. 1981). At the summary judgment stage, "all that is required [for a non-moving party to survive the motion] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve [at trial] the parties' differing versions of the truth." *Oakley v. Orthopaedic Associates of Allentown, Ltd. et al.*, 2010 U.S. Dist. LEXIS 103230, *3 (E.D.Pa.2010) (*Jackson v. University of Pittsburgh*, 826 F.2d 230, 233 (3d Cir. 1987)).

**B.   Defendants' Motion For Summary Judgment Should Be Denied As There Are Material Facts In Dispute, Namely Whether Plaintiff Was Discriminated Against Based on His Age And/Or His National Origin, And Retaliated Against Based On His Complaints Regarding Defendants' Discriminatory Conduct**

The most important facts in this matter are unquestionably in dispute – whether Plaintiff's age, national origin, and/or complaints of discriminatory conduct played a role in Defendants' adverse actions. Plaintiff believes this to be true, while Defendants disagree. The Third Circuit urges particular caution about granting summary judgment to an employer when intent is at issue, particularly in employment discrimination cases. *Goosby v. Johnson & Johnson*

5

*Med., Inc.*, 228 F.3d 313, 321 (3d Cir. 2000); *see also Stewart v. Rutgers Univ.*, 120 F.3d 426,

431 (3d Cir. 1997) (explaining that the summary judgment standard is to be "applied with added

rigor in employment discrimination cases, where intent and credibility are crucial issues."). That

is because "credibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S.

at 255. It follows logically, then, that watching the witnesses testify at trial is critical to this

analysis. Indeed, as the Third Circuit concluded, "[A[ finding of discrimination is at bottom a

determination of intent. In making that determination, the jury must perform its traditional

function of assessing the…credibility of the witnesses through observation of both direct

testimony and cross-examination at trial…This is uniquely the role of the factfinder, not the

court." *Sheridan v. E.I. Dupont de Nemours & Co.*, 100 F.3d 1061, 1071-1072 (3d Cir. 1996).

    At this stage, the Court is required to draw every inference in Plaintiff's favor. *C.A.R.S.*,

527 F.3d at 362. As such, the Court must recognize that when Defendants' witnesses testify, at

trial, (presumably) that Plaintiff was not terminated for discriminatory or retaliatory reasons, the

jury may not believe their testimony. Defendants' witnesses' actions on the witness stand may

reflect doubt or deception in the juror's minds. For example, if Aharoni is asked at trial – "did

you terminate Plaintiff due to his age, his national origin, and/or his complaints regarding

discriminatory conduct?" – to which he responds by turning red as he answers, or by pausing,

taking a sip of water, asking Counsel to repeat the question, and then, finally answering "no", a

reasonable jury could certainly conclude that he is not being truthful in his response.[4] If the jury

thinks a decision maker is lying when he says the decision was not motivated by a protected trait

---

[4] When Aharoni was asked those questions at his deposition, he denied the same. (SOAF ¶¶ 261-263) A jury should
determine whether his denials are credible; if the fact-finder disbelieves him when he denies that Plaintiff's age,
national origin, and/or complaints of discrimination played a role in the adverse employment decisions to which
Plaintiff was subjected, a jury may conclude that Defendants discriminated and/or retaliated against Plaintiff.

or protected activity, the jury may on that basis *alone* conclude that there was civil rights violation. *St. Mary's Honor Ctr v. Hicks*, 509 U.S. 502, 510-511 (1993). Only the jury should be tasked with weighing factual disputes and contradicting testimonies, and for deciding whether Defendant's witnesses answered questions honestly.

Defendants' Motion for Summary Judgment should be denied because the most central facts in this matter are, undisputedly, in dispute. This is a case that a jury must decide in accordance with the Seventh Amendment of the United States Constitution's right to a jury trial, and efforts by companies to deprive individuals of that right in civil rights cases are inappropriate.

### C. Plaintiff Has Set Forth Compelling Evidence Of Bias In This Case From Which A Jury Could Conclude That Plaintiff Was Discriminated Against Based On His Age And/Or His National Origin

Under the ADEA, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §623(a)(1).[5] Pursuant to Title VII, it us unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's...national origin. 42 U.S.C. § 2000e-2(a). Both of Plaintiff's discrimination claims are analyzed pursuant to the burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1983).[6]

Plaintiff must establish a *prima facie* case by proffering sufficient evidence from which a

---

[5] The same legal standards and analysis are applicable to claims under the ADEA, Title VII, and the PHRA. *Glanzman v. Metropolitan Management Corporation*, 391 F.3d 506 (3d Cir. 2004); *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006).
[6] *Gross v. FBL Financial Services*, 129 S. Ct. 2343, 2351 (2009) did not alter the Plaintiff's burden at the summary judgment stage. *See Geltzer v. Virtua West Jersey Health Systems*, 804 F.Supp.2d 241 (D.N.J., May 20, 2011); *Meyers v. Hoboken Board of Education et al.*, 2010 U.S. Dist. LEXIS 115712 (D.N.J. 2010).

jury could determine that:  (1) he is a member of the protected class [for age discrimination claims, i.e., at least forty years of age]; (2) he was qualified for the position; (3) he suffered an adverse employment decision; and, (4) under circumstances raising an inference of discriminatory action. *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 411 (3d Cir. 1995); *Sarullo v. U.S. Postal Service*, 352 F.3d 789, 797 (3d Cir. 2003); *Simpson v. Kay Jewelers*, 142 F.3d 639, 644 n.5 (3d Cir. 1998).

Once Plaintiff establishes his *prima facie* case of discrimination, the employer must produce evidence of a legitimate, nondiscriminatory reason for the adverse actions at issue. *St. Mary's Honor Ctr v. Hicks*, 509 U.S. 502, 506-509 (1993). If the employer is able to meet its burden, then the plaintiff will be able to defeat summary judgment simply by demonstrating evidence from which a jury could conclude that the employer's stated reason is a pretext for discrimination. *Id.* at 507.  The issue "is whether [the plaintiff] has pointed to evidence of inconsistencies and implausibilities in the employer's proffered reasons for [the employment actions] which *could* support an inference that the employer did not act for nondiscriminatory reasons." (emphasis included). *Sorba v. Pennsylvania Drilling Co.*, 821 F.2d 200, 205 (3d Cir. 1987) (*citing Chipollini v. Spencer Gifts*, 814 F.2d 893, 900 (3d Cir. 1987)).

In other words, Plaintiff can defeat summary judgment by pointing to some evidence from which a rational factfinder could reasonably either disbelieve the employer's articulated explanation or "believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  "[F]actors such as the defendant's credibility, the timing of an employee's dismissal, and the employer's treatment of the employee could raise an inference of pretext which would make summary judgment for the employer inappropriate." *Josey v. John R.*

*Hollingsworth Corp.*, 996 F.2d 632, 638-639 (3d Cir. 1993).

Other than Defendants' assertion that Plaintiff's PIP and his negative mid-year review are not adverse actions[7], it appears (although it is unclear) that the only other element of Plaintiff's *prima facie* case of age discrimination and national origin discrimination that Defendants are disputing is that Plaintiff has demonstrated that he was subjected to adverse actions based on his age and his national origin (i.e., the fourth element of his *prima facie* case). Based on the evidence set forth below, Plaintiff has demonstrated that his negative review and his PIP are adverse employment actions. As detailed below, Plaintiff has also met the fourth prong of his *prima facie* case by setting forth sufficient evidence from which a jury could conclude that his termination occurred under circumstances which give rise to an inference of discrimination. *E.g.*, Sarullo, 352 F.3d at 797.

