# IN THE UNITED STATES DISTRICT COURT FOR
# THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| _____ | : | |
| **STEPHEN MIDDLEBROOKS** | : | |
| | : | **CIVIL ACTION NO. 17-0412** |
| | : | |
| **Plaintiff,** | : | |
| **v.** | : | |
| | : | |
| **TEVA PHARMACEUTICALS** | : | |
| **USA, INC.; TEVA PHARMACEUTICAL** | : | |
| **INDUSTRIES LIMITED** | : | |
| | : | |
| **Defendants.** | : | |
| _____ | : | |

## PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I.   Plaintiff's Long History of Excellent Performance at Defendants

1.   Plaintiff was born in July 1957. (Exhibit 2, Pl. Dep. 10:15-18).

2.   Plaintiff's 2008 performance review, on which he received an overall rating of "Meets," included the following comments:

> Has integrity, reliability, and loyalty
> Professional at the HARD services and have tactical management capabilities
> Safety and QA are top priority
> service-oriented, team player
> Strong commitment to Teva, to US, to GFM and mainly to his staff
> Understand the complexity of managing suppliers
> Work well in a familiar environment

(Exhibit 27, Teva (SM) 000215).

3.   Plaintiff received an overall rating of "Meets" on his 2009 performance review. (Exhibit 28, Teva (SM) 000211).

4.   Plaintiff received an overall rating of "Exceeds" on his 2011 performance review. (Exhibit 29, Teva (SM) 000205).

5.   Plaintiff received an overall rating of "Meets" on his 2012 performance review. (Exhibit 30, Teva (SM) 000196-204).

6.   Manager comments on Plaintiff's 2012 review included the following: "Steve did an excellent job supporting several unplanned major initiatives during 2012"; "Steve and his team have done a very good job executing capital projects and managing the tremendous amount of moves associated with the Cephalon integration"; "Steve and his group effectively manage assigned office and laboratory facilities. I rarely receive a complaint, and issues are addressed before they are escalated to me"; "Steve and his department continue to meet business growth needs"; "Steve does an effective job managing and leading his department;" "Steve has many years of experience building, managing, and maintaining facilities. His expertise was valuation for the Kansas City and New York office projects"; "Steve works well with customer departments, satisfying their needs and addressing concerns so that issues are not escalated"; "Steve instituted significant cost savings projects in 2012 and improved the robustness and reliability of IT and distribution infrastructure"; "Steve had a very good year completing capital projects, supporting the Cephalon integration, reducing costs, and effectively running numerous facilities while staying within the approved 2012 expense budget." (Exhibit 30, Teva (SM) 000196-204).

7.   Plaintiff received an overall rating of "Meets" on his 2013 performance review. (Exhibit 31, Teva (SM) 00187-192).

8.   Manager comments on Plaintiff's 2013 review included the following:

"Steve did a very good job executing various capital projects and providing facilities and offices when needed. A highlight was providing the new Kansas City office facility on-time and $2.5 million under budget. Senior Management in Kansas City was very pleased with the project. There have been no safety incidents year-to-date." (Exhibit 31, Teva (SM) 000192).

9.   Up until 2013, Plaintiff had received annual evaluations on which he had always been rated as "meets" or higher; he had always received salary increases (every year); and, he had always received bonuses (every year). (Exhibit 2, Pl. Dep. 32:1-13).

10. Kristin Macone, who reported to Plaintiff for approximately one (1) year, including during 2015, stated about Plaintiff:

Steve was one of the top managers that I have ever had. He was extremely helpful. I thought that he was extremely knowledgeable and a very fair manager. I had zero complaints about him. I know from talking to Steve's other direct reports (including Troy Gaugler, John Eppley, and Elen Cicak) that they felt the same way about him. (Exhibit 32, Middlebrooks 2205).

11. Rhonda Wilton, who reported to Plaintiff for approximately two (2) years, including during 2015 and 2016, stated about Plaintiff:

I do not say this lightly, but if I could work for Steve today, I absolutely would. He is an upstanding, professional, high-integrity individual. He has the chops,

> i.e., the technical prowess, to back up what he says. He is a highly intelligent
> man. I have the utmost respect for Steve as a leader.

(Exhibit 33, Middlebrooks 2093).

Wilton also stated that,

> I can say, without any doubt in my mind that our North American team that Steve
> led was the highest-performing team in the Global Facilities Management
> organization in 2015. I know this based on the metrics that were used to measure
> success, as well as the fact that our group (that Steve managed) was pulled in to
> assist other groups in meeting their targets."

(*Id.*)

12. Ellen Cicak, one of Plaintiff's direct reports since 2008, liked reporting to Plaintiff and found him to be a good manager; he was fair-minded and was able to get people who would normally not cooperate to cooperate and work together. Plaintiff was also very good at consensus buliding and he was ethical. (Exhibit 11, Cicak Dep. 10:19-20; 11:4-13; 22:8-18; 23:2-9).

13. John Eppley, one of Plaintiff's direct reports since April 2014, testified that Plaintiff gave him the "freedom to grow, to make decisions, strategize investments," and that "[i]f I needed something he was always supportive, for meetings, breaking down barriers for processes or politics that just weren't supportive." (Exhibit 13, Eppley Dep. 7:19-8:4; 9:3-6; 26:20-27:4).

14. When Plaintiff was placed on a PIP, Eppley was in disbelief, as he held Plaintiff in high regard as a manager and the team was strong and delivering results, so, per Eppley, "how could [Plaintiff] be a poor performer?" (Exhibit 13, Eppley Dep. 74:15-75:2).

15. Plaintiff was promoted effective November 10, 2014 into the position of Senior Director, Facility Management, reporting to Nir Aharoni. (Exhibit 34, Teva (SM) 658).

16. Prior to November 2014, Aharoni never considered terminating Plaintiff's employment. (Exhibit 1, Aharoni Dep. 105:9-15).

17. When Plaintiff was promoted in November 2014, he received an increase in his base pay. (Exhibit 35, p. 2).

18. Nir Aharoni was unable to think of a single situation in which an employee at Defendants was promoted into a higher-level position when it was not warranted because he or she was a poor performer. (Exhibit 1, Aharoni Dep. 102:12-18).

19. Based on Nir Aharoni's twelve and a half years tenure at Defendants, it was his experience that employees were only promoted because they were doing a good job and performing well. (Exhibit 1, Aharoni Dep. 62:18-23).

20. According to Jennifer Flaisher, Vice President of Human Resources ("HR") with oversight for the HR function for the United States, employees who were not performing well

3

were not promoted. (Exhibit 5, Flaisher Dep. 19:1-3). According to Flaisher, employees were promoted on the basis of good performance. (Exhibit 5, Flaisher Dep. 11:7-9; 11:24-12:14; 19:4-6).

21. As VP of HR, Flaisher's responsibilities included performance management; hiring; employee development; leadership development; organizational effectiveness; employee relations; and, EEO matters. (Exhibit 5, Flaisher Dep. 14:7-15). As VP of HR, Flaisher was the highest-level employee in the United States who was responsible for making sure that employment decisions were not being made on the basis of protected characteristics. (Exhibit 5, Flaisher Dep. 17:20-18:2).

22. Plaintiff's 2014 performance review, which he received in January 2015, included that Plaintiff's strengths were the following:

> Has integrity, reliability, and loyalty
> Professional at the HARD services and have tactical management capabilities
> Safety and QA are top priority
> Service-oriented, team player
> Strong commitment to Teva, to US, to GFM and mainly to his staff
> Understand the complexity of managing suppliers
> Work well in a familiar environment

(Exhibit 36, Teva (SM) 000677).

23. In August 2015, the Human Resources manager conducting the investigation into the complaints made by Plaintiff and his group, Leander Jones, found that, "All members of the US GFM Team expressed their support for their team members and Steve the Manager. They indicated that they all got along well with one another. They supported each other and have a great deal of expertise and skill to be effective as a group." (Exhibit 37, Teva (SM) 000248).

24. During Kristin Macone's interview with Jones as part of the investigation, she said in response to the question, "How would you characterize your working relationship with Steve Middlebrooks?"

> Says her working relationship with Steve is very good. Says she applied for the role in Steve's group and landed the opportunity. Said he works with her and values her opinion. She states that Steve is a good Manager and does a good job of working with the group.

(Exhibit 37, Teva (SM) 000256).

25. During Ellen Cicak's interview with Jones as part of the investigation, she said regarding Plaintiff and his management of the group, she said in response to the question, "How would you characterize your working relationship with Steve Middlebrooks?"

> Ellen feels that Steve is the best Manager she has ever worked for. He quietly handles and corrects you. He works well with others and keeps down controversy. He encourages and takes out roadblocks. He has a good

4

management style and stated she has never seen anything prejudicial with Steve. (Exhibit 37, Teva (SM) 000256).

26. During John Eppley's interview with Jones as part of the investigation, he said in response to the question, "How would you characterize your working relationship with Steve Middlebrooks?"

> Says Steve is a good boss. Not a micro manager. Not going to hold your hands, but does support you in whatever way he can. Personally that works for me. Steve is one of the best bosses I've had. I feel he is underappreciated by Israel. Says Steve values his opinion, but doesn't feel he is valued by Israel. Given the difficulty with the interactions of the team with Nir and others, it makes it hard to get together on priorities.

