## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **STEPHEN MIDDLEBROOKS** | **: CIVIL ACTION** |
| | **:** |
| **v.** | **: NO. 17-412** |
| | **:** |
| **TEVA PHARMACEUTICALS USA,** | **:** |
| **INC.,** *et al.* | |

## MEMORANDUM

**KEARNEY, J.**                                                                           **August 31, 2018**

Within two weeks of reviewing an internal investigation report of complaints from
American employees alleging cultural bias and persistent questions regarding the ages of the
American employees, an international employer based and managed in Israel issued a first-ever
negative performance review and then placed the supervising 58-year-old American executive on
a performance improvement plan citing deficient performance. Ninety days later, the Israel-
based employer fired him for deficient performance – a decision it now characterizes as partially
based on buyer's remorse in promoting him into a senior position after years of growth in a
lesser executive position. The American executive sued the Israeli employer for discriminating
against him based on his age and American national origin and in retaliation for complaints of
discrimination. After extensive discovery, the American executive has now adduced evidence
raising genuine issues of material fact for the jury as to the reasons for his former employer's
decisions adversely affecting his employment. Finding genuine issues of material fact on the
executive's retaliation and discrimination claims based on age and national origin, we deny
Teva's motion.[1]

## I. Undisputed Facts[2]

Teva Pharmaceuticals USA, Inc. hired Mr. Middlebrooks, an American born in 1957, as a Director, Facilities Engineering in its North Wales, Pennsylvania office in 2001.[3] By 2013, Mr. Middlebrooks grew into the position of North American Director of Facilities.[4] In September 2013, Teva selected Nir Aharoni, an Israeli born in 1970 and based in Israel, to lead Teva's newly created Global Facilities Management Group ("Global Group").[5]

On November 7, 2014, Mr. Aharoni selected Mr. Middlebrooks as Senior Director, Facility Management for the newly created North American Facilities Management Group ("North American Group").[6] Before this selection, Mr. Aharoni asked Mr. Middlebrooks his age and when he planned to retire.[7] Mr. Aharoni selected Mr. Middlebrooks for the position despite the opinion of Karin Shanahan, Teva USA's Senior Vice President of the Americas and European Sterile Operations, who did not believe Mr. Middlebrooks the best candidate for the position, an opinion she shared with Mr. Aharoni.[8] Ms. Shanahan had no role in Mr. Middlebrooks's subsequent Performance Improvement Plan ("PIP") or termination and she did not document concerns regarding Mr. Middlebrooks's performance before November 2014 because he did not directly report to her.[9]

In January 2015, two months after Teva promoted him to Senior Director, Mr. Aharoni provided Mr. Middlebrooks with his 2014 annual review.[10] Mr. Aharoni assessed Mr. Middlebrooks's overall performance rating as a "mostly meets" on a scale of "below," "mostly meets," "meets," "exceeds," and "exceptional."[11] Before this 2014 review, Teva supervisors graded Mr. Middlebrooks's overall performance ratings at "meets" or "exceeds"[12] and recommended salary increases and bonuses every year.[13]

2

In March 2015, Teva retained an outside recruiting agency to search for a replacement for Mr. Middlebrooks's position.[14] Between April and December 2015, "gaps in communication" between the outside search firm and Mr. Aharoni "essentially halt[ed] the search efforts," with the search "re-started" in March 2016, after Mr. Middlebrooks's termination.[15] Herminia Rodriguez, a Teva Human Resources Senior Manager, testified no one raised the issue of terminating Mr. Middlebrooks before she left Teva's employ on December 11, 2015.[16]

In June 2015, two Israeli-based members of the Global Group, Roni Kafre and Shimrit Shemtov, travelled to Teva USA's North Wales facility to meet with Mr. Middlebrooks and his team in the North American Group to discuss the 2016 Annual Operating Plan and to review the 2015 Annual Operating Plan.[17] The meeting with the Global Group raised concerns among Mr. Middlebrooks and his team regarding perceived age and cultural bias prompting them to meet with Ms. Rodriguez to complain about treatment by the Israeli-based Global Group.[18] One employee complained of being asked her age and another employee reported a hostile work environment.[19]

After receiving these complaints, Ms. Rodriguez concluded allegations of "bias[ed] treatment, violations of employment labor practices, and possible hostile work environment claims" warranted further investigation.[20] Ms. Rodriguez told Mr. Aharoni a formal investigation would be made in response to the North American Group's complaints, including of a hostile work environment.[21] The parties dispute whether the investigation angered Mr. Aharoni; Mr. Aharoni testified an investigation into complaints did not anger him while Mr. Middlebrooks testified Mr. Aharoni became angry at him for the investigation, telling Mr. Middlebrooks "a good manager would have controlled his people and it never would have gotten

