# EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

STEPHEN MIDDLEBROOKS,                    :
                                         :
              Plaintiff,                 :    CIVIL ACTION
                                         :
                                         :    NO. 17-0412
         vs.                             :
                                         :
                                         :
TEVA PHARMACEUTICALS USA, INC.,          :
TEVA PHARMACEUTICALS INDUSTRIES,         :
LIMITED,                                 :
                                         :
              Defendants.                :
_____/


- - -


Monday, March 12, 2018

- - -


          ORAL DEPOSITION of STEPHEN

MIDDLEBROOKS, taken pursuant to notice,

held at the Law Offices of Stevens & Lee,

1818 Market Street, 29th Floor,

Philadelphia, Pennsylvania, commencing at

10:03 a.m., on the above date, before

Robert Stec, Court Reporter - Notary


Public, there being present.

Page 2

```
 1   A P P E A R A N C E S
 2   CONSOLE MATTIACCI LAW, LLC
     BY:  CAREN N. GURMANKIN, ESQUIRE
 3       1525 Locust Street
         9th Floor
 4       Philadelphia, Pennsylvania 19102
         (215) 545-7676
 5       gurmankin@consolelaw.com
         Attorney for the Plaintiff
 6
     STEVENS & LEE
 7   BY:  LARRY J. RAPPOPORT, ESQUIRE
         1818 Market Street
 8       29th Floor
         Philadelphia, Pennsylvania 10103
 9       (215) 575-0100
         ljr@stevneslee.com
10       Attorney for the Defendants
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1
 2           E X H I B I T S
 3           - - -
 4   NO.        DESCRIPTION      PAGE
 5   D-1        Email            36
 6   D-2        Email            74
 7   D-3        Email            97
 8   D-4        Email            100
 9   D-5        Email            115
10   D-6        Email            133
11   D-7        Email            137
12   D-8        Report           146
13   D-9        Email            232
14   D-10       Email            240
15   D-11       Email            254
16   D-12       Email            261
17   D-13       Email            267
18   D-14       Email            268
19   D-15       Report           271
20   D-16       Email            285
21   D-17       Email            286
22   D-18       Email            287
23   D-19       EEOC             301
24   D-20       Memo             307
```

Page 3

```
 1
 2
 3           - - -
 4           I N D E X
 5           - - -
 6   STEPHEN MIDDLEBROOKS
 7   EXAMINATION                 PAGE
 8       BY:  MR. LARRY J. RAPPOPORT    10
 9       BY:  MS. CAREN N. GURMANKIN    332
10
11           - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
 1
 2
 3           E X H I B I T S
 4           - - -
 5
 6
 7   NO.        DESCRIPTION      PAGE
 8
 9   D-21       Email            306
10   D-22       Email            319
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

d6848dba-d9f9-429a-826b-42316962d1a9

Page 58

1    Q.    Okay.  And did you know even before the
2    trip began that you were a candidate for a position?
3    A.    I hoped that I was.
4    Q.    Okay.  You wanted the position?
5    A.    I wanted to continue to work at TEVA, yes.
6    Q.    And was there anything about the time that
7    you spent with Nir visiting the sites that changed
8    your mind as to whether this was a position that you
9    really wanted?
10   A.    No.
11   Q.    Do you know whether there were other
12   candidates?
13   A.    I do not know.
14   Q.    Do you know whether Mr. Urban was a
15   candidate?
16   A.    I do not know.
17   Q.    Okay.  During the course of the 17 days,
18   did Nir ever suggest to you that he made up his mind
19   as it relates to your being a candidate for the
20   position?
21   A.    No, he did not.
22   Q.    Did Nir ever provide you with any opinions
23   that he had about the globalizing of the
24   organization?

Page 59

1    A.    Well, he spoke about the globalizing often
2    so there were many, you know, many, many, many
3    opinions.
4    Q.    Was he looking forward to running the
5    global organization?
6    A.    Oh, absolutely.
7    Q.    Was he forward to working with you and
8    other Americans in the U.S.
9    A.    I can't answer that question.
10   Q.    He didn't express anything to that effect?
11   A.    He expressed that he was interested in
12   taking on this position, the global position; he was
13   very interested in that.  He was very excited about
14   it, he was -- it was a big promotion for him.  It
15   was a great opportunity, a wide ranging opportunity
16   and he was very excited about it.
17   Q.    Okay.  Did he ever make any disparaging
18   remarks about any Americans during the 17 days that
19   you spent together?
20   A.    Not that I recall.
21   Q.    Did you ever hear him make a disparaging
22   remark about anyone in a protected group, whether it
23   be race or gender or age or national origin?
24         MS. GURMANKIN:  During that

Page 60

1    17-day trip?
2    BY MR. RAPPOPORT:
3    Q.    Well, at any time?
4    A.    He did make some comments to me regarding
5    Americans directly to me and it had to do with
6    America's support of Israel.
7    Q.    This is to Ms. Gurmankin's point.  Was
8    this during the 17 days together?
9    A.    No.
10   Q.    Subsequent?
11   A.    Subsequent to that, yes.
12   Q.    Do you recall when?
13   A.    I don't remember an exact date.
14   Q.    Okay.  Do you recall a context?
15   A.    I'm going to say -- and I don't remember
16   the exact dates -- but I believe somewhere in 2014
17   Israel was attacked with missile attacks and Nir was
18   brought back into active duty and so was Roni Kafre.
19   Both of them had to go back into active duty along
20   with many other people.  There's -- let me preface
21   this by saying there's so many altercations with
22   Israel and its neighbors that I don't remember.  I
23   think that this was the Syrians that were causing
24   trouble at this time.

Page 61

1         And it was after that was over that he
2    came back and we were meeting and he said that the
3    Americans let them down, that they should have
4    supported them more quickly and more, you know, sent
5    in more troops, they should have brought in an
6    aircraft carrier.  And so let me again preface by
7    saying I have no military experience, I am not a
8    military person.  No one in my family -- my father
9    was in the navy in a World War II but I have no
10   military experience.
11        So his comments to me about what America
12   should have done in terms of response -- I don't
13   know if it's correct.  I don't have an opinion, I
14   don't understand the military response.  But he was
15   very negative about it, he was very vocal about it
16   that the Americans had let them down, that they
17   should have intervened, they should have come in
18   faster, they should have brought in more troops,
19   they should have --
20        And he was also very upset about how the
21   media -- another one of his comments later on after
22   that have had to do with yet another altercation
23   where Israel was being rocketed again by one of its
24   neighbors; I'm not sure which of the neighbors, I'd

d6848dba-d9f9-429a-826b-42316962d1a9

Page 62

1  have to back and look it up. The press -- the U.S.
2  press -- was very negative the Israeli response
3  because the Israeli's had sent missiles back and had
4  killed innocent bystanders apparently.
5        Again, I'm not that familiar with it but
6  his direct response to me was how many missiles
7  would Canada have to fire at Washington, D.C. before
8  the United States would fire back? The Israelis had
9  used extraordinary restraint and they shouldn't be
10  beaten up in the press because some innocent
11  bystanders were injured in the protection of Israel.
12  Q.    Okay. This was the second episode?
13  A.    Yes.
14  Q.    Are there other episodes too?
15  A.    Directly to me?
16  Q.    Yeah.
17  A.    No.
18  Q.    And these were both in 2014?
19  A.    I -- I'm not sure of the dates. I think
20  the second one may have been in 2015.
21  Q.    Okay. And did you conclude, as a result
22  of these comments, that Nir had anti American bias?
23  A.    Not specifically and exclusively from
24  those comments no.

Page 63

1  Q.    Was it something more than those comments?
2  A.    Yes.
3  Q.    What?
4  A.    One of my direct employees went to Israel
5  at the request of the CEO to work on organizing a
6  global meeting. And while she was in Israel she
7  took time to go and see Nir to thank him for the
8  opportunity to come to Israel. She was an
9  administrative assistant and she thought this was a
10  phenomenal opportunity for her to go to Israel. She
11  was very pleased that the company had asked her to
12  go. She was excited about being there, she was very
13  enthusiastic about what she was doing there.
14        She sought Nir out, went to his office to
15  thank him specifically for allowing her to go and
16  tell him how beautiful she thought the country was
17  and how nice the people had been to her. And he sat
18  at his desk apparently and made some very derogatory
19  comments to her that basically put her to tears and
20  upset her greatly. It had to be do with comments
21  about the narrow mindedness of Americans and very
22  inappropriate comments.
23  Q.    What was the comment?
24  A.    Paraphrase to me when I found out was so

Page 64

1  you Americans don't realize -- or just are now
2  realizing that we are all just a bunch of
3  towel-headed camel jockeys.
4  Q.    That brought her to tears?
5  A.    Yes.
6  Q.    Who is this person?
7  A.    Carolyn Tousious.
8  Q.    Could you spell her last name?
9  A.    T-O-U-S-I-O-U-S.
10  Q.    Does she still work at TEVA?
11  A.    I don't know.
12  Q.    Okay. And when did this happen?
13  A.    I believe it would have been some time in
14  2015, early '15.
15  Q.    Okay. So when you heard about this --
16  from Carolyn or someone else?
17  A.    Carolyn didn't tell anyone about it for
18  some period of time. She and another one of my
19  employees, Ellen Cicak, were very close.
20  Q.    I had a feeling that she might be
21  involved.
22  A.    Excuse me?
23  Q.    I had a feeling that she might be
24  involved.

Page 65

1  A.    Right.
2  Q.    So did she tell -- did Ellen Cicak hear
3  something from Carolyn?
4  A.    Carolyn was obviously very upset and Ellen
5  ask asked her what was wrong and Carolyn after -- it
6  was some period of time, not days but probably
7  weeks, maybe even months -- confided in her what had
8  been said.
9  Q.    Okay.
10  A.    Ellen asked her if she was comfortable to
11  have to come and speak to me. So after a period of
12  time, Carolyn did come to me and confirm what had
13  happened.
14  Q.    Okay. She shared the story about -- it's
15  about time that Americans came to Israel and realize
16  that we weren't a bunch of towel-wearing camel
17  jockeys?
18  A.    Yes, something to that effect, yes.
19  Q.    Okay. Was there more?
20  A.    I didn't hear more than that and I don't
21  think she heard more than that because I think she
22  left the office and never wanted to go back.
23  Q.    Left the office in Israel?
24  A.    Nir's office and went back to the other

17 (Pages 62 to 65)

d6848dba-d9f9-429a-826b-42316962d1a9

Page 66

1    office.
2    Q.       Was she emotional when she described the
3    story to you?
4    A.       Yes.
5    Q.       Did you console her?
6    A.       I tried to.
7    Q.       Did you bring it to anyone else's
8    attention?
9    A.       She asked me not to.
10   Q.       Okay.  Did you advise Nir that he had
11   upset one of your employees?
12   A.       Don't remember if I ever confronted him on
13   that.
14   Q.       So the comments that you had shared about
15   American support during an Israeli military skirmish
16   about the American media as it relates to whether
17   Israel had overreacted to missiles and the anecdote
18   that you had just shared that was brought to your
19   attention by one of the administrative employees
20   together made you conclude what?
21   A.       The narrow headedness of bias against the
22   U.S., people in the U.S.
23   Q.       Okay.  And when did you come to this
24   conclusion?

Page 67

1    A.       I don't remember the exact date.
2    Q.       I didn't ask for an exact date.
3    A.       I had thoughts concerning this bias as
4    early as our 17-day tour and it only supported more
5    and more as time went on over the entire time of my
6    employment with Nir.
7    Q.       I thought you had responded to my question
8    as to whether or not Nir said anything that was
9    disparaging about Americans during this 17-day tour
10   that he had not -- what happened during the 17-day
11   tour that led you to believe that he might have a
12   bias?
13   A.       I apologize; let me restate my answer.
14   Q.       Please.
15   A.       The bias that I talked about in our 17-day
16   tour was with regard to age, not national origin.
17   National origin comments started in 2014 and
18   continued on.
19   Q.       Have you shared with me now all of the so
20   called statements or comments or conduct that
21   perceived that show an anti American bias?
22   A.       Comments, yes; conduct, no.
23   Q.       Okay.  What conduct did you observe that
24   supported your belief that Nir was or had an anti

Page 68

1    American bias?
2    A.       In July of 2015, Nir sent Shimrit and Roni
3    to the U.S. with a couple issues in mind so there
4    was an agenda set up.  Part of the agenda was to do
5    a training course on some new financial systems that
6    were being rolled out that Shimrit was going to do.
7    And another part of the agenda was share the results
8    of the Global Facilities Organization with my
9    team.
10          The actual results were not always shared.
11   We talked about the U.S. and the North American
12   numbers at great length but we never -- part of the
13   Global Facilities Management was to gain
14   understanding of all the different areas so my team
15   had asked for a meeting to share all of the results
16   throughout world so that we could better understand
17   how we were doing -- benchmark -- against the rest
18   of the world and to understand what their best
19   practices were so that we could incorporate them
20   into our practice.  And that was the purpose of this
21   meeting.
22          There was two -- like I said, more than
23   one but those were the two main purposes.  The
24   meeting occurred in the U.S. in a training room in

Page 69

1    North Wales Two.  The financial training was
2    completed and we opened the floor and the next part
3    of the agenda was designed for the U.S. to ask
4    questions, to understand what the rest of the world
5    was doing.
6          Scott Hoyt, one of my direct employees,
7    asked the first question and Shimrit put her hand up
8    in his face and told him to shush and that he was
9    not allowed to ask questions about the rest of the
10   world.  And everybody was put back as to this was
11   the purpose of the meeting.
12          She then went around the room and walked
13   around the room and physically closed all of the
14   computers that people had at their desks and around
15   the table, saying that it was very rude for people
16   to have a computer open during a meeting.  And she
17   proceeded to scold everyone for their poor habits
18   and behaviors.  And she basically stopped the
19   meeting and said, you know, we are not going to
20   cover this; we have other things to cover.  And she
21   just changed the meeting to a different direction.
22          This is completely different than all of
23   the meetings I had seen and been in Israel with
24   Shimrit and Roni and Nir.  Shimrit, Roni, and Nir at

d6848dba-d9f9-429a-826b-42316962d1a9

Page 182

