## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **STEPHEN MIDDLEBROOKS** | **: CIVIL ACTION** |
| | : |
| **v.** | **: NO. 17-412** |
| | : |
| **TEVA PHARMACEUTICALS USA, INC.** | : |

## MEMORANDUM

**KEARNEY, J.**                                                                                    **February 4, 2019**

A senior American executive claiming his long-time Israeli employer fired him because of his age or American national origin, or to retaliate against him for complaining about a work environment turned hostile bears the weight of convincing our jury of the fallacy in his former employer's reasons for firing him. True to their oath, our jury must evaluate witness credibility to decide whether the employer who controls the performance reviews – and its corroborating employee witnesses – fired the former executive for illegal reasons. After several days of testimony, our jury's evaluation of conflicting witness testimony led it to find the employer did not discriminate against its former executive based on his age or American national origin but also led the jury to find the employer created a retaliatory hostile work environment and then retaliated by finally firing him. The jury awarded compensatory damages for emotional distress, back pay, front pay, liquidated damages and $5 million in punitive damages. The employer now raises a variety of post-trial arguments asking for judgment in its favor or for a new trial. The employee seeks pre-judgment interest on his back pay. In the accompanying Order, and mindful of the ample evidence supporting the jury's findings, we reject the employer's arguments except we must reduce the punitive damages to $300,000 under Congress's $300,000 cap on damages for these type of employment cases. We also grant the employee's motion for prejudgment interest.

## I. Background

Stephen Middlebrooks sued Teva Pharmaceuticals Industries, Limited and Teva Pharmaceuticals USA, Inc. (collectively "Teva") under Title VII,[1] the Age Discrimination in Employment Act ("ADEA"),[2] and the Pennsylvania Human Relations Act ("PHRA"),[3] alleging discrimination based on his age and national origin; hostile work environment on the basis of his age and national origin; retaliation for making complaints related to age and national origin; and a retaliatory hostile work environment for making complaints related to age and national origin discrimination.

Following a five-day trial, the jury returned a verdict in favor of Teva on Mr. Middlebrooks's claims of national origin and age discrimination, but found in his favor on his retaliation and retaliatory hostile work environment claims.[4] The jury awarded Mr. Middlebrooks compensatory damages of $200,000; back pay of $332,000; front pay of $450,000; punitive damages of $5,000,000; and, for purposes of liquidated damages under ADEA, found Teva acted willfully in that it knew or showed reckless disregard for whether the law prohibits termination because of age or retaliation for complaining about age.[5]

Teva now moves for judgment as a matter of law in its favor on (1) Mr. Middlebrooks's retaliatory hostile work environment claims; and (2) vacating punitive damages based on the retaliation and retaliatory hostile work environment claims.[6] Teva alternatively moves under Rule 59(a) for a new trial arguing (1) we committed reversible error by instructing the jury on both "pretext" and "mixed motive" relating to the national origin discrimination claim even though Teva defeated this claim; (2) we erred by instructing the jury it may award punitive damages and compounded this error by refusing to include a question on the verdict sheet regarding Teva's "good faith" defense under Title VII; (3) the jury improperly awarded damages for intentional

2

discrimination despite finding Teva did not intentionally discriminate; (4) the verdict sheet is confusing because it asked the jury to use two different start dates for calculation of back pay and the jury's calculation of back pay is not based on any evidence of record: (5) we committed reversible error by instructing the jury it may award damages for emotional distress and the jury's award of emotional distress is not based on evidence of record; (6) the jury's award of front pay is based on consideration of impermissible factors rather than evidence; and (7) if Teva's motion for new trial is not granted, the Court should not enter judgment for more than $200,000 in punitive damages based on the statutory cap on compensatory and punitive damages under Title VII.[7]

Mr. Middlebrooks moves to mold the judgment to include prejudgment interest on the jury's award of back pay.[8] We will enter judgment following our rulings on Mr. Middlebrooks's pending motion for attorney's fees.

## A. Evidence adduced at trial.

### *Mr. Middlebrooks's Teva career.*

Teva hired Mr. Middlebrooks in 2001 as its director of facilities engineering at its North Wales, Pennsylvania facility.[9] It fired him on February 29, 2016. From 2001 to January 2015, Mr. Middlebrooks received several promotions and performance reviews consistently achieving "exceeds [expectations]" or "meets [expectations]," performance categories constituting the second and third-best reviews a Teva employee could receive on Teva's five-scale ranking.[10] Mr. Middlebrooks received bonuses and equity awards after all of his first thirteen years at Teva.[11] Teva awarded Mr. Middlebrooks with the title of Director of Facilities Engineering by 2013.[12] Teva tasked Mr. Middlebrooks with the responsibility of maintaining forty facilities and approximately fifty direct reports.[13]

At the end of 2013, Teva changed its management structure to require all regional facilities managers, like Mr. Middlebrooks, to report to one global facilities manager, an Israeli named Nir Aharoni.[14] In late 2014, Teva promoted Mr. Middlebrooks to senior director of North American facilities management.[15] Mr. Middlebrooks continued to report to Mr. Aharoni in his new position.[16]

### Performance review and denial of equity in January 2015.

In early 2015, Mr. Aharoni provided Mr. Middlebrooks with his 2014 performance review assigning a "mostly meets" rating equivalent to a two out of five on Teva's review scale.[17] Mr. Middlebrooks did not agree with the "mostly meets" review; by his calculation he should have received a "meets" based on the weight given to each goal on Teva's performance review form.[18]

Mr. Middlebrooks met his 2014 performance goals late in 2014.[19] But Teva did not award Mr. Middlebrooks equity in 2015 for his performance in 2014.[20] Mr. Middlebrooks testified Mr. Aharoni told him those who received a "mostly meets" review are not eligible for equity.[21] Mr. Middlebrooks discussed this equity denial with Ray Duggan, Teva's director of security, who received a "meets" performance review but who did not receive an equity award despite eligibility for such an award.[22] Mr. Middlebrooks testified Mr. Duggan questioned Mr. Aharoni why he (Mr. Duggan) did not receive equity. Mr. Aharoni told Mr. Duggan "equity is only designed for people who are going to stay with the company for a long period of time."[23] Both Mr. Middlebrooks and Mr. Duggan were then 56 years old.[24] Teva awarded equity to Troy Gaugler, who was about twenty years younger than Messrs. Middlebrooks and Duggan, and the only other member of Mr. Middlebrooks's group eligible for equity.[25]

### *Mr. Middlebrooks's attempts to meet with Mr. Aharoni for a mid-year review regarding 2015 goals.*

In this 2014 performance review, Mr. Aharoni identified seven goals for Mr. Middlebrooks to meet by year end 2015.[26] Teva assigned Mr. Middlebrooks an executive coach following his "mostly meets" review.[27] Mr. Middlebrooks viewed working with an executive coach as an opportunity to improve his skills and met with the coach approximately six times in 2015.[28] Mr. Middlebrooks expected he would review his progress with Mr. Aharoni in a mid-year review, based on his understanding employees receiving a "mostly meets" performance review should have a mid-year review in the first week of July.[29] In July 2015, Mr. Middlebrooks called and emailed Mr. Aharoni seeking this mid-year review.[30] Mr. Aharoni never responded. With no response from Mr. Aharoni, Mr. Middlebrooks sought the help of Teva's human resources to prompt Mr. Aharoni to provide a mid-year review. Mr. Middlebrooks received no response from human resources.[31] Mr. Middlebrooks then emailed to Mr. Aharoni a self-evaluation of his mid-year performance.[32] In the email, Mr. Middlebrooks assessed his own performance as having improved and either meeting or exceeding all seven goals set by Mr. Aharoni for 2015.[33] Mr. Middlebrooks asked Mr. Aharoni for comments and suggestions for further improving performance.[34] Mr. Middlebrooks included in his self-evaluation the additional savings goals imposed on his department in late 2014.[35] Mr. Aharoni did not respond to Mr. Middlebrooks's email.[36]

Even though Mr. Middlebrooks met Teva's savings goals imposed after the "meets" review, Teva then added additional goals at the end of 2015.[37] Mr. Middlebrooks referred to it as "mov[ing] the goalposts."[38]

5

*June 2015 meeting between Mr. Middlebrooks's team and the Israeli team.*

In June 2015, two members of Teva's management team based in Israel, Shimrit Shemtov and Roni Kafre, came to the United States for a meeting.[39] Ms. Shemtov, Teva's finance business partner, slammed shut the laptops of everyone at the meeting even though employees commonly used laptops at meetings.[40] Later in the meeting, Ms. Shemtov put her hand in the face of an American employee who asked a question about the performance of Teva departments and "shushed" him, telling him he could not ask questions.[41] Teva employee Troy Gaugler, present at the June 2015 meeting, testified the Israeli management dismissed the presentation of the North American finance leader.[42]

Other Teva employees present at the June 2015 meeting testified about other acts they perceived as discriminatory based on either national origin or age. Mr. Middlebrooks testified Mr. Aharoni complained to him the United States military did not provide adequate support to Israel after attacks in Israel.[43] Mr. Gaugler testified about an atmosphere beginning in 2014 in which Teva's Israeli management directed dismissive or negative conduct toward only American employees.[44] Mr. Gaugler felt the Israeli management accused Americans of an inability to do their jobs, and "constant[ly]" witnessed management dismissing opinions of American employees with needed expertise in favor of Israeli employees without such expertise.[45] Mr. Middlebrooks, Mr. Gaugler, and Mr. Duggan testified Mr. Aharoni and Mr. Kafre, operations manager from Israel, asked each about his age or the ages of those in Mr. Middlebrooks's department ostensibly to send out birthday cards; no birthday cards were ever received.[46] Ellen Cicak, a former Teva project manager in Mr. Middlebrooks's department, testified Mr. Kafre asked her age at an early meeting.[47] Ms. Cicak testified at meetings Israelis attended, the Israelis received "deference" the Americans did not.[48] John Eppley, a senior manager in facilities engineering and who worked for

Mr. Middlebrooks, testified Ms. Shemtov asked his marital status and, learning he was not married, told him she could "set him up with a nice Jewish girl," a comment Mr. Eppley found inappropriate in a work atmosphere.[49] Mr. Eppley testified someone on the Israeli team asked for his age. Ms. Macone, a finance manager who reported to Mr. Middlebrooks, testified Teva asked her in an interview about her age and marital status, and she complained at least twice to Teva's human resources about the nature of these inquiries, but no one in human resources responded to her.[50]

