**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| STEPHEN MIDDLEBROOKS | : CIVIL ACTION |
| | : |
| v. | : NO. 17-412 |
| | : |
| TEVA PHARMACEUTICALS USA, INC. | : |

<u>**MEMORANDUM**</u>

**KEARNEY, J.** February 26, 2019

Congress motivates lawyers to represent employees claiming their employer discriminated or retaliated against them by allowing federal judges to award reasonable fees and costs to compensate the lawyers. When, as today, the jury vindicates the employee's federal rights, we carefully consider the employee's post-trial motion seeking the former employer pay his attorneys' hourly fees and costs. Proving an employer's discriminatory or retaliatory state of mind may be difficult if the employer controls both the performance reviews and many of the remaining employees. But we must ensure the requested fee is based on a reasonable number of hours billed for the success obtained at trial and a reasonable hourly rate charged by trial or employment lawyers in this District. We review time entries to confirm the lawyers worked for the employee's benefit. Lawyers need to contemporaneously describe their billed time with enough specificity to allow a reasonableness finding. We cannot award fees for time billed to emails or internal lawyer conferences with no subject matter or billed at "working on trial prep" for weeks. We must also set a reasonable hourly rate based on the adduced market rate evidence. We cannot find a reasonable rate based on the lawyer's, or our, *ipse dixit*. After studying billing records now filed in support of a motion for attorney's fees after the employee won a significant verdict based on an employer's retaliatory conduct, but not on his discrimination claims, we enter the accompanying

Order granting in part the employee's motion for reasonable fees and costs based on competent evidence. We decline to enhance the attorney's fee beyond the reasonable hours and rates.

### I.    Background[1]

Senior executive Stephen Middlebrooks believed his former employer Teva[2] discriminated against him based on his age and American national origin; created a hostile work environment based on his age and national origin; retaliated against him for making complaints related to age and national origin; and, created a retaliatory hostile work environment for making complaints related to age and national origin discrimination.

***Console Mattiacci filed EEOC charges based on an undisclosed hourly agreement.***

Mr. Middlebrooks appears to have first contacted Stephen G. Console, Esquire, founder of Console Mattiacci Law LLC, sometime before November 9, 2015. We do not know when Mr. Middlebrooks retained Console Mattiacci. We do not know the terms of representation. All we know is Firm Founder Console first billed time to Mr. Middlebrooks on November 9, 2015 when he spoke to his legal assistant about the case. Firm Founder Console now swears his law firm represented Mr. Middlebrooks on an hourly fee agreement of some sort. Represented by Console Mattiacci, Mr. Middlebrooks first pursued a remedy by filing a charge of discrimination with the Equal Employment Opportunity Commission and Pennsylvania Human Relations Commission on November 25, 2015. It appears Firm Founder Console assigned the matter to one his firm's associates, M. Susan Toth, Esquire.[3] Firm Founder Console, with over thirty-five years' experience, swears his normal hourly rate is $940.00. Attorney Toth, an associate attorney with eight to nine years' experience, billed Mr. Middlebrooks at her normal hourly rate of $340.00.

Teva fired Mr. Middlebrooks on February 29, 2016 while the EEOC and PHRA studied his charge of discrimination.

Firm Founder Console swears from November 2015 through March 2016, he and Ms. Toth represented Mr. Middlebrooks based on an undisclosed hourly fee agreement.[4]  Ms. Toth only billed for services through March 30, 2016.  Console Mattiacci filed a second charge with the EEOC and PHRA on March 23, 2016.

### *Console Mattiacci begins billing on an undisclosed contingency fee "arrangement."*

Console Mattiacci claims Mr. Middlebrooks hired it based on an undisclosed hourly basis. But as its invested hours exceeded $10,000, the firm agreed to still represent him but be paid at the end of the case if Mr. Middlebrooks won.[5]  Founder Console swears knowing "Mr. Middlebrooks would not be able to litigate this case with counsel if he had to continue to pay our fees as they accrued."[6]  After March 2016, Console Mattiacci began representing Mr. Middlebrooks on a "straight contingency fee arrangement."[7]  The firm did not show us a contingent fee agreement or "arrangement" as part of its burden to obtain fees today.  We have no idea what it means by a "straight contingency fee arrangement."  In a statutory fee shifting case, the attorney's recovery is contingent on a court awarding its reasonable hourly fees (a lodestar) only if the former employee succeeds; but, a contingency could also mean a percentage of the total recovery awarded to Mr. Middlebrooks, regardless of the invested time.  As we would not compare the lodestar to a percentage fee in this context and Founder Console swears the lawyers kept regular time records and the firm generates approximately $500,000 annually in hourly billings, we presume Console Mattiacci's use of the term "straight contingency fee" means the lodestar awarded today – and it is not also asking Mr. Middlebrooks to pay a "straight contingency" on the total recovery.

As it being paid now became contingent on a recovery, Console Mattiacci assigned one of its partners, Caren Gurmankin, Esquire, to be principally responsible for representing Mr.

Middlebrooks in May 2016.[8]  Attorney Gurmankin, with approximately ten years' experience, billed at her normal hourly rate of $530.00.

Investing 486.3 hours, Attorney Gurmankin principally represented Mr. Middlebrooks from the May 2016 drafting and submitting rebuttal papers with the EEOC, through the filing of this case, drafting both the initial complaint[9] and a second amended complaint, defeating Teva's motion to dismiss, extensive discovery including reviewing over 2,200 documents, deposing seven of Teva's witnesses, attending depositions taken by Teva's counsel, preparing oppositions to Teva's summary judgment motion, preparing proposed voir dire and jury instructions, drafting oppositions to Teva's motions *in limine*, preparing trial exhibits, and, most recently, drafting the post-trial briefs including the motion for attorney's fees before us today.  In many instances, we have no idea what Attorney Gurmankin did in emails or internal conferences.  For example, she reports dozens of emails or communications with "OC" but no description of what she did or identifying "OC."  Although her time records do not help other than provide us with a progress of her efforts, it appears partner-level Attorney Gurmankin managed this case up to the day before trial and then after the verdict.

### *Console Mattiacci's billing for final pre-trial and trial work.*

In early August 2018, the Clerk of Court reassigned this case to our docket following Chief Judge Stengel's departure.  We scheduled a telephone status and trial scheduling conference for August 8, 2018.  The day before our scheduling call, Laura C. Mattiacci, Esquire, a senior Member of Console Mattiacci with sixteen years' experience, entered her appearance to represent Mr. Middlebrooks. She swears her normal hourly billing rate is $750.00.  We have no idea what Attorney Mattiacci knew about the case when she entered her appearance.  Console Mattiacci's business model manifest in this representation includes having one partner (Caren N. Gurmankin)

invest 486.3 hours at $530.00 an hour to do everything to get ready for trial and then another partner (Laura C. Mattiacci) billing $750.00 an hour to learn the case right before trial and then handle all aspects of the trial. It is unclear when Console Mattiacci decided its senior trial Attorney Laura Mattiacci would be lead trial counsel, including whether this strategy existed when Attorneys Toth and then Gurmankin invested their hours. Again, as we are unable to review a fee agreement, we do not know whether Mr. Middlebrooks agreed to this strategy. We have only Attorney Mattiacci's declaration explaining, in her role as her firm's lead trial counsel, she did not, as is her general practice, actively participate in discovery, depositions, and motion practice but communicated with Firm Founder Console and Attorney Gurmankin regarding the status of the case.[10]

At our initial August 8, 2018 trial conference, we discussed issues regarding the deposition of Teva witnesses located in Israel and set trial to begin on November 13, 2018. On September 25, 2018, Teva filed an emergency motion for leave to take the videotaped trial depositions of Teva witnesses in Israel. On Thursday, September 27, 2018, we held a conference with counsel regarding Teva's emergency motion. The same day, September 27, 2018, we ordered the parties to notice these videotaped trial depositions of the Israel witnesses no later than October 2, 2018.[11]

On October 2, 2018, Attorney Mattiacci began billing time at $750.00 an hour. She now swears investing 374.5 hours at $750.00 an hour beginning October 2, 2018 through trial and with limited time (2.8 hours) after trial to date. She moves for us to order Teva to pay her $750.00 an hour for 299 hours represented in forty entries for her services between October 2 and November 11, 2018 for time described only as "worked on trial prep." For example, on Friday, November 2, 2018, she billed 8 hours and then another 9 hours on the same day as "worked on trial prep." Facing our scrutiny, she now swears investing her time in reviewing documents[12]; preparing for

trial including an opening statement, closing argument, witness outlines and a trial deposition; research of evidentiary issues and jury instructions; and, trying the case for five days.

In mid-October 2018, a month before trial, Attorney Gurmankin needed to excuse herself from work.[13] Facing a trial in a month, Firm Founder Console assigned associate Kevin Console, Esquire, with five years' experience, to act as associate trial counsel.[14] Attorney Kevin Console billed time at his normal hourly rate of $340.00. Attorney Kevin Console worked on the case for four days in October 2018 until Attorney Gurmankin's unexpected early return to work and resumed her role as trial co-counsel.[15] Upon Attorney Gurmankin's earlier than expected return, Firm Founder Console reassigned Attorney Kevin Console from Mr. Middlebrooks's case to other cases. On November 12, 2018, the day before we started trial, Attorney Gurmankin faced another conflict preventing her from trying the case with Attorney Mattiacci.[16] Firm Founder Console again reassigned associate Attorney Kevin Console to serve as associate trial counsel.[17] Attorney Kevin Console swears he invested 93.1 hours at $340.00 an hour. He provides us with sixteen time entries, including 15.5 hours for trial on November 12 (the day before trial); 12.1 hours for trial on November 13 (first trial day); two entries of 10.5 hours for trial on November 14 (for a total of 21 hours billed on the second trial day); 17.2 hours for trial and detailed efforts on November 15 (third trial day); 12.2 hours for trial on November 16 (fourth trial day); and, 6.1 hours on November 19 (awaiting jury verdict).

We proceeded to trial with Attorney Mattiacci acting as lead trial counsel and Attorney Kevin Console as associate trial counsel. In September 2018, Console Mattiacci assigned Ortal Mendelawe as a law clerk to research issues on motions in limine and trial concerns. Out of law school the same number of years as Attorney Kevin Console (albeit in Israel), she invested 97

hours at $120 an hour. As a licensed attorney in Israel and now in New York, Console Mattiacci provided her research and drafting services at a significant discount.