1. **Record evidence from *multiple* witnesses demonstrates the age bias of Defendants', including Nir Aharoni, Plaintiff's supervisor and the primary decision-maker regarding the adverse actions at issue**

In 2015, there were three (3) employees in Plaintiff's group who were eligible for equity awards: Plaintiff (fifty eight (58)) and two (2) of Plaintiff's direct reports, Ray Duggan (fifty seven (57)); and, Troy Gaugler (forty eight (48)). (SOAF ¶¶ 94, 96, 99)  Aharoni, who had discretion to award equity, gave it only to Gaugler, but not Plaintiff or Duggan. (SOAF ¶¶ 94-95) When Duggan asked Aharoni why he did not receive the equity award, Aharoni's response was that the awards were "only for employees that will be with us for a long time." (SOAF ¶ 97) Based on Aharoni's comment, Duggan understood (and told other employees) that he was not

---

[7] Defendants are not, as they cannot, asserting that Plaintiff's termination is not an adverse action. Also, although they have not moved for summary judgment on Plaintiff's claim that they discriminated against him based on his age by failing to give him an equity award, there can be no legitimate dispute that the same is an adverse employment action for the purpose of discrimination.

awarded equity because it was given to the people who were younger (and added more value). (SOAF ¶¶ 99-101)[8]

At the beginning of Plaintiff and Aharoni's working relationship at the inception of the Global Facility Management organization, Aharoni asked Plaintiff about his age and his retirement plans. (PRDF ¶ 18)   Aharoni testified that he would want to know if an employee was thinking about retirement or had long-term plans to retire so that he could make future plans for his group and be prepared for the change. (SOAF ¶ 106)

*Multiple* employees testified that Aharoni and Israeli employees on his team asked them their ages (or dates of birth) and the ages of other employees in the group. (SOAF ¶¶ 107, 108, 110, 112, 113, 119-121, 128, 130, 131, 132)   (Although Aharoni said that they needed the information so that they could send birthday cards out to the group, an explanation as to why employees' birth years were needed for that alleged initiative was not provided, and birthday cards were not received). (SOAF ¶ 129)   Aharoni asked Plaintiff for the dates of birth of his direct reports, and told him that they needed that information because they made employment decisions based on age. (SOAF ¶ 109)   Not surprisingly, there was a fear among Plaintiff's direct reports that they were being asked their age because certain decisions were being made based on age. (SOAF ¶ 133)   Defendants' top-level HR manager in the U.S. testified that questioning employees about protected characteristics (such as age) might suggest a bias on the part of the questioner. (SOAF ¶ 134)

---

[8] Defendants' reason as to why Plaintiff did not get the equity award is that he received a performance review rating of "Mostly Meets" for 2014 and employees needed to receive at least a "Meets" rating to be eligible. (SOAF ¶ 104) Completely undermining Defendants' asserted reason for their failure to award equity to Plaintiff is the fact that Duggan also did not get an equity award and he received a "Fully Meets" performance review rating for 2014. (SOAF ¶ 105)  As such, a reasonable jury could conclude that the real reason why Plaintiff (and the other employee his age) did not receive the award was exactly what Aharoni told Duggan i.e., that it was reserved "only for employees that will be with us for a long time," meaning younger people.

Israel, where Aharoni lived and worked during his employment at Defendants, has a mandatory retirement age for male employees; employees are notified about three (3) months before their sixty seventh birthdays so that they can transition their responsibilities before that time. (SOAF ¶ 148)

Record evidence also demonstrates Defendants' age bias (beyond the conduct of Aharoni and his employees). One of Plaintiff's direct reports testified that he has heard multiple people at Defendants say that it is more economical to hire younger people, and he heard that the former Vice President of Human Resources made comments about needing to get younger interns and getting rid of all of the old ladies over fifty. (SOAF ¶¶ 126-127)

Aharoni's comments and conduct (and those of his Israeli team members, especially in the context of the environment in which he lived and worked in which there was a mandatory retirement age, and in the context of Plaintiff being terminated and replaced by an employee twenty one (21) years younger, as set forth below) "may be critical for the jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive." *Romantine v. CH2M Hill Engineers, Inc.*, 2010 U.S. Dist. LEXIS 136011 (W.D.Pa. 2010) (*quoting Walden*, 126 F.3d at 521)); *see also Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 546 (3d Cir. 1992) ("Evidence of discriminatory atmosphere may be relevant because it tends 'to add color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff.").

## 2. Defendants replaced 58 year old Plaintiff with a 37 year old (and substantially less tenured) employee

As Defendants set forth in their Motion, it is established that, "With respect to the ADEA age claims, the fourth prong requires that plaintiff was replaced by someone sufficiently younger to support an inference of discriminatory animus." Defs. Mot. p. 27. Here, there can be no

dispute that Plaintiff has met that requirement. After Plaintiff's termination, Defendants selected Dan Ramirez to fill his position. (SOAF ¶ 264) Ramirez, whose tenure with Defendants started in 2015, fourteen (14) years after Plaintiff's hire date, was twenty one (21) years younger than Plaintiff. (SOAF ¶ 265) As such, Plaintiff has met the fourth prong of his *prima facie* case of age discrimination. *See Larison v. FedEx Corp. Servs.*, 2017 U.S. Dist. 90372 (E.D.Pa. June 13, 2017)(plaintiff satisfied the fourth element of her *prima facie* case by showing only that her replacement was seven (7) years younger than she was); *Vandegrift v. Atl. Envelope Co.*, 2004 U.S. Dist. LEXIS 11359 (E.D.Pa. Apr. 12, 2004)(plaintiff established a *prima facie* case of age discrimination where the replacement was nineteen (19) years younger).

### 3. <u>Multiple witnesses have testified that Aharoni had a bias against Americans</u>

According not just to Plaintiff but also to other employees, Aharoni had a bias against Americans. One of Plaintiff's direct reports believed that Aharoni (and his Israeli team members) thought that Americans were stupid, and that they treated Plaintiff poorly (including being disrespectful and dismissive of his opinions and recommendations) because Plaintiff is American. (SOAF ¶ 123)

Aharoni told Plaintiff that he believed that Americans had a narrow-minded perception of Israelis and that Americans did a poor job of supporting Israel in its military actions in the Middle East.[9] (SOAF ¶ 123) When another employee in Plaintiff's group returned from her work trip to Israel, she said (to both Plaintiff and another employee in his group) that, when she told Aharoni what a wonderful time she had and how beautiful the country was, his response was

---

[9] Aharoni, who denied making such comments, admitted that if he had, it would indicate a bias against Americans. (SOAF ¶¶ 139-140) Given Aharoni's testimony on that issue, Defendants' assertion in their Motion that, "[t]aken at face value, [Aharoni's comments regarding America's response to Israeli military activities] cannot even be interpreted as derogatory toward Americans," is nonsensical. Defs.' Mot. p. 36.

that now she would know that they were not just a bunch of guys riding camels. (SOAF ¶¶ 114-118)

Plaintiff's direct reports believed that there was a bias against Americans in how they were treated by Aharoni and his (Israeli) team, including that there was a feeling that Israelis were considered higher than Americans on the "totem pole"; that they were micromanaging the American group; failing to give them information when they requested it; and, changing the group's objectives when the other regions failed to meet their goals. (SOAF ¶¶ 122, 141-142)

Shortly after Plaintiff was terminated, his group went to Israel for a meeting (with Aharoni) during which another employee made a comment about people of different ethnicities that was derogatory and insulting to Americans. After the American employees expressed their discomfort about the derogatory comment, the offending employee (who reported to Aharoni) told them that she was sorry that they did not know what funny was). Aharoni was also dismissive of their concerns, telling them that, while he understood that they did not like the comment, it was the kind of thing that they think is funny" and that the American employees needed to be okay with it in that context. (SOAF ¶¶ 145-147)

For the same reasons set forth above regarding Aharoni's age-biased conduct, a reasonable jury could infer from the above that Aharoni had a bias against Americans and was motivated by the same in the adverse employment actions to which Plaintiff was subjected.