(Exhibit 37, Teva (SM) 000256).

27. During Rhonda Wilton's interview with Jones as part of the investigation, she said in response to the question, "How would you characterize your working relationship with Steve Middlebrooks?"

> Says her and Steve work well together. He has a style that lets her do her job in Canada. When she needs something or needs to talk, he's available and is very responsive.

(Exhibit 37, Teva (SM) 000256).

28. During Scott Hoyt's interview with Jones as part of the investigation, she said in response to the question, "How would you characterize your working relationship with Steve Middlebrooks?"

> Said he is always available to help and is supportive. Said he feel[s] Steve is working toward bettering the relationship with the global team, but it is a challenge for him.

(Exhibit 37, Teva (SM) 000256).

29. During Troy Gaugler's interview with Jones as part of the investigation, he said in response to the question, "How would you characterize your working relationship with Steve Middlebrooks?"

> Says Steve is a good manager and needs to get support from them. He has a very good working relationship with him and he allows him to do his job. Says they work together to get things done. They all respect one another.

(Exhibit 37, Teva (SM) 000257).

30. During Ray Duggan's interview with Jones as part of the investigation, he said in response to the question, "How would you characterize your working relationship with Steve Middlebrooks?"

Said he is a big fan of Steve Middlebrooks. Felt Steve has done a good job of keeping the team focused and producing in light of the great responsibilities he has on him. Has great respect for him and his knowledge and says the GFM US group is a close knit group. Steve has done well in picking up the slack for some of the short fall of the interactions and challenges we face. Things are ignored by Nir, but Steve fills in where and when he can. I need quite a bit of approvals for the work I do in my role. Nir has not been responsive.

(Exhibit 37, Teva (SM) 000257).

31. Prior to the August 2015 investigation, Mini Rodriguez, one of the HR business partners who supported Plaintiff's group in 2015, never concluded that Plaintiff did or said anything that was dishonest. (Exhibit 4, Rodriguez Dep. 20:3-6; Exhibit 5, Flaisher Dep. 19:12-18).

32. From the time that Rodriguez started supporting the Facilities Management group in around late spring 2014 through the end of her employment in December 2015, Rodriguez never get any complaints from Plaintiff's direct or indirect reports about his management or leadership. (Exhibit 4, Rodriguez Dep. 8:11-21; 4:21-24; 20:7-13).

33. From the time that Rodriguez started supporting the Facilities Management group in around late spring 2014 through the end of her employment in December 2015, Rodriguez never heard any complaints about Plaintiff from the employees who reported to him directly or indirectly. (Exhibit 4, Rodriguez Dep. 8:11-21; 4:21-24; 20:14-19).

34. Up until the time that Rodriguez left her employment at Defendants, around December 11, 2015, no one had raised the issue of terminating Plaintiff's employment. (Exhibit 4, Rodriguez Dep. 196:22-197:4; 189:9-11).

35. Around October 2015, Nir Aharoni said in a meeting that the North American team was the best performing or highest-performing team under him. (Exhibit 12, Gaugler Dep. 131:14-24). Aharoni said that they were performing very well, and then he raised their bar. (Exhibit 12, Gaugler Dep. 131:23-24).

36. Eppley also remembered Aharoni making a comment about the North American group being the best performing group under his supervision when they were in Toronto (in October 2015). (Exhibit 13, Eppley Dep. 132:5-23).

37. Prior to the August 2015 investigation into the complaints made by Plaintiff and his group, no one mentioned to Rodriguez terminating Plaintiff's employment. (Exhibit 4, Rodriguez 10:3-7; 16:10-13).

38. Prior to the August 2015 investigation into the complaints made by Plaintiff and his group, no one specifically mentioned placing Plaintiff on a PIP. (Exhibit 4, Rodriguez 10:3-7; 11:21-24).

39. Prior to mid-June 2014, Rodriguez did not have any concerns about Plaintiff's performance or his management. (Exhibit 4, Rodriguez Dep. 26:17-20).

40. Chris Swartz took over as HR Business Partner for Plaintiff's group in late 2015. (Exhibit 5, Flaisher Dep. 19:12-18; Exhibit 38, Swartz Dep. 20:4-10).

41. Flaisher never concluded that Plaintiff was dishonest at any point up through his termination on February 29, 2016. (Exhibit 5, Flaisher Dep. 77:10-19).

## II.   **Nir Aharoni's Deficient Performance, Management, and Leadership**

42. Nir Aharoni was born in 1970. (Exhibit 1, Aharoni Dep. 11:21-22.  He is Israeli. (Exhibit 1, Aharoni Dep. 11:23-24).  He started working at Defendants in May 2005. (Exhibit 1, Aharoni Dep. 27:24-28:2).

43. As of around late 2013, Nir Aharoni was in the position of Vice President, Head of Global Facility Management, reporting to Eli Aharoni. (Exhibit 1, Aharoni Dep. 47:7-11; 72:12-17; 72:22-24).  In that capacity, he was head of the global organization that existed in all regions. (Exhibit 1, Aharoni Dep. 47:12-16).

44. Throughout Nir Aharoni's entire employment with Defendants, he was never disciplined regarding his conduct. (Exhibit 1, Aharoni Dep. 57:3-6).

45. According to Defendants' witnesses, Nir Aharoni had a "serious credibility issue among the US leaders." (Exhibit 39, Teva (SM) 001896).

46. According to Flaisher, Head of HR for the U.S., Nir Aharoni had "some capability gaps." (Exhibit 39, Teva (SM) 001896).

47. Chris Swartz agreed with Flaisher that Nir Aharoni had "some capability gaps." (Exhibit 38, Swartz Dep. 138:6-8).

48.     Swartz stated about Aharoni, "he is difficult to wrangle in and execute.  I have to continuously stay on him." ((Exhibit 40, Teva (SM) 1922).

48. Rodriguez talked to Nir Aharoni repeatedly regarding his lack of responsiveness, which was causing frustrating among his employees.  Rodriguez also talked to Ilanit Strouchler, the Human Resources Business Partner for global support functions who supported the Global Facilities Management organization through 2016, repeatedly, regarding Nir Aharoni's lack of responsiveness and the resulting frustration that it caused within the team. (Exhibit 9, Strouchler Dep. 17:13-23; 25:1-5; Exhibit 4, Rodriguez Dep. 66:1-67:8).

49. According to Rhonda Wilton, "Nir gave conflicting directions; changed requirements regarding our savings targets; changed the end zone/goal post on our targets.  Steve did his best to keep up the team morale and to keep the team motivated despite these difficulties resulting from Nir's management.  From my perspective, management of the group was not handled well

from Nir's end." (Exhibit 33, Middlebrooks 2093).

50. During John Eppley's interview with Jones as part of the August 2015 investigation, he said that he "runs into problems when he can't get Nir to approve things…I have sent confidential agreements to him and he's not been responsive on a number of occasions.  Feels the group as a whole is not getting the cooperation they need to be effective in their roles." (Exhibit 37, Teva (SM) 000249).

51. During Troy Gaugler's interview with Jones as part of the August 2015 investigation, he said that, "he feels they don't get the support they need from Nir.  Says he's running into losing personnel because Nir won't make decisions.  This has led to a great deal of frustration on his part and the others.  He had a person to quit because he was trying to get a pay increase processed and Nir wouldn't act.  The person ended up leaving.  Says he has more of his people thinking about leaving and he's trying to do something about it, but can't get the help from Nir." (Exhibit 37, Teva (SM) 000250).

52. During Ray Duggan's interview with Jones as part of the August 2015 investigation, he "[i]ndicates he can't get things signed or approved to keep things moving due to Nir not responding.  Said that's not right and feels this is what creates this type of work environment that has people feeling differently about management." (Exhibit 37, Teva (SM) 000253).

53. Strouchler had concerns about Nir Aharoni's performance, including that it took too long for him to make decisions; that he was "too soft"; and, that it was very difficult for him to deliver a difficult message, including to all of his employees. (Exhibit 9, Strouchler Dep. 44:6-45:20).

54.    Nir Aharoni's lack of action on open positions was a significant problem in the U.S. (Exhibit 9, Strouchler Dep. 121:4-9; 123:1-4).

55. Nir Aharoni was given feedback on more than one occasion regarding his lack of action on filling open positions, but he was never disciplined for that issue, and he was never put on any type of performance improvement plan regarding that issue. (Exhibit 1, Aharoni Dep. 207:15-208:12; 210:5-12).

56. As of October 16, 2015, there was concern on the part of HR that Nir Aharoni's "lack of action on the open positions is negatively impacting the existing team and risking potential prospects.  It's also impacting the productivity of the US GFM team." (Exhibit 41, Teva (SM) 1511).

57. Nir Aharoni denied ever being given feedback that his failure to fill open positions was impacting the productivity of the U.S. teams. (Exhibit 1, Aharoni Dep. 213:12-17).

58. Strouchler gave Nir Aharoni feedback on multiple occasions about her concerns regarding his performance. (Exhibit 9, Strouchler Dep. 45:21-46:2).

59. Strouchler spoke with Nir Aharoni's boss on multiple occasions about her concerns regarding Nir Aharoni's performance deficiencies. (Exhibit 9, Strouchler Dep. 46:3-8).

60. Strouchler shared with her supervisor her concerns regarding Nir Aharoni's performance on multiple occasions. (Exhibit 9, Strouchler Dep. 46:9-13).