3

this far."[22] It is undisputed Mr. Aharoni was not told any complaints were made about his conduct.[23]

On July 31, 2015, Ms. Rodriguez asked Leander Jones, Teva's Director of Human Resources in Virginia, to investigate allegations of the North American Group's complaints (the "Investigation").[24] In September 2015, Mr. Jones interviewed Mr. Middlebrooks, his team members, and Global Group Israeli-based managers Mr. Kafre, Ms. Shemtov, and Mr. Aharoni.[25] The Investigation included findings Teva's Israeli-based management asked Mr. Middlebrooks and some of his team members to supply the ages of employees or directly asked for their ages.[26] Ms. Shemtov admitted she asked one employee her age during an interview.[27] Mr. Middlebrooks told Mr. Jones he "went to Management" to ask the requests for age-related information stop, but later received "a memo from Israel to send them all this information" and, after refusing to provide information, he "continu[ed] to get the request," telling "those making the request that if I got another one like this, I would make sure somebody got fired," and the requests stopped.[28] Mr. Jones additionally noted comments regarding a perceived bias among Mr. Middlebrooks and his team against Americans by Israeli management.[29]

The Investigation shows Mr. Middlebrooks told Mr. Jones "he would have hoped that Managers at a certain level in Global roles would be able to understand cultural challenges and gaps that exist"; "Managers and individuals he works with who are his bosses don't have that level of understanding, sensitivities, and need training to help."[30] In summarizing responses to his question of whether a hostile work environment existed, Mr. Jones noted most of the team attributed the term "hostile work environment" to "the number of issues cited with interactions between the [US team] and the Global Group," citing to "incidents involving employment practice questions about age as a problem given it shouldn't play a part in decision making for

4

management" and "comments about biases perceived" showing "a level of favoritism for one group vs. another that had to do more with heritage than with knowledge and skill (e.g. Israeli v. American.)"[31]

Mr. Jones's Investigation ultimately found no hostile work environment, but identified areas of concern including "legal issues" such as "personally being asked my age in a formal interview"; "on-going requests made by Israel for age and demographic information"; and "perceived discrimination due to ethnic bias."[32] Mr. Jones recommended Mr. Aharoni, Mr. Kafre, and Ms. Shemtov be provided with "cultural and sensitivity training . . . [e]specially on US practices/law, culture, and ways of working" and "address the topic of retaliation," and recommended counseling to Mr. Kafre and Ms. Shemtov "regarding their behavior and interaction with the team and the need for adherence to US laws and statutes" and "[e]xpress need for accountability and sincere desire to change."[33] Although Mr. Jones's Investigation recommended Ilanit Shtrouchler, the Human Resources business partner for the Global Group based in Israel, provide counseling to Mr. Kafre and Ms. Shemtov, Ms. Shtrouchler testified she did not give either Mr. Kafre or Ms. Shemtov anything in writing regarding counseling and she did not give either any performance warnings for their conduct as reported in the Investigation.[34]

Mr. Jones sent his 32-page report of the Investigation to Ms. Rodriguez and other Teva Human Resource personnel on September 28, 2015.[35] Mr. Aharoni received a condensed report of the Investigation on October 14, 2015.[36]

One week later, on October 21, 2015, Mr. Aharoni gave Mr. Middlebrooks a negative mid-year review.[37] Teva's Human Resources Management Guideline policy provides employees who receive a rating of "mostly meets" expectations receive a Performance Consistency Plan

("PCP") and those receiving a rating of "below expectations" receive a PIP.[38] Teva's Senior Director of Human Resources, Jennifer Flaisher, testified a PIP is worse than a PCP.[39]

The parties dispute the reason why Mr. Aharoni chose to give a "mid-year" review in October rather than in June or July 2015. Teva contends Mr. Middlebrooks's ongoing performance deficiencies noted in the mid-year review covered the same concerns raised in the 2014 annual review given in January 2015.[40] Three months earlier, on July 23, 2015, Mr. Middlebrooks provided Mr. Aharoni with a self-evaluation for his mid-year review noting improved performance and either meeting or exceeding 2015 goals.[41] Mr. Aharoni never contacted or responded to Mr. Middlebrooks regarding the July 23, 2015 self-evaluation of his 2015 goals.[42]