```
1    Q.    Okay.  And are you sure that Troy Galger
2   was eligible for the equity participation?
3    A.    Yes.
4    Q.    He was at that labor grade?
5    A.    Yes.
6    Q.    Was he the only one of your director
7   reports other than Ray that was at that labor grade?
8    A.    At that point, yes.
9    Q.    Is that because he was a senior director?
10   A.    No, he was a director.
11   Q.    Okay.
12   A.    He was a director and above at the time so
13  associate so associate directors, on this particular
14  year to my knowledge, would not given them but,
15  again, a vice president could give them to managers,
16  to -- I mean, he could pretty much give them to
17  anybody.
18   Q.    Okay.
19   A.    You could give them all to you secretary,
20  you could do whatever you want with them was my
21  understanding.  Now, did anybody do that?  I have no
22  idea.
23   Q.    Okay.
24   A.    There's no way for me to know what anyone
```

Page 183

```
1   else has ever received.  No one ever -- you sign an
2   agreement that you're not going to tell anyone what
3   equity shares you got when you get them.  There's a
4   sign off sheet that says basically this is between
5   you and your manager and that's it.
6    Q.    Are you familiar with the pivot program?
7    A.    Pivot program.
8    Q.    Pivot, P-I-V-O-T?
9    A.    IN regards to what?
10   Q.    A project at TEVA that involved facilities
11  management?
12   A.    I know there was a company called Pivot
13  that was being used by Nir, a consulting company.  I
14  don't know that it was a program.
15   Q.    All right.  What do you know about -- did
16  that Pivot organization interact with you?
17   A.    Yes.
18   Q.    Okay.  And did you need to provide them
19  with information?
20   A.    A ton of information, yes.
21   Q.    Okay.  Did any of the information that the
22  Pivot program asked for involve the ages of
23  employees?
24   A.    Yes.
```

Page 184

```
1    Q.    Okay.  When did Pivot first ask you for
2   that information?
3    A.    I'm going to say it was somewhere in the
4   beginning of 2014.
5    Q.    First quarter of 2014?
6    A.    I believe so.
7    Q.    Okay.  Did anyone at Pivot ask you or tell
8   you why they needed that information?
9    A.    At one point, they got back to me and said
10  that the information would be used to determine
11  preferences for food services at a site.
12   Q.    Do you recall who told you that?
13   A.    There was a gentleman named Nir -- it
14  wasn't Nir Aharoni, it was Nir Joseph, I believe his
15  name was.
16   Q.    Do you know a name Revital Michaelovitch
17  who, I believe, who was a consultant with Pivot?
18   A.    That may have been Joseph's -- Nir
19  Joseph's -- boss.
20   Q.    Okay.
21   A.    I didn't have much to do with him but I --
22  there were a couple of meetings where the upper
23  management of Pivot were present.  That name does
24  not ring a bell but it could very easily be.  Most
```

Page 185