After the June 2015 meeting with Ms. Shemtov and Mr. Kafre, Mr. Middlebrooks's team members expressed concern about conduct both before the meeting and at the meeting.[51] In August 2015, at the team's next scheduled group meeting with Teva's human resources representative business partner, Mini Rodriguez, Mr. Middlebrooks and his team complained about Ms. Shemtov's and Mr. Kafre's conduct in the June 2015 meeting.[52] Mr. Gaugler complained to Ms. Rodriguez of a hostile work environment, including a complaint of ongoing requests for age information.[53]

### *Ms. Rodriguez initiates an investigation into the complaints from Mr. Middlebrooks and his team.*

In response to complaints from Mr. Middlebrooks and his team, particularly Mr. Gaugler's comments about a hostile work environment, Ms. Rodriguez and Jennifer Flaisher, Teva's Vice President of Human Resources for the United States, decided to initiate an investigation.[54] Ms. Flaisher asked Leander Jones, Director of Human Resources at a Teva facility in Virginia, to investigate.[55]

Mr. Jones received his assignment to investigate on August 3, 2015 and began his interviews of Mr. Middlebrooks and his team, as well as Mr. Aharoni, in September 2015.[56] Mr. Jones prepared a written investigative report. Mr. Jones's investigation detailed Mr. Middlebrooks's and his team's reports of conduct by the Israeli team causing Mr. Jones concern

7

the conduct either violated or potentially violated Teva's EEO policy.[57] Mr. Jones's report summarized Mr. Middlebrooks's interview including Mr. Middlebrooks's statement he reported concerns of the Israeli team's conduct to Ms. Rodriguez "about 9 weeks or so" ago which he felt "warranted a more thorough investigation right at that time and felt 9 weeks was too long" but "is glad we are at this point of addressing it now."[58] Mr. Jones understood Mr. Middlebrooks's statements during their interview as reporting a violation of Teva's EEO and discrimination policies.[59] Mr. Middlebrooks testified at trial he complained to Mr. Jones about both age and national origin discrimination.[60]

At the end of his investigation, Mr. Jones discussed his findings with Ms. Flaisher and Ms. Rodriguez and gave them a written report.[61] Mr. Jones's report proposed recommendations including counseling to Ms. Shemtov and Mr. Kafre regarding their behavior and interaction with Mr. Middlebrooks's team and the "need for adherence to U.S. laws and statutes."[62]

### *Within days of receiving a copy of Mr. Jones's investigative report, Mr. Aharoni gave Mr. Middlebrooks a poor mid-year review, and two weeks later issued a performance improvement plan.*

On October 14, 2015, Ms. Rodriguez emailed to Mr. Aharoni a summary of Mr. Jones's investigation.[63] Almost immediately after receiving the report, Mr. Aharoni contacted Mr. Middlebrooks about the mid-year review Mr. Middlebrooks requested three months earlier.[64] On October 16, 2015, Ms. Flaisher sent Mr. Aharoni an email editing Mr. Aharoni's notes for the mid-year review as well as a telling Mr. Aharoni she is "working on" a performance improvement plan ("PIP") for Mr. Middlebrooks.[65] Ms. Flaisher admitted she expected Mr. Middlebrooks's mid-year review to be coupled with a PIP.[66] Before October 16, 2015, Mr. Aharoni never suggested Mr. Middlebrooks poorly performed or failed to meet goals for 2015, and never responded to Mr.

Middlebrooks's attempts to gather feedback on his 2015 performance or Mr. Middlebrooks's self-evaluation provided to him in early July 2015.

Mr. Middlebrooks described meeting with Mr. Aharoni for the mid-year review as "extraordinarily difficult."[67] Mr. Aharoni reviewed the seven goals he set for Mr. Middlebrooks in January 2015, but then also raised "an entire litany of other issues that were ... rambling in nature.[68] Mr. Middlebrooks testified, "anything he could think of that he could throw at me, he was throwing at me."[69] The mid-year review, typically taking forty-five minutes to an hour, took nearly six hours and Mr. Middlebrooks testified "for a large majority of the meeting, Mr. Aharoni was bringing in issues and facts that were from left field."[70] Mr. Middlebrooks testified Mr. Aharoni appeared "agitated" and "disjointed" and "anything he could think of that he could throw at me, he was throwing at me."[71]

On October 29, 2015, Mr. Aharoni and Ms. Rodriguez placed Mr. Middlebrooks on the PIP Ms. Flaisher admittedly helped prepare two weeks earlier.[72] The PIP required Mr. Middlebrooks to complete fourteen items within ninety days or Teva would terminate him.[73] The PIP imposed additional goals on Mr. Middlebrooks not contained in the seven goals originally set out in his January 2015 review.[74]

Mr. Middlebrooks testified his placement on a PIP constituted a departure from Teva's normal practice in which an employee who receives a "mostly meets" gets a chance to complete the goals outlined in their end-of-year review before Teva places him on a PIP.[75] Mr. Middlebrooks testified it was impossible to meet some of the PIP's goals in only ninety days.[76]

### *Mr. Middlebrooks objects to the PIP as retaliatory and files a charge of discrimination with the EEOC.*

On November 12, 2015, Mr. Middlebrooks emailed Mr. Aharoni, copying Ms. Rodriguez and Ms. Flaisher, objecting to his placement on the PIP; outlining the history of his requests for a

9

mid-year review in June 2015, including Mr. Aharoni's failure to conduct a mid-year review or object to Mr. Middlebrooks's performance at any time before mid-October 2015; stating he met or exceed all seven goals Mr. Aharoni set for 2015, the items listed in the PIP are not included in the stated goals for 2015, and his belief Teva placed him on a ninety-day PIP as a result of age and national origin discrimination and in retaliation for his team's complaints to Ms. Rodriguez resulting in Mr. Jones's investigation concluded one week before the mid-year review.[77][78]

On November 25, 2015, Mr. Middlebrooks filed a charge with the EEOC, dual filed with the PHRC, alleging Teva discriminated against him based of his age and American national origin as well as retaliation.[79] Mr. Middlebrooks emailed his administrative charge to Mr. Aharoni, Ms. Flaisher, and Ms. Rodriguez.[80]

### *Mr. Middlebrooks's attempt to comply with PIP, extension of PIP, and training on employment law.*

Mr. Middlebrooks nevertheless began to work on the PIP's goals.[81] In mid-December 2015, Mr. Middlebrooks began sending Mr. Aharoni emails reporting on his progress on meeting his PIP goals and requesting Mr. Aharoni meet with him as the PIP required. Mr. Aharoni either skipped or cancelled these required meetings.[82] Mr. Aharoni did not answer those emails in writing, and instead changed the PIP's goals each time Mr. Middlebrooks notified he had completed a goal.[83]

Mr. Aharoni originally scheduled the PIP to expire at the end of January 2016.[84] Teva then extended the duration of Mr. Middlebrooks's PIP to the end of February 2016.[85]

In early February 2016, Teva held training led by Morgan Lewis & Bockius LLP with the United States and Israeli teams on discrimination, retaliation, and hostile work environment as well as cultural training as recommended by Mr. Jones's investigation.[86] Mr. Aharoni prepared a document, dated February 10, 2016, summarizing Mr. Middlebrooks's performance on the PIP

10

goals.[87] The document does not mention terminating Mr. Middlebrooks who continued to work in meeting the evolving PIP goals. Mr. Middlebrooks did not receive the document on February 10.

On February 26, 2016, Mr. Middlebrooks emailed three Teva senior executives notifying them of his PIP, charge of discrimination with the EEOC, and his belief Teva discriminated against him and he now feared retaliation.[88] Three days later, Teva terminated Mr. Middlebrooks at his North Wales office.[89] Mr. Middlebrooks testified his termination differed from Teva's usual termination practices - terminations typically "would be done very, very quietly" but here Mr. Middlebrooks's "entire North Wales team sat outside [his] office."[90] Because of the office's glass partitions, "it was pretty obvious what was going on."[91]

Mr. Middlebrooks testified to Teva's policy when an employee is terminated, his insurance coverage continues to the end of the month of termination. If an employee is terminated on the last day of the month, his insurance coverage ends.[92] Because Teva terminated Mr. Middlebrooks on February 29, 2016 (the leap year last day of February), Mr. Middlebrooks and family did not have insurance on March 1.

### *The effects of termination on Mr. Middlebrooks and his attempts to secure employment.*

Mr. Middlebrooks testified he felt "horrible" immediately after his termination.[93] His team came into his office to help him collect his things.[94] He "broke down."[95] Mr. Middlebrooks testified he only received one document explaining Teva's reasons for termination, dated February 10, 2016 and including no information explaining Teva planned to terminate Mr. Middlebrooks.[96]

At the time of his termination, Mr. Middlebrooks earned a base pay at Teva of $192,000.[97] He could receive a yearly merit increase of up to four percent.[98] Mr. Middlebrooks received bonuses of up to thirty percent of his base pay.[99] He also received yearly equity at the beginning of each year which he testified averaged about $50,000.[100] Mr. Middlebrooks also received

11

benefits and contributed to a 401(K) plan at Teva which matched ten percent of his contributions.[101]

At the age of 59, Mr. Middlebrooks immediately began looking for a new job in March 2016.[102] He approached his job search like an engineer, getting up early in the morning and working all day at his dining room table looking for similar work. He called it a "very stressful time," like a "roller coaster" for him.[103] Some days he felt excited after conducting a job interview; other days he received rejections from multiple jobs. Mr. Middlebrooks testified he treated the search like a full-time job.[104]

Mr. Middlebrooks eventually found new employment in August 2016 as director of facilities at Wuxi Apptec, a technology start-up.[105] At Wuxi Apptec, Mr. Middlebrooks earned base pay of $150,000, received a pro-rated bonus of twenty percent bonus but not equity, received a pro-rated merit increase of approximately three percent, entered a health insurance plan which cost him about $5,000 to $10,000 more per year than Teva's plan, and a 401(K) plan which matched three percent of his contributions.[106]

Mr. Middlebrooks left Wuxi Apptec in August or September 2017 to accept a position at Jones Lang LaSalle ("JLL"), his current employer.[107] At JLL, his base pay is $192,000, he is eligible for merit increases of up to three percent, he is eligible for a twenty percent bonus, receives no equity, health insurance which is about $10,000 to $15,000 more expensive per year than the plan he had at Teva, and a 401(K) plan which matches three percent of contributions but only after the first year.[108]

Mr. Middlebrooks testified he is planning to work for another seven years until age 68.[109] His goal at Teva had been to make it to 2025, which would have constituted his twenty-fifth anniversary with Teva.[110]

12

## II. Analysis

### A. We deny Teva's Rule 50(b) motion for judgment as a matter of law.

A motion for judgment as a matter of law under Rule 50(b) "should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability."[111] We may grant the motion only if "the record is critically deficient of the minimum quantum of evidence to sustain the verdict."[112] While judgment as a matter of law should be granted sparingly, a "scintilla of evidence" is insufficient to sustain a jury's verdict.[113] "The question is not whether there is literally no evidence supporting the unsuccessful party, but whether there is evidence upon which a reasonable jury could properly have found its verdict."[114] In considering a motion under Rule 50(b), we do not "weig[h] the evidence, determin[e] the credibility of witnesses, or substitut[e] our own version of the facts for that of the jury."[115]

Teva makes two arguments in its Rule 50(b) motion: (1) there is insufficient evidence to support a finding of a retaliatory hostile work environment; and (2) Teva established a good faith defense to Mr. Middlebrooks's claim for punitive damages, Mr. Aharoni's conduct may not be imputed to Teva based on its good faith efforts to comply with the law, and there is insufficient evidence from which the jury could reasonably infer the requisite state of mind of Mr. Aharoni necessary to show malice or reckless disregard for the law.