### *Mr. Middlebrooks succeeds on retaliation claims but not discrimination claims.*

At trial, we granted Teva's Rule 50(a) Motion for judgment as a matter of law on Mr. Middlebrooks's hostile work environment claims finding he failed to adduce sufficient evidence of a severe or pervasive hostile work environment based on age or national origin from which a jury could reasonably find liability.[18]

Following trial, the jury returned a verdict in favor of Teva on Mr. Middlebrooks's claims of national origin and age discrimination but found in favor of Mr. Middlebrooks on his retaliation and retaliatory hostile work environment claims. The jury awarded Mr. Middlebrooks compensatory damages of $200,000; back pay of $332,000; front pay of $450,000; punitive damages of $5,000,000; and, for purposes of liquidated damages under ADEA, found Teva acted willfully in that it knew or showed reckless disregard for whether the law prohibits termination because of age or retaliation for complaining about age.[19]

Teva filed post-trial motions for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and for a new trial under Rule 59(a). We denied Teva's motions, but reduced the jury's $5 million punitive damages award to $300,000 based on Title VII's statutory cap.[20]

## II. Analysis

Mr. Middlebrooks now moves for attorney's fees and costs under the fee-shifting statutes at issue. He seeks reimbursement of attorney's fees in the amount of $639,778; a contingency fee enhancement of $319,889; costs of $51,723.89; and post-judgment interest.[21] Teva responds we should either eliminate or reduce attorney's fees to a reasonable rate and number of hours, eliminate or reduce fees and costs, and deny a contingency fee enhancement.[22]

Mr. Middlebrooks proceeded on three theories of liability. Each allow an award of a reasonable attorney's fee if successful. Under Title VII, "the court, in its discretion, may allow the prevailing party … a reasonable attorney's fee …."[23] Similarly, an award of attorney's fees is discretionary under the PHRA. Under the ADEA, which incorporates Section 216(b) of the Fair Labor Standards Act, the court "shall, in addition to any judgment awarded to the plaintiff …, allow a reasonable attorney's fee … and costs."[24]

In civil rights cases, we employ the "lodestar" formula to calculate attorney's fees by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate, which is presumed to be a reasonable fee.[25] Mr. Middlebrooks, as the party seeking attorney's fees, "has the burden to prove that [his] request … is reasonable" by "submit[ting] evidence supporting the hours worked and rates claimed."[26] "[T]he party opposing the fee award then has the burden to challenge, by affidavit or brief with sufficient specificity to give fee applicants notice, the reasonableness of the requested fee."[27] We have "a positive and affirmative function in the fee fixing process, not merely a passive role" and "[i]n calculating the hours reasonably expended, [we] should 'review the time charged, decide whether the hours set out were reasonably expended for each of particular purposes described and then exclude those that are 'excessive, redundant, or otherwise unnecessary.'"[28] In calculating the lodestar, we may not award less in fees than requested unless the opposing party makes specific objections to the fee request.[29]

Our discretion in awarding attorney's fees in fee-shifting statutes "includes the ability to deny a fee request altogether when, under the circumstances, the amount requested is 'outrageously excessive.'"[30] Time entries must "be specific enough to allow the district court to determine if the hours claims are unreasonable for the work performed."[31] Our Court of Appeals defines the requisite degree of specificity required of a party seeking attorney's fees as "some fairly definite

information as to the hours devoted to various general activities, e.g., pretrial discovery, settlement negotiations, and the hours spent by various classes of attorneys, e.g., senior partners, junior partners, associates. However, it is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney."[32]

Time entries such as "miscellaneous research, telephone conversations, and conferences concerning facts, evidence, and witnesses" are sufficiently specific.[33] Our Court of Appeals found entries such as "att[entio]n to papers" and "att[entio]n to status" without indicating "what 'papers' or 'status'" to which the attorney attended, and entries such as "e-mails," "conference call," "correspondence" and "review papers" are insufficient to determine if the hours claimed are unreasonable for the work performed.[34]

We are permitted to award time for block billing – "the practice of recording multiple tasks in one, non-itemized entry" – "so long as 'there is a reasonable correlation between the various activities listed in the block and the time spent completing those tasks.'"[35]

### A. We reduce Console Mattiacci's requested 1,130.4 hours for contingency work.[36]

Firm Founder Console swears his law firm represented Mr. Middlebrooks on a straight contingency fee arrangement beginning in March 2016. The contingent fee arrangement is neither provided nor described to us. From November 2015 through January 27, 2019, Mr. Console swears his firm invested 1,130.40 hours of work.[37] We reduce the requested 1,130.4 hours to 983.33 hours.

While the submitted time records for the Console Mattiacci attorneys do not offer much description, the declarations in support of today's fee request provide slightly more detail:

- 51.4 hours by Firm Founder Console for overseeing the case through litigation including attending a settlement conference; formulating a settlement demand; reviewing correspondence and filings; attending jury selection; and formulating strategy with Attorneys Gurmankin, Mattiacci, and Kevin Console;[38]

- 486.3 hours by Attorney Gurmankin from May 2016 through post-trial motions. Her time includes taking the deposition of seven witnesses; defending the depositions of Mr. Middlebrooks and another witness, and attending three other depositions taken by Teva; reviewing over 4,300 pages of documents produced by Teva and over 2,200 documents produced by Mr. Middlebrooks; and successfully defeating Teva's Motion for summary judgment;[39]

- 374.5 hours by Attorney Mattiacci as lead trial counsel, almost all of which occurred between October through December 2018, including creating trial strategy; preparing direct and cross-examination of witnesses; analyzing trial exhibits; preparing opening and closing arguments; working on final preparations for trial; handling evidentiary issues at trial; and trying the case to a successful verdict;[40]

- 93.1 hours by Attorney Kevin Console in October and November 2018 including legal research on evidentiary issues and jury instructions; reviewing and summarizing deposition transcripts; reviewing and assisting in organizing trial exhibits; participating in strategy meetings; and helping prepare examinations of witnesses;[41]

- 28.1 hours by Attorney Toth, formerly of the firm; Firm Founder Console swears Attorney Toth acted as the primary attorney from November 2015 through May 2016 when she left the firm;[42] and,

- 97 hours by Ortal Mendelawe, a law clerk who assisted in research and drafting motions *in limine* and responses to motions *in limine* and performed legal research.[43]

Mr. Middlebrooks argues he is entitled to a fully compensated attorney's fee award because Console Mattiacci vindicated his statutorily protected rights against unlawful discrimination and retaliation by Teva, taking the case to trial in a difficult, hard-fought litigation. Console Mattiacci contends, with the exception of the four-month period it represented Mr. Middlebrooks on an hourly basis, it took Mr. Middlebrooks's case on a contingent basis making the commitment to take his case to trial "when likely few firms would or could." Mr. Middlebrooks's Motion is supported by Firm Founder Console's declaration, as well as the declarations of trial counsel Laura Mattiacci, Caren Gurmankin, Kevin Console, and the declarations of six employment attorneys in the Philadelphia area.

Mr. Middlebrooks argues Console Mattiacci worked a reasonable number of hours necessary to obtain the "resounding victory" and his attorneys "did what was necessary to win this case" and he should be fully compensated for the firm's efforts to "secure an excellent result" in this civil rights litigation. Ms. Mattiacci swears prevailing at trial "presented particular challenges" including the number of documents; number of witnesses; multiple adverse actions at issue; "many levels of cover-up employed by [Teva] to hide the discriminatory and retaliatory animus at play;" and the vigorous defense mounted by Teva, a "large and sophisticated employer," from the outset of the case.[44]

Teva objects to the hours worked as excessive and including redundant and unnecessary time. It asks we reduce the number of compensable hours. Teva claims the time records lack specificity, and Mr. Middlebrooks failed to meet his burden of showing the hours expended on the case are reasonable.

### 1. We discount "work on trial prep" entries of Attorney Mattiacci by one-third as lacking a basis to find reasonableness.

Teva objects to 299 hours billed by Attorney Mattiacci from October 2 through November 12, 2018 totaling $224,250.00 for unspecified work described only as "Work on trial prep."[45] On Friday, November 2, 2018, she billed 8 hours and then another 9 hours on the same day as "worked on trial prep." Teva objects these "Work on trial prep" entries are identical, vague, and provide only a general description without any detail sufficient to evaluate the reasonableness of Attorney Mattiacci's time entries. Although conceding Attorney Mattiacci's declaration provides some examples of her work, she provides no detail regarding how much time she spent on those tasks and includes tasks more junior attorneys or law clerks could have performed such as digesting depositions, reviewing and organizing documents, and conducting legal research. For these same

reasons, Teva objects to hours billed by Attorney Kevin Console attributed to "trial prep." For example, Attorney Kevin Console billed 10.5 hours in trial prep twice on the same day.

Teva objects to excessive and duplicative time Attorney Mattiacci billed to "work on trial prep," arguing it should not have taken 299 "hours of a highly experienced trial attorney's time" to prepare for trial. Teva argues we can conclude Attorney Mattiacci spent excessive and duplicative time learning about the case and reviewing documents Attorney Gurmankin had already become familiar. Teva argues we should take these excessive and duplicative efforts into consideration in reducing Attorneys Mattiacci's and Kevin Console's trial prep time, asking we reduce by half Attorney Mattiacci's time, if not eliminate it, and eliminate Attorney Kevin Console's time in its entirety because of his late substitution in the case to cover for Attorney Gurmankin.

On balance, relying upon the sworn declarations, we reduce Attorneys Mattiacci's time described as "worked on trial prep" by one-third. We cannot approve payment of legal fees for hundreds of hours in forty days for "work on trial prep" without some type of description in the contemporaneous time records. We know of no client who would agree to pay out of pocket for hundreds of hours of "worked on trial prep" with no description. Absent a fee agreement, we cannot find Mr. Middlebrooks approved of this billing entry. Console Mattiacci does not explain these entries. If it seeks attorney fees under federal law, it must provide appropriate billing. This is not a personal injury contingency matter where the time entries may not matter. We will not approve this billing strategy in a fee shifting case where we must decide the reasonableness of time.

We recognize Attorney Mattiacci prepared for trial. She needed to review substantial discovery and prepare for trial. She describes these efforts in a declaration filed with the motion

for fees. Declarations filed ten weeks later now attempt to recast their contemporaneous time entries. Attorneys Mattiacci and Kevin Console did not prepare their declarations. Attorney Gurmankin billed over ten hours for preparing these declarations in the week before filing motion for fees. We wonder how Attorney Gurmankin could know what the other attorneys did on certain dates. She did not. Instead, the declarations summarize activities. These summaries are not enough to justify a complete reward when not tied to entries. Console Mattiacci does not try to explain the double billing by Attorney Mattiacci on November 2 and Attorney Kevin Console on November 13. This double billing is evidence of inadequate training in billing practices. Mistakes happen in contemporaneous billing records, but we expect attorneys review bills before they send them to clients or file them in federal court. These experienced attorneys presumably read the declarations before they signed them, and Attorneys Mattiacci and Attorney Kevin Console (to a lesser extent) somehow thought they could bill hundreds of hours without describing what they did.[46] We cannot grasp how they could come to this conclusion unless it is borne of a belief a federal judge will rubber stamp their lodestar simply because their demonstrated trial skills allow them to present compelling facts (which they did not create) in a manner understandable to our properly-skeptical jury.