### 4. **Defendants tolerated and/or outright ignored inappropriate conduct that may have demonstrated a bias based on age and/or national origin**

Defendants' lack of action in response to reports of inappropriate conduct indicates their tolerance of the same. Duggan told HR Business Partner Mini Rodriguez about Aharoni's comment that equity awards were only for employees who would be with Defendants for a long time. (SOAF ¶ 102) Although Rodriguez said that she would look into it, her only response a

13

couple weeks later was that the ship had sailed and it was too late to do anything.  (SOAF ¶ 103)

It is undisputed that Defendants concluded that Israeli members of Aharoni's group, Shimrit Shemtov and Roni Kafre, engaged in inappropriate conduct (including Shemtov asking employees about their age and marital status). (SOAF ¶¶ 167, 170, 171, 176)  And, yet, they were subjected to nothing more than a conversation about the same.  They were not given performance warnings; they did not receive anything in writing regarding their conduct; and, there is no documentation of the "counseling" that they (allegedly) received. (SOAF ¶¶ 177-179)[10]

As set forth above, when a manager in Aharoni's group made a "joke" that was derogatory and offensive to the Americans in the group (at which an HR representative was present), Aharoni's response was just tell the American employees that, while he understood that they did not like the comments, they needed to understand that that was just the kind of thing that "they think is funny" and that the American employees needed to be okay with it in that context. (SOAF ¶¶ 145-147)

Defendants failed to investigate Plaintiff's internal complaints of discrimination and retaliation.  There is no evidence that they investigated Plaintiff's EEOC Charge alleging the same. (SOAF ¶¶ 240-241)

Where, as in this present matter, multiple witnesses testified to Defendants' lack of remedial or corrective (or, in some cases, any) action regarding discriminatory conduct, there can be no credible argument that a jury could not reasonably "believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

---

[10] The HR Business Partner on Aharoni's team was not involved in any discussions about giving Aharoni any type of disciplinary action in connection with the investigation. (SOAF ¶ 180)

5.  **Defendants failed to ensure that their Israeli managers with responsibilities in the U.S. were trained on U.S. laws regarding discrimination**

As of 2015/2016, an Equal Employment Opportunity policy did not exist at Defendants' Israeli entity. (SOAF ¶ 270)  As of 2016, employees at Defendants' Israeli offices were not trained about discrimination (other than sexual harassment). (SOAF ¶ 271)   Prior to Aharoni's deposition (in November 2017), he had never seen Defendants' Harassment, Discrimination and Retaliation Prevention and Reporting Policy, or a similar document referencing discrimination and retaliation. (SOAF ¶ 271)  When Defendants' U.S. VP of HR., Jennifer Flaisher, was asked how Defendants ensured that managers who worked outside of the U.S. but managed employees in the U.S. had an understanding of U.S. anti-discrimination/retaliation laws, she testified that there was nothing formal in place, and that everyone had to read a global code of conduct policy regarding the same (contradicting Aharoni's testimony). (SOAF ¶ 272)

Defendants' failure to ensure that employees (including managers who supervised U.S. employees) were trained on U.S. anti-discrimination/retaliation laws, coupled with their lack of action in response to inappropriate conduct  and comments and conduct in which a high-level manager engaged as set forth above, evidences tolerance for discriminatory conduct.  As such, there can be no credible argument that a jury could not reasonably "believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

6.  **Plaintiff's 13 years younger, Israeli supervisor was deficient in his performance yet he was never terminated, or disciplined, for the same**

Several of Defendants' managers had concerns regarding Aharoni's performance as head of Global Facilities Management ("GFM"). (SOAF ¶ 272)  Multiple employees complained about Aharoni's performance as part of Defendants' August 2015 investigation. (SOAF ¶¶ 49-

15

52)   According to Flaisher (HR VP), Aharoni had a "serious credibility issue among the US leaders." (SOAF ¶ 45)   Multiple managers believed that Aharoni had performance deficiencies and counseled him about the same. (SOAF ¶¶ 46-48, 53-63, 68-69)   And yet, Aharoni, the forty five (45) year old Israeli employee was never disciplined, never given a warning, never placed on a PIP, never told that he was in jeopardy of being terminated. (SOAF ¶¶ 64-67)   Plaintiff, the fifty eight (58) year old American employee, on the other hand, was placed on a PIP for alleged performance deficiencies just eight (8) days after being given a negative review (after fourteen (14) years of consistently good performance and less than one (1) year after being promoted) and then terminated just about three (3) months later. (SOAF ¶¶ 1, 2-20, 187, 191)

Defendants' punishment of the fifty eight 58) year old American for alleged performance deficiencies while completely excusing performance deficiencies (to which multiple witnesses of Defendants testified) of the thirteen (13) years younger Israeli employee is evidence of bias on the basis of age and national origin.   Based upon the differential treatment, a reasonable jury could conclude that Plaintiff was given a negative mid-year review; placed on a PIP; and, then terminated based on his age and/or national origin.

### 7.  <u>Israeli employees undisputedly engaged in inappropriate conduct, yet were not disciplined regarding the same</u>

As set forth above in Section II.C.4, it is undisputed that Defendants concluded that Shemtov and Kafre engaged in inappropriate conduct; indeed, Shemtov admitted to asking employees questions and making comments about their age and marital status. (SOAF ¶¶ 167, 170, 171, 176)   The recommendations resulting from the August 2015 investigation into complaints by Plaintiff and his group included that Defendants should provide cultural and sensitivity training for Kafre and Shemtov (and Aharoni), especially regarding "US practices/law, culture and ways of working" and that they be counseled, including regarding "the

need for adherence to US laws and statutes." (SOAF ¶ 176)  (The recommendations did not include that Plaintiff be trained or counseled in any way). (*Id.*)  And, yet, Shemtov and Kafre (Israeli) were not given performance warnings; they did not receive anything in writing regarding their conduct; and, there is no documentation of the "counseling" that they (allegedly) received. (SOAF ¶¶ 177-179)  On the other hand, Plaintiff (American) was placed on a PIP for alleged performance deficiencies (none involving the need to adhere to US law, contrary to Shemtov and Kafre's issues).

### 8.  **Defendants misstate the law to argue, inappropriately, that the Court should draw inferences in their favor**

Defendants incorrectly assert that this Court must find, as a matter of law, that they could not have discriminated against Plaintiff based on his age/national origin because Aharoni both selected Plaintiff for the NAFM Head position and terminated his employment.  Defendants are, essentially, asking this Court to draw an inference, in their favor, that an actor who hires an employee cannot possibly discriminate against that same employee.  Not only can such an inference not be drawn in the movant's favor in a summary judgment motion, but the "same actor inference" has been rejected by courts in this Circuit.

In *Waldron v. SL Industries, Inc.*, 56 F.3d 491 (3d Cir. 1995), the Court reversed the District Court's grant of summary judgment to the defendant.  The Court, in a footnote, noted its disagreement with the defendant's argument to the District Court that the fact that the plaintiff was hired at age sixty one (61) and fired at age sixty three (63) signified a strong inference that discrimination was not a determinative factor in the adverse action at issue. *Id*. at FN6.  The *Waldron* Court accepted the EEOC's position that evidence of the same hirer and firer "is simply evidence like any other and should not be accorded any presumptive value," and that, "it was plausible under the evidence presented at summary judgment that the defendant would hire the

17

plaintiff, use his skills for a few years while a younger person was being 'groomed" for his position, and then fire the plaintiff because of his age. *Id. See Miller v. Keystone Blind Ass'n/TPM*, 2013 U.S. Dist. LEXIS 2381 (W.D.Pa. Jan. 8. 2013)(noting that the Third Circuit rejected the "same actor inference" in *Waldron* and that the "mere fact that [the same individual] promoted and demoted Plaintiff does not demonstrate that [the defendant] could not have acted with discriminatory intent"); *Frantz v. Ferguson Enters.*, 2009 U.S. Dist. LEXIS 6241 (E.D.Pa. Jan. 28, 2009)(citing *Waldron* to conclude that, "[e]ven if the inference was adopted, our Circuit has already stated that it would be inappropriate for a district court to invoke it at this stage of the litigation, particulary in the face of evidence that gives rise to inferences in favor of the non-moving party.").