61. Rodriguez shared with Strouchler that Nir Aharoni was not responsive to her requests and that it took him a very long time to get back to her. (Exhibit 9, Strouchler Dep. 46:18-47:4).

62. According to Rodriguez, Nir Aharoni was not a strong manager. (Exhibit 4, Rodriguez Dep. 170:18-20).

63. Others, including Flaisher and Strouchler, shared Rodriguez's opinion that Nir Aharoni was not a strong manager. (Exhibit 4, Rodriguez Dep. 171:19-172:3).

64. Strouchler never recommended to anyone that Nir Aharoni be placed on a performance improvement plan or given some type of warning regarding his performance. (Exhibit 9, Strouchler Dep. 48:8-15).  No one ever raised that issue to Strouchler. (Exhibit 9, Strouchler Dep. 48:16-17).

65. During the time that Strouchler supported the Global Facilities Management group, Nir Aharoni was never given any disciplinary action regarding performance issues. (Exhibit 9, Strouchler Dep. 49:1-5).

66. Nir Aharoni was never told that he was in danger of being terminated. (Exhibit 9, Strouchler Dep. 49:6-8).

67. Nir Aharoni was never placed on a performance improvement plan. (Exhibit 9, Strouchler Dep. 49:9-11).

68. Aharoni was given feedback regarding his passivity regarding filling open positions. He was never disciplined or put on any performance improvement plan regarding the same. (Exhibit 1, Aharoni Dep. 207:22-208:12).

69. As of October 17, 2015, there was concern on the part of HR about Nir Aharoni's continued performance deficiencies, as Rodriguez stated as follows in an email to Strouchler:

> IMPORTANT :  we need to resolve the open headcount.  This is a huge source of frustration for the US team and its negatively impacting the moral of the team and their productivity.  It's also eroding not only their view of Steve but also of Nir and more importantly the team is short-staffed and working more hours to cover which is wearing them down.  I'm not sure if Nir sees or understands this.  I personally have provided information to him on more than one occasion, I've spoken to him, I've answered questions and still he won't act.  Please if there is anything you can do to influence him to take action I'm certain this will have a positive effect on the entire team and reduce a good a fair amount of tension.

(Exhibit 42, Teva (SM) 1517).

### III.  The Creation of the Global Facility Management Organization

70. The global facilities management organization was a new initiative for Defendants. (Exhibit 1, Aharoni Dep. 72:18-21).

71. Nir Aharoni was responsible for leading the Global Facilities Management Organization. (Exhibit 43, Teva (SM) 000809).

72. When Nir Aharoni took over as head of global facility management, it was a brand new initiative.  As a result, he expected that there would be issues or bumps in the road. (Exhibit 1, Aharoni Dep. 85:13-86:7).

73. There were growing pains associated with the brand new Global Facilities Management group. (Exhibit 9, Strouchler Dep. 52:9-21).  As of May 2015, there were still growing pains with the GFM organization as it tried to work itself out and settle in. (Exhibit 4, Rodriguez Dep. 68:20-24).

74. It is part of facilities management to get complaints from internal clients regarding the services that the organization managers. (Exhibit 1, Aharoni Dep. 130:7-131:16).

75. Nir Aharoni was ultimately responsible for making sure that everything went smoothly with the new global facility management organization. (Exhibit 1, Aharoni Dep. 86:8-12).  Nir Aharoni was ultimately responsible for the global facility management organization. (Exhibit 4, Rodriguez Dep. 27:18-23).

76. Plaintiff became part of Defendants' Global Facilities Management organization in early January 2014, reporting directly to Nir Aharoni, Global Facility Management, Director. His position was Head of the North America (US and Canada) Facility Management Organization. (Exhibit 44, Exhibit 45).

77. Nir Aharoni selected Plaintiff as head of North American Global Facilities Management in part because Plaintiff had already been managing some of the sites in the U.S. and he already oversaw the areas that were the responsibility of the new Global Facilities Management organization. (Exhibit 1, Aharoni Dep. 74:17-10).

78. Aharoni placing Plaintiff into the position of Head of North American facilities management was helpful to Aharoni in his new role as head of global facilities management, particularly as Plaintiff was the one who was knowledgeable and familiar with some of the U.S. sites. (Exhibit 1, Aharoni Dep. 168:3-19).

79. Plaintiff had been doing facilities for a "long time" in North America. (Exhibit 4, Rodriguez Dep. 28:6-7).

80. According to Nir Aharoni, the only changes to Plaintiff's responsibilities when he became head of North American Facilities Management were to take over certain sites in the U.S. and Canada that he had not managed before, and taking responsibility for soft services at the TGO sites. (Exhibit 1, Aharoni Dep. 80:16-81:3).

81. According to Aharoni, Human Resources, such as Rodriguez and Flaisher, did not understand the work demands or requests or what was needed; as such, they were not qualified to have opinions on topics such as headcount issues. (Exhibit 1, Aharoni Dep. 216:3-14).

## IV.    Defendants Retain An Executive Coach For Plaintiff

82. Retaining an executive coach for employees had been done in situations in which an employee was in a new position; situations in which an employee was in a new group; part of a development program for employees; to use as a tool to help an employee grow into their role when the manager believed in the potential of that employee to grow and develop. (Exhibit 9, Strouchler Dep. 73:19-74:11).

83. According to Rodriguez, Nir Aharoni was not engaged in the coaching process for Plaintiff that he had initiated. (Exhibit 4, Rodriguez Dep. 72:16-73:4).

84. The form to obtain the coach for Plaintiff does not include anything about the reason(s) for the same being any performance deficiencies or performance problems on Plaintiff's part. (Exhibit 7; Exhibit 4, Rodriguez Dep. 103:9-13).

85. On the part of the coaching form that talks about expectations regarding coaching and desired outcomes, it does not say anything about performance deficiencies regarding Plaintiff. (Exhibit 4, Rodriguez Dep. 106:23-107:9).

86. The form to retain the coach for Plaintiff and that Rodriguez signed includes a statement that the undersigned "confirm this individual is in good standing and considered a key talent within Teva." (Exhibit 6, Teva (SM) 000351).

87. Plaintiff did everything that he was asked to do regarding the coaching process. (Exhibit 4, Rodriguez Dep. 111:21-24). Rodriguez did not have any concerns regarding Plaintiff's full engagement in that process. (Exhibit 4, Rodriguez Dep. 112:1-3).

88. Rodriguez was disappointed with Nir Aharoni's lack of engagement and lack of responsiveness to her, Plaintiff, and the coach, in the coaching process. (Exhibit 4, Rodriguez Dep. 73:3-8; 110:8-23; 113:8-10). Although she spoke with Flaisher and Strouchler regarding that issue, nothing changed regarding Nir Aharoni's engagement or his lack of responsiveness. (Exhibit 4, Rodriguez Dep. 111:18-20; 113:11-114:7).

89. The coach wrote in his final report that,

> "I experienced Steve to be fully engaged in the coaching process. During each session Steve expressed his desire to be successful in his role as a Sr. Director in

11

Facilities Management.  Our conversations were earnest and truthful and Steve ask[ed] many questions on how he might be more successful in working with Nir and implementing GFM."
(Exhibit 46, Teva (SM) 000345).

90. The coach also included that, "I did not experience Steve as either slow moving or unwilling to change.  Rather, I experienced Steve as a manager who understood when he could leverage the larger environment and when he needed to operate within the environmental restrictions to be successful." (Exhibit 46, Teva (SM) 000345).

91. The coach included the following observations that he made during the coaching process:

- Steve was fully engaged in the coaching process.
- Conversations with Steve were thoughtful and considered.
- Suggestions made by me were talked through and tried by Steve after the coaching session.
- After trying a suggestion, Steve and I would discuss what worked, what to keep and what to do differently the next time at the next session.
- Steve wants to be successful in his role and to have an effective working relationship with Nir.
- Nir was not engaged in Steve's coaching program.  At no point did I have a conversation with Nir
- Meetings requested by Nir and Mini [Rodriguez] to Nir to discuss Steve's coaching program were regularly cancelled by Nir.

(Exhibit 46, Teva (SM) 000344).

92. The coach wrote in his final report that, "Nir's seeming indifference to the North American cultural, legal and regulatory environment added to the challenge of coaching Steve." (Exhibit 46, Teva (SM) 000345).

93. Rodriguez never discussed the coach's concern regarding Nir's seeming indifference to the North American cultural, legal and regulatory environment added to the challenge of coaching Steve" with the coach and she does not remember sharing it with anyone at the company. (Exhibit 46; Exhibit 4, Rodriguez Dep. 116:5-24).

## V.   Discriminatory Conduct by Nir Aharoni and Members of his Israeli Team

94.     Aharoni told Plaintiff that, of the three employees in his group who were eligible for equity awards in 2015, Troy Gaugler, Roy Duggan, and Plaintiff, Aharoni was awarding it only to Gaugler. (Exhibit 2, Pl. Dep. 173:19-174:14).

95. Managers had discretion as to the award of equity to their employees. (Exhibit 4, Rodriguez Dep. 196:11-18).

96. Gaugler was born in 1966. (Exhibit 12, Gaugler Dep. 10:15-18).

12

97. When Duggan did not receive an equity award in 2015 for 2014, he asked Nir Aharoni why he did not get the award. Nir Aharoni's response was that the awards were "only for employees that will be with us for a long time."(Exhibit 14, Duggan Dep. 24:5-25:19).