One week after the mid-year review, Mr. Aharoni placed Mr. Middlebrooks on a PIP on October 29, 2015.[43] On November 12, 2015, Mr. Middlebrooks sent Mr. Aharoni, Ms. Rodriguez, and Ms. Flaisher an email objecting to the PIP, including his belief he received the PIP based on his age and national origin and in retaliation for complaints about the Global Group's request for age information and perceived bias.[44] Mr. Middlebrooks filed a charge with the Equal Employment Opportunity Commission ("EEOC") and Pennsylvania Human Relations Commission ("PHRC") on November 25, 2015 and sent a copy of the charge to Mr. Aharoni, Ms. Rodriguez, and Ms. Flaisher.[45]

On January 14, 2016, Teva extended Mr. Middlebrooks's PIP to the end of February.[46] Teva fired Mr. Middlebrooks on February 29, 2016.[47] Teva replaced Mr. Middlebrooks with 38-year old Dan Ramirez, born in 1978 and twenty-one years younger than Mr. Middlebrooks.

6

Mr. Middlebrooks timely sued alleging Teva violated the Age Discrimination in Employment Act ("ADEA"),[48] Title VII of the Civil Rights Act of 1964 ("Title VII")[49] and the Pennsylvania Human Rights Act ("PHRA").[50]

## II. Analysis

Teva moves for summary judgment, arguing Mr. Middlebrooks has not established a *prima facie* case of retaliation or discrimination based on age or national origin and, even if he satisfies a *prima facie* case, he cannot show pretext.[51] Mr. Middlebrooks responds there is evidence in the record to make out a *prima facie* case of discrimination based on both age and national origin and to show pretext, there are material facts in dispute, and the motivations for Teva's conduct as well as credibility issues must be resolved by a jury.

### A. We deny summary judgment on claims of discrimination based on age and national origin.

We apply the familiar three-part framework of *McDonnell Douglas*[52] to Mr. Middlebrooks's claims of discrimination under both ADEA and Title VII.[53] To establish a *prima facie* case of discrimination under ADEA, Mr. Middlebrooks must show (1) he is forty years of age or older; (2) he suffered an adverse employment action; (3) he is qualified for the position; and (4) he was replaced by another employee sufficiently younger to support an inference of discrimination.[54] To establish a *prima facie* case of discrimination under Title VII, Mr. Middlebrooks must show (1) he is a member of a protected class; (2) he was qualified for the position he sought to attain or retain; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination.[55] "To establish a *prima facie* case at summary judgment, 'the evidence must be sufficient to convince a reasonable factfinder to find all of the elements of [the] *prima facie* case.'"[56]

7

If Mr. Middlebrooks establishes a *prima facie* case of age or national origin discrimination, the burden shifts to Teva to show a legitimate, non-discriminatory reason for its adverse employment action.[57] If Teva meets its burden, the burden shifts back to Mr. Middlebrooks to show Teva's proffered reason is pretext.[58] Teva asserts its legitimate, non-discriminatory reason for terminating Mr. Middlebrooks is his failure to successfully complete the terms of his PIP and failure to perform well in his new role as Senior Director of the North American Group, pointing to Mr. Aharoni's deposition testimony.

At the summary judgment stage, Mr. Middlebrooks can show pretext in two ways: (1) he "may point to evidence in the record that would cause a reasonable juror to disbelieve [Teva's] articulated legitimate non-discriminatory reason, thereby creating a genuine dispute of material fact as to the credibility of that reason"; or (2) "by pointing to evidence that indicates that [Teva] acted with discriminatory animus."[59] In an age discrimination case, a plaintiff must show age was the "but-for" cause of the employer's adverse employment action.[60]

### 1. Mr. Middlebrooks established a *prima facie* case of age and national origin discrimination.

Teva asserts Mr. Middlebrooks fails to establish a *prima facie* case of both age and national origin discrimination because the October 2014 mid-year poor performance review and the PIP are not adverse actions. It is undisputed Teva terminated Mr. Middlebrooks, an adverse action Teva does not address. With no other argument on an asserted failure to establish a *prima facie* case of discrimination in violation of ADEA and Title VII, we find Mr. Middlebrooks established a *prima facie* case of age discrimination.

8

### 2. There are genuine issues of material fact on whether Teva's reasons for termination are pretext for age discrimination.