```
1   of my dealings were with Nir Joseph.
2    Q.    What other information was Nir Joseph
3   seeking?
4    A.    Wow.
5    Q.    Demographic?
6    A.    Demographic information.  He also -- it
7   was all types of information -- organizational
8   charts, costs of various activities, the size and
9   shape of the facility, the landscaping square
10  footage, the amount of -- the products that were
11  made at a facility, how many products were made,
12  what were the volumes made.  So all of the
13  statistics regarding production.
14   Q.    Do you know what a data dump is?
15   A.    I'm familiar with the term, yes.
16   Q.    Okay.  Did you provide a data dump with
17  information to Pivot and the person of Nir Joseph?
18   A.    Oh, my, yes.
19   Q.    Okay.  Did you give Nir Joseph the age
20  information that he was seeking?
21   A.    No, I did not.
22   Q.    Why not?
23   A.    I didn't think it was appropriate.
24   Q.    Did you tell Nir Joseph that?
```

47 (Pages 182 to 185)

Page 186

1    A.    Yes, I did.
2    Q.    Okay.  What was his response?
3    A.    He asked for the information a second time
4    and a third time and a fourth time.
5    Q.    To you?
6    A.    Yes, and to my people.  He went -- after
7    he went to me then he sent it directly to my people
8    and my people got back to me and said what is this.
9    And so I went back to him and I said no.  The last
10   time he did it he changed the spreadsheet to include
11   not ages of people but ranges of ages.  So he wanted
12   to know how many people were between 20 and 25, how
13   many were 25 to 30, 35 to 40 and I rejected that, as
14   well.  I said this is not information that I have,
15   it's not information that I can give you, and it's
16   inappropriate.
17   Q.    Okay.  Did you share with the other Nir,
18   Nir Aharoni, that you'd been asked to provide this
19   information?
20   A.    Yes.
21   Q.    Okay.  And did he indicate to you that you
22   would not be required to provide it?
23   A.    He asked for it.
24   Q.    Nir Aharoni did?

Page 187

1    A.    Asked me specifically.  So two different
2    asks -- Nir Aharoni asked me for the ages of
3    everyone who worked either directly for me or
4    indirectly for me, so the 73 people in my group.  He
5    asked me specifically for that information.
6    Q.    Okay.  Was that unrelated to the Pivot
7    program?
8    A.    These were separate from the Pivot
9    program.
10   Q.    Was it at the same time?
11   A.    First Nir came and then the Pivot
12   organization came.
13   Q.    Okay.  Was the request for information the
14   same request just made by two different Nirs?
15   A.    No.
16   Q.    Okay.
17   A.    So the first one from Nir had to do
18   specifically with my direct reports.
19   Q.    Okay.  And that was in the first quarter
20   of 2014?
21   A.    Yes.
22   Q.    Okay.
23   A.    That was form Nir.
24   Q.    Okay.  Nir Aharoni, just so we're clear?

Page 188

1    A.    Nir Aharoni.  And Nir Aharoni so there was
2    a -- just to be clear -- Nir asked for the dates of
3    all the people.  He asked for a smaller data dump.
4    He wanted the name, email address, phone number,
5    date of birth, I believe he asked if they were male
6    or female, and also when they started with TEVA.  So
7    there were six or seven items.
8    Q.    Okay.  Did he tell you why he needed that
9    information?
10   A.    Yes, he did.
11   Q.    What did he tell you?
12   A.    He said very specifically that he was a
13   hands-on people manager so that he needed to have
14   this information so that when someone's birthday
15   came up he could send them a birthday card and say
16   congratulations on your birthday blah, blah, blah,
17   or if their anniversary with the company came up
18   that he would send a congratulatory message saying,
19   you know, congratulations on your eight years with
20   the company, great job, you know, thank you for your
21   support.
22   Q.    Did you accept his explanation?
23   A.    I'll tell you what I did do.
24   Q.    Answer my question and then you can tell

Page 189

1    me what you did do.  Did you accept his explanation?
2    A.    At face value, yes.
3    Q.    Okay.  What did you do?
4    A.    I had Holly, one of my assistants, prepare
5    a list as he requested of all the 73 people on our
6    list with names, emails, phone numbers, and day of
7    birth; I left off the year.  Because I figured if
8    you're going to send somebody a message on your
9    birthday, if it's July 21st it doesn't matter what
10   year it is.
11   So I sent that to him in an email.  I
12   still have a copy of the form that Holly put
13   together for me and sent it off to him very early in
14   our organization.
15   Q.    Do you recall whether or not you provided
16   that email to your counsel as part of my discovery
17   request?
18   A.    I believe I did.
19   Q.    Okay.  And when he received the email that
20   you've just made reference to with birth dates but
21   not birth years, did he respond?
22   A.    He wanted to know why I didn't include the
23   years.
24   Q.    Okay.  Was this by phone or by email?

d6848dba-d9f9-429a-826b-42316962d1a9

Page 190

```
 1      A.    This was by phone.
 2      Q.    Okay.
 3      A.    So if I can, there was one birth year on
 4   the list, mine.
 5      Q.    Why did you provide yours?
 6      A.    I had already told him how old I was.
 7      Q.    Okay.  So this was a message of sorts?
 8            MS. GURMANKIN:  Objection to
 9      form, you can answer.
10            THE WITNESS:  It was not a
11      message of any sort.  He already knew my
12      date of birth so I wasn't giving him any
13      new information.
14   BY MR. RAPPOPORT?
15      Q.    Okay.  So when he receives your email with
16   your date of birth but no one else's, he asks you
17   why and you provide an explanation?
18      A.    Yes.  I told him that I did not have the
19   information of the date of birth of people, I could
20   not get the information of the date of birth, and I
21   could not ask for that from my people, and that it
22   was against the law for me to even ask those
23   question of my people.
24            His response to me was that's ridiculous.
```

Page 191

```
 1   Knowing someone's age in Israel is as common a
 2   practice as can be.  In fact, everyone puts their
 3   age on the first line of their resume and that
 4   hiring decision and promotion decisions are
 5   typically made using age as one the discerning
 6   factors and it was common practice in Israel.  To
 7   which I responded that it is against the law in the
 8   United States to do so and I would not be providing
 9   that information to him.
10      Q.    And did he ask again?
11      A.    He did not ask again.  Pivot asked, who
12   reported to him.
13      Q.    We're not going to talk about Pivot until
14   I get to Pivot but let me just stay with Nir.
15      A.    Yes.
16      Q.    Did you share with Elaine McGee what you
17   you've just described as it relates to the list of
18   your organization?
19      A.    Yes, I did.
20      Q.    What did she tell you?
21      A.    She was aghast.
22      Q.    You don't tell someone I'm aghast, you --
23      A.    She was incredulous.
24      Q.    Same thing, you -- what did she say to
```

Page 192

```
 1   you?
 2      A.    She said that this was inappropriate
 3   behavior and that she would contact the HR people in
 4   Israel and make sure that this didn't happen again.
 5      Q.    Do you have any reason to believe that she
 6   did or didn't?
 7      A.    I take her for her word; I believe she
 8   did.
 9      Q.    Okay.  So is that everything?  Is there
10   more to the story with regard to Nir Aharoni asking
11   you for the ages of employees within your
12   organization?
13      A.    So as the Pivot people --
14      Q.    I'm not at Pivot yet.
15      A.    Let me finish, please.  As the Pivot
16   people continued to ask the questions after the
17   third or fourth request, I got back on the phone
18   with Nir and said you have to stop this.  I said if
19   I have to I'll go to HR on this and this is going to
20   be become a huge issue; we need to stop this, please
21   make it happen.  And between that and Elaine McGee
22   the responses for age information stopped.
23      Q.    What month would you say that that would have
24   been?
```

Page 193