#### 1. There is sufficient evidence to support the jury to reasonably find a retaliatory hostile work environment.

Although Teva's counsel argued he never heard of such a theory, our Court of Appeals recognizes a retaliatory hostile work environment claim under Title VII.[116] To succeed on a retaliatory hostile work environment claim, Mr. Middlebrooks must show: "(1) [he] suffered intentional discrimination because of [his] protected activity; (2) the discrimination was severe or

13

pervasive; (3) the discrimination detrimentally affected [him]; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present."[117]

Teva argues Mr. Middlebrooks failed to show intentional discrimination "because of" his protected activity; failed to show "severe or pervasive" discrimination; and, failed to show alleged discrimination detrimentally affected him or would have detrimentally affected a reasonable person in like circumstances.

Analyzing the "severe or pervasive" prong first, and considering the totality of the evidence, the jury heard enough evidence to return a verdict for Mr. Middlebrooks because the environment included pervasive discrimination. "To determine whether an environment is hostile, a court must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"[118] A hostile work environment under Title VII is actionable where a plaintiff adduces evidence of a "workplace ... permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[119] "The 'severe or pervasive' standard is disjunctive and so 'a plaintiff need not show that [his] hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered [his] working conditions."[120]

Days of evidence adduced facts sufficient for a jury to reasonably find pervasive discrimination. Teva subjected Mr. Middlebrooks to pervasive discrimination after he complained of age and national origin discrimination by ignoring his emails asking for a mid-year review,

14

subjecting him to a six-hour meeting in which Mr. Aharoni brought issues out of "left field," placing him on a personal improvement plan ("PIP") contrary to company practice, adding fourteen goals through the PIP in addition to Mr. Middlebrooks's original seven goals, ignoring Mr. Middlebrooks's follow-up emails about his progress on the PIP and his concerns the PIP was discriminatory, firing Mr. Middlebrooks in a public manner contrary to company practice, and only providing Mr. Middlebrooks with a document dated several weeks before his firing to explain his termination.

Though none of these incidents *alone* are severe enough to establish a retaliatory hostile work environment, Mr. Middlebrooks presented enough evidence, taken as a *whole*, for the jury to find the discrimination became pervasive. It is particularly persuasive Teva departed from its usual practices in placing Mr. Middlebrooks on the PIP and kept "mov[ing] the goalposts." By doing so, Teva created an angst-ridden environment in which Mr. Middlebrooks's termination became inevitable. Teva's pattern of ignoring Mr. Middlebrooks and then repeatedly changing the goals altered the conditions of his employment. While this case does not involve ridicule or insults like some other retaliatory hostile work environment cases,[121] the pervasiveness of the adverse employment actions is sufficient to support a retaliatory hostile work environment verdict. The jury reviewed evidence confirming, particularly in evaluating the credibility of Mr. Middlebrooks and Mr. Aharoni, Teva became an environment of hostile treatment towards Mr. Middlebrooks in retaliation for his offering substantiated complaints. He took the fall for a variety of complaints, including his own. The jury could reasonably conclude Teva's Mr. Aharoni decided to make an example of Mr. Middlebrooks as the senior facilities executive – make his work life miserable and no one will complain again.

15

Against this evidence we dispose of Teva's other arguments Mr. Middlebrooks failed to show he suffered intentional discrimination "because of" his protected activity and any alleged discrimination detrimentally affected him or a reasonable person in like circumstances. All of the above evidence supporting Mr. Middlebrooks's retaliatory hostile work environment claim occurred after he complained to Teva's human resources department, which is protected activity. The time line of events is compelling. Mr. Middlebrooks made complaints to Ms. Rodriguez prompting Mr. Jones's investigation; Mr. Middlebrooks made statements to Mr. Jones regarding age and national origin discrimination; days after receiving a summary of Mr. Jones's investigation report, Mr. Aharoni gave Mr. Middlebrooks a poor mid-year review after ignoring Mr. Middlebrooks's requests for feedback on progress toward his 2015 goals and without any documentation of any performance problems from January 2015 to mid-October 2015; two weeks later, it issued Mr. Middlebrooks a PIP contrary to Teva policy and "moved the goal posts" of metrics to meet or face termination; made the decision to terminate Mr. Middlebrooks during the legal and sensitivity training held months after Mr. Jones recommended the training; and then terminated Mr. Middlebrooks on the last day of February 2016 depriving him of his family's insurance contrary to Teva custom. There is ample evidence through Mr. Middlebrooks's testimony Teva's conduct detrimentally affected him and would detrimentally affect a reasonable person in similar circumstances. The jury believed Mr. Middlebrooks based on this evidence.

Finally, even if Mr. Middlebrooks did not present enough evidence as a matter of law to support the retaliatory hostile work environment claims, we would not need to alter the damages. The jury found for Mr. Middlebrooks on his pure retaliation claims, which arise under Title VII and ADEA and entitle him to compensatory, punitive, and liquidated damages.

### 2. The jury's punitive damages award is soundly based on the evidence of both Teva's conduct and good faith defense.

Teva argues we should enter judgment as a matter of law on the punitive damages claim because the evidence does not support it and, even if it did, Teva established a good faith defense to punitive damages.

Title VII provides for punitive damages if the plaintiff can prove the defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual."[122] "An employer may be vicariously liable for the discrimination of its employee if the employee was serving in a 'managerial capacity' and committed the wrong while 'acting in the scope of his employment.'"[123] Under the Supreme Court's decision in *Kolstad v. American Dental Association*, "an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII."[124]

Teva's primarily relies on *Kolstad* where the Supreme Court considered the circumstances under which punitive damages may be awarded in a Title VII action. The Court held where an employer "has undertaken such good faith efforts at Title VII compliance, it 'demonstrat[es] that it never acted in reckless disregard of federally protected rights'" necessary to hold it vicariously liable for punitive damages.[125] Teva argues it established its good faith compliance with the law and, under *Kolstad*, the jury could not have reasonably awarded punitive damages against it. Teva argues there is no evidence any employee of Teva Pharmaceuticals USA, Inc. ("Teva USA") displayed malice or reckless disregard for the law and Mr. Aharoni is not an agent of Teva USA, but of the dismissed Teva Pharmaceutical Industries, Ltd. ("Teva Limited"). Teva essentially argues we cannot impute Mr. Aharoni's conduct, as an agent of the dismissed Teva Limited, to Teva USA because Teva USA established a good faith defense to punitive damages.

17

The record shows otherwise. At our charging conference with counsel, we specifically addressed the responsibility of Teva Limited for the conduct of Mr. Aharoni. When reviewing the jury instructions, *counsel for Teva* suggested removing the reference to Teva Limited, in our charge describing the background of the case, based on a stipulation of counsel.[126] We asked for the stipulation to be agreed to on the record:

**The Court:** ... The stipulation would be that Teva Pharmaceuticals Industries, Limited is dismissed under 41(a) by the Plaintiff with – with the understanding of what?

**Ms. Mattiacci:** That from - for - *from this point forward, we would refer to the Defendants as Teva, so there would not be a distinction between USA and Ltd. That if there is a verdict that Teva USA will satisfy the verdict. To the extent they can't satisfy that verdict, Ltd will satisfy that verdict. And that in arguing for punitive damages, we would just use the word Teva, but there wouldn't be an argument by defense counsel that somehow they should not be liable for punitive damages because Mr. Aharoni was an employee of Ltd.*

**The Court:** Well, that would apply – let's take up punitives. That argument would apply regardless, arguably. I mean, it could say -it could say the misconduct relative to the employees, unless I don't have a joint employer charge. So the purpose of today, I have two employees as of right now.

**Ms. Mattiacci:** Right. So with this – with having Ltd out, I just don't want the –

**The Court:** *But the conduct of Mr. Aharoni will be imputed for purposes of this trial to Teva US.*

**Ms. Mattiacci:** *Yes.*

**The Court:** *All right. Mr. Rappoport, I know you're catching on the fly, but any thoughts?*

**Mr. Rappoport:** *No, that's fine, Your Honor.*

**The Court:** All right. With that stipulation, I will enter 41 – it's on the record now, but I'll enter 41 dismissing Teva, and I'll must take out - the reference I'll refer to Defendant – I'll refer to it as Teva. Okay. Thank you, Mr. Rappoport.[127]

Teva's present claim Mr. Aharoni's actions cannot be imputed to Teva USA is directly contradictory with the stipulation agreed to by the parties. We deny Teva's motion on this basis.

Teva next argues it established its good faith compliance with the law, pointing to Ms. Flaisher's testimony she assisted Mr. Aharoni in developing Mr. Middlebrooks's mid-year review and the PIP, and if she thought either were in any way retaliatory she would never have allowed them to go forward and would have escalated her concerns; Teva gave additional time to Mr. Middlebrooks to meet the terms of his PIP; Ms. Flaisher made efforts to find Mr. Middlebrooks another position; and Teva terminated Mr. Middlebrooks only after he failed to meet his PIP goals and after Mr. Aharoni consulted with human resources, including Ms. Flaisher.

The issue of Teva's good faith defense is a question for the jury. We allowed Teva to repeatedly argue good faith. The jury disagreed. After hearing evidence, the jury found an award of punitive damages appropriate. This evidence includes Mr. Aharoni, Vice President of Teva's Global Facilities Management, gave Mr. Middlebrooks a negative mid-year review in a six-hour meeting only days after receiving Mr. Jones's investigation and having ignored Mr. Middlebrooks's previous attempts to get feedback from Mr. Aharoni through a self-evaluation; two weeks later placing Mr. Middlebrooks on a PIP, contrary to Teva policy, imposing new goals and deadlines; failure to respond to Mr. Middlebrooks's attempt to meet his PIP; Teva's failure to conduct training as recommended by Mr. Jones; and termination on the last day of February 2016 and contrary to the manner Teva typically handled performance-based terminations. This evidence overwhelmingly painted a picture sufficient for a jury to reasonably find conduct justifying punitive damages. Teva's disappointment with the jury's credibility findings is not a basis for a Rule 50(b) motion. It made the good faith arguments, but the jury could have easily found its witnesses lacked credibility.