Our criticism of billing for this unreasonable time before trial does not affect our view of their trial work. We witnessed the fruits of the hard work by Attorneys Mattiacci and Kevin Console at trial. They persuaded the jury to find retaliation after finding no age or national origin discrimination. We heard evidence Teva fought an earlier lawsuit brought by at least one witness, Ellen Cicak, based on discrimination and hostile work environment. This earlier challenge offered the jury an insight into Teva's knowledge of the ongoing conduct.[47] Console Mattiacci persuaded a jury to award $5,000,000 in punitive damages for retaliation. They succeeded under any

measure on the retaliation claims. We know the amount of work necessary for trial counsel to prepare for trial. But we also expect experienced counsel knows they need to properly account for their efforts if they wish to be paid.

###    2.    We discount entries for communications and telephone conferences without identifying the subject matter.

Teva objects to insufficient descriptions of email communications and telephone conferences lacking reference to the subject matter concerned. Teva objects to the majority of Attorney Gurmankin's entries consisting of reviewing and sending various email correspondence for which no topic is specified. Without a description of the subject matter of these communications, Teva argues we cannot assess the reasonableness of the work performed including whether a junior attorney could have performed the tasks or even if the tasks relate to Mr. Middlebrooks's case. Teva asks we either strike all time entries for email communications and telephone conferences with no subject or, at a minimum, substantially reduce the time because of insufficient description for all attorneys.

Console Mattiacci again bills time without giving us the ability to find their work effort is reasonable. Most of the emails and internal conferences have no subject. Many reference "OC" and do not identify "OC." With some fair inference, we presume Attorney Gurmankin is referring to "opposing counsel." We presume Teva would know the subject of communications with it and do not strike this time. But we have no basis for several others.

We will not include time on internal communications with no subject matter. We cannot find an email or internal conference is properly billed to this case when the billing professional does not take the time to describe the subject matter. And we cannot simply find the firm does not describe the subject matter; to the contrary, Firm Founder Console knows how to do it once in a while. On November 28, 2018, he billed .7 hours for "E-mails to/from attorneys regarding

affidavits" and on November 20, 2018, he billed .4 hours for "Internal conference with Kevin C. Console, Esquire regarding punitive damages."

We do not doubt the attorneys performed services. But we cannot find the time billed is entirely reasonable without a description or a context from the other daily entries. For example, we can fairly conclude Firm Founder Console's communications with his co-counsel during trial focused on the trial and we will not deduct those hours. We also will not deduct time billed to communications with the client as the disclosure of subject matter may risk waiver of the privilege. We will not require Teva to pay for the time entries which do not include a description for an internal communication without a surrounding context to inform the subject matter:

| Date | Atty | Deducted Time | Description |
|------|------|---------------|-------------|
| 1/25/2019 | CNG | (.2) | Emails to/from LCM |
| 1/24/2019 | CNG | (.4) | Email to/from SGC; internal conference with SGC |
| 1/22/2019 | CNG | (.4) | Email to/from LCM; email to RAD |
| 1/15/2019 | CNG | (.4) | Email from/to LCM; internal conference with SGC |
| 12/23/2018 | CNG | (.4) | Email to SGC |
| 11/28/2018 | CNG | (.2) | Internal conference with SGC |
| 11/11/2018 | CNG | (.4) | Email to LCM; email to DS/OTM |
| 11/9/2018 | CNG | (.1) | Emails from/to LCM |
| 11/8/2019 | CNG | (.6) | Emails to/from LCM; ICs with LCM |
| 11/7/2018 | CNG | (.5) | Email to/from LCM; internal conference with SGC/LCM |
| 11/6/2018 | CNG | (.5) | Internal conference with LCM |
| 11/5/2018 | CNG | (.2) | Emails to/from LCM |

| 11/4/2018 | CNG | (.4) | Emails from/to LCM |
|---|---|---|---|
| 11/3/2018 | CNG | (.4) | Emails to LCM |
| 10/31/2018 | CNG | (.4) | Emails to/from LCM |
| 10/30/2018 | CNG | (.4) | Emails from/to LCM |
| 10/29/2018 | CNG | (1.0) | ICs with LCM/OTM; emails to/from LCM |
| 10/25/2018 | CNG | (1.0) | Internal conference with OTM; emails from LCM |
| 10/23/2018 | CNG | (.5) | Internal conference with LCM |
| 10/22/2018 | CNG | (.5) | Internal conference with SGC; email to/from LCM |
| 10/15/2018 | CNG | (.2) | Emails to LCM |
| 10/12/2018 | CNG | (.7) | Email to LCM; internal conference with LCM |
| 10/10/2018 | CNG | (.4) | Emails to/from LCM |
| 10/9/2018 | CNG | (.9) | Emails to/from LCM; internal conference with LCM |
| 10/8/2018 | CNG | (.4) | Emails to/from LCM |
| 10/7/2018 | CNG | (.2) | Email to LCM |
| 10/5/2018 | CNG | (.4) | Emails to/from LCM |
| 10/3/2018 | CNG | (.9) | Emails to/from LCM; internal conference with SGC |
| 10/2/2018 | CNG | (.1) | Email to LCM |
| 9/28/2018 | CNG | (.1) | Email to LCM |
| 9/27/2018 | CNG | (.3) | Telephone conference with LCM; email to LCM |
| 9/26/2018 | CNG | (.2) | Emails to/from LCM |
| 9/25/2018 | CNG | (.2) | Email from/to LCM |
| 9/24/2018 | CNG | (.3) | Telephone conference with SGC/LCM |
| 9/23/2018 | CNG | (.3) | Emails to/from LCM; email from SGC |

| | | | |
|---|---|---|---|
| 9/20/2018 | CNG | (.3) | Email to LCM; telephone conference with LCM; email to OTM |
| 9/18/2018 | CNG | (.2) | Email to/from SGC |
| 9/4/2018 | CNG | (1.0) | Email to SGC; internal conference with SGC |
| 8/17/2018 | CNG | (.5) | Email to/from SGC; internal conference with SGC |
| 8/6/2018 | CNG | (.6) | Email to/from LCM; internal conference with SGC |
| 8/3/2018 | CNG | (.2) | Email to SGC |
| 6/5/2018 | CNG | (.4) | Internal conference with SGC |
| 6/4/2018 | CNG | (.2) | Internal conference with SGC |
| 6/3/2018 | CNG | (.3) | Email to SGC; telephone conference with SGC |
| 6/1/2018 | CNG | (.2) | Ems to SGC; draft email to SGC |
| 5/31/2018 | CNG | (.2) | Email to SGC |
| 12/11/2017 | CNG | (.2) | Internal conference with SGC |
| 9/29/2017 | CNG | (.1) | Internal conference with SGC |
| 9/27/2017 | CNG | (.2) | Internal conference with SGC |
| 9/11/2017 | CNG | (.2) | Email to/from SGC |
| 8/29/2017 | CNG | (.3) | Internal conferences with SGC |
| 8/28/2017 | CNG | (.1) | Email to SGC |
| 4/3/2017 | CNG | (.5) | Emails to SGC; Internal conferences with SGC |
| 2/7/2017 | CNG | (.1) | Email from SGC |
| 2/6/2017 | CNG | (.1) | Email to SGC |
| 12/9/2016 | CNG | (.2) | Email to/from SGC |
| 12/4/2016 | CNG | (.1) | Emails from/to SGC |
| 12/1/2016 | CNG | (.1) | Email to SGC |

| 1/17/2019 | KC | (.2) | Emails to/from CNG |
|---|---|---|---|
| 12/31/2018 | KC | (.2) | Telephone conference with CNG |
| 10/16/2018 | KC | (.2) | Emails to/from LCM and SGC |
| 12/3/2015 | MST | (.2) | Email to Stephen Console, Esquire |
| 12/1/2015 | MST | (.2) | Internal conference with Stephen G. Console, Esquire |
| 12/28/2018 | SGC | (.4) | Texts to/from Laura C. Mattiacci, Esquire; e-mails to/from Caren N. Gurmankin, Esquire |
| 12/12/2018 | SGC | (.6) | Telephone conference with Laura C. Mattiacci, Esquire; telephone conference with Laura C. Mattiacci, Esquire and Caren N. Gurmankin, Esquire |
| 11/6/2018 | SGC | (.8) | Internal conference with Laura C. Mattiacci, Esquire |
| 10/30/2018 | SGC | (.8) | E-mails to/from attorneys |
| 10/29/2018 | SGC | (.2) | Telephone conference with Laura C. Mattiacci, Esquire |
| 10/17/2018 | SGC | (1) | Internal conference with Kevin C. Console, Esquire; telephone conference with Laura C. Mattiacci, Esquire |
| 10/9/2018 | SGC | (.4) | E-mails to/from attorneys |
| 10/4/2018 | SGC | (.5) | Meeting with attorneys; internal conference with Laura C. Mattiacci, Esquire |
| 10/3/2018 | SGC | (1) | Internal conference with Caren N. Gurmankin, Esquire |
| 10/1/2018 | SGC | (.4) | E-mails to/from attorneys |
| 9/24/2018 | SGC | (.7) | Review e-mails; telephone conference with Caren N. Gurmankin, Esquire; telephone conference with Caren N. Gurmankin, Esquire and Laura C. Mattiacci, Esquire |
| 9/18/2018 | SGC | (.3) | E-mail to/from Caren N. Gurmankin, Esquire |
| 9/6/2018 | SGC | (.2) | Internal conference with Caren N. Gurmankin, Esquire |
| 9/4/2018 | SGC | (.4) | Email from Caren N. Gurmankin, Esquire; internal conference with Caren N. Gurmankin, Esquire |
| 8/17/2018 | SGC | (.4) | Internal conference with Caren N. Gurmankin, Esquire |
| 8/8/2018 | SGC | (.3) | Internal conference with Caren N. Gurmankin, Esquire |