A reasonable jury could conclude that Aharoni selected Plaintiff for the position (despite Plaintiff's age) because he needed him in that role at that time.  The factfinder could further conclude that Aharoni intended to get rid of Plaintiff (and replace him with someone younger) once he depleted Plaintiff's extensive well of knowledge regarding NAFM and himself became more aware of North American clients/issues with which Plaintiff was so familiar.  Supporting this argument is the fact that Plaintiff was really the only person who could have been placed into that NAFM Head position; he had been handling NAFM for a long time, and, according to Aharoni, Plaintiff was the one who was knowledgeable and familiar with some of the U.S. sites. Aharoni admitted that his decision to place Plaintiff into that position was helpful to Aharoni in his new role as head of GFM. (SOAF ¶¶ 77-79)

That is exactly what happened here.  Just about two (2) years after Plaintiff became the head of NAFM and just two (2) months after the (substantially younger) employee who ended up as his replacement was hired and Plaintiff helped train him, Aharoni placed Plaintiff on a PIP,

and then terminated him.[11] (SOAF ¶¶ 77-78, 266)

For the same reasons as set forth above, a reasonable jury could also conclude that any efforts that Defendants made to search for a replacement for Plaintiff in 2015 could also be a result of age discrimination.  In other words, Aharoni took a little over one year to work with Plaintiff to exhaust Plaintiff's extensive knowledge and experience with the U.S. sites and then, according to Defendants, he started searching for Plaintiff's replacement.  Two (2) months after Aharoni found Plaintiff's replacement (in August 2015, when Plaintiff's eventual replacement was hired) and after Plaintiff helped to train him, he gave Plaintiff a mid-year review and placed him on a PIP to set in motion Plaintiff's termination.  Then, Plaintiff was terminated and replaced by that twenty one (21) years younger employee. (SOAF ¶¶ 77-78, 266)

Also for the reasons set forth above, Defendants' conclusory argument that they could not have discriminated on the basis of national origin because they hired an American to replace Plaintiff should similarly be rejected by this Court at this stage.  The Third Circuit has rejected that same argument.  *See Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 353 (3d Cir. 1999)("Even if the plaintiff was replaced by someone within her own class, this simply demonstrates that the employer was willing to hire people from this class…and does not establish that the employer did not fire the plaintiff on the basis of her protected status.")  The *Pivirotto* Court further referenced the Court's prior holding that a "plaintiff could make out a prima facie case even without demonstrating that employees outside of the relevant class were treated more favorably, let alone that the plaintiff herself was replaced by someone outside of the

---

[11] Defendants asserted in their Motion that Aharoni "picked and championed Plaintiff until his performance cast doubt on Mr. Aharoni's hiring decision." Defs.' Mot. p. 34.  After hearing the record evidence and seeing the witnesses testify, a jury could believe what Defendants are asserting or a jury could believe Plaintiff's position as set forth above, i.e., that Aharoni selected Plaintiff for the position because he needed him and then, once he no longer needed him, hired Plaintiff's (substantially younger) replacement and then went down the path of getting Plaintiff out of the company; Plaintiff was given the negative mid-year review and placed on the PIP within just two (2) months of his replacement starting. (SOAF ¶¶ 187, 191, 266)

relevant class." *Id.* at 357 (*citing Matczak v. Frankford Candy & Chocolate Co.*, 136 F.3d 933, 939 (3d Cir. 1997)).[12]

      9.   **Defendants subjected Plaintiff to adverse employment actions based on his age and/or national origin[13]**

      Defendants incorrectly argue in their present Motion that Plaintiff's negative performance review and placement on a PIP are not adverse employment actions for the purpose of his discrimination claims because they were not accompanied by a change to his pay, benefits, or employment status. *See Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)(an adverse employment action is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.") Plaintiff has demonstrated the same here, as his PIP included "a new set of requirements." (SOAF ¶ 191) When Plaintiff was placed on the PIP, he had to schedule a special meeting with his team so that he could review with them the new set of requirements; he went over with this team the responsibilities, divided them up, set up teams, and actively started working on the action items. (*Id.*) As such, the PIP altered the terms, conditions, or privileges of his employment.

      Moreover, Defendants' current position does not make sense given their assertion that they terminated Plaintiff based on his failure to meet the terms of the PIP. In other words, according to Defendants, Plaintiff's termination was a direct result of his placement on the PIP

---

[12] Also, at the time that Defendants selected an American to replace Plaintiff, they were obviously well aware that Plaintiff was making a claim of national origin (American) discrimination. (SOAF ¶¶ 230, 233, 264) A reasonable jury could conclude that Defendants, already having received Plaintiff's EEOC Charge alleging, *inter alia*, discrimination on the basis of his national origin, replaced him with an American so that they could make the very same argument that they are now making. *See Loeb v. Textron, Inc., et al.*, 600 F.2d 1003, 1014 n. 9 (1st Cir. 1979)(concluding that replacement by someone in the same protected class as the plaintiff would suggest no discrimination based on the same, but would not disprove it conclusively; the "replacement could have been hired, for example, to ward off a threatened discrimination suit.").

[13] Although Defendants did not move for summary judgment on Plaintiff's claim that he was discriminated against when Defendants failed to award him equity, there can be no legitimate dispute that the same is an adverse employment action for the purpose of a discrimination claim, as it resulted in lost compensation to him.

(which was supported by the negative mid-year review).  Aharoni went even further than that, testifying that the primary reason for Plaintiff's termination was his (alleged) failure to meet expectations set forth in the PIP. (PRDF ¶ 209)  As such, how can Defendants argue with any legitimacy that the PIP was unaccompanied by any change to Plaintiff's employment status?[14]

10. **Plaintiff has set forth sufficient evidence such that a reasonable jury could conclude that Defendants' asserted reasons for taking adverse actions against him are pretextual**

As set forth in detail below, Plaintiff has demonstrated evidence demonstrating weakness, implausibilities, inconsistencies, incoherencies, and contradictions such that a jury could disbelieve Defendants' proffered explanations for engaging in adverse employment actions against Plaintiff, or believe that the real reason for the same was Plaintiff's age and/or national origin.

a. **Aharoni gave Plaintiff a negative mid-year review *months* late and without issuing him *any* performance-related documentation for the prior ten (10) months**

After Plaintiff received his annual review in January 2015 (for 2014), there is no documentation regarding any alleged performance deficiencies on his part until *after* he engaged in protected activity months later. (SOAF ¶¶ 187, 192-194)  When Plaintiff sent Aharoni an email in July 2015 enclosing his self-evaluation for his mid-year review and confirming that he was either meeting or exceeding all of his 2015 goals, Aharoni did not respond to the same.[15] (SOAF ¶¶ 183-187)  He did not even *draft* Plaintiff's mid-year review until October 2015, ten (10) months after Plaintiff received his 2014 review and four (4) months after Plaintiff sent

---

[14] A finding here that Plaintiff's negative performance review and placement on a PIP were not adverse employment actions would allow employers to escape liability for adverse actions such as this that are clearly designed to set up a defense for the employer to use when they inevitably and subsequently terminate the plaintiff.

[15] While Aharoni testified that he disagreed with Plaintiff's assessment, there is no documentation regarding the same or indicating that he ever communicated the same to Plaintiff. (SOAF ¶

Aharoni his mid-year review with his assessment that he was doing well.[16] (SOAF ¶¶ 185-187)

Aharoni did not document his disagreement at all between July and October when he drafted for

the first time Plaintiff's mid-year review. (SOAF ¶ 187)

Contrary to the record evidence, Defendants are arguing that Plaintiff cannot show

pretext; according to them, Plaintiff demonstrated ongoing performance problems throughout

2014 and 2015, prior to getting a negative mid-year review and being placed on a PIP.