98. At the time of Nir Aharoni's explanation to Duggan as to why he did not get the equity award, Duggan was in his late fifties, had been with the company for about twenty eight years at that point, and planned to be at the company until his retirement, probably between the ages of sixty two and sixty five. (Exhibit 14, Duggan Dep. 26:10-22).

99. According to Gaugler, Duggan, who was born in 1958, told him that Aharoni told him that he was not awarded equity because it was given to the people who were younger and added more value. (Exhibit 12, Gaugler Dep. 136:5-14; Exhibit 14, Duggan Dep. 6:15-16).

100. Duggan told Eppley about Aharoni's comment to him. Eppley understood from talking to Duggan that Duggan understood Aharoni's comment to be age-based, i.e., that Duggan was not awarded equity because of his age. (Exhibit 13, Eppley Dep. 120:7-121:10).

101. Duggan told Plaintiff that Aharoni had told him that the reason why he did not get an equity award was because equity was designed for people who were going to be with the company for a long period of time and it was not designed for people of his age. (Exhibit 2, Pl. Dep. 179:6-17).

102. Duggan told Rodriguez about Nir Aharoni's comment that equity awards were only for employees who will be with us for a long time. She said that she would look into it. (Exhibit 14, Duggan Dep. 32:14-33:8).

103. When Rodriguez got back to Duggan a couple weeks later, her only response was that the ship had sailed and it was too late to do anything. (Exhibit 14, Duggan Dep. 33:9-14).

104. Aharoni told Plaintiff that he did not receive an equity award because employees who receive "Mostly Meets" ratings on their performance reviews are not eligible for equity. (Exhibit 2, Pl. Dep. 175:1-5).

105. Duggan's performance review ratings for 2014 and 2015 were both "Fully Meets." (Exhibit 14, Duggan Dep. 32:4-10).

106. Nir Aharoni testified that he would like to know if an employee was thinking about retirement or had long-term plans to retire so that he could make future plans for his group and be prepared for the change. (Exhibit 1, Aharoni Dep. 78:9-18).

107. Shimrit Shemtov and Roni Kafre, both of whom were reports to Aharoni, asked Plaintiff for information regarding the ages of Plaintiff's direct reports. (Exhibit 47, No. 5).

108. After Plaintiff began reporting to Aharoni, Aharoni asked Plaintiff for the dates of birth of each of Plaintiff's direct reports. (Exhibit 47, No. 5).

109.     Aharoni, Shemtov, and Kafre told Plaintiff that they needed information regarding the ages of employees because they make employment decisions based on age. (Exhibit 47, No. 5).

110.     Shemtov admitted to the investigator that she asked Macone's age in the interview process, and that she made comments about Eppley and Wilton's marital status.  She said, "I have been in the U.S. on several occasions and do understand some of the ways, but in this case I must admit I should not have said these things." (Exhibit 37, Teva (SM) 000270).

111.     Plaintiff was the first American whom Nir Aharoni directly supervised. (Exhibit 1, Aharoni Dep. 62:24-63:3).

112.     Nir Aharoni asked Ellen Cicak for the birth dates of her reports. (Exhibit 11, Cicak Dep. 91:1-4).

113.     Roni Kafre asked Ellen Cicak how old she was around 2014. (Exhibit 11, Cicak Dep. 89:7-14).

114.     When another employee, Carolyn Tousius, returned from her trip to Israel, she told Cicak that, when she stopped by Nir Aharoni's office to tell him what a wonderful time she had and how beautiful the country was, he told her that now she would know that they weren't just a bunch of guys riding camels. (Exhibit 11, Cicak Dep. 94:18-95:9).

115. Tousius told Cicak that she was offended by Nir Aharoni's comment. (Exhibit 11, Cicak Dep. 95:10-11).

116. Cicak told Plaintiff what Tousius told her about Nir Aharoni's comment. (Exhibit 11, Cicak Dep. 96:2-5).

117. Tousius told Plaintiff about the incident involving Aharoni in Israel, i.e., that Aharoni said to her that it was about time that Americans came to Israel and realized that they were not a bunch of towel-wearing camel jockeys.  Tousius was emotional when she told Plaintiff about this incident. (Exhibit 2, Pl. Dep. 65:10-66:4).

118. Eppley heard from either Plaintiff or Troy Gaugler that Carolyn Tousius had said that Aharoni made comments suggesting that Americans perceive Israelis as towel-headed camel jockeys. (Exhibit 13, Eppley Dep. 116:17-117:118:2).  When Eppley heard the comments that Aharoni made according to Tousius, he understand them to be derogatory comments about Americans. (Exhibit 13, Eppley Dep. 117:22-118:2).

119. Both Nir Aharoni and Kafre, on multiple occasions, asked Plaintiff's age. (Exhibit 1, Aharoni Dep. 149:10-150:12).

120. Wilton heard Roni Kafre, who reported directly to Nir Aharoni, asked questions about the ages of employees in the group.  She also heard that he engaged in similar conduct with other employees other than her. (Exhibit 33, Middlebrooks 2093).

121. Wilton heard from other employees in the group that Nir Aharoni asked employees questions about age and marital status. (Exhibit 33, Middlebrooks 2093).

122. Wilton "[s]aid that she is somewhat aware of the biases that occur.  Israelis are higher on the totem pole and US is lower." (Exhibit 37, Teva (SM) 000265).

123. Macone believed that Nir Aharoni and Roni Kafre treated Plaintiff poorly, including not respecting his answers or approach to issues; not giving him an opportunity to give his opinions and recommendations and not being interested in them; and, being very disrespectful to him. (Exhibit 32, Middlebrooks 2205).  Macone's belief was that Kafre and Nir Aharoni's treatment of Plaintiff was based on the fact that he was American.  Macone thought that Kafre and Nir Aharoni believed that Americans lacked knowledge and that they were stupid, and that Aharoni and Kafre knew everything. (Exhibit 32, Middlebrooks 2205).

124. Eppley testified that Aharoni and others on the Israeli team would make repeated requests to Plaintiff and his team for the same information; they questioned the team's business processes that may or may not have been within the team's sphere of influence or ownership; and, they asked others in other departments for direction and/or feedback that was not within the discretion of those other departments. (Exhibit 13, Eppley Dep. 111:20-112:7).

125. Plaintiff had told Rodriguez, in around late spring 2014, that he was getting requests from the Israeli group for the ages of employees on the Global Facility Management team. (Exhibit 4, Rodriguez Dep. 62:11-23).  Rodriguez testified that she told Nir Aharoni that that was not their practice in the United States, that Aharoni said that he was not aware of the same, and that the requests stopped after that time. (Exhibit 4, Rodriguez Dep. 62:23-63:6).

126. In around 2013, Eppley heard about the former Vice President for Human Resources making comments about needing to get younger interns and also getting rid of all of the old ladies over fifty. (Exhibit 13, Eppley Dep. 121:11-21; 123:22-124:6).

127. Eppley has heard more than one person at Teva make comments about it being more economical to hire younger people. (Exhibit 13, Eppley Dep. 125:3-6; 128:9-21).

128. Nir Aharoni and Kafre asked Duggan his age on numerous occasions. (Exhibit 14, Duggan Dep. 17:14-19:12).

129. At some point, Duggan and others in the group concluded that the reason that they were given for being asked about their ages, that Nir and Kafre liked to communicate with everyone on their birthdays, was not the real reason.  No one communicated with Duggan on his birthday after he was asked about his age. (Exhibit 14, Duggan Dep. 20:8-21; 22:18-24).

130. Cicak and Gaugler told Duggan that Nir Aharoni and/or Kafre and/or other members of the Israeli team asked them their ages. (Exhibit 14, Duggan Dep. 23:9-18).

131. Shemtov asked Eppley how old he was on a phone call. (Exhibit 13, Eppley Dep. 35:16-36:4).  Shemtov did not tell Eppley why she wanted that information. (Exhibit 13, Eppley

15

Dep. 36:5-7).

132. Macone told Eppley that Shemtov had asked her how old she was. (Exhibit 13, Eppley Dep. 37:21-24).

133. There was a fear among Plaintiff's direct reports that they were being asked their age because certain decisions were being made based on age. (Exhibit 13, Eppley Dep. 38:21-39:6).

134. Flaisher testified that asking employees questions about protected characteristics might indicate bias on the part of the person asking the question. (Exhibit 5, Flaisher Dep. 57:2-16).

135. At one point, someone in Aharoni's group requested age information so that they could understand different services that needed to be supplied.  Plaintiff and Rodriguez said that that request was not acceptable. (Exhibit 1, Aharoni Dep. 147:12-148:6).

136. Plaintiff advised that he was going to address the requests for employees' ages with Aharoni as those kinds of questions were not appropriate. (Exhibit 13, Eppley Dep. 39:16-40:2).

137. Aharoni denied ever asking the ages of employees in the Global Facilities Management group. (Exhibit 1, Aharoni Dep. 147:5-8).

138. Nir Aharoni denied ever, at any time, making comments that were derogatory to Americans. (Exhibit 1, Aharoni Dep. 64:22-65:3).