Teva asserts Mr. Middlebrooks cannot establish the reason for his termination is pretextual. Teva cites to Mr. Aharoni's testimony he terminated Mr. Middlebrooks for failure to successfully complete the terms of his PIP and for poor performance in his role as Senior Director documented in his 2014 annual review and continuing into 2015. Teva argues there is no genuine issue of material fact under either prong of *Fuentes*: (1) there is no evidence Mr. Aharoni took any action based on Mr. Middlebrooks's age, pointing to Mr. Aharoni's decision to promote Mr. Middlebrooks knowing his age and the "same actor" theory weighs heavily against any pretext finding;[61] (2) once Mr. Middlebrooks complained to Teva's Human Resources about age questions, the conduct stopped; and (3) simply making an age inquiry in and of itself is not age discrimination.

Mr. Middlebrooks responds he demonstrates evidence supporting both prongs of *Fuentes*: there are weaknesses, implausibilities and contradictions such that a jury could disbelieve Teva's proffered reasons for its adverse actions or believe the real reason for Teva's adverse actions is Mr. Middlebrooks's age.

We find there are genuine issues of material fact on pretext including the lack of any performance- related documentation between January and October 2015 when Mr. Aharoni gave Mr. Middlebrooks a negative mid-year review; placement on a PIP rather than a PCP for a "mostly meets expectations" mid-year review contrary to Teva's own Human Resources guidelines; testimony from Ray Duggan, 57 years old and one of Mr. Middlebrooks's direct reports, who testified he did not receive an equity bonus although eligible for it and when Mr. Duggan asked Mr. Aharoni why he did not receive an equity award, Mr. Aharoni responded the awards are "only for employees that will be with us for a long time"; of the three employees in

9

Mr. Middlebrooks's group – Mr. Middlebrooks, Mr. Duggan, and Troy Gaugler – eligible for an equity award, only 48-year old Mr. Gaugler received the award; inconsistencies in Mr. Aharoni's explanation for why Mr. Middlebrooks did not receive an equity award because only employees who receive a "meets" expectations to be eligible versus Mr. Duggan's rating of "fully meets" performance review for 2014; questions of age, including Mr. Aharoni's testimony he wanted to know if an employee is thinking about retirement so he could make future plans; testimony from multiple witnesses in Mr. Middlebrooks's group regarding age-related questions; and replacing Mr. Middlebrooks with a 38-year old.

Finding evidence a jury could either disbelieve Teva's articulated legitimate non-discriminatory reason for its adverse actions or believe the real reason for its adverse action is based on age, we deny summary judgment on claims of age discrimination.

### 3. There are genuine issues of material fact on whether Teva's reasons for termination are pretext for national origin discrimination.

Mr. Middlebrooks's claim of pretext based on national origin discriminatory animus passes the summary judgment standard. Mr. Middlebrooks contends Mr. Aharoni and other Israeli management had a bias against Americans.

Mr. Middlebrooks cites the following evidence: one of Mr. Middlebrooks's direct reports, Kristin Macone, believed Mr. Aharoni and his team members thought Americans "stupid" and treated Middlebrooks poorly, including being disrespectful and dismissive of his opinions and recommendations because he is American; Mr. Aharoni told Mr. Middlebrooks he believed Americans have a "narrow-minded perception of Israelis" and Americans "did a poor job of supporting Israel in its military actions in the Middle East"; when another employee in Mr. Middlebrooks's group returned from a work trip to Israel and reported when she told Mr. Aharoni she had a wonderful time in Israel, he responded "now [you] know [we are] not just a

10

bunch of guys riding camels"; one of Mr. Middlebrooks's direct reports believed there is a bias against Americans in how Mr. Aharoni and his Israel team treated them, including Israelis are higher on the "totem pole" than Americans, the Israeli team micromanaging the American team , failing to give Americans information when requests, and changing the group's objectives when other regions failed to meet goals; after Mr. Middlebrooks's termination, his group went to Israel for a meeting with Mr. Aharoni during which another employee made a comment about people of different ethnicities perceived as derogatory and insulting to Americans, and after Americans expressed discomfort with the comment, the offending employee (who reported to Mr. Aharoni) said "she was sorry they [the Americans] didn't know what funny was"; Mr. Aharoni's dismissiveness of their concerns, telling the American group it is the kind of thing the Israelis think funny and the Americans "needed to be OK with it"; and another employee in Mr. Middlebrooks's group believed there is an implicit bias against Americans because, when the American group asked for information from Mr. Aharoni, Mr. Kafre, and Ms. Shemtov, they denied information.