```
 1      A.    Probably midyear.
 2      Q.    Elaine McGee was replaced by Mini in June
 3   of 2014; I'll make that representation.  Does that
 4   help you in terms of putting a timeline as to when
 5   this would have occurred?
 6      A.    It would have been right about that time
 7   because Mini was also aware of this.
 8      Q.    Okay.
 9      A.    Yes.
10      Q.    All right.
11      A.    Can I add one more --
12      Q.    At the risk of your --
13            MS. GURMANKIN:  Yes, go ahead.
14            THE WITNESS:  So you asked me if
15      Nir here was sincere in his request.
16   BY MR. RAPPOPORT:
17      Q.    About birthdays?
18      A.    About birthdays.  So he received all of
19   that information with the birthdays and the start
20   dates of employees and for two and a half years the
21   clock ran.  And on no single occasion did he ever
22   write an email to anyone on that list as a birthday
23   or a date off-- anniversary date.  So you're going to
24   ask me at the beginning do I take him at his word --
```

## Page 218

1    THE WITNESS: Because we talk to
2 HR all the time.
3 BY MR. RAPPOPORT:
4    Q.    Absolutely, you're right; bad question, I
5 can start all over if you want me to.
6    A.    Please.
7    Q.    Okay. Prior to the meeting with Shimrit
8 and Roni in July of 2015, had you or to your
9 knowledge anyone in your organization complained
10 about the treatment to Nir or other Israelis?
11    A.    I had complained about the age requests to
12 HR prior that.
13    Q.    In 2014?
14    A.    In 2014, yes.
15    Q.    And you said that was to Elaine and to
16 Mini as she was joining the organization?
17    A.    Yes.
18    Q.    Okay.
19    A.    As far as any other activities, I don't
20 know if Ray -- I mean, Ray would have contacted HR
21 regarding his equity issue but I don't know exactly
22 -- again, so that would have occurred early 2015
23 prior to this meeting.
24    Q.    Okay.

## Page 219

1    A.    After the meeting with Shimrit and Roni,
2 we had a meeting, a staff meeting, lined up for
3 August in Pennsylvania. I added Mini to the agenda
4 so that we could talk through the issues and I gave
5 her a heads up as to what some of the issues might
6 be.
7    Q.    And what were the heads up issues that you
8 gave her?
9    A.    Well, I gave her the heads up issues about
10 the timing problems that we had, the difference in
11 treatment that the group felt that they were being
12 treated differently than their counterparts in
13 Europe and in Israel.
14    Q.    And that was just based upon what you had
15 shared because no one else had any comparative
16 information other than you and what you testified
17 previously and I'm going on was you had noticed how
18 Shimrit in meetings and now what she was being
19 critical of. So no one else had any exposure to
20 that?
21    A.    Well, they have exposure to meetings every
22 day in the U.S. where people don't do what.
23    Q.    Okay, all right. What else was on the
24 agenda?

## Page 220

1    A.    There were standard items, there was our
2 budget, there was, you know, standard and then there
3 was HR issues. And HR included -- so any HR issues.
4 So the biggest one at that time was the issue
5 surrounding that meeting with Shimrit and Roni so
6 that was the big one.
7    Q.    Something bad happened during that
8 meeting --
9    A.    Yes.
10    Q.    -- that upset people?
11    A.    Yes.
12    Q.    You were one of the people that were
13 upset?
14    A.    Yes.
15    Q.    Okay. You felt you were belittled?
16    A.    Yes.
17    Q.    And how were you belittled?
18    A.    I was treated like a child.
19    Q.    Okay. In what way?
20    A.    Well, when's the last time someone put
21 their hand over your face and shushed you?
22    Q.    You were shushed?
23    A.    Yeah.
24    Q.    I don't recall. Although I'm usually not

## Page 221

1 answering your questions; it's the other way around.
2    A.    You understand. So yes, there were direct
3 implications from that meeting.
4    Q.    Okay. So you observed the way -- the
5 behaviors of Roni and Shimrit and you decided that
6 it would be a good idea for Mini to attend your
7 meeting to discuss that meeting?
8    A.    And also -- so let me -- so while I'm
9 sitting here thinking. So after the meeting with
10 Shimrit and Roni we all decided to go out to dinner.
11    Q.    Including Shimrit and Roni?
12    A.    Yes, we took them out to dinner as hosts,
13 they're in our country, of course, it was part of
14 the agenda; it's always part of the agenda. When I
15 was in Israel, they took me out to dinner.
16    Q.    To Arthur Ann, as I recall, is where
17 Heather always takes people to dinner.
18    A.    There are other places -- you know, I let
19 them decide, I let them -- all right. And they were
20 very gracious to me when I was in Israel, they
21 always took me out, and I reciprocated that here in
22 the U.S. always. So we went out to dinner. On the
23 way to dinner, Rhonda Wilton took a phone call.
24    Q.    She's the Canadian?

d6848dba-d9f9-429a-826b-42316962d1a9

Page 222

```
1    A.    She's the Canadian.
2    Q.    You're in the car?
3    A.    I'm driving.
4    Q.    Okay.  Who else is in the car?
5    A.    Shimrit and Roni.
6    Q.    Okay.  The four of you?
7    A.    The four of us in my car driving, I'm
8    driving.  Rhonda gets a phone call and so I'm not
9    necessarily listening and she talks to someone on
10   the phone and at the end she says, oh, thanks, you
11   know, love you honey.
12   Q.    Okay.  She uses the term of endearment
13   honey?
14   A.    Honey.
15   Q.    And Shimrit makes reference to it.
16   A.    Yes.  Why don't you call your husband
17   hubby?  What does honey mean?
18   Q.    She was joking?
19   A.    Really?  Are you testifying to that?  Were
20   you there.
21   Q.    That was a question.  She was joking
22   question mark.
23   A.    No.
24   Q.    She was saying it in an official capacity?
```

Page 223

```
1    A.    She wanted to know why she didn't call the
2    person on the phone hubby.
3    Q.    Okay.  To which Rhonda responded that
4    she's not married?
5    A.    She's not married.
6    Q.    Okay.
7    A.    At which point --
8    Q.    Shimrit lectures her?
9    A.    -- Shimrit at the top of her lungs screams
10   at her about having children out of marriage.  And
11   then turns to me while I'm driving and says Steve,
12   you have to solve this problem -- and started
13   banging me on the back of my shoulder saying you
14   need to do something right now, you're the manager,
15   you need to solve this issue.
16   Q.    What would be the issue that needed to be
17   solved?
18   A.    Apparently I needed to get the two of them
19   married.
20   Q.    All right.  So that was something you
21   wanted Mini to know about?
22   A.    Absolutely.
23   Q.    And you shared that with Mini in the
24   contact that you had with her to set up the meeting?
```

Page 224

```
1    A.    Yes.
2    Q.    Because you felt that was inappropriate
3    and improper behavior?
4    A.    And because -- whether or not I thought it
5    was inappropriate it affected Rhonda very
6    negatively.
7    Q.    Okay.
8    A.    So Rhonda ended up in tears and she could
9    barely talk about the incident afterward.  Just
10   prior to that, as well, John Epley, who is the
11   engineer who worked for me and became the
12   engineering director after.  Shimrit had come out of
13   the meeting and we were all in our little area and
14   someone -- and I wasn't privy to the conversation, I
15   was in my office -- and somehow she heard that John
16   had broken up with his long term girlfriend of 11 or
17   12 years.
18   Q.    Someone you've met.
19   A.    I did not meet her, no.
20   Q.    Okay.  And doesn't Shimrit say something
21   to the effect that meet -- introduce her to a nice
22   Jewish girl?
23   A.    Yes.
24   Q.    Okay.
```

Page 225