19

## B. We deny Teva's motion for a new trial, but will enter judgment limited to Title VII's statutory damages cap.

Under Rule 59(a)(1)(A), we "may, on motion, grant a new trial on all or some of the issues – and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action in federal court."[128] Rule 59 does not provide specific grounds to grant a new trial, leaving the decision to our discretion.[129] Motions for new trial may be granted where there is "substantial error in the admission or exclusion of evidence; error in the court's instructions to the jury; where the jury's verdict [is] inadequate or excessive; or where the verdict [is] against the weight of the evidence."[130] Our Court of Appeals cautions we should grant a motion for new trial "only when 'the great weight of the evidence cuts against the verdict and ... [ ] a miscarriage of justice would result if the verdict were to stand.'"[131]

Teva moves for a new trial arguing (1) we committed reversible error by instructing the jury on both "pretext" and "mixed motive" relating to the national origin discrimination claim (on which Teva prevailed); (2) we erred by instructing the jury it may award punitive damages and compounded its error by refusing to include a question on the verdict sheet regarding Teva's "good faith" defense under Title VII; (3) the jury improperly awarded damages for intentional discrimination despite finding Teva did not intentionally discrimination; (4) the verdict sheet reviewed at extraordinary length with counsel is confusing because we asked the jury to use two different dates for calculation of back pay based on differing evidence for age and national origin claims and the jury's calculation of back pay is not based on any evidence of record: (5) we committed reversible error in instructing the jury it may award damages for emotional distress and the jury's award of emotional distress is not based on evidence of record; (6) the jury's award of front pay is based on consideration of impermissible factors rather than evidence; and (7) if Teva's

20

motion for new trial is not granted, we should not enter judgment for more than $300,000 in combined compensatory and punitive damages based on the statutory cap under Title VII.

Addressing Teva's arguments in turn, we deny its motion for new trial. But we will limit the punitive damages award to the Title VII statutory cap of $300,000.

### 1. Instructing the jury on both pretext and mixed motive theories is not reversible error.

Teva argues we should not have instructed the jury on both mixed motive *and* pretext theories with respect to Mr. Middlebrooks's claim of national origin discrimination. Teva contends the decisions of our Court of Appeals in *Armbruster v. Unisys Corp.*[132] and *Giffiths v. Cigna*[133] require us to charge the jury on *either* a mixed motive theory or pretext theory of discrimination, but not both. Teva also argues we could not have given a mixed motive charge in any event because Mr. Middlebrooks did not adduce direct evidence of discrimination.

Teva prevailed on the discrimination claims but now argues our error prejudiced it by confusing the jury. Teva points to the jury's verdict sheet finding Teva did not discriminate against Mr. Middlebrooks based on national origin, but then awarded damages for intentional discrimination. It argues we must grant it a new trial to remedy prejudicial error.

We disagree with Teva on both the law and the facts. Mr. Middlebrooks alleged both a pretext and mixed motive theory of national origin discrimination under Title VII by pleading, in his second amended complaint, "national origin was a motivating and/or determinative factor in connection with Defendants' discriminatory treatment of Plaintiff."[134] As Teva does not appear to contest, "[a] Title VII plaintiff may make a claim for discrimination under either the pretext theory set forth in *McDonnell Douglas Corp. v. Green* . . . or the mixed-motive theory set forth in *Price Waterhouse v. Hopkins* . . . under which a plaintiff may show that an employment decision was made based on both legitimate and illegitimate reasons."[135] As explained by our

21

Court of Appeals in *Connelly*, the difference between these theories "is in the degree of causation that must be shown: in a 'mixed-motive' case, the plaintiff must ultimately prove that [his] protected status was a 'motivating' factor, whereas in a non-mixed-motive or 'pretext' case, the plaintiff must ultimately prove that [his] status was a 'determinative' factor."[136]

At our charging conference, Teva objected to including both a mixed motive and pretext question on the jury's verdict sheet and charging the jury on both theories.[137] Teva argued there is no evidence to support a mixed motive charge. We disagreed, finding evidence warranting a mixed motive instruction. We instructed the jury on both theories, explaining the difference between the "motivating" and "determinative" during our jury charge while explaining the challenged questions on the verdict sheet to the jury:

> As you see in questions 1 and 2, if you look at them, okay, they are identical with a difference of one word, "determinative" in 1 and "motivating" in 2. Okay? I am going to tell you the difference there. ...
>
> [*"Motivating" Instruction*]
>
> I am going to talk about the second one now, first. Mr. Middlebrooks must prove his national origin was a motivating factor in Teva's decision to terminate employment. That's one way he can win this, if it's a motivating factor in Teva's decision to terminate his employment. To prevail on this claim Mr. Middlebrooks must prove both of the following by a preponderance: one, that Teva terminated him; two, that Mr. Middlebrooks'[s] national origin was a motivating factor – you see that word there – in Teva's decision. We are going to talk about that in a minute. Although Mr. Middlebrooks must prove Teva acted with the intent to discriminate, Mr. Middlebrooks is not required to prove Teva acted with a particular intent to violate his civil rights. So in showing Mr. Middlebrooks'[s] national origin was a motivating factor for Teva's action, Mr. Middlebrooks is not required to prove his national origin was the sole motivation or even the primary motivation for Teva's decision. Mr. Middlebrooks need only prove that his national origin played a motivating part in Teva's decision, even though other factors may have motivated Teva. In this instruction, I am using the word "motivating." I am going to tell you Mr. Middlebrooks'[s] national origin was a motivating factor if his national origin played a part or played a role in Teva's decision to terminate his employment. If you find that Teva's treatment of Mr. Middlebrooks was motivated by both discriminatory and lawful reasons, you then must decide whether Mr. Middlebrooks is entitled to damages.[138]

The alternative way that Mr. Middlebrooks can show national origin discrimination is the word "determinative." That's the first question. Mr. Middlebrooks must prove his national origin was a determinative factor in Teva's decision to terminate his employment. To prevail on this question, number 1, Mr. Middlebrooks must prove both of the following by a preponderance: 1, again, Teva terminated him; 2, Mr. Middlebrooks'[s] national origin was a determinative factor in Teva's decision. Same rule. Although Mr. Middlebrooks must prove Teva acted with the intent to discriminate, he is not required to prove Teva acted with a particular intent to violate his civil rights. He is not required to produce direct evidence of intent, such as statements admitting discrimination. Intentional discrimination may be inferred from the existence of other facts. You should weigh all evidence received in the case in deciding whether Teva intentionally discriminated against Mr. Middlebrooks. Now, Teva has given you a nondiscriminatory reason for its termination of Mr. Middlebrooks. If you believe Teva's stated reason and you find that termination would have occurred because of Teva's stated reason, regardless of Mr. Middlebrooks'[s] national origin, then you must find for Teva. If you disbelieve Teva's stated reason for its conduct, then you may, but need not, find Mr. Middlebrooks has proved intentional discrimination. In determining whether Teva's stated reason for its actions was a pretext or excuse of discrimination, you may not question Teva's business judgment. You cannot find intentional discrimination simply because you disagree with the business judgment of Teva or because you believe it's harsh or unreasonable. You are not to consider Teva's wisdom; however, you may consider whether Mr. Middlebrooks has proven Teva's reason is merely a cover-up for discrimination. Ultimately, under this alternative, the word "determinative," you must decide whether Mr. Middlebrooks has proven his national origin was a determinative factor in Teva's decision to terminate his employment. Okay. Determinative factor means that if not for Mr. Middlebrooks'[s] national origin, the termination would not have occurred.[139]

We explained the verdict sheet to the jury which contained two questions relating to Mr. Middlebrooks's claim of national origin discrimination: Question 1 asked "was Stephen Middlebrooks's national origin a determinative factor in Teva's decision to terminate him?" and Question 2 asked "was Stephen Middlebrooks's national origin a motivating factor in Teva's decision to terminate him?"[140] The jury answered "No" to Question 1 (determinative factor) and "Yes" to Question 2 (motivating factor) but found for Teva in its affirmative defense it would "have made the same decision to terminate Mr. Middlebrooks even in the absence of the

impermissible motivating factor."[141] Accordingly, the jury found *in favor of* Teva on Mr. Middlebrooks's claims of national origin discrimination.

Nevertheless, Teva seeks a new trial arguing instructing the jury on both pretext and mixed motive is reversible error and prejudiced it. Neither *Armbruster* nor *Griffiths* requires us to charge on one or the other theory, precluding us from charging on both theories of recovery. In *Griffiths*, our Court of Appeals found error where the district court *combined* pretext and mixed motive instructions into the same instruction.[142] Here, we included separate questions on the verdict sheet - one asking if Mr. Middlebrooks's national origin was a determinative factor in Teva's decision to terminate him, and another asking if Mr. Middlebrooks's national origin was a motivating factor in Teva's decision to terminate him.[143] We read *Connelly*, decided in the context of a motion to dismiss, as to allow "even at trial, [a plaintiff] 'may present his case under both theories,' provided that, prior to instructing the jury, the judge decides whether *one or both theories* applies."[144]

We found evidence both theories could apply based on the jury's evaluation of witness credibility. There is no error in giving both charges, and even if in error, Teva suffered no prejudice. The jury found in Teva's favor on the national origin discrimination claim. Nevertheless, Teva argues our instruction confused the jury, and thus prejudiced Teva, by its later finding of intentional discrimination in its award of back pay. Intent is an element of both retaliation and a retaliatory hostile work environment claim, and the jury found for Mr. Middlebrooks on those claims.[145]

Finally, we disagree with Teva's argument we erred by giving the mixed motive instruction because a mixed motive instruction requires direct evidence of discrimination, and Mr. Middlebrooks presented none. This argument fails because a mixed motive instruction does not require direct evidence of discrimination.[146] Rather, to obtain a mixed motive instruction, "a

24

plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.'"[147]  Mr. Middlebrooks presented evidence national origin was a motivating factor for Teva's employment practices, including Mr. Aharoni's comments about the United States military, management's actions at the June 2015 meeting, testimony from several Teva employees regarding the preferential treatment Israeli employees received, sudden changes in Mr. Middlebrooks's working conditions after Mr. Aharoni became global facilities manager, and an awkward joke at a global Teva meeting.

### 2. We did not err by instructing the jury on punitive damages and by failing to include a separate question about "good faith" on the verdict sheet.

Teva next argues we erred in instructing the jury on punitive damages, an error compounded by our refusal to include a question on Teva's "good faith" defense on the verdict sheet. Teva's argument is essentially the same as its argument raised in its Rule 50(b) motion, and we deny Teva's Rule 59 motion for same reasons. We add the following to address Teva's argument *Kolstad's* good faith element should have been included on the verdict sheet.