| | | | |
|---|---|---|---|
| 8/6/2018 | SGC | (.2) | Internal conference with Caren N. Gurmankin, Esquire |
| 6/6/2018 | SGC | (.2) | E-mails to/from Caren N. Gurmankin, Esquire |
| 6/4/2018 | SGC | (.2) | Internal conference with Caren N. Gurmankin, Esquire |
| 6/3/2018 | SGC | (.5) | Review e-mail; telephone conference with Caren N. Gurmankin, Esquire |
| 6/1/2018 | SGC | (.5) | E-mail to/from Caren N. Gurmankin, Esquire |
| 3/6/2018 | SGC | (.2) | Internal conference with Caren N. Gurmankin, Esquire |
| 1/19/2018 | SGC | (1.8) | Telephone conference with Laura C. Mattiacci, Esquire (11/18); internal conference with Caren N. Gurmankin, Esquire |
| 9/11/2017 | SGC | (.4) | E-mails to/from Caren N. Gurmankin, Esquire |
| 8/29/2017 | SGC | (.3) | Internal conference with Caren N. Gurmankin, Esquire; review e-mails |
| 6/29/2017 | SGC | (.3) | E-mails to/from Caren N. Gurmankin, Esquire |
| 4/3/2017 | SGC | (.2) | E-mail from Caren N. Gurmankin, Esquire; internal conference with Caren N. Gurmankin, Esquire |
| 11/30/2016 | SGC | (.1) | Telephone conference with Caren N. Gurmankin, Esquire |
| 3/16/2016 | SGC | (.2) | E-mails to/from M. Susan Toth, Esquire |
| 3/11/2016 | SGC | (.2) | E-mails from/to M. Susan Toth, Esquire |
| 3/1/2016 | SGC | (.5) | Internal conference with M. Susan Toth, Esquire |
| 2/29/2016 | SGC | (.2) | Internal conference with M. Susan Toth, Esquire |
| 2/23/2016 | SGC | (.2) | E-mails to/from M. Susan Toth, Esquire |
| 2/17/2016 | SGC | (.1) | Internal conference with Nancy Glace, Legal Assistant |
| 1/22/2016 | SGC | (.5) | Internal conference with M. Susan Toth, Esquire |
| 1/5/2016 | SGC | (.2) | Internal conference with M. Susan Toth, Esquire |
| 12/18/2015 | SGC | (.2) | Internal conference with M. Susan Toth, Esquire |
| 12/16/2015 | SGC | (.2) | Internal conference with M. Susan Toth, Esquire |

| 12/1/2015 | SGC | (.2) | Internal conference with M. Susan Toth, Esquire |
| 11/9/2015 | SGC | (.1) | Internal conference with Nancy Glace, Legal Assistant; |

The failure to describe some form of subject to afford context for these internal communications requires we discount 16.1 hours from Firm Founder Console; 20.8 hours from Attorney Gurmankin; .4 hours from Attorney Toth; and, .6 hours from Attorney Kevin Console in addition to striking his double billing of 10.5 hours of time for one trial day.

### 3. We overrule Teva's objection to block-billed time entries with descriptions.

Teva objects to block-billed time entries because they do not show how much time the attorney spent on individual tasks, making it impossible to evaluate the reasonableness of time spent on each task. Teva objects to Ms. Gurmankin's time spent preparing for Mr. Aharoni's deposition on November 24 and November 26 through 30, 2017 totaling 26.5 hours as block-billed, and failing to break down the time spent on each task described in one billing entry. Teva argues Mr. Middlebrooks fails to carry his burden of showing reasonableness of his attorneys' block-billed time, and asks we eliminate or reduce block-billed entries.

We disagree if the block-billed time is tied to a specific subject, such as preparing for a deposition. We cannot second guess the amount of time specifically described in a bill. Each lawyer needs the time she needs to be ready. She has a professional obligation to be prepared. The challenged block-billing does not raise question of excessive or unnecessary billing. We overrule this objection.

### 4. We overrule Teva's remaining challenges.

Teva additionally argues internal conferencing time are excessive and unnecessary and should be eliminated entirely. Teva points to time billed by Firm Founder Console and Attorney

Toth for internal conferences and emails with legal assistant Nancy Glass on November 17, 2015; February 4, 2016; February 8, 2016; and February 17, 2016. Teva also seeks to eliminate Firm Founder Console's "numerous conferences and emails" with Attorneys Mattiacci and Gurmankin because they are partners in the Console Mattiacci firm and are "capable of handling matters on their own without consultation with Stephen Console."

Teva argues we should further reduce the attorney's fees where more than one attorney unnecessarily attended meetings and conferences, for example where both Attorney Gurmankin and Firm Founder Console participated in a client meetings and telephone conferences and conferences with the Court on December 12, 2016; September 29, 2017; June 3, 2018; and June 5, 2018. Teva asks we eliminate Firm Founder Console's time because Attorney Gurmankin acted as the primary attorney handling the matter.

Teva asks we eliminate Attorney Kevin Console's time waiting on jury deliberations on November 19, 2018 as unnecessary to have both him and Attorney Mattiacci present during deliberations. Teva asks we eliminate all time by Firm Founder Console as unnecessary after Attorney Toth left the firm in March 2016. Teva argues Firm Partner Attorney Gurmankin then accepted responsibility and later Attorney Mattiacci handled the trial, rendering Firm Founder Console's time unnecessary. Teva objects to Firm Founder Console's involvement after May 2016, arguing most of his time is attributed to internal conferences and emails which added nothing to the prosecution of the case and appears to be incurred solely for the purpose of keeping him aware of the case status.

Teva also objects to the time billed by Attorney Kevin Console who, after Attorney Gurmankin billed over 486 hours, "was then required to get up to speed" because of a conflict with Attorney Gurmankin's obligations. Teva also objects to recovery of time billed by Attorney Toth

(who left the firm) and law clerk Mendelawe because they did not file separate declarations even though Firm Founder Console describes their efforts in detail and their time is confirmed in contemporaneous billing records. In a note, Teva objects to .2 hours billed by a "DIG" on April 29, 2018 and June 1, 2018 claiming it is not aware of any "DIG" billing person.

We overrule each of these objections as stated. Mr. Middlebrooks retained Console Mattiacci as a law firm. Internal conferences, if properly described as to subject matter, are an important service in a law firm. We would expect our surgeons, engineers and contractors to consult with other professionals when necessary; we will not second guess our trial lawyers on important decisions. Mr. Middlebrooks has the right to the benefit of the experience of several skilled attorneys. He would not want to pay for Firm Founder Console to participate in the day-to-day but he should expect Firm Founder Console would have continuing input. Firm Founder Console has a duty to supervise cases where he signs the complaints and is counsel of record. While we today do not credit hours without a description of the services provided, we will not second guess trial counsel's strategy. We do not second guess Attorney Kevin Console's presence during jury deliberations; the jury may return with substantive questions and Mr. Middlebrooks is entitled to have the best thinking on these time-sensitive inquiries. We also do not discount the time described by Attorney Toth and law clerk Mendelawe just because they did not file a declaration. Firm Founder Console fully described their relatively minor roles in the case and their time records confirm their roles. We also do not find a "DIG" in billing records. We cannot discount time when we are not shown this challenged time entry of .2 by a "DIG."

Lawyers should be credited for their hard work, but they need to tell us what they did. When they do not, we cannot find the amount of billed time is reasonable. We appreciate giving credit for any time billed without specific description may encourage dishonest billing by

overinflating the time and hoping to be paid for half the time. This is a valid concern, but not today. We witnessed the effects of hard work in the courtroom. Console Mattiacci and firms with similar billing practices will be better served (and paid) when they properly account for their efforts.

### B. We set the reasonable hourly rate based on Community Legal Services' schedule slightly adjusted for 2019 and based on Teva's hourly rates.

Mr. Middlebrooks carries the burden to produce "satisfactory evidence in addition to the attorney's own affidavits that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."[48] A "reasonable hourly rate" is generally calculated according to the prevailing market rates in the relevant community and our starting point is the attorney's usual billing rate.[49] However, the attorney's usual billing rate is "not dispositive."[50] When determining the prevailing market rate, we are directed by our Court of Appeals to "assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."[51]

Mr. Middlebrooks contends the hourly rates for the Console Mattiacci attorneys and law clerk are reasonable, arguing (a) Console Mattiacci's hourly rates reflected in the billing entries in its lodestar calculation are the same as the regular rates charged for services in non-contingent cases in 2018; (b) Console Mattiacci's rates are in line with the prevailing market rates for attorneys of similar experience, skill, and reputation, citing the declarations of six employment law attorneys in the Philadelphia area; (c) we should consider Firm Founder Console's declaration, based on his over thirty years' experience in employment law, attesting to the firm's rates as within the prevailing market rate for similar work performed by attorneys of comparable skill and experience; (d) Console Mattiacci's usual and customary rates are consistent with rates charged

by Philadelphia-based defense firms according to the 2013 National Law Journal Survey of Billing Rates; and (e) Console Mattiacci's usual and customary rates have been approved in other litigations in this District, the United States District Court for the Middle District of Pennsylvania, and in arbitration.[52]

Teva responds Console Mattiacci's rates are unreasonable. Teva objects to hourly rates of the Console Mattiacci firm as well above the prevailing market rate in the community. Teva objects to hourly rates of $940.00 per hour for Mr. Stephen Console; $750.00 per hour for Ms. Mattiacci; $530.00 per hour for Ms. Gurmankin; $340.00 per hour for Attorneys Kevin Console and Toth; and $120.00 per hour for Ms. Mendelawe. Teva additionally argues Mr. Middlebrooks's references to recognitions and publications by Console Mattiacci's attorneys should "hold no sway" because Teva's attorneys have credentials "of equal rate" and they do not charge the rates of Console Mattiacci.

Teva argues the reasonable hourly rate is the prevailing market rate in the community and points to the fee schedule established by Community Legal Services, Inc.[53] Teva argues, at a minimum, we must reduce the Console Mattiacci rates – which as to Firm Founder Console and Attorney Mattiacci run between $240.00 to $300.00 over the Community Legal Services rates and as to Attorneys Gurmankin and Kevin Console at $100.00 over the Community Legal Services rates. Teva suggests a schedule within the Community Legal Services rates, arguing a rate of $650.00 per hour for Firm Founder Console; $480.00 per hour for Attorney Mattiacci; $360.00 per hour for Attorney Gurmankin; and $255.00 per hour for Attorney Kevin Console.[54]

Mr. Middlebrooks replies we should not apply the Community Legal Services rates. He concedes some courts in this District apply the Community Legal Services rates where attorneys seeking fees are associated with Community Legal Services or where limited evidence is

submitted, but argues we have a different situation here. Mr. Middlebrooks argues courts reject the Community Legal Services where (1) the rate does not reflect the prevailing rate at the time of the petition; (2) the attorneys are unaffiliated with Community Legal Services; (3) the parties submit sufficient evidence of the prevailing market rates; and (4) the Community Legal Services rates do not take into account any specialized skills or experience attorneys bring to their practice. Mr. Middlebrooks emphasizes the third and fourth reasons, suggesting Console Mattiacci submitted sufficient evidence of the prevailing market rates and the firm's specialized skill and experience militate against applying the Community Legal Services rates, citing *Mitchell v. City of Philadelphia.*[55] In *Mitchell*, the district court declined to apply the Community Legal Services rate, instead awarding attorney's fees at the hourly rate requested by plaintiff finding such rate reasonable in light of counsel's education, experience, and reputation.[56] The court explained the four-year-old Community Legal Services rate schedule does not reflect current rates; the matter did not involve a Community Legal Services affiliated attorney; counsel provided sufficient evidence of prevailing market rates; and, plaintiff's attorney possessed specialized skill and experience not recognized in the Community Legal Services rates.[57]

*Mitchell* is distinguishable. Console Mattiacci must show the reasonableness of its billed rates. Returning to Microeconomics 101 in setting a reasonable market price, we may look to what a willing client would pay a willing lawyer. But Console Mattiacci does not give us their fee agreement for their willing client Mr. Middlebrooks. While it claims its rates are reasonable can be based on what people in Philadelphia are willing to pay, they offer no evidence including from Mr. Middlebrooks. We have no idea what Mr. Middlebrooks thought to be a reasonable hourly rate. He paid approximately $376.00 an hour for 26.6 hours of services but then could not continue to pay at this rate. Given Firm Founder Console's sworn observation as to Mr. Middlebrooks's

inability to pay after March 2016 at this rate, we cannot find he would pay the rates sought today even though he earns over $200,000 a year. We also cannot find these hourly rates are reasonable because Console Mattiacci generated $500,000 in revenue based on hourly rates. We have no context for those fees, including where the lawyers provided those services. We cannot recklessly leap to a find a reasonable fee in this District today because some undefined fraction of Console Mattiacci's annual revenue is drawn from hourly rates paid by someone for some case in some venue.