Undermining Defendants' transparent attempts to evade liability for their discriminatory conduct

include the following:  (1) Plaintiff's promotion to Senior Director (with a salary increase) in

November 2014, something that, according to Defendants' witnesses, occurs only when

employees are performing well[17]; (SOAF ¶¶ 15, 17, 18-20) (2) the lack of documentation

regarding Plaintiff's alleged performance deficiencies between his January 2015 (for 2014)

review and his mid-year review/PIP which he got (10) months later; (SOAF ¶¶ 183-187, 192-

194) (4) the fact that witnesses *other than Plaintiff* believed that the PIP was unjustified and

illegitimate (as set forth below in Section II.C.10.b.); (SOAF ¶¶ 213-216) (5) the fact that

Aharoni violated Defendants' practices by failing to give Plaintiff his mid-year review at mid-

year (and by not doing so until October, eight (8) days before they placed Plaintiff on the PIP)

despite the fact that the mid-year review was supposed to be done mid-year (in June/July), and

despite the fact that it was standard practice to give an employee with a "Mostly Meets" rating a

---

[16] This was about two (2) months after Defendants hired then 37-year old Dan Ramirez, whom Plaintiff helped train and who, just a few months later, replaced Plaintiff in his position as Head of NAFM. (SOAF ¶ 264-266)  As stated above, a reasonable jury could conclude that, now that Aharoni had found his (substantially younger) replacement for Plaintiff, he could move forward with getting rid of the fifty eight (58) year old.  Also, and as Plaintiff has set forth in detail below, this was just about two (2) months after Defendants' investigation into the protected activity due to discriminatory conduct in which Plaintiff (and the group that he led) engaged.

[17] Plaintiff was promoted just about two (2) months before he received his 2014 performance review in January 2015.  Also, in that review, Plaintiff's ratings on the fourteen (14) individual categories (one "Exceptional"; three (3) "Exceeds"; four (4) "Meets"; and, six (6) "Mostly Meets" suggests that Plaintiff's average ratings was "Meets," not "Mostly Meets."  Morever, this was done at a time when, according to Defendants' witnesses, the GFM organization was experiencing "growing pains."

mid-year review.[18] (SOAF ¶¶ 188-190)

A reasonable jury could certainly conclude that the real reason for the delay in Plaintiff's mid-year review was because there were really no performance issues and that Defendants only decided to give it to Plaintiff months later because, at that point, they had already hired the (twenty one (21) years younger) employee who would become Plaintiff's replacement. As such, they could now head down the path of getting rid of Plaintiff (and/or because Plaintiff had, by that time, engaged in protected activity, as set forth below in Section II.D).

Furthermore, Defendants' Performance Improvement policy states that employees who receive overall ratings of "Mostly Meets Expectations" should be placed on a Performance *Consistency* Plan ("PCP") and that employees who receive overall ratings of "Below Expectations" should be placed on a Performance *Improvement* Plan ("PIP"). (SOAF ¶ 227, 228)  The PIP is worse than a PCP, i.e., it is to be reserved for the lowest-performing employees. Plaintiff received a "Mostly Meets" rating on his January 2015 review (for 2014);  yet, not only was he not placed on a PCP at that time, he was never placed on a PCP. (PRDF ¶ 71; SOAF ¶¶ 227-228)  Instead, Defendants failed to comply with their own policy and went right to placing Plaintiff on a PIP (despite the fact that he never received a "Below Expectations" rating). (SOAF ¶ 9)  Defendants also violated the Policy when Plaintiff was placed on the PIP by failing to, as required, document all monitoring meetings between the manger and the employee on the PIP. (PRDF ¶ 177; SOAF ¶ 228)

Defendants' deviation from their own practices with regard to addressing any supposed performance deficiencies is evidence of pretext. *E.E.O.C. v. Sears Roebuck & Co.*, 2006 U. S.

---

[18] Defendants argued in their Motion that a delay in a performance evaluation is not an adverse action.  Plaintiff is not alleging the same.  What he is alleging (as explained above) is that the delay undermines Defendants' argument that there was a history of performance issues pre-dating Plaintiff's protected activity.  Moreover, a reasonable jury could conclude that the reason for the delay in giving Plaintiff his

Dist LEXIS 26608, *21 (D.N.J. April 24, 2006). *See also Antol v. Perry*, 82 F. 3d 1291, 1301

(3d Cir. 1996) (an employer's failure to follow its procedures is "evidence of discriminatory

intent"). *See Johnson v. Verizon Servs. Corp.*, 2017 U.S. Dist. LEXIS 59472 (E.D.Pa. Apr. 18,

2017)(finding that there was a genuine dispute of material fact as to pretext and denying

summary judgment where there was a "lack of documentation concerning [the plaintiff's]

termination…" and where the Court "only has before it dueling narratives provided…as to the

motivation for [the plaintiff]'s termination").  The lack of any supporting documentation is

evidence of pretext. *See Eno v. Lumberman's Merchandising Corp.*, 2012 U.S. Dist. LEXIS

54319, **17-18 (E.D.Pa. Apr. 18, 2012)(lack of documentation on alleged performance

deficiency demonstrates pretext).   Inconsistencies in the process demonstrate pretext. *Tomasso*

*v. Boeing Co.,* 445 F.3d 702, 707 (3d Cir. 2006)

### b.  <u>Record evidence demonstrates that the PIP was just a set-up to help Defendants justify subsequently terminating Plaintiff</u>

Witnesses other than Plaintiff believed that the PIP on which he was placed was

completely unjustified given the performance of Plaintiff's group at the time. (SOAF ¶¶ 213-

216)  One of Plaintiff's direct reports, John Eppley, was in disbelief when he learned that

Plaintiff had been placed on a PIP, not only because he held Plaintiff in high regard, but also

because their team was strong and delivering results so, "how could [Plaintiff] be a poor

performer?" (SOAF ¶ 215)  Eppley further testified that "[s]ome of the goals relative to the due

dates [on the PIP] and where they would have required to have been completed were aggressive.

So it certainly appeared that some of the goals were lofty, perhaps on purpose."  (SOAF ¶ 213)

Eppley also believed that goals on Plaintiff's PIP were unrealistic. (SOAF ¶ 214)

Another of Plaintiff's direct reports was also surprised when Plaintiff was placed on the PIP

since their team seemed successful. (SOAF ¶ 216)  Indeed, around the time that Plaintiff was

given a negative mid-year review and placed on the PIP, Aharoni announced that the North American team was not only performing very well, but that it was the best performing or highest-performing team under him. (SOAF ¶¶ 35-36)

     If multiple witnesses believe that that there was not a legitimate reason to place Plaintiff on the PIP, a reasonable jury could certainly come to the same conclusion, and, as a result, could further infer that the reason for the same was discriminatory and/or retaliatory.[19]

     Further demonstrating the pretextual nature of the PIP is the fact that Aharoni repeatedly ignored Plaintiff's efforts to discuss with him his progress on the PIP, including cancelling multiple meetings with Plaintiff regarding the same.

### c.  Defendants used the PIP to manufacture a(n alleged) legitimate reason for Plaintiff's termination

     As of the date on which Defendants advised Plaintiff that his PIP was being extended (2/10/2016), Aharoni had not yet decided to terminate Plaintiff's employment, according to his testimony. (SOAF ¶ 181, 255)  Completely undermining both Aharoni's testimony and any (asserted) legitimacy of Plaintiff's placement on the PIP is the fact that, on February 16, 2016, an email was sent between, *inter alia*, Aharoni and Flaisher, in which it was stated that the plan to terminate Plaintiff's employment had already been put into place the prior week. (SOAF ¶ 254) February 10th, the date on which Plaintiff was given his PIP was right in the middle of the week prior to February 16th (the date of the email confirming that the plan had been put in place to terminate Plaintiff). (SOAF ¶ 254)  Aharoni denied that Defendants waited until the February to terminate Plaintiff because it would look better for them to have given him additional time to (alleged) improve his performance (and thus giving them an asserted legitimate, non-

---

[19] When Defendants did terminate Plaintiff's employment and Eppley was told that the reason for the same was related to performance, he was not satisfied with that explanation because he knew that at least some of the items that he had helped contribute to related to the PIP obligations had been fulfilled. (SOAF ¶ 245)

discriminatory with which to justify his termination). (PRDF ¶ 185)  Based on such evidence, a reasonable jury could disbelieve Aharoni's testimony and conclude that Plaintiff's initial placement on the PIP, and the extension of the same, was done for the purpose of providing Defendants with an ability to assert a legitimate, non-discriminatory reason for his termination.[20]

### d.  <u>Defendant has proffered inconsistent stories as to the identity of the decision-makers regarding Plaintiff's PIP and his termination</u>

Defendants have proffered inconsistent stories regarding the identity of those who were involved in the decisions to place Plaintiff on a PIP and to terminate his employment.