139. Aharoni denied making a comment about Americans having a narrow-minded perception of Israelis, or something to that effect. (Exhibit 1, Aharoni Dep. 65:4-7).  Aharoni agreed that, if he had made such a comment, it would indicate a bias against Americans. (Exhibit 1, Aharoni Dep. 65:8-12).

140. Aharoni denied making a comment about Americans doing a poor job of supporting Israel in its military actions in the Middle East. (Exhibit 1, Aharoni Dep. 65:16-19).  Aharoni agreed that a comment like that might indicate a bias against Americans. (Exhibit 1, Aharoni Dep. 65:20-66:2).

141. Eppley believed that there was an implicit bias against Americans in that, when the American group, led by Plaintiff, asked for information from Nir Aharoni, Kafre, and Shemtov, they would not get it.  The American group was also told that their objectives changed because the other regions did not achieve their goals. (Exhibit 13, Eppley Dep. 29:16-31:8).  The American group would get sporadic information, but it was rare to get any real feedback. (Exhibit 13, Eppley Dep. 31:23-32:3).

142. Cicak and all of Plaintiff's direct reports felt that Kafre, with Nir Aharoni's permission, was micromanaging Plaintiff and the North American facilities management organization. (Exhibit 11, Cicak Dep. 56:2-11).

16

143. When Cicak brought her concerns regarding her belief that the Israeli team was uninformed regarding the way in which the North American team did its jobs, Plaintiff was supportive of the leadership team beginning with Nir Aharoni and recommended that Cicak be clear and concise when communicating with them. (Exhibit 11, Cicak Dep. 59:9-60:1).

144. Cicak observed Aharoni shouting at Plaintiff and embarrassing and humiliating Plaintiff. (Exhibit 11, Cicak Dep. 66:1-67:5).

145. In 2016, after Plaintiff's termination, his group was on a trip to Israel.  During the trip, another employee was speaking to the Global Facility Management group, and made an opening remark to break the ice about people of different ethnicities that was derogatory and insulting to Americans.  The group of Americans at the table were "visibly tensed" to the point where an HR representative came over to them at the next break and asked if they were okay. The group said that they did not appreciate the remarks, that it was insulting.  The HR representative agreed and said that she would have the employee apologize. (Exhibit 11, Cicak Dep. 92:7-93:17).

146. At lunch, the employee came over to the American group and told them that she was sorry that they did not know what funny was. (Exhibit 11, Cicak Dep. 93:18-20).

147. At the end of the conference, Nir Aharoni told the American group that he understood that they did not like the comments, but that they needed to understand that that was just the kind of thing that "they think is funny" and that they needed to be okay with it in that context. (Exhibit 11, Cicak Dep. 93:21-94:6).

148. Israel has a mandatory retirement age for men. (Exhibit 9, Strouchler Dep. 29:12-16. Men are notified about three (3) months before their 67th birthdays and then usually, in the last month or so before they turn 67 years old, they transition their responsibilities. (Exhibit 9, Strouchler Dep. 36:11-20; 38:5-22).

## VI.     Plaintiff's Protected Activity And Defendants' Discriminatory And Retaliatory Response

### A.     Plaintiff's Initial Protected Activity Leading to Defendants' "Investigation"

149. When Nir Aharoni learned of the complaints made by Plaintiff's group, including that employees were making complaints that they were being asked questions about their ages, he was concerned about the same. (Exhibit 1, Aharoni Dep. 112:9-113:13; 122:10-20).

150. In the staff meeting that Rodriguez attended that led to the investigation, Plaintiff was one of those complaining about differential treatment between Israelis and Americans. (Exhibit 2, Pl. Dep. 332:14:21).

151. Prior to the staff meeting that led to the investigation, Plaintiff told Rodriguez that his group felt that they were being treated differently, i.e., worse than their counterparts in Europe and Israel. (Exhibit 2, Pl. Dep. 219:7-221:9).

152. When Gaugler mentioned that the environment was hostile in the June 2105 meeting, he did not say anything about it being hostile because of age or national origin. (Exhibit 12, Gaugler Dep. 130:11-16).

153. Gaugler did not recall whether or not he told Jones during the course of the investigation that he believed that it was a hostile work environment based on age or national origin. (Exhibit 12, Gaugler Dep. 130:17-24).

154. When Plaintiff informed Aharoni about the meeting and that he believed that it warranted an investigation, Aharoni's response was that, "a good manager would have stopped this prior to an investigation," and that it was Plaintiff's responsibility, and Plaintiff's fault that there was going to be an investigation." (Exhibit 2, Pl. Dep. 233:11-234:2).

155. That was the first time that Aharoni's reports were the subject of the kinds of concerns and issues being raised by Plaintiff's group. (Exhibit 1, Aharoni Dep. 121:22-122:5).

156. Aharoni had never had to deal with an issue like these complaints in his entire career with Defendants. (Exhibit 1, Aharoni Dep. 142:9-12).

157. Aharoni was never informed that there were any complaints involving his conduct as part of the investigation process. (Exhibit 1, Aharoni Dep. 171:17-172:2).

158. Aharoni was never interviewed as part of a formal investigation before. (Exhibit 1, Aharoni Dep. 142:13-15).

159. Aharoni viewed as an issue and a problem from Plaintiff the fact that Plaintiff did not handle the situation regarding the complaints from his group and Aharoni had to get involved regarding the same. (Exhibit 1, Aharoni Dep. 131:17-132:7).

160. Rodriguez believed that this was the first time that anyone at Defendants had complained about Nir Aharoni as a manager. (Exhibit 4, Rodriguez Dep. 153:2-7).

161. Aharoni felt that if Plaintiff were a stronger manager, he could have handled these complaints himself and Aharoni would not have had to deal with them. (Exhibit 1, Aharoni Dep. 132:23-133:4).  If Plaintiff had handled the complaints on his own, Aharoni would have never had to be bothered with them. (Exhibit 1, Aharoni Dep. 133:13-16).

162. Nir Aharoni was angry about the internal investigation.  As Plaintiff testified,

"He told me directly that a good manager would have controlled his people and it never would have gotten this far.  He was angry about the EEOC complaint.  He said it was the first time that anyone had made a complaint like that and he told me that there were weeks that went by that he was too angry even to talk to me.  He couldn't even get on the phone to talk to me; he was that angry."

Those comments that Aharoni made to Plaintiff about the investigation were in around October 2015. (Exhibit 2, Pl. Dep. 288:6-23; 289:21-23).

18

163. Aharoni's comments to the investigator included the following:

> "I feel if Steve was stronger as a Manager, we would not be as involved with the team as we are. Steve is committed and is a nice guy, but managerially we have problems with him. Mini [Rodriguez] came to me and indicated that there were problems...

> When meeting with everyone they said that they had concerns with recruitment, the differences in the culture, not getting quick responses to things, lack of approved headcount, etc. I felt that all these things were managerial things. If Steve would have managed these things they could have been mitigated."

(Exhibit 37, Teva (SM) 000273).

164. When HR told Aharoni that a formal investigation would have to be conducted into the complaints from Plaintiff's group, he questioned that decision. (Exhibit 1, Aharoni Dep. 142:24-143:3).

165. As of the time that these complaints came up, Aharoni knew that it was illegal in the U.S. to ask an employee's age. (Exhibit 1, Aharoni Dep. 145:2-6).

166. During the course of the investigation, Plaintiff told the investigator the following:

- "The numerous requests for data that is not acceptable (age) and them not knowing what we do is impacting negatively on getting things done."

- "Said Kristin [Macone] was interviewed and was asked questions about how old she was, whether she was married, and whether she had kids. Said he went to Management and asked that it stop."

- "After this, said he got a memo from Israel to send them all this information. Said he told them he would not be providing this information. He spoke to Mini Rodriguez (Sr. HR Mgr.) and Ilanit Strouchler (HR) about it. I continue to get the request. I did collect some information for them, but not illegal stuff. I did at one point say to those making the request that if I got another one like this, I would make sure somebody got fired."

- "[Shemtov] told another member of the team that having kids without being married is inappropriate. After saying this, she then asks me to fix it implying that I as [the employee's] Manager must fix it."

(Exhibit 37, Teva (SM) 000251, 000261).

167. During the course of the investigation, Kristin Macone told the investigator that Shemtov asked her age and marital status during her interview process. (Exhibit 37, Teva (SM) 000248).

19

168.     During the course of the investigation, Ellen Cicak told the investigator that there were times when there appeared to be ethnic bias. (Exhibit 37, Teva (SM) 000249).

169. During the course of the investigation, Scott Hoyt told the investigator that he has been asked to supply age and demographic information from time to time and that they "don't understand why they can't be asking these types of questions." (Exhibit 37, Teva (SM) 000250).

170. During the course of the investigation, Troy Gaugler told the investigator that there were "questions about age on-going." (Exhibit 37, Teva (SM) 000252).

171. During the course of the investigation, Ray Duggan told the investigator that Shemtov asked people their age and other things that she shouldn't. Dep. Ex. P-17, Teva (SM) 000253.

172. Nir Aharoni denied being told that any complaints were being raised by Plaintiff's group about him, as part of the August 2015 investigation. (Exhibit 1, Aharoni Dep. 127:3-6). He was told that all of the complaints that were being made by Plaintiff's group were about Shimrit Shemtov and Roni Kafre. (Exhibit 1, Aharoni Dep. 127:3-14).