Mr. Middlebrooks also cites Teva's failure to act in response to complaints of bias against Americans pointing to the lack of discipline for Israeli–based Mr. Kafre and Ms. Shemtov for their conduct at the June 2015 meeting and Teva's failure to document Mr. Aharoni's performance deficiencies. Mr. Middlebrooks argues the Investigation recommended Mr. Kafre, Ms. Shemtov, and Mr. Aharoni receive cultural and sensitivity training on "US practices/law, culture and ways of working" and, for Mr. Kafre and Ms. Shemtov, receive counseling, but were not given performance warnings while Mr. Middlebrooks was placed on a PIP for alleged performance deficiencies.

11

Mr. Middlebrooks also cites evidence Mr. Aharoni, his younger Israeli supervisor, also had performance issues but did not receive any discipline or a PIP. For example, a document authored by Ms. Flaisher around the time of Mr. Middlebrooks's termination stated she believed Mr. Aharoni "has a serious credibility issue among the US leaders" and "has some credibility gaps."[62] Christopher Swartz, the Human Resources business partner for Mr. Middlebrooks's group in late 2015, agreed with Ms. Flaisher's statement Mr. Aharoni "had some capability gaps," explaining Mr. Aharoni "could have probably been, at times, a better communicator in getting information, you know, out in a timely manner to his team."[63] Ms. Shtrouchler testified she had concerns about Mr. Aharoni's performance, including "taking too long for him to take decisions [sic]," describing it as "one of the major barrier [sic]" for him and that he "was too soft."[64]

We find this evidence on pretext relating to national origin, albeit not overwhelming compared to evidence on age, a sufficient basis for a jury to reasonably either (1) disbelieve Teva's proffered legitimate non-discriminatory reason for its actions or (2) believe an invidious discriminatory reason is more likely than not a motivating or determinative cause of Teva's actions based on Mr. Middlebrooks's national origin.[65]

### B. Fact issues preclude summary judgment on the retaliation claim.

To establish a *prima facie* claim of retaliation, Mr. Middlebrooks must show (1) protected employee activity; (2) "adverse action by [Teva] either after or contemporaneous with the employee's protective activity"; and (3) a causal connection between the protected activity and the adverse action.[66] In the context of an adverse action in a retaliation claim, Teva's retaliatory conduct must be one that "that . . . well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[67] For the causation prong, Mr. Middlebrooks

12

may rely on temporal proximity if "unusually suggestive."[68]  In the absence of temporal proximity, we consider "timing plus other evidence" allowing us to "consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistences in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action."[69]

Applying the *McDonnell Douglas* framework to retaliation claims, once Mr. Middlebrooks establishes a *prima facie* case of retaliation the burden shifts to Teva to articulate a legitimate, non-discriminatory reason for its action. If the employer does so, the burden shifts to Mr. Middlebrooks to show the reason is merely pretext and retaliation is the real reason for the adverse employment action.[70] We analyze ADEA, Title VII, and PHRA retaliation claims coextensively.[71]

Teva argues Mr. Middlebrooks fails to establish all three elements of a *prima facie* claim of retaliation. Beginning with the first prong, Teva argues there is no protected activity until November 12, 2015 when Mr. Middlebrooks emailed Mr. Aharoni, Ms. Rodriguez, and Ms. Flaisher of Teva Human Resources objecting to the imposition of the PIP as discriminatory based on age and national origin and in retaliation for the complaints made regarding the June 2015 meeting. If there is no protected activity until November 12, 2015, all actions before that date – namely the October 2015 negative mid-year review and PIP – would not be considered an adverse action occurring "either after or contemporaneous with" protected activity.

Although Teva recognizes complaints made to its Human Resources department in June 2015, it contends Mr. Middlebrooks himself did not make any such complaints instead, complaints were made by his team; the one person on his team who complained of a hostile work

13

environment testified he did not actually mean hostility based on age or national origin; and, after Teva's Investigation, it did not find a hostile work environment.

But Mr. Middlebrooks cites competent evidence showing a factual issue regarding when he first complained about discriminatory treatment. Mr. Middlebrooks complained to Ms. Rodriguez of discriminatory treatment by the Global Group in the summer of 2015; Teva's Investigation finding Mr. Middlebrooks complained of "numerous requests for data that is not acceptable (age) . . ." and inappropriate comments regarding marital status; the Investigation reporting Mr. Middlebrooks's statement to Mr. Jones on September 3, 2015 he "went to [Ms. Rodriguez] about 9 weeks or so and she attended a meeting we had" where Ms. Rodriguez "asked questions and got honest answers" and Mr. Middlebrooks's belief allegations of a hostile work environment "warranted a more thorough investigation right at that time and felt 9 weeks was too long"; and the Investigation reporting Mr. Middlebrooks's complaint to "Management" regarding requests for age information from the Israeli-based Global Group. This evidence shows Mr. Middlebrooks complained of age-related questions and cultural bias before November 12, 2015.