```
1    A.    To which John is very upset and everyone
2    around them is --
3    Q.    Aghast, as you would say?
4    A.    -- yes.
5    Q.    Okay.
6    A.    Inappropriate behavior.
7    Q.    Because she used the term nice Jewish
8    girl?
9    A.    No, because she said I'll set you up with
10   -- you know, it's none of her business.
11   Q.    Okay.  So she was being a little bit too
12   familiar?
13         MS. GURMANKIN:  Objection to
14         form.
15   BY MR. RAPPOPORT:
16   Q.    Okay.  And this comes to your attention
17   because John shares it with you?
18   A.    No, I heard -- once it started, I heard it
19   come through my office because voices got raised
20   and, you know, people were, you know, incredulous as
21   to what was going on.
22   Q.    And that was the same day as the dinner
23   comment?
24   A.    Yeah.
```

d6848dba-d9f9-429a-826b-42316962d1a9

# EXHIBIT "B"

# In The Matter Of:

*STEPHEN MIDDLEBROOKS v.*

*TEVA PHARMACEUTICALS USA, INC., et al.*

---

*ELLEN H. CICAK*

*April 4, 2018*

---

*Terry Burke Reporting*

*Registered Professional Reporters*

*terryburkermr@gmail.com*

*(215) 205-9079*

**Min-U-Script® with Word Index**

STEPHEN MIDDLEBROOKS v.
TEVA PHARMACEUTICALS USA, INC., et al.

ELLEN H. CICAK
April 4, 2018

Page 89

1    A.  The next day when we clarified.
2    Q.  What did he share with you that he
3  meant?
4    A.  That he meant "keep it short."
5    Q.  Do you find that offensive too?
6    A.  No.
7    Q.  Did Roni ever ask you what your age was?
8    A.  Yes.
9    Q.  When?
10   A.  Early in the IFM time period.
11   Q.  In 2014?
12   A.  That's likely the time.
13   Q.  What did Roni ask?
14   A.  He asked me how old I was.
15   Q.  Did he tell you why he needed that
16  information?
17   A.  No.
18   Q.  That would have been before you were
19  promoted, wouldn't it have been?
20   A.  I don't know.
21   Q.  Around the same time, at least?
22   A.  I don't know.
23   Q.  But it certainly didn't cause you to
24  have any change in your job condition, did it?

Page 90

1    A.  No.
2    Q.  Did you tell him how old you were?
3    A.  I did.
4    Q.  Were you embarrassed by the question?
5    A.  I knew in the business world it wasn't
6  appropriate.
7    Q.  That wasn't my question.
8       MS. GURMANKIN: She is not
9  finished.
10      MR. RAPPOPORT: She doesn't
11  answer my question.
12      MS. GURMANKIN: She is not
13  finished.  Let her finish.
14      THE WITNESS: I knew in the
15  business world it wasn't appropriate.  I
16  wasn't comfortable answering it.  But I did
17  answer it.
18  BY MR. RAPPOPORT:
19   Q.  Why?
20   A.  Because I didn't want to argue with him
21  about it.
22   Q.  Did he tell you why he needed the
23  information?
24   A.  No.

Page 91

1    Q.  Did Nir ever ask you what your age was?
2    A.  No.  He asked for birth dates.
3    Q.  Did he ask you your birth date?
4    A.  He asked for birth dates of the reports.
5    Q.  Did he ask that of you?
6    A.  He did not ask that of me.
7    Q.  So please listen to my question.
8    A.  I am.
9    Q.  Because I am trying to be clear and it
10  seems like you want to tell your story.
11      When I said did he ever ask you
12  your age, you said no.  And then you said he
13  asked birth dates, but he didn't even ask you
14  your birth date.  So listen to the question.
15  It will make this a lot easier and less
16  painful.
17   A.  Okay.
18   Q.  Okay.
19      Did either Roni or Nir ever ask you
20  what your marital status was?
21   A.  I don't recall.
22   Q.  Did either Roni or Nir ever ask you how
23  many children you had?
24   A.  I don't recall.

Page 92

1    Q.  Did either Roni or Nir ever ask you how
2  many grandchildren you had?
3    A.  I don't recall.
4    Q.  Did either of them ask you what your
5  national origin was?
6    A.  No.
7    Q.  Did you hear either Roni or Nir ever
8  make a disparaging remark about Americans?
9    A.  Yes.
10   Q.  Who?
11   A.  Nir.
12   Q.  When?
13   A.  During the trip to Israel.
14   Q.  In 2016 after Steve was already gone?
15   A.  Yes.
16   Q.  Tell me about what he said?
17   A.  Kat, whose last name I don't recall, was
18  speaking at the GFM group.  She made an opening
19  remark, a joke to break the ice, and the joke
20  was about people of different ethnicities.  That
21  there was, I believe it was a hunger initiative,
22  because all of the different countries around
23  the world responded based on some ethnic
24  assumption. But then when they asked the

Page 93

1  Americans, the Americans just knew nothing.
2  Q.  This was Kat's joke?
3  A.  This was Kat's joke.
4  Q.  Knew nothing or did nothing?
5  A.  Knew nothing is my recollection.
6  Q.  What happened next?
7  A.  The table where the North American group
8  were sitting visibly moved.  Not the table
9  itself, but the people at the table visibly
10  tensed.  And the HR representative at the next
11  break, a representative from HR came over and
12  asked if we were all okay.  And we said we just
13  didn't appreciate it.  It was insulting.
14  Q.  Kat's joke was insulting?
15  A.  Kat's joke was insulting.
16       The HR rep agreed and said she would
17  have Kat apologize.
18       At lunch Kat came over and told us
19  that she was sorry that we didn't know what
20  funny was.
21       At the end of the conference, Nir
22  gathered the North American team together and
23  told us that he understood that we didn't like
24  it, but that we needed to understand that that's

Page 94

1  just the kind of thing they think is funny.
2  Q.  So is it fair to say he basically
3  said "lighten up"?
4  A.  No, I don't think that's what he said.
5  I think what he said is that we needed to be
6  okay with this ethnic context.
7  Q.  Is that the extent of the story or is
8  there more to it?
9  A.  That's the story.
10  Q.  And that is your example of Nir's bias
11  towards Americans?
12       MS. GURMANKIN:  Objection to
13  form.  That wasn't the question.
14       MR. RAPPOPORT:  I believe it was,
15  but you can answer.
16       MS. GURMANKIN:  No, it wasn't.
17  BY MR. RAPPOPORT:
18  Q.  Is that your example, only example of
19  evidence showing Nir's bias towards Americans?
20  A.  No.
21  Q.  What else do you have?
22  A.  Carolyn Tousius, she went to Israel, and
23  when she returned, I was talking to her about
24  something related to the Manhattan office.  And

Page 95

1  she relayed to me what a wonderful time that she
2  had except this problem that she had when she
3  was there with Nir.
4  Q.  Did she describe the problem?
5  A.  She said that she stopped by to see Nir
6  and tell him what a wonderful time she had had
7  and how beautiful the country was.  And Nir's
8  response was that then she would now know that
9  they weren't just a bunch of guys riding camels.
10  Q.  Did you find that to be offensive?
11  A.  Carolyn found it to be offensive.
12  Q.  How about you when shared to you by
13  Carolyn?  Is that an offensive comment?
14       MS. GURMANKIN:  Wait.  Which
15  question do you want answered?
16  BY MR. RAPPOPORT:
17  Q.  Answer the question, did you find it to
18  be offensive when shared to you by Carolyn?
19  A.  I was surprised, not offended.
20  Q.  What surprised you?
21  A.  That there would be any assumption that
22  that would be what we Americans would think.
23  Q.  And when Carolyn shared that with you,
24  did you feel compelled to bring it to the

Page 96

1  attention of your manager Steve Middlebrooks?
2  A.  Well, at the time Steve was also
3  Carolyn's manager.  So yes, because Steve was
4  Carolyn's manager and she was very upset.  I did
5  tell Steve so that he could reach out to her.
6  Q.  When you say she was very upset, it
7  brought her to tears when she shared this with
8  you?
9  A.  I don't know that she was in tears, but
10  she was certainly very angry.  I can't tell you
11  what her emotion was, but she was unhappy.
12  Q.  When you advised Steve of this
13  unfortunate use of the term camels and
14  American's perceptions of Israelis, what did
15  Steve say he would do about it?
16       MS. GURMANKIN:  Objection to
17  form.  You can answer.
18       THE WITNESS:  That he would reach
19  out to Carolyn.
20  BY MR. RAPPOPORT:
21  Q.  And do you know whether he did?
22  A.  No.
23  Q.  Did you ever speak to Carolyn about it
24  again?

# EXHIBIT "C"

STEPHEN MIDDLEBROOKS v. TEVA PHARMACEUTICALS                    JOHN JOSEPH EPPLEY

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

STEPHEN MIDDLEBROOKS,
        Plaintiff,

Vs.          CIVIL ACTION NO. 17-0412

TEVA PHARMACEUTICALS,
USA, INC., TEVA
PHARMACEUTICAL INDUSTRIES
LIMITED,
        Defendants.

        Oral deposition of JOHN JOSEPH
EPPLEY, III, held in the law offices of Stevens &
Lee, 1818 Market Street, 29th Floor, Philadelphia,
Pennsylvania, on May 8, 2018, commencing at
9:32 a.m., before Kathleen McHugh, a Registered
Professional Reporter, Certified Realtime Reporter,
Certified Court Reporter-NJ, and Notary Public.

---

**Page 3**

1           EXAMINATION INDEX
2   John J. Eppley, III
        BY MR. RAPPOPORT . . . . . . . . . . . . 4
3       BY MS. GURMANKIN . . . . . . . . . . . .108
4
5           EXHIBIT INDEX
6   D
7   32  E-mails, TEVA (SM)003903-905        88
8   33  E-mails, TEVA (SM)003781-784        89
9   34  E-mails, TEVA (SM)003909-911        92
10  35  E-mails, TEVA (SM)003958-962        93
11  36  E-mails, TEVA (SM)000926-928        95
12  37  E-mails, TEVA (SM)002525-526        96
13  38  E-mails, TEVA (SM)002471-475        96
14  39  Retention Bonus Agreement, TEVA    102
        (SM)002038-042
15
16
17
18
19
20
21
22
23
24

---

**Page 2**

1   APPEARANCES:
2   CONSOLE MATTIACCI LAW
    BY:  CAREN N. GURMANKIN, ESQUIRE
3   Gurmankin@consolelaw.com
    1525 Locust Street, 9th Floor
4   Philadelphia, Pennsylvania 19102
    215-545-7676
5   Counsel for Plaintiff
6   STEVENS & LEE
    BY:  LARRY J. RAPPOPORT, ESQUIRE
7   Ljrstevenslee.com
    1818 Market Street
8   29th Floor
    Philadelphia, Pennsylvania 19103
9   215-575-0100
    Counsel for Defendants
10
    ALSO PRESENT:
11
    Stephen Middlebrooks
12  Thomas H. McDonough, Esquire
13
14
15
16
17
18
19
20
21
22
23
24

---

**Page 4**

1           JOHN JOSEPH EPPLEY, III, having been
2   duly sworn, was examined and testified as follows:
3           EXAMINATION
4   BY MR. RAPPOPORT:
5   Q.   Good morning, Mr. Eppley.  My name is Larry
6   Rappoport.  I'm an attorney for Teva.  I am
7   defending a lawsuit that was brought by Stephen
8   Middlebrooks against Teva which is pending in
9   federal court.
10          In the course of the litigation
11  parties often take depositions of witnesses who
12  have been identified as having knowledge or
13  information with regard to claims and defenses, and
14  you have been so identified in this case, which is
15  why I'm taking your deposition today.
16          I'm going to ask you a series of
17  questions and expect that you'll respond to my
18  questions and would ask that you respond orally as
19  opposed to using body language to respond.  That
20  way the court reporter will be able to not have to
21  interpret your body language and can just record
22  what it is that you say.
23          I'm going to also suggest to you that
24  you wait until I'm finished my question before you

95e44b3d-c054-4481-af46-f40887da5021

STEPHEN MIDDELBROOKS v. TEVA PHARMACEUTICALS                    JOHN JOSEPH EPPLEY

Page 33

1    the other groups were doing in terms of achieving
2    cost savings, the perception was that you were
3    being treated unfairly?
4    A.    That's correct, or at least differently.
5    Q.    And how do you make the connection that it
6    had anything to do with the fact that you were
7    Americans?
8    A.    America has the biggest -- well, the biggest
9    spend and therefore was continually asked to
10   provide a disproportionate amount of savings.
11   Q.    Did that seem illogical to you?
12   A.    It seemed easy to me.
13   Q.    To target the company or the country that
14   had the biggest spend?
15   A.    Yes.
16   Q.    Did you ever hear anyone reference Americans