Teva argues, in a footnote, our ruling to exclude a good faith question is based on the theory good faith is an affirmative defense. Teva argues the decision of our Court of Appeals in *Fornicoia v. Haemonetics Corp.* holds it is not proper to omit from a verdict sheet a pertinent question simply because it is an affirmative defense.[148]  In *Fornicoia*, the Court of Appeals found error in the jury instructions for failing to properly instruct the jury, on a claim of supervisory liability, whether the plaintiff employee suffered a tangible employment action and the defendant employer's right to assert an affirmative defense if the plaintiff did not suffer a tangible employment action.[149]  The Court of Appeals did not hold it is error to omit from a verdict sheet a question on an affirmative defense.

25

While our Court of Appeals has not determined whether the good faith defense is an affirmative defense,[150] several other courts of appeals treat it as an affirmative defense.[151] Additionally, the Model Jury Instructions of our Court of Appeals treat the good faith defense as an affirmative defense.[152] So have several district courts in this Circuit.[153] "Generally, the failure to include an affirmative defense on a verdict form is not an abuse of discretion where the form, read in light of the jury instructions, informed the jury that in finding the defendant liable they were implicitly rejecting the affirmative defense."[154] We instructed the jury with respect to the good faith defense, but we did not include a separate question on the verdict sheet asking if Teva displayed good faith compliance with Title VII. We did not err in our decision to treat the *Kolstad* good faith defense as an affirmative defense based on the robust caselaw doing the same.

We properly instructed the jury about the good faith defense.

> Even if you make a finding there has been an act of discrimination with malice o[r] reckless disregard of Mr. Middlebrooks'[s] rights, you cannot award punitive damages if Teva proved by a preponderance of the evidence that it made a good faith attempt to comply with the law by adopting policies and procedures designed to prevent retaliation for complaining about alleged discriminatory conduct.[155]

We derived this charge almost verbatim from our Court of Appeals' Model Jury Instructions.[156] We simply added the clause "retaliation for complaining about alleged discriminatory conduct" in the last sentence[157] to reflect the nature of the case, as we had determined Mr. Middlebrooks could earn punitive damages on only his claims of retaliation and retaliatory hostile work environment.[158]

Finally, Teva argues we used an inconsistent verdict sheet, as it included a question about an affirmative defense in the section handling national origin discrimination[159] but did not include a question about the good faith defense. Any error borne of inconsistency is harmless because we sufficiently instructed the jury of the good faith affirmative defense in our charge. Teva directs us

only to decisions from our Court of Appeals requiring us to instruct the jury on applicable affirmative defenses, but does not direct us to cases requiring us to include affirmative defenses as a question on the verdict form.[160]

### 3. The jury did not render inconsistent responses to questions regarding liability and damages.

Teva argues the jury rendered irreconcilably inconsistent responses when it awarded back pay on intentional discrimination in Questions Nos. 13 and 14 but found in Teva's favor on the national origin and age discrimination claims in Questions 1 through 4.

Under Federal Rule of Civil Procedure 49, the "court may require a jury to return only a special verdict in the form of a special written finding on each issue of fact."[161] "Rule 49 places the matter of submitting interrogatories to the jury entirely within the discretion of the trial judge."[162] "[A] verdict must be molded consistently with a jury's answers to special interrogatories when there is *any view* of the case which reconciles the various answers."[163] "Thus, a trial court is under a constitutional mandate to search for a view of the case that makes the jury's answers consistent."[164]

Although the jury found in favor of Teva on the Title VII and ADEA discrimination claims, the jury still found Teva intentionally discriminated against Mr. Middlebrooks on the retaliation claims. We did not ask, through Questions Nos. 13 and 14, the jury to award damages in connection with Mr. Middlebrooks's discrimination *claims*; rather, we asked the jury to award damages commensurate with what Mr. Middlebrooks would have received had he not been the subject of Teva's intentional discrimination.[165] Additionally, Questions Nos. 13 and 14 comport with our Court of Appeals' Model Jury Instructions on back pay damages.[166]

27

**4. Our separate questions regarding two different start dates for back pay are not confusing and the jury did not render irreconcilably inconsistent answers to them.**

Teva next argues it is entitled to a new trial because the jury's "inconsistent and illogical responses" to Questions Nos. 13 and 14 "reveal manifest confusion."

Question 13 on the verdict form asked the jury to determine the amount of back pay "[f]rom the time of termination until now" Mr. Middlebrooks would have received from Teva if Mr. Middlebrooks had not been the subject of Teva's intentional discrimination. Question 14 asked the jury the same question, but changed the start date for back pay "[f]rom the time of the denial of equity in 2015 until now." In response to Question 13, the jury awarded Mr. Middlebrooks $182,000 in back pay. In response to Question 14, the jury awarded Mr. Middlebrooks $332,000 in back pay.

Teva argues the two different starting points for back pay in Questions 13 and 14 are inherently confusing. It contends the start date in Question 14 – the denial of equity in 2015 – improperly asked the jury to award back pay for the entire final year of Mr. Middlebrooks's employment in 2015 to 2016 while he still continued to receive a salary and benefits from Teva. Teva argues the jury awarded $150,000 in equity in response to Question 14, three times the $50,000 amount of equity testified to by Mr. Middlebrooks. Teva further objects to Question 14 because Mr. Middlebrooks's claim for equity is based solely on his allegation of age discrimination; the verdict sheet did not ask whether Teva denied him equity in 2015 because of age; and the jury ultimately found Teva did not discriminate against Mr. Middlebrooks on the basis of age. Teva argues this shows there is no lawful basis to award equity and equity plus back pay beginning a year before termination. In a footnote, Teva argues even if an award of equity is

28

proper, Mr. Middlebrooks failed to provide evidence from which a jury could have calculated the value of equity.

Teva's counsel did not object to the wording of Questions 13 or 14 on the verdict sheet at our charging conference, objecting instead to allowing the jury to consider equity at all because of a lack of evidence. While Teva's failure to object to the language on verdict sheet before we discharged the jury may constitute a waiver, there is no merit to Teva's motion for a new trial based on an objection to Questions 13 and 14.

Questions 13 and 14 ask the same question but from different starting points. The jury reconciled these questions by awarding Mr. Middlebrooks $182,000 in Question No. 13 for lost back pay, then adding three years of lost equity totaling $150,000 in Question No. 14 based on Mr. Middlebrooks's testimony he received an average yearly equity award of $50,000 for a total back pay award of $332,000. The jury did not award back pay for the final year of Mr. Middlebrooks's termination; it awarded Mr. Middlebrooks equity for the years following his protected activity through the date of our trial—2015, 2016, and 2017. Our jury did not award equity for 2018 because Teva would have awarded it in 2019, when we had not conducted our trial. The jury's back pay award is consistent.

Teva argues the jury could not award Mr. Middlebrooks back pay based on equity because Mr. Middlebrooks based his claim for equity on age discrimination, and the jury rejected Mr. Middlebrooks's age discrimination claim. This argument fails because the jury based its equity award on the theory Mr. Middlebrooks lost equity after Teva fired him in retaliation for making complaints.[167]

Teva lastly argues the jury's award in Question 14 is based on "wild speculation or confusion about what it was being asked to calculate" and asks us to grant it a new trial to rectify

this error. It alternatively argues we should decline to enter judgment on the back pay amount.. We deny Teva's motion, finding Mr. Middlebrooks's testimony on the total compensation he received at Teva is sufficient for the jury to base its back pay award.[168]

### 5. Evidence supports the jury's compensatory damages award.

Teva argues the evidence does not support the jury's $200,000 compensatory damages award because there is no evidence Mr. Middlebrooks suffered emotional distress, pointing to Mr. Middlebrooks's testimony he did not seek professional care and he found a new job six months after termination. Relying on the opinions of our Court of Appeals in *Spence v. Bd. of Educ. of Christina Sch. Dist.*,[169] and *Gunby v. Pa. Elec. Co.*,[170] Teva argues Mr. Middlebrooks must prove a "reasonable probability, rather than a mere possibility" of emotional distress and, without corroborating medical evidence, there is no reasonable probability emotional harm occurred.

Mr. Middlebrooks may recover damages for emotional distress and humiliation under Title VII if he presents evidence of actual injury.[171] There must be evidence of a "reasonable probability, rather than a mere possibility, that damages due to emotional distress were in fact incurred as a result of" the challenged conduct.[172] Medical evidence is not required to corroborate a claim for emotional distress.[173] Our Court of Appeals has not ruled on whether a plaintiff's testimony is sufficient to support an award of emotional distress.[174] District courts in our circuit have found a plaintiff's testimony sufficient to uphold compensatory damages awards.[175]

Mr. Middlebrooks testified to his emotional distress resulting from the way Mr. Aharoni terminated him, including how he felt in being treated differently than other directors in the manner of termination; how he felt after being terminated; and his emotional distress before termination when subjected to a retaliatory hostile work environment. Mr. Middlebrooks points to case authority upholding jury awards for emotional distress based solely on plaintiff's testimony and

30

without medical evidence. After Teva ignored Mr. Middlebrooks's emails regarding his progress for months, Teva subjected Mr. Middlebrooks to an "extraordinarily difficult" six-hour meeting in October 2015 in which Mr. Aharoni criticized Mr. Middlebrooks's performance. When Teva terminated Mr. Middlebrooks in February 2016, it departed from its usual practice of having a "very quiet[]"meeting—instead, Mr. Middlebrooks's entire North Wales team could see the meeting in which Ms. Rodriguez and Mr. Aharoni terminated him. Mr. Middlebrooks testified he felt "horrible" and "devastated," and he "broke down" when his team came into his office after Teva terminated him. Teva terminated Mr. Middlebrooks on the last day of the month, meaning his family lost Teva's insurance plan right away. After his termination, Mr. Middlebrooks embarked on a "very stressful" job search which felt like a "roller coaster."

Mr. Middlebrooks's testimony is sufficient for the jury's award. The jury found Mr. Middlebrooks to be credible. We do not find a miscarriage of justice in allowing the jury's award of compensatory damages to stand.

### 6. Evidence supported the jury's front pay award.

Teva argues the evidence does not support the jury's award of seven years of front pay in the amount of $450,000. It argues the jury's award is based on speculation because Mr. Middlebrooks failed to provide data on his work or life expectancy; there is no basis for the jury's award of seven years front pay, a period so long as to be inherently speculative; failed to provide a foundation for his knowledge of his new employer, JLL's, practices with regard to annual pay increase and bonuses having only worked at JLL for just over a year; failed to provide testimony, expert or otherwise, regarding the value of lost equity, anticipated value of his 401(k) account or how much he currently contributes to it or intends to contribute to it over the next seven years; and failed to testify whether his anticipated $10,000 to $15,000 per year increase in health care

deductibles is *more* than he paid when employed by Teva or whether it is the total he will pay each year and failed to provide testimony as to health care costs generally. Teva characterizes Mr. Middlebrooks's testimony as "wildly speculative" and the jury's award of front pay based on his testimony is erroneous, based on guesswork and speculation.