Absent or possibly supplementing an agreement between the contracting parties, we may look to the marketplace where Console Mattiacci provided these services. We can examine reasonableness affidavits of experienced trial and employment attorneys describing the reasonable rates for these types of cases in this District. Console Mattiacci offers comparator affidavits from six experienced employment lawyers. In almost identically verbatim statements, they each declare the Console Mattiacci rates are within the range of fees charged in this District. Teva objects because these employment lawyers are motivated to raise the reasonable rate for all employment lawyers. We disagree with Teva's reasons; we will not so cynically find experienced lawyers in this District would cavalierly disregard their professional reputations to falsely swear so Console Mattiacci can be paid more fees. Our problem centers on the comparator affidavits failing to offer their hourly rates. They conclude as to a "range" of reasonableness but fail to offer evidence. The primary evidence is their hourly rates. We have no evidence of another employment lawyer charging these rates. We appreciate Console Mattiacci may tout being the best employment lawyers and deserve a premium; their comparator affiants do not so swear and we do not measure the reasonableness of fees based on the attorney's own newspaper clippings or say-so.

Looking for more support, Console Mattiacci cites its approved rates in other cases and compares its rates to those charged by the world's largest law firms. The offered rates in other cases are dated at best and approving those rates lacks a basis of reasonableness for employment or trial counsel in this District at this time. The rates obtained by Console Mattiacci in class actions or in uncontested fee requests do not define reasonableness today.[58]

We are not persuaded by published hourly rates charged in 2013 by large law firms. We are reviewing reasonableness in this District for skilled trial lawyers (as to Attorney Mattiacci) and skilled employment lawyers for the others. Average hourly rates at large law firms often include lawyers who avoid courtrooms and find well-paid comfort in boardrooms, administrative, and patent hearings. The large law firms must also account for significant overhead not present, at least to the same extent, at Console Mattiacci. In further examining those large firm rates, we should look to the average partner rates; there is no basis to simply jump to the highest billing rate in a large law firm and set this rate as reasonable. We have no idea who pays those rates and why. If we look to the average hourly rates, they range between $530.00 to $640.00 an hour in 2013. Assuming inflation in the past five or six years, these rates are still far below Console Mattiacci's requests for both Firm Founder Console and Attorney Mattiacci. If we applied an average partner hourly rate at Console Mattiacci based on the three partners in this case, we would set a reasonable hourly rate at $740.00. But no one asks us to do so and this simple equation would not fairly value the partners' impact on the case as most of the billed time is appropriately billed by Attorney Gurmankin. Even if we weighted the hourly rate based on the number of partners' total billed hours, we would reach an average partner hourly rate of $643.42. Again, no one asks us to reach this measure of reasonableness as Teva challenges the reasonableness of the underlying data of hourly rates billed by the three partners.

We are left without evidence of reasonableness of Console Mattiacci's hourly rates. But we have one limited exception: Teva paid its trial counsel $570.00 an hour and its associate trial counsel $400 an hour. Other than this data detailing what a willing client paid counsel for this case, we lack evidence of Mr. Middlebrooks's agreement as to the fee or comparator affidavits disclosing 2018-19 hourly rates from similarly experienced attorneys practicing in this District or either party asking we set a blended hourly rate for partners based on the billed hours.

Absent credible evidence of reasonableness, we may look to rates provided by Community Legal Services, whose fee schedule "has been approvingly cited the Third Circuit as being well developed and has been found by [the Eastern District of Pennsylvania] to be a fair reflection of the prevailing market rates in Philadelphia."[59] The Community Legal Services rate appears in this District on employment cases. For example, in *Jones v. Pa. State Police*, the district court considered a fee petition after a jury found in favor of plaintiff on her hostile work environment claim.[60] Plaintiff's attorney sought $750 per hour in attorney's fees. The court found plaintiff's counsel failed to satisfy his burden of showing the $750 hourly rate is reasonable by providing only his own declaration. The court applied a "dual hourly rate structure" for the attorney's trial and non-trial work, basing the hourly rate of trial work on the Community Legal Services rates.[61]

We apply the Community Legal Services hourly rates as evidence of the baseline for reasonableness in this District. Community Legal Services, like Console Mattiacci today, seek attorney's fees based on an hourly rate. Applying the high end of the range, those hourly rates in February 2017 are: $650.00 for Firm Founder Console; $510.00 for Attorney Mattiacci; $440.00 for Attorney Gurmankin; $340.00 for Attorney Toth; and $255.00 for Attorney Kevin Console. Community Legal Services does not include a rate for law clerks, but provides a rate of $180 to $200 for attorneys with less than two years' experience; $90 to $145 for law students; $115-$140

for paralegals I and II; and $140 to $165 for senior and supervisory paralegals. Mr. Middlebrooks requests reimbursement of Ms. Mendelawe's time at the Console Mattiacci firm's 2018 law clerk rate of $120 per hour.[62] The rate of $120 per hour sought for Ms. Mendelawe, who earned her law degree in Israel in 2013, an LL.M. from the University of Pennsylvania Law School in 2018, and is a member of the Bar of the State of New York, is well below the rate for attorneys with less than two years' experience, is within the rate for law students, and is reasonable.

We adopt these Community Legal Services rates with a ten dollar ($10) hourly increase to account for the 2019 billing with two exceptions: Attorney Mattiacci should be paid at the same $570.00 hourly rate as Teva's trial counsel as we know this is the market for trial counsel in this case and Attorney Kevin Console should be paid his requested $340.00 as Teva paid its associate attorney more than this requested number.

After balancing these factors considering little evidence except the hourly rates paid by Teva and those set by Community Legal Services[63], we set the reasonable hourly rates for Console Mattiacci's approved hours in this case at: $660.00 for Firm Founder Console; $570.00 for Attorney Mattiacci; $410.00 for Attorney Gurmankin; $340.00 for Attorneys Toth and Kevin Console; and, $120.00 for Law Clerk Mendelawe.

### C.   We slightly discount the reasonable fees because Mr. Middlebrooks did not succeed on all seven interrelated claims at trial.

Teva next argues Mr. Middlebrooks's claims of "wild success" must be tempered by our dismissal of the age and national origin hostile work environment claims at the close of the evidence, the jury's finding in favor of Teva on the discrimination and hostile work environment claims based on national origin and age, and because we reduced the punitive damages award under the Title VII damages cap. Teva contends the discrimination claims are "distinct from" the successful retaliation claims and Console Mattiacci did separate work for each claim.

The Supreme Court holds the degree of success is "the most critical factor" in determining an appropriate attorney's fee award.[64] "This factor is particularly crucial where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief."[65]  In this situation, we are directed by the Supreme Court to ask two questions: "First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?"[66]

The Court recognized a plaintiff in one case "may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories" while, in another case, such as civil rights cases, "plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories.  Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims.  Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation."[67] The Court recognized where a plaintiff obtained "excellent results, his attorney should recover a fully compensatory fee," normally encompassing "all hours reasonably expended on the litigation" and, "[i]n these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in his lawsuit…. Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee.  The result is what matters."[68]  To that end, the Court held "[w]here the plaintiff has failed to prevail on a claim that is distinct in all respects from this successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee" but "[w]here

a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised."[69]

Teva asks we apply an "across the board reduction" of Console Mattiacci's fees of at least twenty-five percent to account for Mr. Middlebrooks's partial success, and suggests a reduction of fifty percent is appropriate based on Mr. Middlebrooks's success on his retaliation claims but not his discrimination claims. Teva likens Mr. Middlebrooks's unsuccessful discrimination claims to *Jodlowska v. Soar Corp.*, a 2015 decision from this District where the court reduced attorney's fees attributed to unsuccessful claims.[70] In *Jodlowska*, plaintiff brought claims under Title VII and the PHRA alleging a hostile work environment, race and gender discrimination, retaliation, and a claim for wrongful discharge under Pennsylvania law.[71] Claims of wrongful discharge under Pennsylvania law were dismissed at the summary judgment stage and, at trial, the court granted defendant's motion for judgment as a matter of law on plaintiff's claim of race discrimination; only claims of hostile work environment, gender discrimination, and retaliation went to the jury. The jury found in favor of plaintiff on the hostile work environment and retaliation claims and in favor of defendant on the gender discrimination claim.[72] The court disallowed time attributed to discovery on the unsuccessful race discrimination claim and applied a ten percent across-the-board reduction on the fees to account for the unsuccessful claims as "reasonable and appropriate taking into account the full measure of relief plaintiff ultimately obtained at trial."[73] Teva also relies on *Watcher v. Pottsville Area Emergency Med. Serv., Inc.*[74] In *Watcher*, the district court reduced the lodestar amount by fifty percent to account for plaintiff's "limited success" in proving age discrimination under ADEA and the PHRA but failing to prove sex discrimination under Title VII and the PHRA.[75]