In Defendants' Answers to Plaintiff's Interrogatories, they stated that Nir Aharoni, Christopher Swartz, and Jennifer Flaisher, in consultation with Teva USA's in-house counsel Thomas McDonough, made the decision to terminate Plaintiff's employment in February 2016. (SOAF ¶ 248)  Yet, according to Aharoni, Swartz, and Flaisher's deposition testimony, Aharoni was the sole decision-maker regarding the decision to terminate Plaintiff's employment. (PRDF ¶ 208)

Likewise, according to Defendants' Answers to Plaintiff's Interrogatories, Aharoni; Flaisher; Rodriguez; and, Strouchler made the decision to place Plaintiff on a PIP in October 2015. (SOAF ¶ 199)  According to Aharoni, he was the sole decision-maker. (SOAF ¶¶ 203-204)

Defendant's changing representations as to the identity of the decision-makers regarding Plaintiff's PIP and his termination is evidence of pretext. *See Fuentes*, 32 F.3d 7591.  Where, as here, Plaintiff has set forth evidence that requires the fact-finder to make determinations as to credibility, Defendants' Motion for Summary Judgment must be denied. *See Barnes v. Office*

---

[20] Aharoni did not recall ever documenting the decision to terminate Plaintiff's employment or the reasons for the same. (SOAF ¶ 256)

*Depot, Inc.*, 2009 U.S. Dist. LEXIS 109519 (D.N.J. 2009) (*citing Big Apple BMW v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992)).

### D. **Plaintiff Has Set Forth Sufficient Evidence From Which A Jury Could Conclude That Defendants Retaliated Against Him**

There is ample evidence from which a jury could conclude that Plaintiff was subjected to retaliation based on his complaints regarding Defendants' discriminatory conduct. To establish a claim of retaliation, a plaintiff must show: (1) that he engaged in protected activity; (2) that his employer took an adverse employment action; and, (3) a causal link between the protected activity and the employer's adverse employment action. *Fogelman v. Mercy Hosp., Inc.*, 238 F.3d 561, 567-568 (3d Cir. 2002).[21] Here, it appears that Defendants are contesting all of those elements.

To demonstrate Plaintiff's engagement in protected activity, he must show that he opposed conduct, or participated in an inquiry into conduct, that he reasonably believed to be unlawful under the anti-discrimination statutes at issue in this case. To establish this element, a plaintiff "need not show that the underlying conduct about which [he] complained had actually been violation of" the anti-discrimination laws.

As to the second element of Plaintiff's retaliation claim, an action is considered materially adverse when "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Railway Company v. White*, 126 S.Ct. 2405, 2415-2416 (2006). A plaintiff can meet his burden by demonstrating that an employer's conduct is likely to deter victims of discrimination from complaining about discrimination. *Id.* A jury is ***not*** required to find that the challenged actions were related to the

---

[21] The analysis for retaliation claims under Title VII, the ADEA, and the PHRA are identical. *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997); *Remp v. Alcon Labs.*, 2016 U.S. Dist. LEXIS 38342, *23 (E.D.Pa. Mar. 24, 2016); *Downs v. Anapol Schwartz, PC*, 2015 U.S. Dist. LEXIS 106147, *30 (E.D.Pa. Aug. 12, 2015).

terms or conditions of employment, in order to find that the employer's actions were "materially adverse." *Id.* at 2416; *Johnson v. McGraw Hill Cos.*, 451 F.Supp.2d 681, 710 (W.D.Pa. 2006)(*citing Burlington Northern*, 126 S.Ct. at 2411, 2415).

Whether an action is materially adverse "often depends on a constellation of surrounding circumstances, expectations and relationships which are not fully captured by a simple recitation of the words used or physical acts performed. *Hare,* 220 Fed. Appx. At 128 (quoting *Burlington*, 548 U.S. at 68.) The *Burlington Northern* Court emphasized that "the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Id.* at 64.

Finally, [a] plaintiff may establish a causal link between a protected activity and the employer's adverse action through temporal proximity alone if the timing is 'unusually suggestive' of a retaliatory motive." *Williams v. Philadelphia Housing Authority Police Department*, 380 F.3d 751, 760 (3d Cir. 2004); *Krouse v. American Sterilizer Company et al.*, 126 F.3d 494, 503 (3d Cir. 1997). "When the temporal proximity is not so close as to be unduly suggestive, [the Third Circuit has] recognized that timing plus other evidence may be an appropriate test." *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 288 (3d Cir. 2001). *See also Farrell v. Planters Lifesavers Company*, 206 F.3d 271 (3d Cir. 2000)("a plaintiff may array upon a broad array of evidence to" show a causal link for the purposes of establishing retaliation). The Third Circuit has said that, "[a]lthough timing and ongoing antagonism have often been the basis of a causal link, our case law has allowed a plaintiff to substantiate a causal connection for the purposes of the prima facie case through other types of circumstantial evidence to support that inference." *Farrell*, 206 F.3d at 280-281.

1. <u>**Plaintiff undisputedly engaged in protected activity *before* October 2015 (when Defendants gave him a negative review and placed him on a PIP)**</u>

Defendants incorrectly asserted in their present Motion that the first time that Plaintiff engaged in protected activity was on November 12, 2015, the date on which he made an internal complaint to Defendants.  (Plaintiff followed his internal complaint with an EEOC Charge on November 25, 2015).  Defendants' motive in making this argument is transparent; they want to be able to assert, as they did in their present Motion, that Plaintiff's negative mid-year review and his PIP, both of which he received in October 2015 (within about two (2) months of the investigation into his and his group's complaints about discriminatory conduct) could not have been retaliatory because they were completed *before* Plaintiff engaged in protected activity.  The problem with Defendants' transparent argument is that it contradicts both their own witnesses and their own documents.

First, Defendants' contention that the first time that Plaintiff engaged in protected activity was in November 2015 is baffling as their own witness, their highest-ranked U.S. HR employee, testified that Plaintiff (and the group that he led) made complaints about discriminatory conduct (that led to the August 2015 investigation) and, as such, ***engaged in protected activity when they made their complaints about the same.*** (SOAF ¶ 181)

Second, prior to the June 2015 staff meeting that led to the investigation, Plaintiff told Rodriguez that his group felt that they were being treated differently, i.e., worse than their counterparts in Europe and Israel. (SOAF ¶ 151)  Third, in that June 2015 meeting during which employees complained that led to Defendants' August 2015 investigation, Plaintiff complained about differential treatment between Israelis and Americans. (SOAF ¶ 150)  Fourth, set forth below are excerpts from Plaintiff's interview with the investigator cited in the investigative

report regarding the inappropriate conduct in which the Israeli team was engaging that clearly

contradict Defendants' assertion that they were just "[g]eneral complaints of unfair treatment"[22]:

- "The numerous requests for data that is not acceptable (age) and them not knowing what we do is impacting negatively on getting things done."

- "After this, said he got a memo from Israel to send them all this information.  Said he told them he would not be providing this information.  He spoke to Mini Rodriguez (Sr. HR Mgr.) and Ilanit Strouchler (HR) about it.  I continue to get the request.  I did collect some information for them, but not illegal stuff.  I did at one point say to those making the request that if I got another one like this, I would make sure somebody got fired."

- Said Kristin [Macone] was interviewed and was asked questions about how old she was, whether she was married, and whether she had kids.  Said he went to Management and asked that it stop."

- "[Shemtov] told another member of the team that having kids without being married is inappropriate.  After saying this, she then asks me to fix it implying that I as [the employee's] Manager must fix it."

(SOAF ¶ 166)

Moreover (and as Defendants admit), Plaintiff undisputedly engaged in protected activity

when he made his internal complaint of age discrimination; national origin discrimination; and,

retaliation on November 12, 2015, and when he filed his EEOC Charge on November 25, 2015.