173. The August 2015 Investigative Report includes that, "[t]here are some in the Global group (Shimrit) who feel [Plaintiff] is not fulfilling his responsibilities totally as a Manager for the US GFM business.  They cite a number of issues with his drive for higher level of performance from his team to his inability to communicate appropriately to major stakeholders. As a result of this, he is viewed as not being able to lead and take the group to the next level." (Exhibit 17, Teva (SM) 000258).

174. Shemtov admitted, as part of the investigation, that she made comments based on things like age and marital status. (Exhibit 37, Teva (SM) 000270).

175. The investigator's conclusion in the investigative report indicated that the information gathered as part of the investigation "touched on two distinct areas of concern:" Legal Issues (Hostile Work Environment/Employment Law) and Managerial/Leadership Issue in the Work Environment. (Exhibit 37, Teva (SM) 000274).  The Legal Issues included:  personally being asked my age in a formal interview; on-doing requests made by Israel for age and demographic information; telling someone it is unacceptable to have children and not be married; asking someone's marital status during the interview process; perceived discrimination due to ethnic bias; being told that your request[s] are illegal, but persist in making the request anyway; and, fear of retaliation for sharing. (Exhibit 37, Teva (SM) 000274).

176. The proposed recommendations from the investigation included the following:

- Provide Nir, Roni, and Shimrit with cultural and sensitivity training for Managers. Especially on US practices/law, culture, and ways of working.  Also address the topic of retaliation.
- Provide counseling to Shimrit and Roni regarding their behavior and interaction with the team and the need for adherence to US laws and statutes.  Express need

for accountability and sincere desire to change.
- Have the team capitalize on more purposeful and productive interactions intended to gain understanding and synergies as a way of working to better the team/group overall.
- Suggest HR provide follow-up session with Steve and/or GFM Team on outcomes of investigation and steps agreed upon going forward.
- Provide the GFM team with refresher training on harassment and hostile work environment for clarity and baseline understanding.  Cover also the topic of retaliation.
- Conduct a management alignment session on expectations with Nir, Shimrit, Roni, and Steve.
- Have HR Team address follow up items from investigation to improve work environment and customer satisfaction.

(Exhibit 37, Teva (SM) 000276).

177. Kafre was not given any kind of performance warning for his conduct. (Exhibit 9, Strouchler Dep. 105:12-14).

178. Strouchler did not tell Shemtov that she was being given any type of performance warning. (Exhibit 9, Strouchler Dep. 106:9-11).

179. Defendants did not issue anything in writing to Shemtov or Kafre in connection with the counseling that was recommended that they receive as a result of the investigation. (Exhibit 9, Strouchler Dep. 102:16-18).  There is no documentation of the meetings that Strouchler said that she had with Shemtov and Kafre regarding the counseling that was recommended for them as a result of the investigation. (Exhibit 9, Strouchler Dep. 102:19-21; 107:19-23).

180. There were no discussions about giving Nir Aharoni any type of disciplinary action in connection with the investigation in which Strouchler was involved. (Exhibit 9, Strouchler Dep. 101:14-21).

181. When Flaisher read parts of the investigative report in 2015, she understood that Plaintiff, and the group that he led, made complaints about discriminatory conduct and, as such, engaged in protected activity when they made their complaints about discriminatory conduct. (Exhibit 5, Flaisher Dep. 155:1-15).

182. After the internal complaint was filed, Aharoni treated Plaintiff differently; he became colder and more critical, and their conversations were much shorter and less frequent. (Exhibit 2, Pl. Dep. 136:14-137:4).

## B. **Defendants Give Plaintiff A Negative Mid-Year Review**

183. On July 23, 2015, Plaintiff sent Nir Aharoni a self-evaluation for his mid-year review, and indicated that his performance had improved and that he was either meeting or exceeding all of his 2015 goals. (Exhibit 48).

184. Although Aharoni testified that he disagreed with what Plaintiff wrote, that his performance had improved and that he was either meeting or exceeding all of his 2015 goals, he did not document his disagreement at all between when he received Plaintiff's email in July and October when Aharoni gave Plaintiff his mid-year review. (Exhibit 1, Aharoni Dep. 226:19-227:23).

185. Nir Aharoni did not respond to Plaintiff's sending his mid-year review in July 2015 until October 2015. (Exhibit 1, Aharoni Dep. 226:9-16).  Aharoni did not give Plaintiff any type of mid-year review until October 2015. (Exhibit 1, Aharoni Dep. 226:13-18).

186. Aharoni did not write his response to Plaintiff's mid-year review until October 12, 2015. (Exhibit 8; Exhibit 1, Aharoni Dep. 230:21-231:7).

187. Aharoni's October 12, 2015 response to Plaintiff's mid-year review was the first time since Plaintiff's performance review for 2014 (that he received in January 2015) that Aharoni put in writing concerns about Plaintiff's performance. (Exhibit 1, Aharoni Dep. 234:13-235:9).

188. Rodriguez was concerned that, as of late September 2015, Plaintiff had not yet gotten his mid-year review from Nir Aharoni. (Exhibit 4, Rodriguez Dep. 130:5-8).

189. The mid-year review was supposed to be done mid-year, in June or July. (Exhibit 4, Rodriguez Dep. 131:17-24; Exhibit 1, Aharoni Dep. 232:2-6).

190. Giving an employee who has received a mostly meets performance rating a mid-year review is standard practice. (Exhibit 5, Flaisher Dep. 217:1-10).

## C.  Defendants Place Plaintiff On A PIP

191. On October 29, 2015, Plaintiff was placed on a Performance Improvement Plan. (Exhibit 49).  The PIP involved on a new set of requirements for Plaintiff and his team.  When he was placed on the PIP, he had to schedule a special meeting with his team so that he could review with them the new set of requirements; he went over with this team the responsibilities, divided them up, set up teams, and actively started working on the action items. (Exhibit 2, Pl. Dep. 263:4-264:1).

192. Rodriguez was not aware of any documentation that Plaintiff was given regarding any performance deficiencies between his 2014 performance review through the time that he was placed on the PIP. (Exhibit 4, Rodriguez Dep. 213:1-8).

193. Flaisher never saw any documentation that was given to Plaintiff between January 2015 and October 2015 regarding any performance deficiencies. (Exhibit 5, Flaisher Dep. 181:11-16).

194. Flaisher never spoke with Plaintiff about any performance deficiencies prior to October 2015 (other than his 2014 performance review). (Exhibit 5, Flaisher Dep. 180:23-181:9).

195. Flaisher has no knowledge as to whether anyone at Defendants spoke with Plaintiff about any performance deficiencies prior to October 2015 (other than his 2014 performance review). (Exhibit 5, Flaisher Dep. 180:23-181:5).

196. According to Rodriguez, Nir Aharoni made the decision to put Plaintiff on a PIP. (Exhibit 4, Rodriguez Dep. 13:13-15).

197. Aharoni made the decision to place Plaintiff on the PIP in October 2015, around October 15th. (Exhibit 1, Aharoni Dep. 229:5-12).

198. Aharoni was unaware of anything that Defendants did to ascertain whether he had a retaliatory motive in placing Plaintiff on the PIP. (Exhibit 1, Aharoni Dep. 246:24-247:8).

199. According to Defendants, Nir Aharoni, Jennifer Flaisher, Mini Rodriguez, and Ilanit Strouchler made the decision to place Plaintiff on a PIP in October 2015. (Exhibit 25, No. 4).

200. Nir Aharoni's discussion with Strouchler about his wanting to put Plaintiff on a PIP occurred in October 2015. (Exhibit 9, Strouchler Dep. 114:19-115:17).

201. Strouchler did not have a recollection of Nir Aharoni talking to her about putting Plaintiff on a PIP prior to October 2015. (Exhibit 9, Strouchler Dep. 116:10-13).

202. Plaintiff stated that he had not been told that he was receiving a PIP before it was given to him on October 29, 2015. (Exhibit 23, Teva (SM) 1649). Aharoni disputed that statement by Plaintiff. (Exhibit 1, Aharoni Dep. 240:14-22).

203. According to Strouchler, Nir Aharoni was the sole decision-maker regarding the decision to place Plaintiff on the PIP. (Exhibit 9, Strouchler Dep. 123:23-124:9).

204. According to Aharoni, he was the sole decision-maker regarding the decision to place Plaintiff on the PIP. (Exhibit 1, Aharoni Dep. 229:13-17).

205. Nir Aharoni told Strouchler that Plaintiff was surprised about being placed on the PIP as he was not aware that it was coming. (Exhibit 9, Strouchler Dep. 137:23-138:6).

206. Aharoni said that he told Plaintiff at the mid-year review meeting that he was going to be placed on a PIP. (Exhibit 1, Aharoni Dep. 240:12-241:1).

207. Plaintiff said that Aharoni never told him at the mid-year review meeting that he was going to be placed on a PIP. (Exhibit 23, Teva (SM) 1649).

208. Rodriguez believed Plaintiff when he said that Aharoni never told him at his mid-year review meeting that he was going to be placed on a PIP. (Exhibit 4, Rodriguez Dep. 190:4-24).

209. If an employee is surprised by a performance review rating or by being placed on a PIP, there may be a deficiency in how that employee's supervisor is managing him. (Exhibit 4, Rodriguez Dep. 21:13-18).