Teva next argues Mr. Middlebrooks fails to show an adverse action sufficient to satisfy the second prong of the *prima facie* retaliation claim. It contends the October 2015 mid-year review and PIP are not adverse actions because (a) those events did not "dissuade" Mr. Middlebrooks from complaining as evidenced by his November 12, 2015 email and November 25, 2015 EEOC charge; and (b) a PIP is not an adverse action unless accompanied by a decrease in pay, benefits, or employment status. Even if the October 2015 mid-year review and PIP are not adverse actions for purposes of a retaliation claim, there is no dispute Teva terminated Mr.

14

Middlebrooks and there is at least a fact question about whether the termination "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

Finally, Teva argues there is no evidence of a causal link required for the third prong of the *prima facie* case because (a) the temporal proximity is not "unusually suggestive"; and (b) Mr. Middlebrooks's performance issues pre-dated protected activity precluding a finding of a causal link. We find there are genuine issues of material fact on causation.

The record, subject to credibility questions at trial, shows Mr. Middlebrooks and his team complained to Teva USA's Human Resources after the June 2015 meeting about the behavior of the Israeli-based Global Group, including complaints objecting to questions of age and cultural bias; Ms. Rodriguez, after meeting with Mr. Middlebrooks and his team, concluded the complaints required further investigation; Mr. Jones conducted an investigation documenting age-related questions including the admission by Ms. Shemtov she asked one person about her age during an interview; one week after Mr. Aharoni received the written report of the Investigation, he gave Mr. Middlebrooks a negative mid-year review followed by the PIP; and, after Mr. Middlebrooks's November 12, 2015 email objecting to the PIP on the basis of discrimination and his November 25, 2015 EEOC charge, Mr. Aharoni terminated Mr. Middlebrooks in February 2016.

Teva answers by citing Mr. Middlebrooks's alleged history of poor performance predating even the June 2015 complaints precluding a finding of the requisite causal link. Teva points to a "poor rating" on his 2014 annual performance review and an "ongoing effort to find his replacement." The record shows Mr. Middlebrooks received overall reviews of "meets" or "exceeds" in the years before his 2014 review; despite alleged poor performance, Mr. Aharoni nevertheless promoted Mr. Middlebrooks to Senior Director in November 2014; Mr.

Middlebrooks scored an overall "mostly meets" on his 2014 annual performance review with individual categories scoring "meets" and "exceed"; in July 2015, Mr. Middlebrooks sent Mr. Aharoni a self-assessment of his 2015 goals for a mid-year review, assessing improved performance and Mr. Middlebrooks's belief he is meeting or exceeding his 2015 goals and asking for Mr. Aharoni's comments and suggestions for further improvement; although Teva asserts poor performance by Mr. Middlebrooks during 2015, Mr. Aharoni did not respond to Mr. Middlebrooks's self-assessment or administer a mid-year review until October 21, 2015, one week after receiving the report of Investigation; there is no documentation of any performance deficiencies after the January 2015 review and before the October 21, 2015 mid-year review; and, although Teva engaged an outside search agency to find his replacement, the agency's document shows a delay and suspension of the search for four months in 2015.

The timeline of Teva's actions towards Mr. Middlebrooks further raises issues of material fact. We reviewed competent evidence of a negative mid-year performance review issued one week after Mr. Aharoni received the report of the Investigation and a PIP issued one week after the mid-year review. Our court of appeals holds a temporal proximity of two days is unusually suggestive of causation but a temporal proximity of greater than ten days requires supplementary evidence of retaliatory motive.[72] We find a period of seven days between Mr. Aharoni's receipt of the Investigation and the negative mid-year review usually suggestive, but even if we applied the "time plus" standard, we find sufficient supplementary evidence to create a genuine issue of material fact on causation. This evidence includes Mr. Aharoni's failure to respond to Mr. Middlebrooks's July 2015 self-assessment of meeting or exceeding all 2015 goals; the absence of any documentation of poor performance between January and October 2015; and Teva's policy those receiving a "mostly meets" expectations receive a PCP rather than a PIP.