17   being lazy or stupid or ungrateful or those types
18   of adjectives associated with Americans coming from
19   Nir or Roni?
20   A.    I don't believe so.
21   Q.    Do you personally feel that you were held
22   back because you were an American?
23   A.    No.
24   Q.    Did Steve ever indicate to you, either

Page 34

1    individually or as part of a group, that this all
2    had to do with the fact that you were Americans and
3    that they didn't like Americans?
4    A.    What do you mean by "this?"
5    Q.    The fact that they were insisting or
6    requesting that you achieve greater cost savings
7    than your counterparts?
8    A.    We -- well, Rhonda is Canadian, but North
9    America, you know, our bucket was savings.
10   Q.    I'm sorry.
11   A.    We had to deliver more.  We were asked to
12   deliver more to make up for other groups.
13   Q.    And my question was, did Steve ever indicate
14   to you, either individually or as part of the
15   group, that this was because you were Americans and
16   that the Israelis didn't like you and preferred
17   others?
18   A.    No, I don't believe so.
19   Q.    Was there a we-versus-them mindset at Teva
20   in this period of time, by that I mean 2014/2015?
21   A.    In terms of discussions, yes, there's this
22   group, that group.  We, them.  There's many
23   different aggregations of people.
24   Q.    Did you notice that the we-versus-them

Page 35

1    mindset changed when Dan Ramirez took over?
2    A.    Some aspects changed when Dan took over.
3    Q.    Which ones were they?
4    A.    For me I got more sites, more
5    responsibilities.
6    Q.    But my question was, to the extent there was
7    a we-versus-them mindset that may have existed in
8    2014 and 2015, when Dan Ramirez took over in 2016,
9    did that continue or did it go away?
10   A.    There -- it got pretty quiet from Israel.
11   The interaction for me got less and less in terms
12   of frequency.  And then I think there's a -- with a
13   change in leader, there's a change in -- there's a
14   reset button to some degree that kind of allows for
15   that.
16   Q.    Were you ever asked your age by anyone in
17   the 2014 to 2016 time frame?
18   A.    Yes.
19   Q.    Who?
20   A.    Shimrit.
21   Q.    When?
22   A.    Somewhere, I don't know exactly, but it
23   would have been late April, early May.
24   Q.    In person?

Page 36

1    A.    No, through phone.
2    Q.    And what do you recall her asking?
3    A.    How old, more or less explicitly, how old
4    are you type of conversation.
5    Q.    And did she tell you why she needed that
6    information?
7    A.    No.
8    Q.    Did you tell her how old you were?
9    A.    I sidestepped the answer.
10   Q.    And how were you able to do that?
11   A.    Try and make a joke of, you know --
12   Q.    Did she ever ask again?
13   A.    No, I don't believe -- if she did, I pawned
14   it off again, but it was not numerous times of
15   asking.
16   Q.    Did anyone other than Shimrit ever ask you
17   your age?
18   A.    Within our group, no.
19   Q.    Beg your pardon?
20   A.    Within our group, no.
21   Q.    How about anyone at Teva?
22   A.    Oh, yes, lots of people ask me how old I am.
23   Q.    Are these just Israelis?
24   A.    Americans, too.  Canadians.

95e44b3d-c054-4481-af46-f40887da5021

STEPHEN MIDDLEBROOKS v. TEVA PHARMACEUTICALS                          JOHN JOSEPH EPPLEY

Page 37

1  Q.  Do you sidestep it when you're asked by
2  Americans and Canadians?
3  A.  Usually, yes.
4  Q.  Is that because you think there's a privacy
5  concern?
6  A.  Yes, it's none of people's business how old
7  I am in a work atmosphere.
8  Q.  Was the subject of being asked about ages
9  something that you had heard being discussed in the
10  2014/2015 time period?
11  A.  Yes.
12         MS. GURMANKIN::  Objection to the
13  form.
14  BY MR. RAPPOPORT:
15  Q.  What do you recall hearing in that regard?
16  A.  I thought I, I thought the question was do
17  other people -- yes, so other peers of mine had
18  been asked how old they are.
19  Q.  And did you actually observe that or hear
20  that or were you told that by these peers?
21  A.  At the time I sat next to Kristin Macone and
22  she had been asked how old she was.
23  Q.  Do you recall by who?
24  A.  Shimrit again.

Page 38

1  Q.  Around the same time that you were asked?
2  A.  I believe so.
3  Q.  And do you recall whether Kristin shared
4  that age information?
5  A.  She did not.
6  Q.  What do you recall happening when she didn't
7  provide the age information?
8         MS. GURMANKIN::  Objection to the
9  form.
10  BY MR. RAPPOPORT:
11  Q.  You can answer.
12  A.  I believe she even heard that her other
13  finance colleagues were asked about her and her
14  age.
15  Q.  Was that a matter of concern among the
16  direct reports of Steve Middlebrooks?
17  A.  It was.
18  Q.  Why?
19  A.  There's many things you're not supposed to
20  ask in the U.S.
21  Q.  Was anyone in particular more concerned than
22  others with regard to these age inquiries?
23  A.  It was just a general -- invasion might be a
24  strong word, but it's not required, not necessary,

Page 39

1  and seemed to be taken as an intrusion or -- to
2  find out.
3  Q.  Did anyone ever share with you that certain
4  decisions were being made based on age?
5  A.  That's always the fear with sharing
6  information like that.
7  Q.  So it was a fear that it could be used but
8  are you aware of any instances where it was used?
9  A.  I don't know what I don't know, so it could
10  have been used.  It might not have been used.
11  Q.  You can't identify any time that it was
12  used?
13  A.  It could have been, but I don't know, so no.
14  Q.  So you can't identify?
15  A.  Correct.
16  Q.  Did Mr. Middlebrooks ever weigh in on what
17  he thought about requests made for the ages of the
18  individuals who worked in North America?
19  A.  He asked -- he said he didn't feel it was
20  appropriate for many of the same reasons I just
21  described.
22  Q.  Did he indicate that he would do something
23  about it?
24  A.  I believe he would mention it or was going

Page 40

1  to bring it up to Nir, so that people on Nir's team
2  would not continue with similar types of questions.
3  Q.  And do you know whether he did?
4  A.  I believe he did, but I wasn't present, of
5  course, in that type of private conversation.
6  Q.  Do you know whether it ended as a result of
7  his efforts?
8  A.  I know the questions stopped, yes.
9  Q.  And do you know when they stopped?
10  A.  I don't recall being asked my age after say
11  June or something, later that summer.
12  Q.  Of 2015?
13  A.  Would have been the same -- that's '14,
14  isn't it?
15  Q.  Okay.
16  A.  I believe it's '14.
17  Q.  What was Shimrit Shem-Tov's responsibility
18  as it related to facilities management?
19  A.  She was our global finance partner.
20  Q.  And what did that require her to do?
21  A.  At that level she was aggregating financial
22  accounts for the various different regions.
23  Q.  So she was responsible for data?
24  A.  Yes, it was cost accounting, reporting

95e44b3d-c054-4481-af46-f40887da5021

Page 125

1   saved many of these announcement. I'd have to go
2   look it up.
3   Q.   Any other comments about age or older people
4   that you ever heard from anyone at Teva?
5   A.   Just general comments about, you know,
6   younger people are more economical.
7   Q.   Who have you heard make those general
8   comments?
9   A.   They're typically aligned with hourly or
10  mechanics or positions that don't always require a
11  professional degree or the business doesn't
12  necessarily need decades of experience.
13  Q.   Do you remember anyone who you've heard make
14  those comments that younger people are more
15  economical?
16  A.   Explicitly, I know I've heard it a few
17  times, but they're almost always related to
18  clerical or non -- I don't want to say nonskilled,
19  because these people do have skills, but they're
20  not the traditional sense of skill set.
21  Q.   Do you remember specifically anyone who made
22  that comment?
23  A.   Usually it comes with seating people,
24  departments that I have to renovate a space for,

Page 126

1   and they say, Oh, I'm going to hire -- I need to
2   backfill positions or there's going to be a new
3   position, and I could get one or I could get two
4   for the price of one.
5   You know, they're not necessarily I'm
6   intentionally hiring to save money per se, it's
7   usually a mapping of the workload that's required
8   to the skill set, you know, so that type of thing.
9   Q.   Sure.
10  Do you remember the name of anyone
11  that you've heard make that comment?
12  A.   At any point in time?
13  Q.   Yes.
14  A.   I've heard it used in R&D, because like
15  glass watchers, you know, things like that that are
16  more effort related than professional experience,
17  but they're usually just in passing, not malicious
18  or anything.
19  Q.   Do you remember who in R&D you've heard make
20  that comment?
21  A.   So I know we hired -- yes, there's -- we
22  hired resources through Houman is his name, there's
23  project management support services, it's cheaper
24  to hire a contract project manager than a direct

Page 127

1   hire, that type of thing, employee, for obvious
2   reasons.
3   I was asked those questions through my
4   management, Nir. I was trying to hire a job in
5   West Chester, and I was often asked, Why can't I
6   just get a contract engineer to do the job. West
7   Chester is an R&D site, so -- and I had to write
8   many justifications to try and get a direct hire
9   position.
10  Q.   Did Nir ever make a comment to you along the
11  lines of hiring younger people is more economical?
12  A.   I don't know if he explicitly told me that,
13  but I know it's a general -- you know, we don't pay
14  near retirement salaries to fresh grads, that's
15  just not how it works.
16  Q.   Sure.
17  Houman's title, do you know what that
18  was at the time that you heard him make the
19  comment?
20  A.   He made a comment about contract services.
21  Q.   Did Houman make a comment about it being
22  more economical to hire younger people?
23  A.   That's a jump.
24  Q.   I'm sorry?

Page 128

1   A.   I think that's a jump.
2   Q.   Sure. I just --
3   A.   His comment was hire contract because
4   it's -- can be cheaper if we need the services.
5   The -- those roles are often younger people. There
6   are older people in those contract roles for
7   different reasons, but they're often a mixed bag.
8   Q.   Understood.
9   Do you remember the names of anyone at
10  Teva who made a comment along the lines of, it's
11  more economical to hire younger people?
12  A.   I know I heard it many times, but I need to
13  put a name to it and that's what I need to think
14  about.
15  Q.   Have you heard it made by more than one
16  person at Teva? I understand you're not
17  remembering names right now.
18  A.   In 10 years at Teva, or almost 10 years at
19  Teva, maybe two or three times.
20  Q.   From different people or the same person?
21  A.   Different people.
22  Q.   Any other comments about age or older people
23  or anything age related that you heard during your
24  time at Teva?

95e44b3d-c054-4481-af46-f40887da5021

# EXHIBIT "D"

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEPHEN MIDDLEBROOKS,                   :

                                        :

                    Plaintiff           :

                                        :

        VS                              :

                                        :

TEVA PHARMACEUTICALS USA, INC.          :

and TEVA PHARMACEUTICAL                 :No. 17-00412

INDUSTRIES, LTD.,                       :

                                        :

                    Defendants          :

_____

DEPOSITION OF:   TROY GAUGLER

TAKEN BY:        Defendants

BEGINNING:       Thursday, May 24, 2018

                 5:11 p.m.

                 51 South Duke Street

                 Lancaster, PA 17602

## Page 2