Front pay may be awarded "where a victim of employment discrimination will experience a loss of future earnings because [he] cannot be placed in the position [he] was unlawfully denied."[176] Because work and life expectancy "are pertinent factors in calculating front pay ... such an award 'necessarily implicates a prediction about the future.'"[177] Our Court of Appeals instructs it will not refuse to award front pay "merely because some prediction is necessary" and leaves to our discretion "selecting a cut-off date for an equitable front pay remedy subject to the limitation that front pay only be awarded 'for a reasonable future period required for the victim to reestablish [his] rightful place in the job market.'"[178]

The trial evidence includes Mr. Middlebrooks worked at Teva for thirteen years with no performance issues and planned to stay at Teva until 2025 when he reached age 68, seven years from the time of trial. Mr. Middlebrooks testified, without rebuttal, to his total compensation of $300,000 while employed at Teva; base pay of approximately $192,000; a bonus of thirty percent of base; equity on average of $50,000 a year; health care costs, including insurance and prescription drug co-pays; a ten percent match to a 401(k) plan; and merit increases received while at Teva.[179] Mr. Middlebrooks testified to the differences between his total compensation while at Teva versus his total compensation he received in the year he worked for Wuxi Apptec and since his employment at JLL including his base pay, bonus, double the cost of health care, a three percent 401(k) match, and merit increase.[180] Mr. Middlebrooks testified to the compensation lost after taking a position at JLL: he is eligible for twenty percent bonus at JLL versus a thirty percent

32

bonus at Teva on a \$192,000 base salary; he does not receive equity awards at JLL versus approximately \$50,000 equity award at Teva; JLL's health insurance plan costs him between \$10,000 and \$15,000 more than Teva's per year; and its 401(k) plan only matches contributions up to three percent after the first year of employment versus ten percent at Teva.

The jury heard this evidence and calculated a front pay award. We do not find this amount speculative or unreasonable, finding similar awards upheld by courts in this circuit.[181] Mr. Middlebrooks testified to his compensation while employed at Teva versus his compensation at JLL; the absence of expert testimony does not make his testimony speculative and our Court of Appeals does not require it.[182] Due to the "speculative nature of future damages," a "[p]laintiff must merely prove his damages sufficiently to exclude unreasonable speculation."[183] "[T]he risks associated with any remaining speculation in awarding front pay are upon the employer, because those risks "'must be borne by the wrongdoer, not the victim.'"[184] "[A]bsent a conclusion that the jury engaged in 'unreasonable' or 'wild' speculation," we must let the front pay award stand.[185] We deny Teva's motion for a new trial on this ground.

### 7. The Title VII damages cap applies to limit the punitive damages award to \$300,000.

Teva argues if we do not order a new trial, we must still reduce the jury's \$5 million punitive damages award and limit damages on both punitive and compensatory damages under Title VII's \$300,000 statutory cap.

Mr. Middlebrooks argues we should uphold the punitive damages award because the jury based its award on *retaliation* under ADEA. Mr. Middlebrooks cites the EEOC's August 25, 2016 "Enforcement Guidance on Retaliation and Related Issues" Directive No. 915.004.[186] With regard to compensatory and punitive damages for ADEA retaliation, the EEOC directs "[c]ompensatory and punitive damages are available for retaliation claims brought under the ADEA and [Equal Pay

33

Act], *even though such relief is not available for non-retaliation claims under those statutes.*
Any compensatory and punitive damages obtained under the EPA and the ADEA are not subject
to statutory caps."[187] The EEOC cites the Fair Labor Standards Act ("FLSA") as authorizing
compensatory and punitive damages for retaliation claims under both the Equal Pay Act and the
ADEA.[188]

Mr. Middlebrooks urges us to follow the EEOC's guidance and uphold the punitive
damages award for its finding of retaliation under ADEA. We cannot find, and Mr. Middlebrooks
does not offer, reasoning from a federal court applying EEOC's August 2016 Directive 915.004
in this context. Our research found only one case considering the EEOC's guidance in the context
of punitive damages in ADEA retaliation claims; a 2017 decision from the United States Court of
Appeals for the Fifth Circuit which found the EEOC's guidance did not constitute an intervening
change in the law to justify setting aside its precedent holding punitive damages are not available
in ADEA actions, including claims for retaliation under ADEA.[189] Because we find no case
following the EEOC's guidance as applied to ADEA retaliation claims or any case departing from
disallowing punitive damages in ADEA retaliation claims, we decline to apply the EEOC guidance
here to allow the $5 million punitive damages award on the basis of ADEA retaliation.[190]

Finding the punitive damages award is not available for the ADEA claim, we examine the
award under Title VII. Congress limits damages available in Title VII claims to the "sum of the
amount of compensatory damages ... and the amount of punitive damages" capping damages at
$300,000 for defendants who employ 500 or more employees in each of twenty or more calendar
weeks in the current or preceding calendar year.[191]

Teva argues we must apply the statutory cap to the compensatory and punitive damages
award, reducing the jury's $200,000 compensatory award and $5 million punitive award to a

34

combined total of $300,000. We must decide if we will include the $200,000 compensatory damages award under the damages cap because Congress directs us to net compensatory and punitive judgments.[192] Mr. Middlebrooks argues if we find Title VII's statutory cap applies, we should apply it to the punitive damages only and not the compensatory damages arguing he is entitled to recover his full emotional distress because the jury could have made such an award under the PHRA, to which the federal damages cap does not apply. We agree, and apportion the compensatory damages award to the PHRA claim.

Our Court of Appeals considered this issue in *Gagliardo*, holding the plaintiff could recover damages under the PHRA.[193] There, a jury awarded compensatory damages and punitive damages after the plaintiff sued under the Americans with Disabilities Act, which is subject to the federal cap, and the PHRA, which is not.[194] The district court applied the cap only to the punitive damages, apportioning the compensatory damages to the PHRA claim.[195]  In affirming the district court's decision, our Court of Appeals held "[section] 1981a does not prevent a claimant from recovering greater damages under a state law claim that is virtually identical to a capped federal claim."[196]

Our Court of Appeals interprets the PHRA identically to the ADEA[197] and consistently with Title VII.[198] The PHRA requires plaintiffs to file a complaint with the Pennsylvania Human Resources Commission like Title VII requires plaintiffs to file a complaint with the EEOC.[199] Mr. Middlebrooks filed a dual charge of discrimination with the EEOC and PHRC, stating claims under both Title VII and the PHRA.

There is no reason to apportion the jury's compensatory damages award to Mr. Middlebrooks's federal claims. We will apportion the compensatory damages award of $200,000

35

to Mr. Middlebrooks's PHRA claim and will not include the claim under the federal damages cap.
We otherwise cap the punitive damages claim to $300,000 under § 1981a(b)(3)(D).

## C. We grant Mr. Middlebrooks prejudgment interest on the backpay award at the IRS rate.

Mr. Middlebrooks moves to amend the judgment to include prejudgment interest on the
jury's $332,000 back pay award from the denial of equity in 2015 to the time of trial.

In employment cases, we may award prejudgment interest in our discretion if it "helps to
make victims of discrimination whole," serving to "compensate a plaintiff for the loss of the use
of money that the plaintiff otherwise would have earned had he not been unjustly discharged." [200]
There is a "strong presumption in favor of awarding prejudgment interest, except where the award
would result in 'unusual inequities.'"[201] The prejudgment interest rate applied to an award of back
pay is within our discretion.[202]

Mr. Middlebrooks asks we apply the IRS "overpayment rate" under 26 U.S.C. § 6621.
Applying the IRS overpayment rate, Mr. Middlebrooks calculates prejudgment interest at $23,687
on the back pay award. If we do not use the IRS overpayment rate, Mr. Middlebrooks argues, we
should apply Pennsylvania's statutory rate of 6% which amounts here to $19,920.

Teva argues if we award prejudgment interest at all, it should be on the $182,000 back pay
award, (the figure the jury awarded on back pay from termination until trial) and at the much lower
Treasury yield, or "T-bill," rate under 28 U.S.C. § 1961.[203] Teva argues Mr. Middlebrooks
provides no reason why we should deviate from the T-Bill rate, and we should not apply
Pennsylvania's statutory rate because there is no evidence Middlebrooks used his annual salary
for living expenses, a factor relied on by Judge Bartle in *Grieb v. JNP Foods, Inc.* in using the
higher IRS overpayment rate.[204]

We grant Mr. Middlebrooks's motion and will apply the IRS overpayment rate in 26 U.S.C. § 6621. Mr. Middlebrooks testified for the six months he remained out of work, with no paycheck coming in, he and his wife used their retirement savings to make ends meet.[205] We find the higher rate is appropriate to restore Mr. Middlebrooks to his position if not for Teva's retaliation.[206] We also defer to the jury's findings as to retaliation and award of a substantial punitive damage. The jury did not believe Teva. It found Teva – particularly Mr. Aharoni – retaliated against Mr. Middlebrooks in a several month campaign to make his work life hostile because he complained about treatment towards him and those reporting to him. As good bosses should do, Mr. Middlebrooks took the heat for his team, raised complaints affecting him and his workers and, for reasons the jury did not find credible, Mr. Aharoni went after him. Having been very recently educated about illegal employment practices by Morgan Lewis LLP days earlier, Teva's retaliation campaign is capped by firing him on February 29, 2016 without health insurance the next day and forcing his family to use retirement funds to meet their obligations. They lost the benefit of these retirement funds while Mr. Middlebrooks needed to return to the job market.

## III.  Conclusion

We consider three post-trial motions filed in this employment action brought by Stephen Middlebrooks against his former employer Teva Pharmaceutical Industries Limited and Teva Pharmaceuticals USA, Inc. After a five-day trial, a jury returned a verdict in favor of Mr. Middlebrooks on his claims of retaliation and retaliatory hostile work environment. Teva moves for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) or, alternatively, for a new trial under Rule 59(a). Mr. Middlebrooks moves for prejudgment interest on his award of back pay. In the accompanying Order, we deny Teva's Rule 50(b) Motion in its entirety; deny Teva's Rule 59 Motion in all respects except for its request we apply Title VII's statutory cap of

37

$300,000 to the punitive damages award; and grant Mr. Middlebrooks's motion to award him $23,687 in prejudgment interest on the $332,000 back pay award calculated at the IRS overpayment rate under 26 U.S.C. § 6621. Upon resolving the pending motion for attorney's fees, we will enter judgment against Teva consistent with this Memorandum.