Mr. Middlebrooks replies the jury awarded him all damages to which he is entitled on the retaliation and retaliatory hostile work environment claims and the result would not have changed even if the jury found in his favor on the age and national origin discrimination claims. Mr. Middlebrooks argues both discrimination and retaliation claims required him to demonstrate pretext, and we should look at the result. Citing *Hensley*, Mr. Middlebrooks argues "the result is what matters" and, here, he achieved excellent results. Mr. Middlebrooks also cites *McGuffey v. Brinks, Inc.* where our colleague Judge Brody found the employee's ADEA and PHRA claims of discrimination and retaliation dismissed on summary judgment "closely related" to plaintiff's successful retaliation claim.[76] Answering the first *Hensley* question, Judge Brody found the successful and unsuccessful claims "all involved similar legal theories under the ADEA and PHRA," the "hours expended researching those laws and arguing those theories normally were devoted generally to all ADEA and PHRA claims," and the claims "involved a common core of facts" because the defendant employer offered the same explanation for its challenged conduct.[77] Applying the second *Hensley* question, Judge Brody found plaintiff's success incomplete because the jury did not find defendant liable for age discrimination, but recognized the jury awarded plaintiff a $170,000 award on his retaliation claim.[78] To compensate for "limited success," Judge Brody applied a ten percent reduction to the lodestar.[79]

Applying the first of *Hensley's* two questions, we ask whether Mr. Middlebrooks's unsuccessful discrimination claims are "unrelated" to the successful retaliation claims. Teva argues the discrimination claims are distinct from the retaliation claims. We disagree. The claims are sufficiently related and involve a common core of facts. Although the jury did not find for Mr. Middlebrooks on his age and national origin discrimination claims, it found Teva retaliated against him for the complaints he made regarding discrimination based on age and national origin. Even

if the discrimination claims were not in the case, Mr. Middlebrooks had to develop at trial the factual context of his complaints to Teva regarding perceived age and national origin discrimination. Teva asserted an identical defense to both claims. From the time of summary judgment through trial, Teva asserted Mr. Middlebrooks's performance problems as the reason for his termination in defense of both the retaliation and discrimination claims. These factors lead to the conclusion the unsuccessful discrimination claims are related to the successful retaliation claims.

The second *Hensley* question asks whether Mr. Middlebrooks achieved a level of success making the hours reasonably expended a satisfactory basis for making a fee award. Here, the jury awarded damages to Mr. Middlebrooks on his retaliation claims. Mr. Middlebrooks did not succeed on every claim. Our verdict slip required responses to whether Teva discriminated separate from questions on whether Teva retaliated or created a retaliatory hostile work environment. With counsel's consent, we only offered one compensatory damages question should the jury find Teva discriminated and/or retaliated. No party asked for a separate damages question for each claim. We cannot speculate as to whether, had he succeeded on his national origin discrimination claim, a jury would have awarded him more damages. It certainly could have done so as the national origin discrimination occurred first; by definition, the retaliation occurred for complaints about national origin discrimination. The jury did not find Teva discriminated based on national origin. The jury instead found Teva retaliated and created a retaliatory hostile work environment. Mr. Middlebrooks is correct as most of his alleged compensatory harm is addressed by the jury verdict and the same effort would likely have been necessary even if he did not pursue the national origin discrimination claim. But if *Hensley* is to

have meaning, we must deduct some percentage of the requested hourly fees because Mr. Middlebrooks did not win every claim.

We find this is a relatively minor discount in this context given the interrelated proofs. In balancing these concerns, we deduct four percent (4%) from the reasonable fee to account for Mr. Middlebrooks not winning all his claims at trial.

**D.  We decline to award a contingency fee enhancement.**

Plaintiff seeks a contingency fee enhancement of $319,889, amounting to fifty percent of the claimed lodestar before our analysis.  Mr. Middlebrooks concedes a contingency fee enhancement on his federal claims is precluded under the Supreme Court's decision in *City of Burlington v. Dague*.[80]  Instead, he seeks a contingency fee enhancement on his successful PHRA claims under Pennsylvania Rule of Civil Procedure 1717.  Pennsylvania Rule of Civil Procedure 1717 provides: "In all cases where the court is authorized under applicable law to fix the amount of counsel fees it shall consider, among other things, the following factors: (1) the time and effort reasonably expended by the attorney in the litigation; (2) the quality of the services rendered; (3) the results achieved and benefits conferred upon the class or upon the public; (4) the magnitude, complexity and uniqueness of the litigation; and *(5) whether the receipt of a fee was contingent on success*."[81]

Mr. Middlebrooks relies primarily on two cases to support his argument we should apply a contingency fee enhancement; the decision of our Court of Appeals in *Polselli v. Nationwide Mut. Fire Ins. Co.*[82] and the New Jersey Supreme Court's decision in *Rendine v. Pantzer*.[83]

In *Polselli*, plaintiff prevailed against her insurer on a claim under Pennsylvania's bad faith statute.  The district court awarded an enhancement to the lodestar upon finding plaintiff's counsel faced "a substantial risk of a minimal recovery and [an] extensive number of hours risked … with

no guarantee of renumeration," increasing the lodestar amount by sixty percent.[84]  On appeal, our Court of Appeals addressed "whether, and under what circumstances, a court may enhance a fee under Pennsylvania law to reflect the contingent risk of nonpayment assumed by the plaintiff's attorney in accepting the case on a contingent-fee basis."[85]  With no precedent from the Pennsylvania courts, our Court of Appeals predicted the Pennsylvania Supreme Court "would permit a trial court to enhance the lodestar amount to account for a particular case's contingent risk only to the extent that those factors creating the risk are not already taken into account when calculating the lodestar amount."[86]

The court additionally predicted the Pennsylvania Supreme Court "would conclude that a contingency enhancement would not apply in every case" and would allow an enhancement to the lodestar "to account for a particular case's contingent risk only to the extent that those factors creating the risk are not already taken into account when calculating the lodestar amount."[87] The Court of Appeals directed we "exercise caution" in considering an enhancement "so as not to skew the calculation of a reasonable rate by double counting" for example, "if the complexity of a case is reflected in the high number of hours researching the complex issues or in the relatively high regular hourly rate of the attorney, complexity does not justify a contingency enhancement."[88]  We are also directed to consider "whether the attorney was able to mitigate the risk of nonpayment" for example, an attorney who enters into a contingency fee agreement "has significantly mitigated the continued risk" because the attorney "obtains the prospect of compensation under the agreement substantially in excess of the lodestar amount."[89]  We are also cautioned we "must not … deviate from [our] ultimate responsibility – the calculation of a 'reasonable' fee."[90]  To the extent factors creating a contingent risk in a particular case are mitigated or already taken into

account when calculating the lodestar amount, a contingency enhancement is not reasonable and should not be awarded.[91]

After *Polselli*, the Pennsylvania Superior Court "embraced the reasoning" of *Polselli* holding a "contingency enhancement on top of the lodestar is appropriate only if the lodestar does not reflect counsel's contingent risk."[92] Courts should analyze multiple factors in considering whether to apply a contingency enhancement. These factors include, but are not limited to, the degree of success, the deterrent effect of the verdict, the potential public benefit, and the potential inadequacy of a private fee agreement, whether an award would promote the purposes of the statute at issue, the relationship between the damages sought and those recovered. Further, in a contingent-fee agreement, a court may consider the contingency in determining the enhanced amount but the agreement cannot create an "artificial ceiling based on the percentage agreed upon between attorney and client."[93]

In *Rendine*, cited in *Polselli*, the New Jersey Supreme Court permitted a contingency enhancement to prevailing parties under the New Jersey Law Against Discrimination. The New Jersey Supreme Court reasoned "a counsel fee awarded under a fee-shifting statute cannot be 'reasonable' unless the lodestar, calculated as if the attorney's compensation were guaranteed irrespective of result, is adjusted to reflect the actual risk that the attorney will not receive payment if the suit does not succeed."[94] The New Jersey Supreme Court held contingency enhancements in fee-shifting cases "ordinarily should range" between five and fifty-five percent of the lodestar fee, with the enhancement in "typical contingency cases ranging" between twenty and thirty-five percent of the lodestar. *Rendine* pertained solely to claims under New Jersey statutory law.

Mr. Middlebrooks additionally relies on *Barker v. Hostetter* to support his claim for a contingency fee enhancement.[95] In *Barker*, the court awarded a contingency fee enhancement on

a Pennsylvania Unfair Trade Practices and Consumer Protection Law claim, applying Pennsylvania Rule 1717 and finding plaintiffs' counsel entitled to be fairly compensated for the risk in undertaking the matter on a contingent fee basis; investment of considerable time and expense in case; the complexity of the case; and the achievement of substantial benefits for clients that may not have been able to vindicate rights absent counsel's willingness to take the case on a contingent basis.[96]

Mr. Middlebrooks does not provide us, and we could not find, authority from a Pennsylvania court or Pennsylvania district court or our Court of Appeals applying a contingency fee enhancement to a PHRA claim. Only one case appears to address the issue, *Stewart v. Weis Markets, Inc.*, a 1995 decision from the United States District Court for the Middle District of Pennsylvania.[97] In *Stewart*, plaintiff alleged employment discrimination in violation of Title VII and the PHRA. After a finding in plaintiff's favor, the court found plaintiff entitled to recover counsel feels under Title VII and the PHRA and considered plaintiff's counsel's request for a contingency multiplier. The court concluded the Supreme Court's decision in *Dague* precluded a contingent fee enhancement on her Title VII claims, but questioned whether such an award is available under the PHRA.[98] Recognizing an award of fees is authorized by the PHRA, the court found "[s]cant authority exists, however, on how such an award is to be calculated and what may be included" finding "no authority from the Pennsylvania courts either condoning or disapproving the use of a contingent fee multiplier."[99] Absent guidance from the Pennsylvania courts, the district court "look[ed] to the general premise that Title VII and the PHRA serve the same purpose, and are, if reasonable, to be construed *in pari materia*. In light of that, we conclude that if this issue were to come before it, the Pennsylvania Supreme Court would conclude for much the same

reasons as were stated by the United States Supreme Court in [*Dague*], that use of a multiplier is not appropriate in this context."[100]

Relying on *Polselli, Rendine*, and *Barker*, Mr. Middlebrooks argues Pennsylvania Rule of Civil Procedure 1717 "dictates" a contingency fee enhancement should be awarded on his successful PHRA claim. Mr. Console swears Mr. Middlebrooks would not have been able to litigate this case with counsel if he had to pay fees as accrued through litigation, and if Mr. Middlebrooks did not succeed in the litigation, the Console Mattiacci firm would not have earned any fee.

Teva argues Mr. Middlebrooks is not entitled to a fee award on his PHRA claim in the first place because there is no presumption of fees under the PHRA; the Pennsylvania Supreme Court would not apply a contingency fee enhancement under the PHRA; and even if such an enhancement applied, it is not appropriate here. Teva argues *Polselli* is distinguishable because its holding is limited only to bad faith claims under Pennsylvania's bad faith statute and in determining whether to award a contingency fee enhancement, we should consider an attorney's ability to mitigate the risk of non-payment through a contingency fee agreement. Teva argues the Console Mattiacci firm mitigated its risk of non-payment through a contingency fee agreement; Mr. Middlebrooks's salary made the risk of non-payment minimal; and the recovery obtained in the litigation (although reduced on the punitive damages claim) mitigates the contingent risk in light of the prospect of compensation under the agreement substantially in excess of the lodestar amount.