He was terminated just about three (3) months later (after over fourteen (14) years of

undisputedly excellent employment). (SOAF ¶¶ 229-230, 233)

### 2. All of the retaliatory actions to which Defendants subjected Plaintiff are considered "materially adverse"

Defendants' assertion that a negative performance review and a PIP are not "materially

adverse" actions for the purpose of retaliation claims is directly contradictory to Third Circuit

case law.  Courts in this Circuit have consistently found that being accused of misconduct or

---

[22] It is also clear from the complaints made by Plaintiff's direct reports and relayed to both Aharoni and the investigator that these were also not "[g]eneral complaints of unfair treatment," but rather complaints regarding inappropriate conduct based on protected characteristics such as questions about employees' ages.

poor performance, and/or even just threatened with disciplinary action constitutes material adverse actions for purposes of retaliation. *See, e.g., Mitchell v. Miller*, 884 F.Supp.2d 334 (W.D.Pa. Aug. 3, 2012)(the plaintiff being, *inter alia*, charged with an infraction and threatened with termination was sufficient to demonstrate retaliation); *Fleck v. WILMAC Corp.*, 2011 U.S. Dist. LEXIS 54039 (E.D.Pa. May 19, 2011)(allegations of unwarranted discipline inconsistent with the employer's usual discipline process was sufficient to state a claim for FMLA retaliation, applying the *Burlington Northern* standard); *Harley v. Geithner*, 2010 U.S. Dist. LEXIS 104303 (D.N.J. Sept. 29, 2010)(the employer reporting the plaintiff for investigation into possible fraud satisfied the "materially adverse standard"); *Rivers v. Potter*, 2007 U.S. Dist. LEXIS 92590 (D.N.J. Dec. 18, 2007)(temporary issuance of a letter of warning, and subsequent reduction of the same to an "official discussion," comprise "materially adverse employment actions that could support a retaliation claim under Title VII"); *Hempfling v. United Ref. Co.*, 2008 U.S. Dist. LEXIS 4895 (W.D. Pa. Jan. 23, 2008) (a write-up constituted an adverse employment action).

The cases on which Defendants rely to support their argument that a negative performance review and a PIP are not "materially adverse" actions for the purposes of Plaintiff's retaliation claims are distinguishable from this matter. The Court's comments in *Reynolds v. Dep't of Army*, 439 Fed.Appx. 150 (3d Cir. 2011) to which Defendants cited in their present Motion are not about the plaintiff's retaliation claim, but about what constitutes an adverse action in connection with his discrimination claim. The only other case on which Defendants rely, *Tucker v. Merck & Co.*, 131 Fed.Appx. 852 (3d Cir. 2005) does not involve a retaliation claim (and was issued prior to *Burlington Northern*).

Based on the above, Defendants' assertions that Plaintiff's negative mid-year review and his placement on the PIP were not "materially adverse" actions for the purpose of his retaliation

claims should be rejected by this Court.[23]

> ### 3. Plaintiff has set forth sufficient evidence to support a causal connection between his complaints of discriminatory conduct and the adverse actions to which Defendants subjected him

As set forth in detail below, the record evidence clearly establishes antagonism towards

Plaintiff sufficient to establish a causal connection between his protected activity and his

negative mid-year review; his PIP; and, his termination.[24]

> #### a. Defendants were hostile towards Plaintiff regarding the investigation and Plaintiff's subsequent complaints of discrimination

When Plaintiff informed Aharoni about the staff meeting that led to the investigation and

that he believed that an investigation was warranted, Aharoni's response was that, "a good

manager would have stopped this prior to an investigation," and that it was Plaintiff's

responsibility, and Plaintiff's fault that there was going to be an investigation."[25]

As Plaintiff testified,

> "[Aharoni] told me directly that a good manager would have controlled his people and it never would have gotten this far. He was angry about the EEOC complaint. He said it was the first time that anyone had made a complaint like that and he told me that there were weeks that went by that he was too angry even to talk to me. He couldn't even get on the phone to talk to me; he was that angry."(SOAF ¶ 162)

After the internal complaint was filed, Aharoni treated Plaintiff differently; he became colder and

more critical, and their conversations were much shorter and less frequent.[26] (SOAF ¶ 182)

---

[23] Defendants do not argue (as they cannot, with any legitimacy) that Plaintiff's termination is a "materially adverse" action for the purpose of his retaliation claims.

[24] This is not a case in which there is a dispute as to whether the decision-makers were aware of the complaints of discrimination. This is a case in which every single person involved in the decisions to place Plaintiff on a PIP and then terminate his employment were undisputedly aware of the complaints that he and the group for he was responsible made; his internal complaints of discrimination and retaliation; and, his EEOC Charge alleging discrimination and retaliation. (SOAF ¶ 230, 233, 246-247-248, )

[25] When Aharoni learned that a formal investigation was going to be conducted into the complaints from Plaintiff's group, he questioned that decision. (SOAF ¶ 164)

[26] This was the first time that anyone had complained about Aharoni as a manager, and Plaintiff's EEOC Charge was the first time that Aharoni had been named in a complaint that an employee filed with an outside agency.

It was not just Aharoni who was upset in connection with Plaintiff's protected activity. Rodriguez testified that the allegations that Plaintiff was making in his November 12, 2015 email could reflect poorly on Defendants' HR. (SOAF ¶ 231)  Furthermore, there is no evidence that Defendants ever investigated Plaintiff's internal complaints of discrimination/ retaliation or his EEOC Charge. (SOAF ¶¶ 240-241)   Their failure to do so demonstrates hostility towards Plaintiff based on the same.  That is evidence from which a reasonable jury could infer causation. *See, e.g., Marra v. Phila. Housing Auth.*, 497 F.3d 286, 304 (3d Cir. 20007)(evidence of hostility suggests a causal link). *See, e.g., Marra v. Phila. Housing Auth.*, 497 F.3d 286, 304 (3d Cir. 20007)(evidence of hostility suggests a causal link).  A reasonable jury could certainly infer a causal connection between Plaintiff's protected activity and his subsequent negative mid-year review; PIP, and termination based on Defendants' hostility towards Plaintiff after he (and the group that he led) engaged in protected activity, and then after Plaintiff made complaints of discrimination and retaliation, first internally and then through his EEOC Charge.[27]

### b.   Defendants' adverse actions against Plaintiff occurred only *after* he engaged in protected activity

According to ***Defendants'*** witnesses, the decisions regarding the adverse actions at issue (Plaintiff's negative mid-year review; the PIP; and, his termination) were all made ***after*** Plaintiff engaged in protected activity.

Aharoni testified that he made the decision to terminate Plaintiff's employment in 2016, a few days before his termination date (on February 29, 2016, which was about three (3) months

---

Plaintiff was also the only employee whom Aharoni made the decision to terminate during his twelve and a half years of employment at Defendants.  A reasonable jury could certainly determine that this was not a coincidence.
[27] Indeed, Defendants admitted in their Motion that they were trying to get Plaintiff away from reporting to Aharoni after he filed his EEOC Charge, asserting that, "After Plaintiff filed his agency charges, Mr. Aharoni and others made efforts to find another role in the organization for Plaintiff, including one to be established in Mr. Aharoni's group but to no avail based on a variety of reasons." Defs.' Mot. p. 26.

after Plaintiff made his internal complaint of discrimination and retaliation and filed his EEOC Charge). (SOAF ¶¶ 229-230, 233, 249, 251)  The first time that Aharoni thought about terminating Plaintiff's employment was in 2016. (SOAF ¶ 252)  Prior to October 2015, Aharoni could not remember if the possibility of terminating Plaintiff ever entered his mind. (SOAF ¶ 250)  Prior to the August 2015 investigation into the complaints made by Plaintiff and his group, no one mentioned to HR Business Partner Rodriguez (who supported Plaintiff's group) placing Plaintiff on a PIP or terminating his employment. (SOAF ¶¶ 37-28)[28]