210. Rodriguez admitted that it was possible that Nir Aharoni was uncomfortable placing Plaintiff on the PIP because he might conclude, after hearing Plaintiff's response to the same, that the PIP was not justified. (Exhibit 4, Rodriguez Dep. 175:3-176:24).

211. Strouchler could not remember seeing any documentation to support that the decision to place Plaintiff on the PIP was made before he made complaints of discrimination. (Exhibit 9, Strouchler Dep. 144:12-145:2).

212. Flaisher was aware that, before Plaintiff was placed on the PIP, he had never before been subject to any disciplinary action during his entire employment. (Exhibit 5, Flaisher Dep. 215:15-22).

213. According to Eppley, "[s]ome of the goals relative to the due dates [on the PIP] and where they would have required to have been completed were aggressive.  So it certainly appeared that some of the goals were lofty, perhaps on purpose." (Exhibit 13, Eppley Dep. 84:8-14).

214. Eppley believed that the goals on Plaintiff's PIP were unrealistic, specifically related to the cost savings for the group of around $900,000 and also regarding the call center goal which was not something that could be done unilaterally, but, rather, required communication with IT and other departments that needed to take action and engage in other processes to get that done. (Exhibit 13, Eppley Dep. 136:20-137:15).

215. Eppley was in disbelief when he learned that Plaintiff had been placed on a PIP, not only because he held Plaintiff in high regard, but also because their team was strong and delivering results so, "how could [Plaintiff] be a poor performer?" (Exhibit 13, Eppley Dep. 74:15-75:2).

216. Cicak was surprised when Plaintiff was placed on a PIP since their team seemed successful. (Exhibit 11, Cicak Dep. 99:1-10).

217. Nir Aharoni denied that retaliation was a factor in his decision to place Plaintiff on the PIP. (Exhibit 1, Aharoni Dep. 246:8-23).

218. Nir Aharoni was unaware whether anyone at Teva did anything to ascertain whether retaliation was a factor in the decision to place Plaintiff on a PIP. (Exhibit 1, Aharoni Dep. 246:24-247:8).

219. Aharoni testified that, initially, Plaintiff took the PIP seriously, but that he stopped making an effort sometime before Christmas. (Exhibit 1, Aharoni Dep. 237:15-238:6).

220. On December 13, 2015, Plaintiff sent his "third PIP scorecard summary report" to Nir Aharoni, advising that he was "making excellent progress towards achieving my targeted PIP initiatives," asking to review the same during their scheduled meeting on the following day, and asking for written feedback on these issues. (Exhibit 18). Aharoni did not respond in writing, and he did not provide written feedback. (Exhibit 1, Aharoni Dep. 255:8-17).

221. Plaintiff reached out to Aharoni on December 15, 2015 via email confirming that Aharoni was unable to attend their last scheduled meeting regarding the PIP review, and that Aharoni had canceled their next meeting. Aharoni did not respond in writing. (Exhibit 19; Exhibit 1, Aharoni Dep. 253:8-21; 256:19-24).

222. On December 16, 2015, Plaintiff reached out to Aharoni trying to schedule a PIP review meeting and seeking written feedback regarding his performance that they could review during the meeting. (Exhibit 20). This email was the third time that week that Plaintiff had reached out to Aharoni requesting written feedback regarding his performance, and Aharoni did not respond to any of them. (Exhibit 1, Aharoni Dep. 256:19-24).

223. Nir Aharoni cancelled his scheduled December 14, 2015 meeting with Plaintiff to review Plaintiff's PIP goals. (Exhibit 19, Teva (SM) 1804).

224. Aharoni did not even draft written feedback for Plaintiff until January 23, 2016. (Exhibit 21; Exhibit 1, Aharoni Dep. 257:8-16).

225. On February 10, 2016, Aharoni gave Plaintiff his PIP Summary, i.e., written feedback regarding the PIP. That was the first time that Aharoni gave Plaintiff written feedback on the PIP since Plaintiff requested it in December 2015. (Exhibit 1, Aharoni Dep. 258:17-259:4). The PIP Summary stated that Defendants had decided to extend the PIP through the end of February 2016. (Exhibit 50, Teva (SM) 718).

226. According to Strouchler, the decision to extend Plaintiff's PIP was a joint decision between Nir Aharoni; Flaisher; either Rodriguez or Swartz; and, Strouchler. (Exhibit 9, Strouchler Dep. 152:7-14).

227. According to Defendants' Performance Improvement Policy, employees who receive an overall rating of "Mostly Meets Expectations" "requires a Performance Consistency Plan (PCP) in which the Direct Manager should explain to the employee his/her performance concerns and the need to improve the level of performance to the desired level." The Policy further states that, with regard to the PCP, "[t]he employee will be reassessed against the PCP goals during either Mid-year or Year-End evaluation, whichever is first." (Exhibit 51, Teva (SM) 000699). A PIP is worse than a PIP. (Exhibit 5, Flaisher Dep. 178:9-15). Plaintiff was not placed on a PCP, but Defendants went right to a PIP. (Exhibit 5, Flaisher Dep. 178:16-19; 179:18-180:5).

228. According to Defendants' Performance Improvement Policy, employees who receive an overall rating of "Below Expectations" should be placed on a Performance Improvement Plan." The Policy further states that, "[a]ll monitoring meetings' outcomes [ between the

manager and the employee] should be documented." (Exhibit 51, Teva (SM) 000697, 000698).

### D.  **Plaintiff Makes Internal, And External, Complaints Of Discrimination And Retaliation**

229. On November 12, 2015, Plaintiff sent an email to Nir Aharoni; Eli Aharoni; Flaisher; and, Rodriguez, the subject of which was "Formal response to the PIP document dated 10/29/2015." (Exhibit 23).

230. Plaintiff's 11/12/2015 email stated as follows:

> This email is in response to the recent PIP from Nir Aharoni that I received on 10/29/15.
>
> I have been with TEVA for almost fifteen (15) years and I consistently have received either meets or exceeds reviews. Last year, (2014), for the first time in my career with TEVA, I received a mostly meets review. This was my first review with Nir Aharoni. I had completed the necessary documentation in the G-Tops system prior to the review as per TEVA policy. I did not receive any written documentation prior to or during the oral review with Nir. The oral review was generally balanced in nature and I fully expected another meets review. Subsequent to the oral review, I received a written evaluation which was much more negative than the oral review. As a direct result of the last year's review, I formally requested a mid-year review in June 2015, in order to actively evaluate and assess my performance. A mid-year review is standard practice for employees receiving a mostly meets performance rating. This review was delayed by Nir until October 21st, where I had a six hour face to face performance review with Nir. Again, I was not provided any written documentation prior to or at the time of the oral review. Once again I felt that the oral review was balanced, and there was no mention of my overall rating or any notice of an impending Performance Improvement Plan.
>
> I had a scheduled follow up video meeting with Nir on October 29, 2015. I was very startled to have Mini Rodriguez appear in my office at this same time. Coinciding with this meeting I very unexpectedly received an email from Nir detailing a Performance Improvement Plan document (PIP) that Mini had already received. I had not been told by Nir or anyone else that I was receiving a PIP prior to its actual receipt on 10/29/15. I had no advance warning of the PIP or Mini's invitation to the meeting. I advised Mini of this after the meeting and I also stated my complete disagreement with the contents of the PIP.
>
> I believe that this PIP does not accurately assess my performance in 2015 for the following several reasons:
>
> 1.  Nir has stated publically that the NA FM team is the highest performing team in his organization. My performance is that of an exceeds performer and the

substance of the PIP is incorrect.  I have either met or exceeded all seven (7) of my 2015 goals documented in the G-Tops system.  The items listed in the PIP are not included in my stated 2015 goals or in my very detailed 2015 AOP document.

2.  It is my position that I have received this PIP as a result of both age discrimination and discrimination because of my national origin (US citizen), as I have been treated, evaluated, and compensated negatively differently than my counterparts that are younger and of different national origin.

3.  It is also my position that this PIP is retaliation against me because of my team's allegations that they have been and are being treated differently in a negative fashion by Nir, his supervision, and colleagues because of my team's national origin as US citizens.  These allegations were presented in person to Mini on 8/7/15 during our NA FM monthly staff meeting.  These allegations resulted in an HR investigation that began on 9/3/15, and was concluded one week prior to my oral performance review.

(Exhibit 23).

231. Rodriguez testified that the allegations that Plaintiff was making in his November 12, 2015 email could reflect poorly on Defendants' HR. (Exhibit 4, Rodriguez Dep. 193:16-18).

232.   Nir Aharoni denied that he was upset in the least when he got the email from Plaintiff accusing him of discrimination and retaliation. (Exhibit 1, Aharoni Dep. 247:21-248:22).

233. On November 25, 2015, Plaintiff filed a Charge of Discrimination with the EEOC. On the same day that he filed the Charge, he sent a copy to Nir Aharoni; Flaisher; and, Rodriguez. (Exhibit 52).

234. Nir Aharoni denied that he was upset when he received Plaintiff's EEOC Charge of Discrimination in which Aharoni was named as having engaged in discrimination and retaliation. (Exhibit 1, Aharoni Dep. 249:7-250:5).

235. Aharoni testified that he was not upset about Plaintiff's EEOC Charge because it was not true. (Exhibit 1, Aharoni Dep. 249:23-250:1).