## III. Conclusion

Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd. move for summary judgment on Stephen Middlebrooks's claims alleging they issued an unprecedented (for him) negative performance review, performance improvement plan, and termination in February 2016 on the basis of age and national origin and in retaliation for complaining about discrimination. Teva argues Mr. Middlebrooks has not established a *prima facie* case of retaliation or discrimination based on age or national origin and, even if he satisfies a *prima facie* case, he cannot show pretext under federal law. Mr. Middlebrooks adduced sufficient evidence of age and national origin discrimination leading to his termination by Teva. He also adduced sufficient evidence his supervisor, Mr. Aharoni, issued a negative mid-year review serving as the basis of a PIP and ultimately leading to termination after he, and others working with him, complained about age and national origin discrimination. The disputed facts require our jury's credibility determinations. We deny Teva's motion for summary judgment in the accompanying Order.

---

[1] We refer to Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd. collectively as "Teva."

[2] The Clerk reassigned this matter to us upon Chief Judge Stengel's retirement after Teva moved for summary judgment. Our Chambers' Policies require a Statement of Undisputed Material Facts ("SUMF") and an appendix in support of summary judgment. Teva filed its 214-paragraph SUMF (ECF Doc. No. 42-2) and an appendix (ECF Doc. Nos. 43-55). Mr. Middlebrooks responded to Teva's SUMF (ECF Doc. No. 63-1) ("Response to SUMF"), and added 273 paragraphs of additional facts he contends are material to summary judgment ("SOAF") (ECF Doc. No. 63-2), and supplemented the appendix with additional exhibits (ECF Doc. Nos. 63-5 to 63-12). The parties' appendices are not consecutively Bates stamped as required by our Policies

but we do not strike the appendices given Chief Judge Stengel's earlier assignment. Accordingly, references to the appendices are to each party's exhibit and Bates number.

[3] Response to SUMF at ¶¶ 1-4 (ECF Doc. No. 63-1).

[4] Response to SUMF at ¶ 5 (ECF Doc. No. 63-1).

[5] Response to SUMF at ¶¶ 7-9 (ECF Doc. No. 63-1).

[6] Response to SUMF at ¶¶ 10-12 (ECF Doc. No. 63-1); Middlebrooks Ex. 34 (ECF Doc. No. 63-9).

[7] Response to SUMF at ¶ 18 (ECF Doc. No. 63-1).

[8] Response to SUMF at ¶¶ 21-27 (ECF Doc. No. 63-1).

[9] Response to SUMF at ¶¶ 21-27 (ECF Doc. No. 63-1).

[10] Response to SUMF at ¶ 71 (ECF Doc. No. 63-1).

[11] Teva Ex. 21 at Teva 674 (ECF Doc. No. 48).

[12] Middlebrooks Exs. 27-31 (ECF Doc. Nos. 63-8).

[13] Middlebrooks SOAF at ¶ 9 (ECF Doc. No. 63-2).

[14] Teva Ex. 22 at Teva 567 (ECF Doc. No. 48-1).

[15] Teva Ex. 22 at Teva 568, 570 (ECF Doc. No. 48-1).

[16] Teva Ex. 5 at p. 198 (ECF Doc. No. 45).

[17] Response to SUMF at ¶¶ 87-88 (ECF Doc. No. 63-1).

[18] Response to SUMF at ¶¶ 89-93 (ECF Doc. No. 63-1); Teva Ex. 26 (ECF Doc. No. 50-2).

[19] Teva Ex. 26 (ECF Doc. No. 50-2).

[20] Teva Ex. 28 at Teva 246 (ECF Doc. No. 51).

[21] Response to SUMF at ¶ 107 (ECF Doc. No. 63-1).

[22] Response to SUMF at ¶ 108 (ECF Doc. No. 63-1).

[23] Response to SUMF at ¶ 109 (ECF Doc. No. 63-1).

[24] Response SUMF at ¶ 120 (ECF Doc. No. 63-1).

[25] Response SUMF at ¶ 121 (ECF Doc. No. 63-1).

[26] Teva Ex. 28 at Teva 248, 250, 251-253, 255 (ECF Doc. Nos. 51, 51-1).

[27] Teva Ex. 28 at Teva 256 (ECF Doc. No. 51-1).

[28] Teva Ex. 28 at Teva 261 (ECF Doc. No. 51-1).

[29] Teva Ex. 28 at Teva 249, 252-255 (ECF Doc. Nos. 51, 51-1).

[30] Teva Ex. 28 at Teva 248 (ECF Doc. No. 51).

[31] Teva Ex. 28 at Teva 253 (ECF Doc. No. 51).

[32] Teva Ex. 28 at Teva 274 (ECF Doc. No. 52-1).

[33] Teva Ex. 28 at Teva 275 (ECF Doc. No. 52-1).

[34] Middlebrooks SOAF at ¶¶ 177-179 (ECF Doc. No. 63-2).

[35] Response to SUMF at ¶ 122 (ECF Doc. No. 63-1).