```
 1   APPEARANCES:
 2   On behalf of the Plaintiff:
             CAREN N. GURMANKIN, Esquire
 3           Console Mattiacci Law
             1525 Locust Street
 4           9th Floor
             Philadelphia, PA 19102
 5           215-545-7676
             gurmankin@consolelaw.com
 6
 7
 8   On behalf of the Defendants:
             LARRY J. RAPPOPORT, Esquire
 9           Stevens & Lee
             1818 Market Street
10           29th Floor
             Philadelphia, PA 19103
11           215-496-3839
             ljr@stevenslee.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1                 INDEX TO WITNESS
 2   THE WITNESS                      DIRECT CROSS
     Troy Gaugler
 3        BY MR. RAPPOPORT:           05
          BY MS. GURMANKIN:              130
 4
 5
 6
 7
 8
 9
10
                   INDEX TO EXHIBITS
11
     FOR DEFENDANT                         MARKED
12   Ex. No. 56 - an email thread           65
     Ex. No. 57 - 7/8/14 handwritten document 70
13   Ex. No. 58 - an email thread           77
     Ex. No. 59 - en email thread           87
14   Ex. No. 60 - an email thread           89
     Ex. No. 61 - an email thread           90
15   Ex. No. 62 - notes regarding 6/1015 meeting 98
     Ex. No. 63 - retention bonus agreement 118
16   Ex. No. 64 - an email                 120
     Ex. No. 65 - an email                 124
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1            DEPOSITION SUPPORT INDEX
 2   DIRECTIONS NOT TO ANSWER:
 3   PAGE/LINE:  None
 4
 5
 6
 7   REQUEST FOR DOCUMENTS OR INFORMATION:
 8   PAGE/LINE:  None
 9
10
11
12
13   STIPULATIONS:
14   PAGE/LINE:  5/1
15
16
17
18
19   QUESTIONS MARKED:
20   PAGE/LINE:  None
21
22
23
24
25
```

## Page 5