---

[1] 42 U.S.C. §2000e, *et seq.*

[2] 29 U.S.C. § 621, *et seq.*

[3] 43 P.S. § 951, *et seq.*

[4] At trial, we granted Teva's Rule 50(a) Motion for judgment as a matter of law on Mr. Middlebrooks's hostile work environment claims finding Mr. Middlebrooks failed to adduce sufficient evidence of a severe or pervasive hostile work environment based on age or national origin from which a jury could reasonably find liability. ECF Doc. 130. Consequently, the hostile work environment claims did not go to the jury.

[5] ECF Doc. No. 137.

[6] ECF Doc. No. 144.

[7] ECF Doc. No. 143.

[8] ECF Doc. No. 145.

[9] Notes of Testimony ("N.T.") 11/14/2018 at 5:17.

[10] *Id.* at 7:20–9:12.

[11] *Id.* at 9:13–19.

[12] *Id.* at 10-11.

[13] *Id.* at 11-12.

[14] *Id.* at 10:5–20.

[15] *Id.* at 24:21–25:1.

[16] *Id.* at 25:17.

[17] *Id.* at 25:17–24.

[18] *Id.* at 27:20–25.

[19] *Id.* at 28-29.

[20] *Id.* at 28:1–10.

[21] *Id.* at 30:2–9.

[22] *Id.* at 30:11–15.

[23] *Id.* at 31:5–9. Mr. Duggan testified to his conversation with Mr. Aharoni regarding the reason why Mr. Duggan did not receive equity and Mr. Aharoni's statement in response. *Id.* at 319-320.

[24] *Id.* at 31:20.

[25] *Id.* at 31:24–32:5.

[26] Ex. 34.

[27] N.T. 11/14/2018 at 56-57:2–11.

[28] *Id.* at 57.

[29] *Id.* at 46-47.

[30] *Id.* at 48-49.

[31] *Id.* at 49.

[32] *Id.* at 49-53; Exhibit 65.

[33] *Id.*

[34] *Id.*

[35] N.T. 11/14/2018 at 54-55:1-2.

[36] *Id.* at 52:18–53:14.

[37] *Id.* at 29:10–20.

[38] *Id.* at 29:16.

[39] *Id.* at 36:11–25.

[40] *Id.* at 39:1–9.

[41] *Id.* at 39:21–25.

[42] *Id.* at 283:11–16.

[43] *Id.* at 45:5–11.

[44] *Id.* at 278:10–280:8.

[45] *Id.* at 278:10–280:8.

[46] *Id.* at 35-36; 280-281; 317-318.

[47] N.T. 11/15/18 at 5:12–19.

[48] *Id.* at 7:1–9.

[49] N.T. 11/14/2018 at 355.

[50] *Id.* at 347-348.

[51] *Id.* at 46-47.

[52] *Id.* at 47.

[53] *Id.* at 47-48.

[54] *Id.* at 292-295.

[55] N.T. 11/15/2018 at 37-38.

[56] Ex. 67, 79.

[57] N.T. 11/15/2018 at 52-70.

[58] *Id.* at 70.

[59] *Id.* at 72.

[60] N.T. 11/14/2018 at 60.

[61] N.T. 11/15/2018 at 72.

[62] *Id.* at 86.

[63] N.T. 11/15/2018 at 239-40; Ex. 78.

[64] N.T. 11/14/2018 at 61:9–13.

[65] N.T. 11/15/2018 at 167; Ex. 83.

[66] N.T. 11/15/2018 at 169.

[67] N.T. 11/14/2018 at 62.

[68] *Id.*

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Id.* at 64-66; Ex. 92.

[73] N.T. 11/14/2018 at 64-65.

[74] *Id.* at 71.

[75] *Id.* at 65.

[76] *Id.* at 66–67.

[77] *Id.* at 72-75; Ex. 95.

[78] N.T. 11/14/2018 at 247–249.

[79] N.T. 11/14/2018 at 78-79; Ex. 96.

[80] N.T. 11/14/2018 at 78-79; Ex. 97.

[81] N.T. 11/14/2018 at 79.

[82] N.T. 11/14/2018 at 80-83; Ex. 107-109.

[83] N.T. 11/14/2018 at 84-85.

[84] *Id.* at 85.

[85] *Id.*

[86] *Id.* at 86-87.

[87] *Id.* at 91: Ex. 120.

[88] N.T. 11/14/2018 at 89; Ex. 128.

[89] N.T. 11/14/2018 at 90, 106.

[90] *Id.* at 107.

[91] *Id.*

[92] *Id.* at 108-109.

[93] *Id.* at 107.

[94] *Id.*

[95] *Id.*

[96] *Id.* at 92:15–18.

[97] *Id.* at 95.

[98] *Id.* at 96-97.

[99] *Id.* at 95:15–19.

[100] *Id.* at 95:20–25.

[101] *Id.* at 95–97.

[102] *Id.* at 97-98.

[103] *Id.* at 109:11–17.

[104] *Id.* at 97:9–98:4.

[105] *Id.* at 99:14–21.

[106] *Id.* at 100-101.

[107] *Id.* at 101:9–25.

[108] *Id.* at 102:1–24.

[109] *Id.* at 103.

[110] *Id.*

[111] *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).

[112] *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 211 (3d Cir. 2009).

[113] *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).

[114] *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 433 (3d Cir. 2009) (citation omitted).

[115] *Id.* (quoting *Marra v. Phila. Housing Auth.*, 497 F.3d 286, 300 (3d Cir. 2007)).

[116] *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006), *abrogated in part by Burlington N. & Santa Fe Ry. Co. v White*, 548 U.S. 53 (2006); *Hare v. Potter*, 220 F.App'x 120, 131-32 (3d Cir. 2007); *Clarkson v. Septa*, No. 14-2510, 2016 WL 1637279, at *10 (E.D. Pa. Apr. 25, 2016).

[117] *Jensen*, 435 F.3d at 449 (citations and footnotes omitted).

[118] *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 168 (3d Cir. 2013); *see also Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017) (determining whether an environment is hostile requires looking at the totality of the circumstances) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993))

[119] *Abuomar v. Dept. of Corrections*, No. 17-2751, 2018 WL 5778247, at *3 (3d Cir. Nov. 2, 2018) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).

[120] *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 214 n.12 (3d Cir. 2017) (quoting *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010) (emphasis omitted)).

[121] *See, e.g.*, *Exantus v. Harbor Bar & Brasserie Rest.*, 386 F. App'x 352, 354 (3d Cir. 2010); *Nieves v. Acme Markets, Inc.*, 541 F. Supp. 2d 600, 606–07 (D. Del. 2008).

[122] 42 U.S.C. § 1981a(b)(1).

[123] *Ridley v. Costco Wholesale Corp.*, 217 F. App'x 130, 137 (3d Cir. 2007) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 545 (1999)).

[124] *Kolstad*, 527 U.S. at 545 (1999) (internal quotations omitted).

[125] *Id.* at 544-45.

[126] Charging Conference 11/15/2018 at 5 (ECF Doc. No. 142).

[127] ECF Doc. No. 142 at 5-7 (emphasis added).

[128] Fed. R. Civ. P. 59(a)(1)(A).

[129] *Blancha v. Raymark Indus.*, 972 F.2d 507, 512 (3d Cir. 1992) ("The decision to grant or deny a new trial is confided almost entirely to the discretion of the district court") (citing *Allied Chem. Corp. v. Daiflon, Inc.* 449 U.S. 33, 36 (1980)).

[130] *Snider v. Sterling Airways, Inc.*, No. 13-2949, 2017 WL 3873540, at *2 (E.D. Pa. Sept. 5, 2017) (citations omitted).

[131] *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 386 (3d Cir. 2016) (quoting *Springer v. Henry*, 435 F.3d 268, 274 (3d Cir. 2006)).

[132] 32 F.3d 768 (3d Cir. 1994), *abrogated on other grounds by Showalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231 (3d Cir. 1999).

[133] 988 F.2d 457 (3d Cir. 1993), *overruled on other grounds by Miller v. CIGNA Corp.*, 47 F.3d 586 (3d Cir. 1995).

[134] ECF Doc. No. 10 at ¶ 63. Teva did not move for summary judgment on the mixed motive theory of discrimination.

[135] *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations omitted). *See also Armbruster*, 32 F.3d at 782 n. 17 ("We do not mean to suggest that an employee must elect to proceed on either a pretext or a *Price Waterhouse* theory at trial. Rather, we think that an employee may present his case under both theories and the district court must then decide whether one or both theories properly apply at some point in the proceedings prior to instructing the jury.").

[136] *Connelly*, at 788 (citing *Makky v. Chertoff*, 541 F.3d 205, 214-20 (3d Cir. 2008)).

[137] ECF Doc. No. 142 at 31-33.

[138] N.T. 11/16/2018 at 177-78. We then instructed the jury on the "same decision" affirmative defense, instructing the jury "As shown in question 3, Mr. Middlebrooks is not entitled to damages under this theory if Teva proves by a preponderance of the evidence that it would have treated Mr. Middlebrooks the same even if Mr. Middlebrooks'[s] national origin had played no role in the employment decision." *Id.*

[139] *Id.* at 179-80.

[140] ECF Doc. No. 137.

[141] ECF Doc. No. 137 at ¶ 3.

[142] *Griffiths*, 988 F.2d at 472 ("[T]he court told the jury that it could consider the employer's explanations as 'a pretext or a sham and that in actuality, at least one of the motivating factors was retaliation against him, even though there may have been other valid reasons' for the

termination.").

[143] *See* ECF Doc. No. 137 at ¶¶ 1–2.

[144] *Connelly*, 809 F.3d at 788 (emphasis added) (internal quotations omitted).

[145] *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006) ("[t]he ultimate question in any retaliation case is an intent to retaliate *vel non*.") (quoting *Jensen*, 435 F.3d at 449 n.2).

[146] *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 92 (2003); *Egan v. Delaware River Port Auth.*, 851 F.3d 263, 274–75 (3d Cir. 2017); *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).

[147] *Makky*, 541 F.3d at 214 (quoting *Desert Palace*, 539 U.S. at 101).

[148] 131 F.App'x 867 (3d Cir. 2005).

[149] *Id.* at 870-71.

[150] *See Medcalf v. Trustees of Univ. of Pa.*, 71 F. App'x 924, 933 (3d Cir. 2003) ("[T]he Third Circuit has not addressed the issue of whether the good faith compliance standard set out in *Kolstad* is an affirmative defense for which the defendant bears the burden of proof, or whether the plaintiff must disprove the defendant's good faith compliance with Title VII by a preponderance of the evidence.").