We decline to award a contingency fee enhancement. We have no contingent fee agreement to determine which part of the lodestar figure is attributable to the PHRA claims. We do not know the percentage the Console Mattiacci firm is recovering on the total award and, consequently,

cannot determine whether the lodestar plus a contingency fee enhancement, even if awarded, is more or less than the fee the firm is entitled under a contingent fee agreement, a factor in determining whether to award an enhancement. We also cannot find, and Console Mattiacci does not provide us, with case authority applying a contingency fee enhancement to a PHRA claim. The sentinel case, *Polselli*, applies a contingency fee enhancement to a Pennsylvania statutory bad faith insurance claim and *Barker* applied an enhancement under Pennsylvania's Unfair Trade Practices and Consumer Protection Law. We find pervasive the reasoning of *Stewart v. Weis Markets, Inc.* and similarly decline to apply a contingency fee enhancement to a PHRA claim.

### D. We award reasonable costs.

Mr. Middlebrooks seeks costs as mandatory under ADEA and as the prevailing party he is entitled to reimbursement of his reasonable and appropriate costs of $51,723.90 through December 28, 2018. "Successful civil rights litigants are entitled to reimbursement of 'costs' connected with litigating their claim as long as the costs are reasonably and necessarily incurred."[101] Costs such as travel and parking expenses are recoverable in civil rights cases so long as they are reasonable and necessary to the litigation.[102] The cost of meals may be reimbursed if supported by adequate documentation and are reasonable.[103]

Teva appears to concede Mr. Middlebrooks is entitled to costs, but argues the costs must be reduced (1) because they are excessive and include non-reimbursable items; and (2) to account for Mr. Middlebrooks's partial success in correlation to the corresponding reduction in attorney's fees. Teva specifically objects to attorneys' travel expenses of $1,634; meals and drinks of $675; and courier fees of $140 as part of counsel's out-of-pocket and "overhead" costs not recoverable. Even if recoverable, Teva objects as unreasonable to Attorney Mattiacci's Black Cab rides for travel to and from the court house during trial at $69 each way; a charge of almost $400 for

transportation to and from the court house for paralegal Dan Shanks; and $320 in meals and drinks during trial as well as for other meals for the trial team and client; and use of an express courier service where regular mail would have been sufficient. We disagree with Teva on the travel to/from the courthouse for trial, courier fees and travel expenses. We agree with Teva on the charges for meals on non-trial days of April 4, November 3, 6, 8 and 20, 2018 and deduct $278.16 from the billed costs. We agree with Judge Bartle in *Blagrave*, "[t]here is simply no reason that a client or the defendant should be forced to reimburse attorneys for the costs of an ordinary, workday lunch when the attorneys could have had to purchase those lunches in any event."[104]  In *Becker*, our colleague Judge Robreno excluded meal expenses as undocumented and, even if documented with receipts, "expresse[d] reservations as to whether it is proper to charge the defendant for lunch and dinner costs, which are incurred during a trial by counsel from the local area."[105]

Teva also objects to paying costs relating to the video deposition of Nir Aharoni totaling $10,310 as excessive, arguing counsel "could have travelled to Israel for his deposition" and conducted the deposition in person for less than the cost claimed, particularly when compared to the deposition cost of witness Ilanit Shtrouchler whose video deposition cost $2,808. Teva asks we cut the cost of Mr. Aharoni's video deposition by fifty percent. Mr. Middlebrooks responds Mr. Aharoni's deposition occurred over a two-day period totaling 286 pages as compared to the single day deposition of Ms. Shtrouchler totaling 155 pages.[106]  On September 27, 2018, we granted Teva's emergency motion to allow it to preserve trial testimony of witnesses in Israel but ordered the parties to equally share the reasonable costs for the court reporter, videographer, and translation services.[107]  Both parties decided to remain in Pennsylvania and remotely depose the

witnesses. These are reasonable costs. Teva must now pay Mr. Middlebrooks's share of the costs for the court reporter, videographer and translation service.

Teva objects to a double charge for a process server for a subpoena served on Dr. Gary Best, arguing one fee should be eliminated. Mr. Middlebrooks responds the charges reflect a first attempted service on Dr. Best believed to be located in New Jersey, and a second attempt, and re-service, upon Dr. Best when Mr. Middlebrooks learned Dr. Best moved to Florida. Mr. Middlebrooks introduced the video deposition of Dr. Best at trial. This is a reasonable out-of-pocket cost.

Teva also argues other services should be "clarified before they are ordered to be paid," specifically $5,500 for information technology support during trial; an agreement to equally share in the cost of information technology and audio-visual services at trial for which Teva has not received an invoice; and fees paid to the court reporter for transcripts. Mr. Middlebrooks responds the payment to the court reporter is in addition to the initial $5,000 retainer, referring to his itemized costs.[108] As for the costs of information technology support, Mr. Middlebrooks concedes he has not yet sent an invoice to Teva for half the amount, but he is entitled to full reimbursement of the cost under ADEA. We agree.

Teva lastly argues we should apply the same reduction warranted under *Hensley* to the reasonable costs for lack of a complete victory. We disagree. Unlike attorney's fees, we lack any credible basis to discount out-of-pocket expenses simply because the jury did not return a verdict in Mr. Middlebrooks's favor for age and national origin discrimination.

###   III.     Conclusion

Console Mattiacci persuaded the jury to vindicate Mr. Middlebrooks's federal rights as a Teva senior employee. It won significant damages against a well-funded and motivated employer

in a hard-fought litigation. It met its obligations as a private attorney general in enforcing federal rights in the workplace. Under Congress's mandate, Mr. Middlebrooks is entitled to recovery of his reasonable attorney's fees and costs. After carefully parsing through a thicket of billing records which do not offer a model of time recording for attorneys, we can find a reasonable number of hours based on adequate descriptions of services at a reasonable hourly rate in this District today. In the accompanying Order, we grant Mr. Middlebrooks's motion in part and award him reasonable attorney's fees of $403,947.27 and reasonable costs of $51,445.73.

---

[1] We provide a thorough recitation of the background in our February 4, 2019 Memorandum addressing the parties' post-trial motions. *See* ECF Doc. No. 154.

[2] Teva Pharmaceuticals Industries, Limited and Teva Pharmaceuticals USA, Inc. (collectively "Teva"). At trial, Teva agreed to be treated as one entity for purposes of satisfying a judgment.

[3] Console Mattiacci does not offer a chronology of services leaving us guessing as to a timeline of representation.

[4] We expect Console Mattiacci describes its hourly rates as a material term of its undisclosed retainer agreement. As it failed to produce this agreement, we cannot find Mr. Middlebrooks agreed to any hourly rate as being reasonable.

[5] S. Console Decl. at ¶ 29 (ECF Doc. No. 153-3).

[6] *Id.*

[7] *Id.*

[8] Firm Founder Console swears Attorney Gurmankin is the primary attorney working on the case from May 2016 through litigation and pre-trial preparations. S. Console Decl. at ¶ 19 (ECF Doc. No. 153-3).

[9] On November 1, 2016, the EEOC issued a dismissal and Notice of Rights for both charges of discrimination. After exhausting the administrative remedies, Firm Founder Console and Attorney Gurmankin signed the complaint in this Court on January 30, 2017. Mr. Middlebrooks sued under Title VII, 42 U.S.C. §2000e, *et seq.,* the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.,* and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et seq.*

[10] L. Mattiacci Decl. at ¶ 12 (ECF Doc. No. 153-3).

[11] ECF Doc. No 68.

[12] L. Mattiacci's Decl. at ¶ 15 (ECF Doc. No. 153-3). In undisclosed hours, she "reviewed": summary judgment filings, documents produced in discovery including the "hot" documents, deposition transcripts, trial exhibits, our summary judgment opinion, and Teva's motions *in limine*.

[13] S. Console Decl. at ¶ 21 (ECF Doc. No. 153-3).

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] ECF Doc. 130.

[19] ECF Doc. No. 137.

[20] We additionally granted Mr. Middlebrooks's motion for prejudgment interest on the back pay award. *See* ECF Docs. No. 154, 156.

[21] ECF Doc. No. 153. Mr. Middlebrooks is not now moving for attorney's fees or costs incurred after January 27, 2019, specifically reserving his right to supplement his Motion seeking reimbursement for work performed after January 27, 2019.

[22] ECF Doc. No. 157.

[23] 42 U.S.C. § 2000e-5(k).

[24] 29 U.S.C. § 216(b); 29 U.S.C. § 626(b).

[25] *Hensley v. Eckerhart*, 461 U.S 424, 433 (1983); *Rode v. Dellarciprete,* 892 F.2d 1177, 1183 (3d Cir. 1990) *(citing Blum v. Stetson*, 465 U.S. 886, 897 (1994)).

[26] *Clemens v. N.Y. Cent. Mut. Fire Ins. Co.*, 903 F.3d 396, 400 (3d Cir. 2018) (quoting *Rode,* 892 F.2d at 1183).

[27] *United States ex rel. Palmer v. C&D Technologies, Inc.*, 897 F.3d 128, 139 (3d Cir. 2018) (quoting *Rode*, 892 F.2d at 1183)).

[28] *Id.*

[29] *United States v. Eleven Vehicles, Their Equip. & Accessories*, 200 F.3d 203, 211-12 (3d Cir. 2000).

[30] *Clemens*, 903 F.3d at 398 (quoting *Brown v. Stackler*, 612 F.2d 1057, 1059 (7th Cir. 1980)).

[31] *Id.* at 401 (quoting *Washington v. Phila. Cty. Ct. of Com. Pl.*, 89 F.3d 1031, 1037 (3d Cir. 1996)).

[32] *Washington*, 89 F.3d at 1037–38 (quoting *Rode*, 892 F.2d at 1190).

[33] *Rode*, 892 F.2d at 1191 n.13; *see also McGuffey v. Brink's, Inc.*, 598 F. Supp. 2d 659, 671 (E.D. Pa. 2009) (finding challenge to 18.8 hours of billed time described as "Research," "Review research," "Research ADEA," or "Research ERISA" sufficient for the court to determine whether the costs claims were unreasonable for the work performed).

[34] *Tenalfy Eruv Ass'n, Inc. v. Borough of Tenafly*, 195 F.App'x 93, 100-01 (3d Cir. 2006) (quoting *Washington*, 89 F.3d at 1037)).