Between January 2015, when Plaintiff was issued his "Mostly Meets" performance review rating for 2014 (the first time that he had received such a rating in his tenure at Defendants) and October 2015, when Plaintiff was given a negative mid-year review and placed on the PIP, he did not receive *any* documentation regarding alleged performance deficiencies. (SOAF ¶¶ 187, 192-194)  In fact, according to Aharoni, the first time that he documented any (alleged) performance deficiencies on Plaintiff's part after the January 2015 performance review (for 2014) was about ten (10) months later, in mid-October 2015. (SOAF ¶¶ 183-187)  That was less than two (2) months after Plaintiff (and the group that he led) engaged in protected activity by complaining about discriminatory conduct[29] (which, as set forth above, caused Aharoni to be angry with Plaintiff).  A reasonable jury could conclude that the reason why Aharoni suddenly decided to give Plaintiff a negative mid-year review many months after not documenting any (alleged) performance deficiencies was in retaliation for Plaintiff's protected activity in which he

---

[28] As to Defendants' assertions that they engaged in efforts to replace Plaintiff in 2015, the bottom line remains that they did not actually take any action regarding the same until after he engaged in protected activity.  This assertion is also undermined by Defendants' contradictory claims that they wanted to keep Plaintiff employed even after he was given a negative review and placed on a PIP.  As Defendants cannot seem to decide, even as of this stage, whether they wanted to retain Plaintiff or get rid of him, that issue should go to a jury.
[29] Rodriguez and Flaisher, the HR Business Partner supporting GFM and the U.S. HR VP, respectively, were not aware of any documentation that Plaintiff was given regarding any performance deficiencies from his 2014 performance review through the time that he was placed on the PIP. (SOAF ¶¶ 192-193)

had recently engaged.[30]

Furthermore, although it is "standard practice" for managers to give their employees their mid-year reviews at mid-year (i.e., June or July) (and to give employees who receive "Mostly Meets" ratings mid-year reviews), Aharoni did not give Plaintiff a mid-year review until months later and *after* Plaintiff (and the group that he led) engaged in protected activity. (SOAF ¶¶ 185-187, 189-190, 230)   Defendants asserted in their Motion that Aharoni's failure to give Plaintiff the mid-year review until October "is simply of no consequence."  Contrary to that assertion, a reasonable jury could infer that the reason for the long delay (and the violation of Defendants' standard practice) was that Aharoni did not really believe that Plaintiff's performance was deficient and that he only decided to give Plaintiff a negative review after Plaintiff (and the group that he led) engaged in protected activity.[31]

Defendants' primary argument as to Plaintiff's retaliation claims, which is completely undermined by the record evidence, is that there was a "history of performance issues" which pre-dated his protected activity.  While Defendants spend a lot of time discussing Plaintiff's alleged performance deficiencies in 2014, the (undisputed) fact is that he was promoted in November 2014 (*after* these alleged issues arose); employees at Defendants are promoted, according to *their* witnesses, *only* when an employee is performing well.

Also, according to *Defendants*, they wanted to retain Plaintiff and tried to find another

---

[30] Indeed, according to multiple witnesses (other than Plaintiff), Aharoni praised the performance of Plaintiff's group in October 2015 (at the time that he placed Plaintiff on the PIP) as the best-performing of the teams under his supervision. (SOAF ¶¶ 35-36, 230)  This evidence further supports that a reasonable jury could conclude that Plaintiff's negative mid-year review and his PIP were not justified and that the real reasons for the same were discriminatory and/or retaliatory.

[31] Defendants argued in their Motion that a delay in a performance evaluation is not an adverse action.  Plaintiff is not alleging that it is.  What he is alleging (as explained above) is that the delay undermines Defendants' argument that there was a history of performance issues pre-dating Plaintiff's protected activity.  In other words, Aharoni's months-long delay in addressing Plaintiff's alleged performance issues does not make any sense if Plaintiff's performance deficiencies were as serious as Defendants are now representing.

management-level position for him at the time that he was on the PIP and close to the time that

the made the decision to terminate his employment.  Defendants' argument does not make sense

considering their extensive commentary in their Motion regarding his alleged performance

deficiencies (either he was an extremely poor performer or he was not).[32]  Also, and as set forth

above, there is no documentation regarding performance deficiencies on Plaintiff's part between

January 2015 (when he received his 2014 review)[33] and October 2015 (when he received his

negative mid-year review and was placed on the PIP, neither of which occurred until *after*

Plaintiff engaged in protected activity).[34]

### 4. Plaintiff has set forth sufficient evidence such that a reasonable jury could conclude that Defendant's asserted reasons for their adverse employment actions against Plaintiff are pretextual

For the reasons set forth above in Sections II.C.10 and II.D.3.b., a jury could conclude

That Defendants' asserted reasons for giving Plaintiff a negative mid-year review; placing him

on a PIP; and, terminating his employment shortly after he engaged in protected activity are

pretextual.

### E.   Summary Judgment Cannot Be Granted When Defendants' Explanations For Their Adverse Actions Against Plaintiff Relies On The Testimony Of Witnesses Whose Motivations And Credibility Are Squarely At Issue

Defendants, and their witnesses, have repeatedly demonstrated their untruthfulness

---

[32] There are material issues of disputed fact as to whether Defendants really did want to retain Plaintiff and, to that end, tried to find him another position within the company.  Contrary to Defendants' assertion in their present Motion that Aharoni "strongly advocated for finding another position for Plaintiff within the organization," Aharoni testified that his "efforts" consisted only of thinking about it; talking to Plaintiff generally about his interest in taking an operations position (that was unidentified and not actually open); and, talking generally to Flaisher about it.

[33] On that 2014 review, which was given to Plaintiff just two (2) months after his promotion (and at a time when the GFM organization was still experiencing "growing pains"), out of fourteen (14) individual categories, Plaintiff was rated as "Meets" or above (including one (1) "Exceptional" rating; three (3) "Exceeds" ratings; three (3) "Meets" ratings; and, six (6) "Mostly Meets" ratings. (PRDF ¶ 71; SOAF ¶¶ 15, 73)

[34] While Defendants cite to their retention of an executive coach for Plaintiff as evidence of his need for outside help to improve his performance deficiencies, it is undisputed that the coaching process documentation says nothing about Plaintiff's (alleged) performance deficiencies being the basis for that process; in fact, to commence the process, Defendants had to confirm that Plaintiff was in "good standing"; Plaintiff understood the retention of the executive coach to be a positive development. (PRDF ¶57; SOAF ¶¶ 84-86)

throughout this litigation.  By way of example only, *see* Flaisher's assessment of Aharoni's credibility. (SOAF ¶ 45)  By way of further example, Aharoni denied asking the ages of employees in the GFM group. (SOAF ¶ 137)  Multiple employees in the group, including, but not limited to Plaintiff, testified that he did exactly that. (SOAF ¶¶ 107, 108, 110, 112, 113, 119-121, 128, 130, 131, 132)  Rodriguez testified that she believed Plaintiff when he said that he was surprised when he was placed on the PIP, as he had not been previously told about the same, and that she did not believe Aharoni when he said that he had told Plaintiff about the PIP before he was placed on it.  *See also* Defendants' shifting identities of the decision-makers regarding Plaintiff's placement on the PIP and his termination as set forth in Section II.C.10.d., above.

Summary judgment cannot be granted when the witnesses' motivation and credibility in connection with the adverse employment actions to which Plaintiff was subjected are clearly and squarely in dispute. *E.g., Muldowney,* 2013 U.S. Dist. LEXIS 164502 at *32 (movant for summary judgment cannot rely solely on its own presentation of evidence where the question of fact at issue turns exclusively on the credibility of the movant's own witnesses).

III.   **CONCLUSION**

For the foregoing reasons, as well as the existence of disputed facts as stated in Plaintiff's accompanying Statement of Material Facts, Plaintiff respectfully requests that this Court deny Defendants' present Motion and enter the proposed Order submitted herewith.

Respectfully submitted,

**CONSOLE MATTIACCI LAW, LLC**

Dated: August 17, 2018          BY:   /s/ Caren N. Gurmankin
                                      Caren N. Gurmankin, Esq.
                                      Console Mattiacci Law, LLC

                                      Attorney for Plaintiff

37