236. Plaintiff's EEOC Charge was the first time that Nir Aharoni had been named in a complaint that an employee filed with an outside agency. (Exhibit 1, Aharoni Dep. 250:13-17).

237. On November 26, 2015, the day after Plaintiff filed his EEOC Charge, and sent a copy to Defendants, Nir Aharoni sent an email to Flaisher saying the following:

Hi Jennifer,

Hope you are having good time during your Thanks-giving holiday.

27

I know and apology disturbing you in your holiday.  But we must talk about this charge letter ASAP.

As well, I would appreciate if you can update us about the activities been taken after Steve's E-mail from last week (an official response, you planned to meet with him.

Please let me know when we can talk today or even during weekend. (Exhibit 53, Teva (SM) 001760).

238. Nir Aharoni was surprised and concerned when he learned of Plaintiff's allegations in his EEOC Charge. (Exhibit 9, Strouchler Dep. 145:9-12).

239. Defendants could have still investigated Plaintiff's complaints of discrimination and retaliation even if Plaintiff declined to participate in the investigation. (Exhibit 5, Flaisher Dep. 236:23-237:4).

240. Flaisher could not remember if the assigned investigator actually did anything in connection with investigating Plaintiff's complaints of discrimination and retaliation.  Flaisher never saw any investigative report. (Exhibit 5, Flaisher Dep. 238:1-15; 239:16-19).

241. The investigator did not conduct an investigation. (Exhibit 5, Flaisher Dep. 226:23-227:1).

242. According to Flaisher, Plaintiff was "making this difficult" when he cancelled a meeting with Defendants' employee who was assigned to investigate his internal complaints/EEOC Charge. (Exhibit 54; Exhibit 5, Flaisher Dep. 252:14-22).

243. Aharoni testified that his efforts consisted of thinking about it; talking to Plaintiff generally about his interest in taking an operations position (that was unidentified and not actually open); and, talking to Flaisher. (Exhibit 1, Aharoni Dep. 268:22-271:5).

### E.  **Defendants Terminate Plaintiff's Employment**

244. Plaintiff was the only employee that Nir Aharoni made the decision to terminate in his twelve and a half years at Defendants. (Exhibit 1, Aharoni Dep. 52:2-10).

245. When Plaintiff was terminated and Eppley was told that the reason was that it was related to performance, he was not satisfied with that explantion because he knew that at least some of the items that he had helped contribute to related to the PIP obligations had been fulfilled. (Exhibit 13, Eppley Dep. 88:5-13).

246. Nir Aharoni testified that he was the sole decision-maker regarding Plaintiff's termination. (Exhibit 1, Aharoni Dep. 12:6-8; 12-14).

247. According to Flaisher, Nir Aharoni was the sole decision-maker regarding Plaintiff's termination. (Exhibit 5, Flaisher Dep. 250:18-19; 251:4-5).

248. According to Defendants, Nir Aharoni, Christopher Swartz, and Jennifer Flaisher, in consultation with Teva USA's in-house counsel Thomas McDonough made the decision to terminate Plaintiff's employment in February 2016. (Exhibit 25, No. 2).

249. Nir Aharoni made the decision to terminate Plaintiff's employment in February 2016, two weeks after Plaintiff was given an extension on his PIP. (Exhibit 1, Aharoni Dep. 12:15-13:8).

250. Prior to October 2015, Aharoni could not remember if the possibility of terminating Plaintiff ever entered his mind. (Exhibit 1, Aharoni Dep. 24:3-8).

251. The decision to terminate Plaintiff's employment was made a few days before his termination date of February 29, 2016. (Exhibit 1, Aharoni Dep. 15:8-11).

252. The first time that Aharoni thought about terminating Plaintiff's employment was in 2016. (Exhibit 1, Aharoni Dep. 15:24-16:8).

253. The decision to terminate Plaintiff's employment had already been made as of around the time that Defendants extended Plaintiff's PIP. (Exhibit 22; Exhibit 1, Aharoni Dep. 262:19-264:3; 264:21-265:3).

254. Strouchler sent an email to Flaisher; Swartz; and, Nir Aharoni on February 16, 2016 that included the following:

> Hi Jen and Chris,
> Following our meeting last week, I would like to put in place a plan together with you in order to be prepared for:
> - Separating from Steve
> - Mitigating the potential risks for business continuity
> - Recruiting a regional FM leader for NA
>
> As we discussed in our meeting we plan to separate from Steve by the end of Feb, please send your guidelines to Nir in order to finalize the process properly.

(Exhibit 22, Teva (SM) 418).

255. According to Aharoni, he had not made the decision to terminate Plaintiff's employment as of February 10, 2016. (Exhibit 1, Aharoni Dep. 259:20-23).

256. Aharoni does not remember documenting the decision to terminate Plaintiff and the reasons for the same. (Exhibit 1, Aharoni Dep. 259:24-260:6).

257. The decision to terminate Plaintiff was made around February 10, 2016, at around the time that Defendants extended his PIP. (Exhibit 1, Aharoni Dep. 262:19-263:3; 264:21-

265:3; Exhibit 22; 50).

258.Chris Swartz testified that Nir Aharoni was the sole decision-maker regarding the decision to terminate Plaintiff's employment, and that he, Flaisher, and Strouchler agreed with the decision. (Exhibit 38, Swartz Dep. 108:22-109:17).

259.Defendants' verified First Amended Answers to Plaintiff's First Interrogatories stated the following in response to Plaintiff's Interrogatory, "State with specificity each and every legitimate, non-discriminatory reason as to why Plaintiff was terminated in February 2016, and the complete factual bases for the same":

> "Plaintiff was terminated because of his poor performance as Senior Director of North American Facilities Management, his inability or unwillingness to demonstrate the high level leadership and management skills necessary to succeed in this new position, and his failure to meet the terms of his PIP despite it being extended."

(Exhibit 25, No. 1).

260.Swartz verified Defendants' Answers to Plaintiff's Interrogatories, and verified under penalty of perjury and after he reviewed the answers, that they were true and correct. (Exhibit 38, Swartz Dep. 156:6-20; Exhibit 25).

261.Nir Aharoni denied that Plaintiff's age was a factor in the decision to terminate his employment. (Exhibit 1, Aharoni Dep. 271:9-11).

262.Nir Aharoni denied that Plaintiff's national origin (American) was a factor in the decision to terminate his employment. (Exhibit 1, Aharoni Dep. 271:12-14).

263.Nir Aharoni denied that Plaintiff's complaints of discrimination were factors in the decision to terminate his employment. (Exhibit 1, Aharoni Dep. 271:15-18).

### F.  Defendants Replaced Plaintiff With A Substantially Younger Employee

264.Defendants replaced Plaintiff with an employee, Dan Ramirez, who was twenty one years younger than Plaintiff and had fourteen years less tenure with Defendants, in around June 2016. (Exhibit 25, No. 9).

265.Ramirez was born in 1978.  He started working for Defendants in August 2015. (Exhibit 25, No. 9).

266.Shortly after Ramirez was hired by Defendants, he came to Pennsylvania to meet with Plaintiff so that Plaintiff could train him; share ideas with him; introduce him to the systems and programs that they had in place at the facilities department; go over with him the budgeting process, etc. (Exhibit 2, Pl. Dep. 197:19-198:12).

267.Ramirez manages well up meaning that he will provide whatever a Vice President requests without first checking to see whether it is achievable, which can be a bad trait. (Exhibit 11, Cicak Dep. 81:16-82:15).

268.Plaintiff was more familiar with Teva than Ramirez. (Exhibit 11, Cicak Dep. 82:20).

269.Plaintiff was more technical than Ramirez and was more in tune with the day-to-day activities of employees supporting production plans or R&D sites that have compliance issues. To the contrary, Ramirez was a nontechnical supervisor who did not appreciate the complexities and difficulties of some of those day-to-day decisions. (Exhibit 13, Eppley Dep. 100:7-21).

## VII.   Defendants Failed To Take Action To Ensure That Their Employees Were Trained Regarding The Anti-Discrimination Laws

270.As of the time that Strouchler was supporting Global Facilities Management in an HR capacity, Teva Israel did not have an EEO policy. (Exhibit 9, Strouchler Dep. 40:15-20).

271.Prior to Aharoni's deposition, he had never seen Defendants' Harassment, Discrimination and Retaliation Prevention and Reporting Policy, or a document similar to that that mentioned discrimination and retaliation. (Exhibit 1, Aharoni Dep. 46:14-47:4).

272.When Flaisher was asked at her deposition how the company made sure that managers who worked outside of the United States (who managed employees in the U.S.) had an understanding of U.S. discrimination and retaliation laws, she testified that there was nothing formal in place for that, and that the company had a "global code of conduct policy" that "covered all employees of the company that covered anti-discrimination and harassment within that policy as being something the company didn't tolerate.  And everyone had to read that policy and acknowledge it." (Exhibit 5, Flaisher Dep. 16:13-17:10).

273.As of 2016, employees at Defendants' Israeli offices did not get training about discrimination other than sexual harassment. (Exhibit 9, Strouchler Dep. 41:12-42:8).

Respectfully submitted,

BY:      /s/ Caren N. Gurmankin
Caren N. Gurmankin, Esq.
Console Mattiacci Law, LLC
1525 Locust Street, 9th Floor
Philadelphia, PA 19102

Dated: August 17, 2018