[36] Response to SUMF at ¶ 123 (ECF Doc. No. 63-1).

[37] Response to SUMF at ¶ 144 (ECF Doc. No. 63-1).

[38] Middlebrooks Ex. 51 at Teva 697-699 (ECF Doc. No. 63-12).

[39] Middlebrooks SOAF at ¶ 227 (ECF Doc. No. 63-2).

[40] Response to SUMF at ¶ 149 (ECF Doc. No. 63-1).

[41] Middlebrooks Ex. 48 (ECF Doc. No. 63-11).

[42] Middlebrooks SOAF at ¶¶ 185-186 (ECF Doc. No. 63-2).

[43] Response to SUMF at ¶ 168 (ECF Doc. No. 63-1).

[44] Middlebrooks SOAF at ¶ 230 (ECF Doc. No. 63-2); Middlebrooks Ex. 23 (ECF Doc. No. 63-7).

[45] Middlebrooks SOAF at ¶ 233 (ECF Doc. No. 63-2); Middlebrooks Ex. 52 (ECF Doc. No. 63-12).

[46] Response to SUMF at ¶ 180 (ECF Doc. No. 63-2).

[47] Response to SUMF at ¶ 210 (ECF Doc. No. 63-2).

[48] 29 U.S.C. § 621, *et seq.*

[49] 42 U.S.C. §2000e, *et seq.*

[50] 43 Pa. Cons. Stat. § 951, *et seq.*

[51] Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). On a motion for summary judgment, "we view the facts and draw all reasonable inferences in the light most favorable to the nonmovant." *Pearson*, 850 F.3d at 533-34 (3d Cir. 2017) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)). "The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Willis*, 808 F.3d at 643 (citing *Celotex Corp.*, 477 U.S. at 322-323).

[52] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[53] We analyze ADEA, Title VII, and the PHRA in the same way. *Burton v. Teleflex, Inc.*, 707 F.3d 417, 425-26 (3d Cir. 2013); *Atkinson v. Lafayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006); *Fasold v. Justice*, 409 F.3d 178, 183-84 (3d Cir. 2005).

[54] *Burton*, 707 F.3d at 426 (citing *Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009)).

[55] *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013).

[56] *Burton*, 707 F.3d at 426 (quoting *Duffy v. Paper Magic Grp.*, 265 F.3d 163, 167 (3d Cir. 2001)).

[57] *Vaughn v. Boeing Co.*, --- F.App'x ---, No. 17-1398, 2018 WL 2324224 \*3 (3d Cir. May 22, 2018) (citing *McDonnell Douglas*, 411 U.S. at 802).

[58] *Id.*

[59] *Burton*, 707 F.3d at 430-31 (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

[60] *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009).

[61] The "same actor" inference allows an employer to argue it did not act with discriminatory intent where the same person hired and terminated an employee. In *Waldron v. SL Indus., Inc.*, 56 F.3d 491 (3d Cir. 1995), our court of appeals addressed whether it should apply the "same actor" inference first articulated in a decision by the United States Court of Appeals for the Fourth Circuit in *Proud v. Stone*, 945 F.3d 796 (4th Cir. 1991). Our court of appeals declined to adopt such an inference, holding instead to consider the "same actor" who both hired and fired an employee as "simply evidence like any other and should not be accorded any presumptive value." *Waldron*, 56 F.3d at 496, n.6. While it is undisputed Mr. Aharoni promoted Mr. Middlebrooks and later terminated him, "like other evidence in the record, [it] is important but not dispositive." *Wurtz v. Day and Zimmerman, Inc.*, No. 08-3503, 2009 WL 2178013, at \*4 (E.D. Pa. Dec. 28, 2009).

[62] Middlebrooks SOAF at ¶¶ 45, 46 (ECF Doc. No. 63-2); Middlebrooks Ex. 39 (ECF Doc. No. 63-10).

[63] Middlebrooks SOAF at ¶ 48 (ECF Doc. No. 63-2).

[64] Middlebrooks SOAF at ¶ 53 (ECF Doc. No. 63-2).

[65] *Fuentes*, 32 F.3d at 764.

[66] *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015).

[67] *Moore v. City of Phila.*, 461 F.3d 331, 341 (3d Cir. 2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

[68] *Daniels*, 776 F.3d at 196.

[69] *Id.*; *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000).

[70] *Daniels*, 776 F.3d at 193.

[71] *Fogelman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002).

[72] *Blakney v. City of Phila.*, 559 F.App'x 183, 186 (3d Cir. 2014).