```
 1                  STIPULATION
 2        IT IS HEREBY STIPULATED by and between
 3   counsel for the respective parties that signing, sealing,
 4   certification and filing are hereby waived; and that all
 5   objections except as to the form of the question are
 6   reserved to the time of trial.
 7        *  *  *  *  *
 8   TROY GAUGLER, called as a witness, having been duly sworn,
 9   was examined and testified as follows:
10        *  *  *  *  *
11             DIRECT EXAMINATION
12   BY MR. RAPPOPORT:
13     Q.  Good morning, Mr. Gaugler, my name is Larry
14   Rappoport.  We have met once before.  I'm an attorney that
15   represents Teva.  There are actually two Tevas in this
16   case.  There is Teva USA, and then there's Teva
17   Pharmaceuticals Industries, which is the Israeli parent of
18   Teva USA.  I'm representing both Teva entities in the
19   context of a lawsuit that was brought by a former co-worker
20   of yours, Stephen Middlebrooks, against the two Teva
21   entities that was filed in the Eastern District of
22   Pennsylvania, which is a federal district court.  A
23   deposition is a discovery technique that is used to
24   discover information that is arguably relevant to a case;
25   that is it's either relevant on its face or will likely
```

Page 54

1    A.  No.
2    Q.  Okay.  Did you thank Mini?
3    A.  No.
4    Q.  Okay.  Did you share with any of the other direct
5  reports of Steve that you had received this equity award to
6  see whether they, too, had been so awarded?
7    A.  No.
8    Q.  Okay.  Do you know who Ray Dugan is?
9    A.  Yes.
10    Q.  Okay.  Did Ray Dugan ever talk to you about him
11  not receiving an equity award?
12    A.  No.
13    Q.  And would you receive an equity award each year
14  you worked there until you were finally let go?
15    A.  No.
16    Q.  Okay.  Were there years you did not receive it?
17    A.  To be honest, I think that was the only time I
18  did.
19    Q.  Okay.  So only once?
20    A.  Only once.
21    Q.  In the years where you didn't receive an equity
22  award, did you inquire as to why you hadn't received one?
23    A.  I had asked during my...
24    Q.  Performance review?
25    A.  Performance review.

Page 55

1    Q.  Okay.
2    A.  And said that it was -- it was divvied out by
3  Nir.
4    Q.  Okay.  Now with regard to the performance
5  reviews, were they given to you by Steve Middlebrooks
6  starting in 2014?
7    A.  Yeah.
8    Q.  Did you receive in exceeds?
9    A.  I believe so.
10    Q.  Okay.  And did you continue to receive exceeds up
11  until the time that you left Teva?
12    A.  Mm-hm.
13    Q.  Every year?
14    A.  Yes.
15    Q.  Every year?
16    A.  I believe.  I'm not -- without looking back, but
17  I was either -- I forget the levels, but exceed or
18  exceptional or whatever it is.
19    Q.  Okay.  Something more than meets?
20    A.  Yes.
21    Q.  Do you know whether or not Nir would have had to
22  sign off on these exceeds or exceptional evaluations that
23  you provided?
24    A.  The only -- the only thing he would sign off on
25  and he would never read -- he never asked once of my team

Page 56

1  for the evaluation itself, he asked for a list of my reports
2  and what I rated them.
3    Q.  Okay.  But my question to you was, when Steve
4  would give you the annual reviews, do you know whether or
5  not Nir would have had to approve his grade before he gave
6  it to you that is one level up?
7    A.  Right.  That I don't know for sure.
8    Q.  Well, let me ask it this way:  When you reviewed
9  people, did Steve have to approve your reviews?
10    A.  No.
11    Q.  Okay.  Now did Nir ask you how old you were?
12    A.  Yes.
13    Q.  Okay.  And just so it's clear, did he ask you how
14  old you were or what your date of birth or birthday was?
15    A.  The first -- okay.  No.  He asked my birth date.
16    Q.  Okay.  When do you think that would have been?
17    A.  Shortly after the first meeting.
18    Q.  The meeting that you described?
19    A.  Mm-hm.  Yes.
20    Q.  Okay.  So sometime in the first half of 2014?
21    A.  Yes.
22    Q.  In person, over the phone, in a videoconference?
23    A.  I want to say in person.
24    Q.  Okay.  And did that surprise you that he was
25  asking you for your birthday?

Page 57

1    A.  Yes.
2    Q.  Okay.  Did you tell him what your birthday was?
3    A.  At the time, I did because it was a direct
4  question just to me.
5    Q.  Okay.  And when you told him what your birthday
6  was, did you tell him the year of your birth or just the
7  day of your birthday?
8    A.  I believe I told him year.
9    Q.  Okay.  Did he indicate to you why he needed this
10  information?
11    A.  After he did, because the next question was he
12  wanted the same information from my team and their
13  anniversary date.
14    Q.  Okay.
15    A.  And then it clicked of what he wanted.  Then I
16  asked what he wanted it for.
17    Q.  And what did he tell you?
18    A.  That he wanted to send them cards and
19  congratulation or whatever for your anniversary and birth
20  dates.
21    Q.  Okay.  Were you suspicious of that?
22    A.  I told him I couldn't ask -- I couldn't produce
23  the request for their birthday.
24    Q.  Okay.  Were you able to produce the request for
25  the anniversary day?

Page 58

1    A.   Yes.

2    Q.   And did you provide that to them?

3    A.   Yes.

4    Q.   Okay.  And did you tell him why you couldn't

5  produce the birthdays?

6    A.   Yes.

7    Q.   What did you tell him?

8    A.   That it's against the law.

9    Q.   Okay.  And what made it against the law as far as

10  you understood the law?

11    A.   That we weren't supposed to ask.  We could ask

12  the birth month and day but not the year because we weren't

13  supposed to know the age.

14    Q.   Well, had he asked for the year?

15    A.   Yes.

16    Q.   Okay.  But when he asked you, he only asked for

17  the day, you said?

18    A.   No, no.  He asked for the day.  No.  I'm pretty

19  -- he asked for my birthday, and I said the whole thing.

20    Q.   You gave him more than what he asked for?

21    A.   Probably, yes.

22    Q.   Okay.  But when he asked for your team, did he

23  ask for month and date and year?

24    A.   Yes.  Because I asked if he wanted -- then I

25  clarified to make sure he wanted the full birthday, and he

Page 59

1  said yes.  I said, well, I can't do that.

2    Q.   Okay.  And when you told him you can't do it, did

3  you tell him why?

4    A.   Yes.

5    Q.   What did you tell him?

6    A.   That it was against the law.  And if he wanted

7  the information, he would have to request it from HR.

8    Q.   Okay.  And what was your understanding of what

9  the law based on?

10    A.   From just previous work experience that I was not

11  allowed to ask that.

12    Q.   Okay.  So before you came to work for Teva, some

13  prior employer had told you that you can't ask anyone what

14  their birthday was or their -- or their age?

15    A.   Their age, right.

16    Q.   And you understood that to be a matter of law,

17  not best practices or anything like that?

18    A.   Right.

19    Q.   Okay.  So when you shared that with Nir, did he

20  get upset with you?

21    A.   Yes.

22    Q.   What did he do?

23    A.   He just -- he more or less took it upon me that I

24  was being dismissive of his request and that -- and I tried

25  to explain I'm not being dismissive, and it's not that I

Page 60

1  wouldn't do it for you, but we have to get HR's -- I can ask

2  for month and day, but I cannot ask for the year.

3    Q.   Okay.  And did he accept that explanation?

4    A.   No.

5    Q.   Well, how did he manifest his nonacceptance of

6  the explanation?

7    A.   Kept pushing it towards Steve and --

8    Q.   Was Steve with you at the time?

9    A.   No.  I don't think at that time, but then he

10  would ask the question to Steve, and then Steve would ask,

11  you know, come back and, you know, he -- Steve would tell

12  Nir the same thing.

13    Q.   Okay.  So on how many different occasions did he

14  ask you for the birthdays of your direct reports?

15    A.   Indirectly, I think only did twice.

16    Q.   Both times in 2014?

17    A.   Yeah.  It was shortly thereafter because he --

18    Q.   Okay.  So soon after he became your boss's boss?

19    A.   Yes.

20    Q.   Okay.  And on both occasions, you refused him

21  that information?

22    A.   Yes.

23    Q.   Okay.

24    A.   I did provide the other information.

25    Q.   That being the anniversary dates and the

Page 61

1  birthdays?

2    A.   Yes.

3    Q.   Okay.  Were you ever punished for not giving him

4  the full information?

5    A.   I don't want to say I wasn't punished, but that's

6  when the -- you know, I think that's when it started that he

7  didn't trust me.

8    Q.   Okay.  So now you are saying that the reason he

9  didn't trust you was because you didn't give him --

10    A.   No.  I think that --

11    Q.   That contributed?

12    A.   Contributed to the --

13    Q.   Okay.  What makes you say that?

14    A.   Because I think I -- I think he really took

15  offense to me telling him I couldn't do it by just, like,

16  defying an order that I wouldn't do it.

17    Q.   Okay.  And what makes you think that?

18    A.   Because of how they were -- would act right away

19  when I wouldn't do it.

20        MR. RAPPOPORT:  Okay.  I'm going to close

21    the door to get rid of the vacuum.  I'm going to go to

22    the bathroom so let's just take a two-minute break.

23

24

25