[151] *See, e.g.*, *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1075 (6th Cir. 2015); *White v. BFI Waste Servs., LLC*, 198 F. App'x 283, 287 (4th Cir. 2006); *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 385 (2d Cir. 2001); *Romano v. U-Haul Int'l*, 233 F.3d 655, 670 (1st Cir. 2000); *Passantino v. Johnson & Johnson Consumer Prod., Inc.*, 212 F.3d 493, 516 (9th Cir. 2000); *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 188 F.3d 278, 286 (5th Cir. 1999).

[152] *See* Comment, Model Civ. Jury Instr. 3rd Cir. § 5.4.2 (2018).

[153] *U.S. Equal Employment Opportunity Comm'n v. Scott Med. Health Ctr., P.C.*, No. 16-225, 2017 WL 5493975, at *5 (W.D. Pa. Nov. 16, 2017); *U.S. Equal Employment Opportunity Comm'n v. Bob Evans Farms, LLC*, 275 F. Supp. 3d 635, 667 (W.D. Pa. 2017). *But see Colicchio v. Merck & Co.*, No. 08-3593, 2015 WL 12839170, at *1 (D.N.J. Jan. 30, 2015) (calling the good faith defense "not [an] affirmative defense[]").

[154] *Hilburn v. N.J. Dep't of Corr.*, No. 07-6064, 2012 WL 3133890, at *8 (D.N.J. July 31, 2012).

[155] N.T. 11/16/2018 at 194.

[156] *See* Model Civ. Jury Instr. 3rd Cir. § 5.4.2 (2018).

[157] *Compare* N.T. 11/16/2018 at 194 *with* Model Civ. Jury Instr. 3rd Cir. § 5.4.2 (2018).

[158] ECF Doc. No. 130.

[159] ECF Doc. No. 137 at ¶ 3.

[160] *Fornicoia v. Haemonetics Corp.*, 131 F. App'x 867, 871 (3d Cir. 2005) (finding error where the district court judge failed to charge the jury on the defendant's right to assert an affirmative defense).

[161] Fed. R. Civ. P. 49(a)(1).

[162] *Moyer v. Aetna Life Ins. Co.*, 126 F.2d 141, 145 (3d Cir. 1942); *see also Allstate Ins. Co. v. Hrin*, No. 05-158, 2006 WL 2540778, at *5 (E.D. Pa. Aug. 31, 2006) ("[D]istrict courts have broad discretion to formulate special interrogatories for submission to the jury.").

[163] *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 763 (3d Cir. 1990) (emphasis in original) (internal quotations omitted).

[164] *Id.* at 764 (internal quotations omitted).

[165] ECF Doc. No. 137 ¶¶ 13–14.

[166] *See* Model Civ. Jury Instr. 3rd Cir. § 5.4.3 (2018) ("You may award as actual damages an amount that reasonably compensates [plaintiff] for any lost wages and benefits, taking into consideration any increases in salary and benefits, including pension, that [plaintiff] would have received from [defendant] had [plaintiff] not been the subject of [defendant's] intentional discrimination.").

[167] ECF Doc. No. 137 at ¶¶ 6, 8.

[168] *See* Section 6, *infra*, for Mr. Middlebrooks's testimony on Teva's compensation to him.

[169] 806 F.2d 1198 (3d Cir. 1986).

[170] 840 F.2d 1108 (3d Cir. 1988).

[171] *Gunby,* 840 F.2d at 1121 (citations omitted).

[172] *Spence*, 806 F.2d at 1201.

[173] *Bolden v. Septa*, 21 F.3d 29, 34 and n.4 (3d Cir. 1994).

[174] *Gallagher v. Green*, No. 12-3840, 2016 WL 3213346, at *13 (E.D. Pa. June 10, 2016).

[175] *See, e.g.*, *Williams v. Care*, No. 14-6347, 2016 WL 4478810, at *5 (E.D. Pa. Aug. 25, 2016) ("Plaintiff may support an award for emotional distress based solely on her own testimony."); *Holt v. Pennsylvania*, No. 10-5510, 2015 WL 4944032, at *28 (E.D. Pa. Aug. 19, 2015) ("[w]e find that

[plaintiff's] testimony alone may support an award for emotional harm"), *aff'd in part, rev'd in part on other grounds and remanded*, 683 F. App'x 151 (3d Cir. 2017).

[176] *Donlin v. Philips Lighting N.Am. Corp.*, 581 F.3d 73, 86 (3d Cir. 2009).

[177] *Id.* at 87 (internal citations omitted).

[178] *Id.* (quoting *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 889-90 (3d Cir. 1984)).

[179] N.T. 11/14/2018 at 94-97.

[180] *Id.* at 99-104.

[181] *See Zielinski v. SPS Tech. LLC*, No. 10-3106, 2011 WL 5902214, at *8-*9 (E.D. Pa. Nov. 22, 2011) (collecting cases).

[182] *Maxfield v. Sinclair Int'l.*, 766 F.2d 788, 797 (3d Cir. 1985). *See also Branning v. Wayne Co.*, No. 15-1936, 2018 WL 2090807, at *3 (M.D. Pa. May 1, 2018) (plaintiff's testimony as to his annual salary and produced W2 forms sufficient to show front pay and jury does not require an expert to calculate future earnings based on past salaries and benefits) (collecting cases); *Cole v. Delaware Tech. & Cmty. Coll.*, 459 F. Supp. 2d 296, 310 (D. Del. 2006) (citing *Maxfield,* 766 F.2d at 797) ("[a] jury can reasonably calculate front pay, based on evidence of past earnings, and can reduce the award to present value without expert testimony").

[183] *Conway v. Hercules Inc.*, 831 F. Supp. 354, 358 (D. Del. 1993) (emphasis added) (internal quotation omitted).

[184] *Id.* (quoting *Bartek v. Urban Redevelopment Auth. of Pittsburgh*, 882 F.2d 739, 746 (3d Cir. 1989)).

[185] *Olabode v. Hecht Inc.*, No. 95-6221, No. 92-6952, 1997 WL 805187, at *12 (E.D. Pa. Dec. 30, 1997) (quoting *Marchese v. Goldsmith*, Nos. 92-6952, 92-6954, 1994 WL 263301, at *4 (E.D. Pa. June 13, 1994)).

[186] https://www.eeoc.gov/laws/guidance/retaliation-guidance.cfm. The EEOC explains its positions in the guideline "represent the Commission's well-considered guidance on its interpretation of the laws it enforces." *Id.* at 2.

[187] *Id.* at 59-60 (emphasis added).

[188] *Id.* at n. 186.

[189] *Vaughan v. Anderson Reg. Med. Ctr.*, 849 F.3d 588, 591-92 (5th Cir. 2017).

[190] The Honorable Terrence McVerry, our now retired colleague in the United States District Court for the Western District of Pennsylvania, addressed the issue of punitive damages in an ADEA

retaliation case, albeit before the EEOC's Directive 915.004. Judge McVerry found although courts are split on the issue, he agreed with authority finding ADEA does not allow for punitive damages in ADEA retaliation claims. *Karlo v. Pittsburgh Glass Works, LLC*, No. 10-1283, 2016 WL 69651, at *3 (W.D. Pa. Jan. 6, 2016) (collecting cases). *See also*, H. Eglit, 2 Age Discrimination § 8.111 (2d ed.) (Oct. 2018 Update).

[191] 42 U.S.C. § 1981a(b)(3)(D). We attribute the punitive damages award to the Title VII claim only; the PHRA does not allow for punitive damages. *Gagliardo v. Connaught Labs., Inc.*, 311 F.3d 565, 570, n.3 (3d Cir. 2002) (citing *Hoy v. Angelone*, 691 A.2d 476, 483 (Pa. Super. 1997)).

[192] *See* 42 U.S.C. § 1981a(b)(3)(D).

[193] 311 F.3d at 570.

[194] *Id.*

[195] *Id.*

[196] *Id.*

[197] *See Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) ("Since this Court has determined that the interpretation of the PHRA is identical to that of federal anti-discrimination laws, including the ADEA, we present a single analysis for Willis's claims under both statutes.").

[198] *See Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 n.5 (3d Cir. 2006) ("We construe Title VII and the PHRA consistently."); *Larochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 677 (E.D. Pa. 2016) ("In the employment discrimination context, the analysis for adjudicating claims under the PHRA is identical to a Title VII analysis."), *clarified on denial of reconsideration*, No. 12-5567, 2016 WL 6135577 (E.D. Pa. Oct. 21, 2016).

[199] *See Koller v. Abington Mem'l Hosp.*, 251 F. Supp. 3d 861, 863–64 (E.D. Pa. 2017).

[200] *Booker v. Taylor Milk Co., Inc.*, 64 F.3d 860, 868 (3d Cir. 1995).

[201] *Id* (citation omitted).

[202] *Taxman v. Bd. of Educ. of Piscataway*, 91 F.3d 1547, 1566 (3d Cir. 1996); *Johnson v. Dependability Co., LLC*, No. 15-3355, 2016 WL 852038, at * 3 (E.D. Pa. Mar. 3, 2016) (citing *Diaz v. Saucon Valley Manor, Inc.*, No. 12-433, 2013 WL 4564300, at *2 (E.D. Pa. Aug. 27, 2013)).

[203] Title 28 U.S.C. § 1961(a) is the federal post-judgment interest rate district courts may apply in calculating prejudgment interest. *See Koch v. Mack Trucks, Inc.*, No. 16-4857, 2018 WL 2461921, at *9 (E.D. Pa. June 1, 2018).

[204] *Grieb v. JNP Foods, Inc.*, No. 15-1575, 2015 U.S. Dist. LEXIS 171631, \*8-\*9 (E.D. Pa. Dec. 23, 2015).

[205] N.T. 11/14/2018 at 102-103.

[206] *See Taxman*, 91 F.3d at 1566 (affirming trial court's application of IRS rate); *Security and Data Tech., Inc. v. Sch. Dist. of Phila.*, No. 12-2392, 2016 WL 7427758, at \*21 (E.D. Pa. Dec. 20, 2016) (awarding prejudgment interest to plaintiff in action under 42 U.S.C. § 1981 at IRS overpayment rate); *Johnson v. Dependability Co., LLC*, No. 15-3355, 2016 WL 852038, at \*3-\*4 (E.D. Pa. Mar. 3, 2016) (awarding prejudgment interest as appropriate in ADA case at IRS overpayment rate); *Marra v. Phila. Housing Auth.*, 404 F.Supp. 2d 839 (E.D. Pa. 2005), 848 n.2 (awarding prejudgment interest on back pay award at IRS rate in Title VII and PHRA claims).