[35] *Pasternack v. Klein*, No. 14-2275, 2017 WL 4642283, at *3 (E.D. Pa. Oct. 17, 2017) (quoting *Hatchett v. City of Phila.*, No. 09-1708, 2010 WL 4054285, at *4 (E.D. Pa. Oct. 15, 2010)).

[36] From November 2015 through March 2016, Console Mattiacci represented Mr. Middlebrooks under an hourly fee agreement at the firm's standard hourly rates. Console Mattiacci did not provide the hourly fee agreement to us. Firm Founder Console swears Mr. Middlebrooks paid for 26.6 hours of service amounting to $10,000. This is an average hourly rate of $376 paid for services. Console Mattiacci seeks reimbursement of the $10,000 in hourly fees paid.

[37] S. Console Decl. at ¶ 30 (ECF Doc. No. 153-3).

[38] *Id.* at ¶ 17.

[39] C. Gurmankin Decl. at ¶ 16 (ECF Doc. No. 153-3).

[40] L. Mattiacci Decl. at ¶ 15 (ECF Doc. No. 153-3).

[41] K. Console Decl. at ¶ 12 (ECF Doc. No. 153-3).

[42] S. Console Decl. at ¶ 18 (ECF Doc. No. 153-3).

[43] *Id.* at ¶¶ 23-24.

[44] L. Mattiacci Decl. at ¶ 13 (ECF Doc. No. 153-3).

[45] Teva objects to 257 hours of Attorney Mattiacci's time, directing us to its Exhibit D collecting all of Attorney Mattiacci's time entries described as "Work on trial prep." Exhibit D shows a total of 299 hours bearing the objected to description, not 257 hours. *See* ECF Doc. No. 157-5.

[46] Attorney Kevin Console billed .4 hours for revising a draft declaration on January 17, 2019.

[47] N.T. E. Cicak, Nov. 15, 2018, pp. 21-23.

[48] *Blum*, 465 U.S. at 895 n.11.

[49] *Loughner v. Univ. of Pittsburgh*, 260 F.3d 173, 180 (3d Cir. 2001) (citing *Blum*, 465 U.S. at 895 and *Pub. Interest Grp. of N.J., Inc. v. Windall*, 51 F.3d 1179, 1185 (3d Cir. 1995)).

[50] *Pub. Int. Grp.*, 51 F.3d at 1185 (citations omitted).

[51] *Rode*, 892 F.2d at 1183 (citing *Student Pub. Interest Research Grp. of NJ, Inc. v. AT&T Bell Labs.*, 842 F.2d 1436, 1447 (3d Cir. 1988) and *Blum*, 465 U.S. at 895 n. 11).

[52] S. Console Decl. at ¶ 34 (ECF Doc. No. 153-3). Mr. Middlebrooks does not provide us with the decisions from two arbitration fee awards.

[53] Community Legal Services of Philadelphia published its range of hourly rates effective February 15, 2017. Its rates "do not reflect any adjustment for contingency, and are based on Philadelphia law firm market survey data and increases in the Consumer Price Index." *See* https://clsphila.org/about-cls/attorney-fees.

[54] ECF Doc. No. 157 at 4, n.2.

[55] No. 99-6306, 2010 WL 1370863 (E.D. Pa. Apr. 4, 2010).

[56] *Id.* at *15.

[57] *Id.*

[58] The cases cited by Mr. Middlebrooks where the district court awarded Console Mattiacci its full rates are distinguishable. For example, *Sessions v. Owens-Illinois, Inc.* involved court approval of an ERISA class action settlement which is not an appropriate comparator and the decision of the district court does not show the hourly rates approved. *See Sessions v. Owens-Illinois, Inc.*, No. 07-1669 (M.D. Pa. Oct. 23, 2014) (final order and judgment approving settlement and dismissing action with prejudice) (ECF Doc. No. 283). In *Marthers v. Gonzalez*, Console Mattiacci only handled the initial stages of the litigation and Firm Founder Console billed at only $380 per hour. *See Marthers v. Gonzales*, No. 05-3778 (E.D. Pa. Aug. 13, 2008) (memorandum granting in part and denying in part plaintiff's application for attorney fees, costs and prejudgment interest) (ECF Doc. No. 81). Cases from 2005 and 2007 are over ten years old and the parties did not contest the reasonableness of the rates.

[59] *Maldonado v. Houston*, 256 F.3d 181, 187 (3d Cir. 2001) (citation omitted).

[60] No. 16-4205, 2018 WL 2197226 (E.D. May 11, 2018), appeal docketed, No. 18-3803 (3d Cir. Dec. 31, 2018).

[61] *Id.* at *3-*4. *See also Dowd v. Se. Pa. Transp. Auth.*, No. 04-294, 2006 WL 1371183, * (E.D. Pa. May 16, 2006) (in Title VII, PHRA, and §1981 action where jury found defendant

discriminated against plaintiff, court reduced attorney's fees of $350 per hour for trial counsel to $285 per hour within the range of Community Legal Services rate).

[62] *See* S. Console Decl. at ¶ 23 (ECF Doc. No. 153-3).

[63] While neither party asked, we query for future cases as to the extent a judge can vary from the rates set by Community Legal Services which we may use in a wide variety of statutory fee-shifting cases. Should we adapt when we face the unanticipated circumstances presented in representing Mr. Middlebrooks? We may consider the original nature (hourly v. contingent) of the lawyer's representation as it sets expectations when accepting the case; the level of lawyering required given the challenges posed by the facts, law and the employer's positions – all of which are outside the lawyer's control; and, our interest in modestly incentivizing talented lawyers to vindicate an employee's civil rights as compared to possibly more lucrative representations. Applying these factors to the baseline set by Community Legal Services in a wide variety of contexts, Console Mattiacci swears it contracted to provide services on an hourly fee basis (but does not tell us the hourly rate) and must face the time value of money in not being paid on an hourly basis when it began representing Mr. Middlebrooks. We must also address the heightened level of lawyering provided by Console Mattiacci in this difficult discrimination and retaliation case against a well-funded and motivated employer who appears to have disputed almost every issue, including today's requests. We must also recognize obtaining a retaliation verdict for a senior executive may pose significantly more work effort than other cases presented by clients represented by Community Legal Services. In balancing these factors, we may raise the hourly rate baseline set by Community Legal Services. But how much? We decline to guess lacking counsel's request, let alone input. We have no basis to set the percentage increase other than fiat as to reasonableness. We could find an increase in the hourly rate baseline is justified by the nature of this case. We could find a certain increase over the Community Legal Services baseline balances the need to find a reasonable rate for this case with our need to avoid setting a windfall for lawyers who do not otherwise offer the client's agreement to pay a certain rate or comparator affidavits confirming their higher hourly rates. But we lack a reasoned approach to how much of an increase. We instead add $10 an hour to account for the increase in rates since February 2017 on the Community Legal Services rates and will award Mr. Middlebrooks the same hourly rate as Teva paid its trial and associate trial counsel.

[64] *Hensley*, 461 U.S. at 434, 436.

[65] *Id.* at 434.

[66] *Id.*

[67] *Id.* at 435.

[68] *Id.* (footnote omitted).

[69] *Id.* at 440.

[70] No. 13-2845, 2015 WL 1255968 (E.D. Pa. Mar. 18, 2015).
[71] *Id.* at * 3.

[72] *Id.*

[73] *Id.*

[74] 559 F. Supp.2d 516 (M.D. Pa. 2008).

[75] *Id.* at 528.

[76] 598 F. Supp.2d 659, 673 (E.D. Pa. 2009).

[77] *Id.* at 674.

[78] *Id.*

[79] *Id.* at 675.

[80] 505 U.S. 557 (1992).  In *Dague*, the Court held "fee-shifting provisions in federal statutes do not permit enhancement of fees beyond the lodestar amount to reflect the fact that the prevailing party's attorneys were retained on a contingent-fee basis," specifically rejecting the argument a "reasonable fee" for attorneys retained on a contingency-fee basis "must go beyond the lodestar, to compensate for risk of loss and of consequent nonpayment."  *Id.* at 562

[81] Pa. R.Civ.P. 1717 (emphasis added).

[82] 126 F.3d 524 (3d Cir. 1997).

[83] 661 A.2d 1202 (N.J. 1995).

[84] *Polselli*, 126 F.3d at 527-28.

[85] *Id.* at 527.

[86] *Id.* at 535.

[87] *Id.*

[88] *Id.*

[89] *Id.*

[90] *Id.* at 536.

[91] *Id.*

[92] *Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 978-79, 980 (Pa. Super. 2011) (citing *Birth Ctr. v. St. Paul Cos., Inc.*, 727 A.2d 1144 (Pa. Super. 1999) (*disapproved on other grounds, Mishoe v.*

*Erie Ins. Co.*, 824 A.2d 1153 (Pa. 2003)).

[93] *Braun*, 24 A.3d at 679 (citations omitted).  *Braun* involved claims brought by a putative class of hourly employees of Wal-Mart alleging wage violations under Pennsylvania wage statutes and common law.

[94] *Rendine*, 661 A.2d at 1228.

[95] No. 13-5081,  2017 WL 3215415, at *4 (E.D. Pa. July 28, 2017).

[96] *Id.* at *4.

[97] 890 F. Supp. 382 (M.D. Pa. 1995).

[98] *Id.* at 399-400.

[99] *Id.* at 400.

[100] *Id.*

[101] *Becker v. ARCO Chemical Co.*, 15 F.Supp.2d 621, 635 (E.D. Pa. 1998) (citation omitted); *see also McGuffy*, 598 F. Supp.2d at 675 (citation omitted).

[102] *Petrunich v. Sun Bldg. Sys., Inc.*, 625 F.Supp. 199, 211 (MD. Pa. 2008) (awarding parking expenses); *Kratzer v. Wegman's Restaurant, LP*,  No. 04-5889, 2005 WL 2847320, at * 2-*3 (E.D. Pa. Oct. 27, 2005) (awarding photocopying costs, filing fees, travel expenses for attorneys, and expert fees).

[103] *Becker*, 15 F. Supp.2d at 637.

[104] *Blagrave,* 2009 WL 440299, at *8.

[105] *Id.* (collecting cases).  *See also Borrell v. Bloomsburg Univ.*, 207 F.Supp.3d 454, 523 n.58 (M.D. Pa. 2016) (excluding costs designated at "lunch" with no documentation to substantiate costs); *Blagrave v. Nutrition Mgmt. Servs. Co.*, No. 05-6790, 2009 WL 440299, at *8 (E.D. Pa. Feb. 20, 2009) (following *Becker*, excluded costs of lunch on "an ordinary workday when no travel is involved" and when "attorneys would have had to purchase those lunches in any event").

[106] ECF Doc. No. 158.

[107] ECF Doc. No. 68.

[108] *See* ECF Doc. No. 153-3 at 81.