## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **STEPHEN MIDDLEBROOKS** | : | |
| | : | **CIVIL ACTION NO. 17-0412** |
| | : | |
| **Plaintiff,** | : | |
| **v.** | : | |
| | : | |
| **TEVA PHARMACEUTICALS** | : | |
| **USA, INC.** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Stephen Middlebrooks, Plaintiff, hereby appeals to the United

States Court of Appeals for the Third Circuit based on The Honorable Judge Mark A. Kearney's

February 4, 2019 Order on Defendant's Motion for a new trial, the February 26, 2019 Order on

Plaintiff's Motion for Attorney's Fees, and the Judgment entered on February 26, 2019

(regarding (1) the court's ruling that punitive damages are not available in a retaliation claim

under the ADEA and (2) the court's ruling as to the amount of the attorneys fees awarded which

includes the methodology used for determining the same and the ruling that a multiplier under

state law is not available).

Respectfully submitted,

**CONSOLE MATTIACCI LAW, LLC**

Dated: March 6, 2019              BY:   ***/s/ Caren N. Gurmankin***
                                       Laura C. Mattiacci, Esq.
                                       Caren N. Gurmankin, Esq.
                                       1525 Locust Street, 9th Fl.
                                       Philadelphia, PA 19102
                                       (215) 545-7676

                                       Attorneys for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I, Caren N. Gurmankin, Esquire, hereby certify that Plaintiff's Notice of Appeal was

served via ECF, this day of **March 6, 2019,** upon the following:

Larry J. Rappoport, Esq.
Jennifer A. Ermilio, Esq.
**Stevens & Lee**
1818 Market Street, 29th Floor
Philadelphia, PA 19103

**Counsel for Defendant**

**CONSOLE MATTIACCI LAW, LLC**

BY:   *<u>/s/ Caren N. Gurmankin</u>*
Laura C. Mattiacci, Esq.
Caren N. Gurmankin, Esq.
1525 Locust Street, 9th Fl.
Philadelphia, PA 19102
(215) 545-7676

Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **STEPHEN MIDDLEBROOKS** | : | **CIVIL ACTION** |
| | : | |
| v. | : | **NO. 17-412** |
| | : | |
| **TEVA PHARMACEUTICALS USA, INC.** | : | |
| | : | |

## ORDER

**AND NOW**, this 4th day of February 2019, upon considering the Defendant's Motions for judgment as a matter of law (ECF Doc. No. 144) or for new trial (ECF Doc. No. 143), Plaintiff's Oppositions (ECF Doc. Nos. 149, 150), Defendant's Reply (ECF Doc. Nos. 151, 152), and for reasons in the accompanying Memorandum, it is **ORDERED**:

1.     Defendant's Motion for judgment as a matter of law (ECF Doc. Nos. 144) is **DENIED**;

2.     Defendant's Motion for a new trial is **GRANTED in part** only to cap punitive damages at $300,000 but otherwise **DENIED**; and,

3.     We will enter judgment upon resolving Plaintiff's pending motion for attorney's fees (ECF Doc. No. 153).

_____
KEARNEY, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **STEPHEN MIDDLEBROOKS** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 17-412** |
| | : | |
| **TEVA PHARMACEUTICALS USA, INC.** | : | |

**MEMORANDUM**

**KEARNEY, J.**                                                                            **February 4, 2019**

A senior American executive claiming his long-time Israeli employer fired him because of his age or American national origin, or to retaliate against him for complaining about a work environment turned hostile bears the weight of convincing our jury of the fallacy in his former employer's reasons for firing him. True to their oath, our jury must evaluate witness credibility to decide whether the employer who controls the performance reviews – and its corroborating employee witnesses – fired the former executive for illegal reasons. After several days of testimony, our jury's evaluation of conflicting witness testimony led it to find the employer did not discriminate against its former executive based on his age or American national origin but also led the jury to find the employer created a retaliatory hostile work environment and then retaliated by finally firing him. The jury awarded compensatory damages for emotional distress, back pay, front pay, liquidated damages and $5 million in punitive damages. The employer now raises a variety of post-trial arguments asking for judgment in its favor or for a new trial. The employee seeks pre-judgment interest on his back pay. In the accompanying Order, and mindful of the ample evidence supporting the jury's findings, we reject the employer's arguments except we must reduce the punitive damages to $300,000 under Congress's $300,000 cap on damages for these type of employment cases. We also grant the employee's motion for prejudgment interest.

## I. Background

Stephen Middlebrooks sued Teva Pharmaceuticals Industries, Limited and Teva Pharmaceuticals USA, Inc. (collectively "Teva") under Title VII,[1] the Age Discrimination in Employment Act ("ADEA"),[2] and the Pennsylvania Human Relations Act ("PHRA"),[3] alleging discrimination based on his age and national origin; hostile work environment on the basis of his age and national origin; retaliation for making complaints related to age and national origin; and a retaliatory hostile work environment for making complaints related to age and national origin discrimination.

Following a five-day trial, the jury returned a verdict in favor of Teva on Mr. Middlebrooks's claims of national origin and age discrimination, but found in his favor on his retaliation and retaliatory hostile work environment claims.[4] The jury awarded Mr. Middlebrooks compensatory damages of $200,000; back pay of $332,000; front pay of $450,000; punitive damages of $5,000,000; and, for purposes of liquidated damages under ADEA, found Teva acted willfully in that it knew or showed reckless disregard for whether the law prohibits termination because of age or retaliation for complaining about age.[5]

Teva now moves for judgment as a matter of law in its favor on (1) Mr. Middlebrooks's retaliatory hostile work environment claims; and (2) vacating punitive damages based on the retaliation and retaliatory hostile work environment claims.[6] Teva alternatively moves under Rule 59(a) for a new trial arguing (1) we committed reversible error by instructing the jury on both "pretext" and "mixed motive" relating to the national origin discrimination claim even though Teva defeated this claim; (2) we erred by instructing the jury it may award punitive damages and compounded this error by refusing to include a question on the verdict sheet regarding Teva's "good faith" defense under Title VII; (3) the jury improperly awarded damages for intentional

2

discrimination despite finding Teva did not intentionally discriminate; (4) the verdict sheet is confusing because it asked the jury to use two different start dates for calculation of back pay and the jury's calculation of back pay is not based on any evidence of record: (5) we committed reversible error by instructing the jury it may award damages for emotional distress and the jury's award of emotional distress is not based on evidence of record; (6) the jury's award of front pay is based on consideration of impermissible factors rather than evidence; and (7) if Teva's motion for new trial is not granted, the Court should not enter judgment for more than $200,000 in punitive damages based on the statutory cap on compensatory and punitive damages under Title VII.[7]

Mr. Middlebrooks moves to mold the judgment to include prejudgment interest on the jury's award of back pay.[8]   We will enter judgment following our rulings on Mr. Middlebrooks's pending motion for attorney's fees.

### A. Evidence adduced at trial.

#### *Mr. Middlebrooks's Teva career.*

Teva hired Mr. Middlebrooks in 2001 as its director of facilities engineering at its North Wales, Pennsylvania facility.[9]  It fired him on February 29, 2016.   From 2001 to January 2015, Mr. Middlebrooks received several promotions and performance reviews consistently achieving "exceeds [expectations]" or "meets [expectations]," performance categories constituting the second and third-best reviews a Teva employee could receive on Teva's five-scale ranking.[10]  Mr. Middlebrooks received bonuses and equity awards after all of his first thirteen years at Teva.[11] Teva awarded Mr. Middlebrooks with the title of Director of Facilities Engineering by 2013.[12] Teva tasked Mr. Middlebrooks with the responsibility of maintaining forty facilities and approximately fifty direct reports.[13]

At the end of 2013, Teva changed its management structure to require all regional facilities managers, like Mr. Middlebrooks, to report to one global facilities manager, an Israeli named Nir Aharoni.[14]  In late 2014, Teva promoted Mr. Middlebrooks to senior director of North American facilities management.[15]  Mr. Middlebrooks continued to report to Mr. Aharoni in his new position.[16]

### *Performance review and denial of equity in January 2015.*

In early 2015, Mr. Aharoni provided Mr. Middlebrooks with his 2014 performance review assigning a "mostly meets" rating equivalent to a two out of five on Teva's review scale.[17]  Mr. Middlebrooks did not agree with the "mostly meets" review; by his calculation he should have received a "meets" based on the weight given to each goal on Teva's performance review form.[18]

Mr. Middlebrooks met his 2014 performance goals late in 2014.[19]  But Teva did not award Mr. Middlebrooks equity in 2015 for his performance in 2014.[20]  Mr. Middlebrooks testified  Mr. Aharoni told him those who received a "mostly meets" review are not eligible for equity.[21]  Mr. Middlebrooks discussed this equity denial with Ray Duggan, Teva's director of security, who received a "meets" performance review but who did not receive an equity award despite eligibility for such an award.[22]  Mr. Middlebrooks testified Mr. Duggan questioned Mr. Aharoni why he (Mr. Duggan) did not receive equity.  Mr. Aharoni told Mr. Duggan "equity is only designed for people who are going to stay with the company for a long period of time."[23]  Both Mr. Middlebrooks and Mr. Duggan were then 56 years old.[24]  Teva awarded equity to Troy Gaugler, who was about twenty years younger than Messrs. Middlebrooks and Duggan, and the only other member of Mr. Middlebrooks's group eligible for equity.[25]

4

***Mr. Middlebrooks's attempts to meet with Mr. Aharoni for a mid-year review regarding 2015 goals.***

In this 2014 performance review, Mr. Aharoni identified seven goals for Mr. Middlebrooks to meet by year end 2015.[26] Teva assigned Mr. Middlebrooks an executive coach following his "mostly meets" review.[27] Mr. Middlebrooks viewed working with an executive coach as an opportunity to improve his skills and met with the coach approximately six times in 2015.[28] Mr. Middlebrooks expected he would review his progress with Mr. Aharoni in a mid-year review, based on his understanding employees receiving a "mostly meets" performance review should have a mid-year review in the first week of July.[29] In July 2015, Mr. Middlebrooks called and emailed Mr. Aharoni seeking this mid-year review.[30] Mr. Aharoni never responded. With no response from Mr. Aharoni, Mr. Middlebrooks sought the help of Teva's human resources to prompt Mr. Aharoni to provide a mid-year review. Mr. Middlebrooks received no response from human resources.[31] Mr. Middlebrooks then emailed to Mr. Aharoni a self-evaluation of his mid-year performance.[32] In the email, Mr. Middlebrooks assessed his own performance as having improved and either meeting or exceeding all seven goals set by Mr. Aharoni for 2015.[33] Mr. Middlebrooks asked Mr. Aharoni for comments and suggestions for further improving performance.[34] Mr. Middlebrooks included in his self-evaluation the additional savings goals imposed on his department in late 2014.[35] Mr. Aharoni did not respond to Mr. Middlebrooks's email.[36]

Even though Mr. Middlebrooks met Teva's savings goals imposed after the "meets" review, Teva then added additional goals at the end of 2015.[37] Mr. Middlebrooks referred to it as "mov[ing] the goalposts."[38]

### *June 2015 meeting between Mr. Middlebrooks's team and the Israeli team.*

In June 2015, two members of Teva's management team based in Israel, Shimrit Shemtov and Roni Kafre, came to the United States for a meeting.[39]  Ms. Shemtov, Teva's finance business partner, slammed shut the laptops of everyone at the meeting even though employees commonly used laptops at meetings.[40]  Later in the meeting, Ms. Shemtov put her hand in the face of an American employee who asked a question about the performance of Teva departments and "shushed" him, telling him he could not ask questions.[41]  Teva employee Troy Gaugler, present at the June 2015 meeting, testified the Israeli management dismissed the presentation of the North American finance leader.[42]

Other Teva employees present at the June 2015 meeting testified about other acts they perceived as discriminatory based on either national origin or age.  Mr. Middlebrooks testified Mr. Aharoni complained to him the United States military did not provide adequate support to Israel after attacks in Israel.[43]  Mr. Gaugler testified about an atmosphere beginning in 2014 in which Teva's Israeli management directed dismissive or negative conduct toward only American employees.[44]  Mr. Gaugler felt the Israeli management accused Americans of an inability to do their jobs, and "constant[ly]" witnessed management dismissing opinions of American employees with needed expertise in favor of Israeli employees without such expertise.[45]  Mr. Middlebrooks, Mr. Gaugler, and Mr. Duggan testified Mr. Aharoni and Mr. Kafre, operations manager from Israel, asked each about his age or the ages of those in Mr. Middlebrooks's department ostensibly to send out birthday cards; no birthday cards were ever received.[46]  Ellen Cicak, a former Teva project manager in Mr. Middlebrooks's department, testified Mr. Kafre asked her age at an early meeting.[47]  Ms. Cicak testified at meetings Israelis attended, the Israelis received "deference" the Americans did not.[48]  John Eppley, a senior manager in facilities engineering and who worked for

Mr. Middlebrooks, testified Ms. Shemtov asked his marital status and, learning he was not married, told him she could "set him up with a nice Jewish girl," a comment Mr. Eppley found inappropriate in a work atmosphere.[49] Mr. Eppley testified someone on the Israeli team asked for his age. Ms. Macone, a finance manager who reported to Mr. Middlebrooks, testified Teva asked her in an interview about her age and marital status, and she complained at least twice to Teva's human resources about the nature of these inquiries, but no one in human resources responded to her.[50]

After the June 2015 meeting with Ms. Shemtov and Mr. Kafre, Mr. Middlebrooks's team members expressed concern about conduct both before the meeting and at the meeting.[51] In August 2015, at the team's next scheduled group meeting with Teva's human resources representative business partner, Mini Rodriguez, Mr. Middlebrooks and his team complained about Ms. Shemtov's and Mr. Kafre's conduct in the June 2015 meeting.[52] Mr. Gaugler complained to Ms. Rodriguez of a hostile work environment, including a complaint of ongoing requests for age information.[53]

### *Ms. Rodriguez initiates an investigation into the complaints from Mr. Middlebrooks and his team.*

In response to complaints from Mr. Middlebrooks and his team, particularly Mr. Gaugler's comments about a hostile work environment, Ms. Rodriguez and Jennifer Flaisher, Teva's Vice President of Human Resources for the United States, decided to initiate an investigation.[54] Ms. Flaisher asked Leander Jones, Director of Human Resources at a Teva facility in Virginia, to investigate.[55]

Mr. Jones received his assignment to investigate on August 3, 2015 and began his interviews of Mr. Middlebrooks and his team, as well as Mr. Aharoni, in September 2015.[56] Mr. Jones prepared a written investigative report. Mr. Jones's investigation detailed Mr. Middlebrooks's and his team's reports of conduct by the Israeli team causing Mr. Jones concern

the conduct either violated or potentially violated Teva's EEO policy.[57]  Mr. Jones's report summarized Mr. Middlebrooks's interview including Mr. Middlebrooks's statement he reported concerns of the Israeli team's conduct to Ms. Rodriguez "about 9 weeks or so" ago which he felt "warranted a more thorough investigation right at that time and felt 9 weeks was too long" but "is glad we are at this point of addressing it now."[58]  Mr. Jones understood Mr. Middlebrooks's statements during their interview as reporting a violation of Teva's EEO and discrimination policies.[59]  Mr. Middlebrooks testified at trial he complained to Mr. Jones about both age and national origin discrimination.[60]

At the end of his investigation, Mr. Jones discussed his findings with Ms. Flaisher and Ms. Rodriguez and gave them a written report.[61]  Mr. Jones's report proposed recommendations including counseling to Ms. Shemtov and Mr. Kafre regarding their behavior and interaction with Mr. Middlebrooks's team and the "need for adherence to U.S. laws and statutes."[62]

### *Within days of receiving a copy of Mr. Jones's investigative report, Mr. Aharoni gave Mr. Middlebrooks a poor mid-year review, and two weeks later issued a performance improvement plan.*

On October 14, 2015, Ms. Rodriguez emailed to Mr. Aharoni a summary of Mr. Jones's investigation.[63]  Almost immediately after receiving the report, Mr. Aharoni contacted Mr. Middlebrooks about the mid-year review Mr. Middlebrooks requested three months earlier.[64]  On October 16, 2015, Ms. Flaisher sent Mr. Aharoni an email editing Mr. Aharoni's notes for the mid-year review as well as a telling Mr. Aharoni she is "working on" a performance improvement plan ("PIP") for Mr. Middlebrooks.[65]  Ms. Flaisher admitted she expected Mr. Middlebrooks's mid-year review to be coupled with a PIP.[66]  Before October 16, 2015, Mr. Aharoni never suggested Mr. Middlebrooks poorly performed or failed to meet goals for 2015, and never responded to Mr.

Middlebrooks's attempts to gather feedback on his 2015 performance or Mr. Middlebrooks's self-evaluation provided to him in early July 2015.

Mr. Middlebrooks described meeting with Mr. Aharoni for the mid-year review as "extraordinarily difficult."[67] Mr. Aharoni reviewed the seven goals he set for Mr. Middlebrooks in January 2015, but then also raised "an entire litany of other issues that were … rambling in nature.[68] Mr. Middlebrooks testified, "anything he could think of that he could throw at me, he was throwing at me."[69] The mid-year review, typically taking forty-five minutes to an hour, took nearly six hours and Mr. Middlebrooks testified "for a large majority of the meeting, Mr. Aharoni was bringing in issues and facts that were from left field."[70] Mr. Middlebrooks testified Mr. Aharoni appeared "agitated" and "disjointed" and "anything he could think of that he could throw at me, he was throwing at me."[71]

On October 29, 2015, Mr. Aharoni and Ms. Rodriguez placed Mr. Middlebrooks on the PIP Ms. Flaisher admittedly helped prepare two weeks earlier.[72] The PIP required Mr. Middlebrooks to complete fourteen items within ninety days or Teva would terminate him.[73] The PIP imposed additional goals on Mr. Middlebrooks not contained in the seven goals originally set out in his January 2015 review.[74]

Mr. Middlebrooks testified his placement on a PIP constituted a departure from Teva's normal practice in which an employee who receives a "mostly meets" gets a chance to complete the goals outlined in their end-of-year review before Teva places him on a PIP.[75] Mr. Middlebrooks testified it was impossible to meet some of the PIP's goals in only ninety days.[76]

### Mr. Middlebrooks objects to the PIP as retaliatory and files a charge of discrimination with the EEOC.

On November 12, 2015, Mr. Middlebrooks emailed Mr. Aharoni, copying Ms. Rodriguez and Ms. Flaisher, objecting to his placement on the PIP; outlining the history of his requests for a

mid-year review in June 2015, including Mr. Aharoni's failure to conduct a mid-year review or object to Mr. Middlebrooks's performance at any time before mid-October 2015; stating he met or exceed all seven goals Mr. Aharoni set for 2015, the items listed in the PIP are not included in the stated goals for 2015, and his belief Teva placed him on a ninety-day PIP as a result of age and national origin discrimination and in retaliation for his team's complaints to Ms. Rodriguez resulting in Mr. Jones's investigation concluded one week before the mid-year review.[77][78]

On November 25, 2015, Mr. Middlebrooks filed a charge with the EEOC, dual filed with the PHRC, alleging Teva discriminated against him based of his age and American national origin as well as retaliation.[79] Mr. Middlebrooks emailed his administrative charge to Mr. Aharoni, Ms. Flaisher, and Ms. Rodriguez.[80]

### Mr. Middlebrooks's attempt to comply with PIP, extension of PIP, and training on employment law.

Mr. Middlebrooks nevertheless began to work on the PIP's goals.[81] In mid-December 2015, Mr. Middlebrooks began sending Mr. Aharoni emails reporting on his progress on meeting his PIP goals and requesting Mr. Aharoni meet with him as the PIP required. Mr. Aharoni either skipped or cancelled these required meetings.[82] Mr. Aharoni did not answer those emails in writing, and instead changed the PIP's goals each time Mr. Middlebrooks notified he had completed a goal.[83]

Mr. Aharoni originally scheduled the PIP to expire at the end of January 2016.[84] Teva then extended the duration of Mr. Middlebrooks's PIP to the end of February 2016.[85]

In early February 2016, Teva held training led by Morgan Lewis & Bockius LLP with the United States and Israeli teams on discrimination, retaliation, and hostile work environment as well as cultural training as recommended by Mr. Jones's investigation.[86] Mr. Aharoni prepared a document, dated February 10, 2016, summarizing Mr. Middlebrooks's performance on the PIP

goals.[87] The document does not mention terminating Mr. Middlebrooks who continued to work in meeting the evolving PIP goals.  Mr. Middlebrooks did not receive the document on February 10.

On February 26, 2016, Mr. Middlebrooks emailed three Teva senior executives notifying them of his PIP, charge of discrimination with the EEOC, and his belief Teva discriminated against him and he now feared retaliation.[88]  Three days later, Teva terminated Mr. Middlebrooks at his North Wales office.[89]  Mr. Middlebrooks testified his termination differed from Teva's usual termination practices - terminations typically "would be done very, very quietly" but here Mr. Middlebrooks's "entire North Wales team sat outside [his] office."[90]  Because of the office's glass partitions, "it was pretty obvious what was going on."[91]

Mr. Middlebrooks testified to Teva's policy when an employee is terminated, his insurance coverage continues to the end of the month of termination.  If an employee is terminated on the last day of the month, his insurance coverage ends.[92]  Because Teva terminated Mr. Middlebrooks on February 29, 2016 (the leap year last day of February), Mr. Middlebrooks and family did not have insurance on March 1.

**_The effects of termination on Mr. Middlebrooks and his attempts to secure employment._**

Mr. Middlebrooks testified he felt "horrible" immediately after his termination.[93]  His team came into his office to help him collect his things.[94]  He "broke down."[95]  Mr. Middlebrooks testified he only received one document explaining Teva's reasons for termination, dated February 10, 2016 and including no information explaining Teva planned to terminate Mr. Middlebrooks.[96]

At the time of his termination, Mr. Middlebrooks earned a base pay at Teva of $192,000.[97]  He could receive a yearly merit increase of up to four percent.[98]  Mr. Middlebrooks received bonuses of up to thirty percent of his base pay.[99]  He also received yearly equity at the beginning of each year which he testified averaged about $50,000.[100]  Mr. Middlebrooks also received

11

benefits and contributed to a 401(K) plan at Teva which matched ten percent of his contributions.[101]

At the age of 59, Mr. Middlebrooks immediately began looking for a new job in March 2016.[102] He approached his job search like an engineer, getting up early in the morning and working all day at his dining room table looking for similar work. He called it a "very stressful time," like a "roller coaster" for him.[103] Some days he felt excited after conducting a job interview; other days he received rejections from multiple jobs. Mr. Middlebrooks testified he treated the search like a full-time job.[104]

Mr. Middlebrooks eventually found new employment in August 2016 as director of facilities at Wuxi Apptec, a technology start-up.[105] At Wuxi Apptec, Mr. Middlebrooks earned base pay of $150,000, received a pro-rated bonus of twenty percent bonus but not equity, received a pro-rated merit increase of approximately three percent, entered a health insurance plan which cost him about $5,000 to $10,000 more per year than Teva's plan, and a 401(K) plan which matched three percent of his contributions.[106]

Mr. Middlebrooks left Wuxi Apptec in August or September 2017 to accept a position at Jones Lang LaSalle ("JLL"), his current employer.[107] At JLL, his base pay is $192,000, he is eligible for merit increases of up to three percent, he is eligible for a twenty percent bonus, receives no equity, health insurance which is about $10,000 to $15,000 more expensive per year than the plan he had at Teva, and a 401(K) plan which matches three percent of contributions but only after the first year.[108]

Mr. Middlebrooks testified he is planning to work for another seven years until age 68.[109] His goal at Teva had been to make it to 2025, which would have constituted his twenty-fifth anniversary with Teva.[110]

## II. Analysis

### A. We deny Teva's Rule 50(b) motion for judgment as a matter of law.

A motion for judgment as a matter of law under Rule 50(b) "should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability."[111] We may grant the motion only if "the record is critically deficient of the minimum quantum of evidence to sustain the verdict."[112] While judgment as a matter of law should be granted sparingly, a "scintilla of evidence" is insufficient to sustain a jury's verdict.[113] "The question is not whether there is literally no evidence supporting the unsuccessful party, but whether there is evidence upon which a reasonable jury could properly have found its verdict."[114] In considering a motion under Rule 50(b), we do not "weig[h] the evidence, determin[e] the credibility of witnesses, or substitut[e] our own version of the facts for that of the jury."[115]

Teva makes two arguments in its Rule 50(b) motion: (1) there is insufficient evidence to support a finding of a retaliatory hostile work environment; and (2) Teva established a good faith defense to Mr. Middlebrooks's claim for punitive damages, Mr. Aharoni's conduct may not be imputed to Teva based on its good faith efforts to comply with the law, and there is insufficient evidence from which the jury could reasonably infer the requisite state of mind of Mr. Aharoni necessary to show malice or reckless disregard for the law.

#### 1. There is sufficient evidence to support the jury to reasonably find a retaliatory hostile work environment.

Although Teva's counsel argued he never heard of such a theory, our Court of Appeals recognizes a retaliatory hostile work environment claim under Title VII.[116] To succeed on a retaliatory hostile work environment claim, Mr. Middlebrooks must show: "(1) [he] suffered intentional discrimination because of [his] protected activity; (2) the discrimination was severe or

pervasive; (3) the discrimination detrimentally affected [him]; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present."[117]

Teva argues Mr. Middlebrooks failed to show intentional discrimination "because of" his protected activity; failed to show "severe or pervasive" discrimination; and, failed to show alleged discrimination detrimentally affected him or would have detrimentally affected a reasonable person in like circumstances.

Analyzing the "severe or pervasive" prong first, and considering the totality of the evidence, the jury heard enough evidence to return a verdict for Mr. Middlebrooks because the environment included pervasive discrimination. "To determine whether an environment is hostile, a court must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"[118] A hostile work environment under Title VII is actionable where a plaintiff adduces evidence of a "workplace ... permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[119]   "The 'severe or pervasive' standard is disjunctive and so 'a plaintiff need not show that [his] hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered [his] working conditions.'"[120]

Days of evidence adduced facts sufficient for a jury to reasonably find pervasive discrimination. Teva subjected Mr. Middlebrooks to pervasive discrimination after he complained of age and national origin discrimination by ignoring his emails asking for a mid-year review,

subjecting him to a six-hour meeting in which Mr. Aharoni brought issues out of "left field," placing him on a personal improvement plan ("PIP") contrary to company practice, adding fourteen goals through the PIP in addition to Mr. Middlebrooks's original seven goals, ignoring Mr. Middlebrooks's follow-up emails about his progress on the PIP and his concerns the PIP was discriminatory, firing Mr. Middlebrooks in a public manner contrary to company practice, and only providing Mr. Middlebrooks with a document dated several weeks before his firing to explain his termination.

Though none of these incidents *alone* are severe enough to establish a retaliatory hostile work environment, Mr. Middlebrooks presented enough evidence, taken as a *whole*, for the jury to find the discrimination became pervasive. It is particularly persuasive Teva departed from its usual practices in placing Mr. Middlebrooks on the PIP and kept "mov[ing] the goalposts." By doing so, Teva created an angst-ridden environment in which Mr. Middlebrooks's termination became inevitable. Teva's pattern of ignoring Mr. Middlebrooks and then repeatedly changing the goals altered the conditions of his employment. While this case does not involve ridicule or insults like some other retaliatory hostile work environment cases,[121] the pervasiveness of the adverse employment actions is sufficient to support a retaliatory hostile work environment verdict. The jury reviewed evidence confirming, particularly in evaluating the credibility of Mr. Middlebrooks and Mr. Aharoni, Teva became an environment of hostile treatment towards Mr. Middlebrooks in retaliation for his offering substantiated complaints. He took the fall for a variety of complaints, including his own. The jury could reasonably conclude Teva's Mr. Aharoni decided to make an example of Mr. Middlebrooks as the senior facilities executive – make his work life miserable and no one will complain again.

15

Against this evidence we dispose of Teva's other arguments Mr. Middlebrooks failed to show he suffered intentional discrimination "because of" his protected activity and any alleged discrimination detrimentally affected him or a reasonable person in like circumstances. All of the above evidence supporting Mr. Middlebrooks's retaliatory hostile work environment claim occurred after he complained to Teva's human resources department, which is protected activity. The time line of events is compelling. Mr. Middlebrooks made complaints to Ms. Rodriguez prompting Mr. Jones's investigation; Mr. Middlebrooks made statements to Mr. Jones regarding age and national origin discrimination; days after receiving a summary of Mr. Jones's investigation report, Mr. Aharoni gave Mr. Middlebrooks a poor mid-year review after ignoring Mr. Middlebrooks's requests for feedback on progress toward his 2015 goals and without any documentation of any performance problems from January 2015 to mid-October 2015; two weeks later, it issued Mr. Middlebrooks a PIP contrary to Teva policy and "moved the goal posts" of metrics to meet or face termination; made the decision to terminate Mr. Middlebrooks during the legal and sensitivity training held months after Mr. Jones recommended the training; and then terminated Mr. Middlebrooks on the last day of February 2016 depriving him of his family's insurance contrary to Teva custom. There is ample evidence through Mr. Middlebrooks's testimony Teva's conduct detrimentally affected him and would detrimentally affect a reasonable person in similar circumstances. The jury believed Mr. Middlebrooks based on this evidence.

Finally, even if Mr. Middlebrooks did not present enough evidence as a matter of law to support the retaliatory hostile work environment claims, we would not need to alter the damages. The jury found for Mr. Middlebrooks on his pure retaliation claims, which arise under Title VII and ADEA and entitle him to compensatory, punitive, and liquidated damages.

### 2. The jury's punitive damages award is soundly based on the evidence of both Teva's conduct and good faith defense.

Teva argues we should enter judgment as a matter of law on the punitive damages claim because the evidence does not support it and, even if it did, Teva established a good faith defense to punitive damages.

Title VII provides for punitive damages if the plaintiff can prove the defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual."[122] "An employer may be vicariously liable for the discrimination of its employee if the employee was serving in a 'managerial capacity' and committed the wrong while 'acting in the scope of his employment.'"[123] Under the Supreme Court's decision in *Kolstad v. American Dental Association*, "an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII."[124]

Teva's primarily relies on *Kolstad* where the Supreme Court considered the circumstances under which punitive damages may be awarded in a Title VII action. The Court held where an employer "has undertaken such good faith efforts at Title VII compliance, it 'demonstrat[es] that it never acted in reckless disregard of federally protected rights'" necessary to hold it vicariously liable for punitive damages.[125] Teva argues it established its good faith compliance with the law and, under *Kolstad*, the jury could not have reasonably awarded punitive damages against it. Teva argues there is no evidence any employee of Teva Pharmaceuticals USA, Inc. ("Teva USA") displayed malice or reckless disregard for the law and Mr. Aharoni is not an agent of Teva USA, but of the dismissed Teva Pharmaceutical Industries, Ltd. ("Teva Limited"). Teva essentially argues we cannot impute Mr. Aharoni's conduct, as an agent of the dismissed Teva Limited, to Teva USA because Teva USA established a good faith defense to punitive damages.

17

The record shows otherwise. At our charging conference with counsel, we specifically addressed the responsibility of Teva Limited for the conduct of Mr. Aharoni. When reviewing the jury instructions, *counsel for Teva* suggested removing the reference to Teva Limited, in our charge describing the background of the case, based on a stipulation of counsel.[126] We asked for the stipulation to be agreed to on the record:

> **The Court:** … The stipulation would be that Teva Pharmaceuticals Industries, Limited is dismissed under 41(a) by the Plaintiff with – with the understanding of what?

> **Ms. Mattiacci:** That from - for - *from this point forward, we would refer to the Defendants as Teva, so there would not be a distinction between USA and Ltd. That if there is a verdict that Teva USA will satisfy the verdict. To the extent they can't satisfy that verdict, Ltd will satisfy that verdict. And that in arguing for punitive damages, we would just use the word Teva, but there wouldn't be an argument by defense counsel that somehow they should not be liable for punitive damages because Mr. Aharoni was an employee of Ltd.*

> **The Court:** Well, that would apply – let's take up punitives. That argument would apply regardless, arguably. I mean, it could say -it could say the misconduct relative to the employees, unless I don't have a joint employer charge. So the purpose of today, I have two employees as of right now.

> **Ms. Mattiacci:** Right. So with this – with having Ltd out, I just don't want the –

> **The Court:** *But the conduct of Mr. Aharoni will be imputed for purposes of this trial to Teva US.*

> **Ms. Mattiacci:** *Yes.*

> **The Court:** *All right. Mr. Rappoport, I know you're catching on the fly, but any thoughts?*

> **Mr. Rappoport:** *No, that's fine, Your Honor.*

> **The Court:** All right. With that stipulation, I will enter 41 – it's on the record now, but I'll enter 41 dismissing Teva, and I'll must take out - the reference I'll refer to Defendant – I'll refer to it as Teva. Okay. Thank you, Mr. Rappoport.[127]

Teva's present claim Mr. Aharoni's actions cannot be imputed to Teva USA is directly contradictory with the stipulation agreed to by the parties. We deny Teva's motion on this basis.

18

Teva next argues it established its good faith compliance with the law, pointing to Ms. Flaisher's testimony she assisted Mr. Aharoni in developing Mr. Middlebrooks's mid-year review and the PIP, and if she thought either were in any way retaliatory she would never have allowed them to go forward and would have escalated her concerns; Teva gave additional time to Mr. Middlebrooks to meet the terms of his PIP; Ms. Flaisher made efforts to find Mr. Middlebrooks another position; and Teva terminated Mr. Middlebrooks only after he failed to meet his PIP goals and after Mr. Aharoni consulted with human resources, including Ms. Flaisher.

The issue of Teva's good faith defense is a question for the jury. We allowed Teva to repeatedly argue good faith. The jury disagreed. After hearing evidence, the jury found an award of punitive damages appropriate. This evidence includes Mr. Aharoni, Vice President of Teva's Global Facilities Management, gave Mr. Middlebrooks a negative mid-year review in a six-hour meeting only days after receiving Mr. Jones's investigation and having ignored Mr. Middlebrooks's previous attempts to get feedback from Mr. Aharoni through a self-evaluation; two weeks later placing Mr. Middlebrooks on a PIP, contrary to Teva policy, imposing new goals and deadlines; failure to respond to Mr. Middlebrooks's attempt to meet his PIP; Teva's failure to conduct training as recommended by Mr. Jones; and termination on the last day of February 2016 and contrary to the manner Teva typically handled performance-based terminations. This evidence overwhelmingly painted a picture sufficient for a jury to reasonably find conduct justifying punitive damages. Teva's disappointment with the jury's credibility findings is not a basis for a Rule 50(b) motion. It made the good faith arguments, but the jury could have easily found its witnesses lacked credibility.

### B. We deny Teva's motion for a new trial, but will enter judgment limited to Title VII's statutory damages cap.

Under Rule 59(a)(1)(A), we "may, on motion, grant a new trial on all or some of the issues – and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action in federal court."[128] Rule 59 does not provide specific grounds to grant a new trial, leaving the decision to our discretion.[129] Motions for new trial may be granted where there is "substantial error in the admission or exclusion of evidence; error in the court's instructions to the jury; where the jury's verdict [is] inadequate or excessive; or where the verdict [is] against the weight of the evidence."[130] Our Court of Appeals cautions we should grant a motion for new trial "only when 'the great weight of the evidence cuts against the verdict and ... [ ] a miscarriage of justice would result if the verdict were to stand.'"[131]

Teva moves for a new trial arguing (1) we committed reversible error by instructing the jury on both "pretext" and "mixed motive" relating to the national origin discrimination claim (on which Teva prevailed); (2) we erred by instructing the jury it may award punitive damages and compounded its error by refusing to include a question on the verdict sheet regarding Teva's "good faith" defense under Title VII; (3) the jury improperly awarded damages for intentional discrimination despite finding Teva did not intentionally discrimination; (4) the verdict sheet reviewed at extraordinary length with counsel is confusing because we asked the jury to use two different dates for calculation of back pay based on differing evidence for age and national origin claims and the jury's calculation of back pay is not based on any evidence of record: (5) we committed reversible error in instructing the jury it may award damages for emotional distress and the jury's award of emotional distress is not based on evidence of record; (6) the jury's award of front pay is based on consideration of impermissible factors rather than evidence; and (7) if Teva's

motion for new trial is not granted, we should not enter judgment for more than $300,000 in combined compensatory and punitive damages based on the statutory cap under Title VII.

Addressing Teva's arguments in turn, we deny its motion for new trial. But we will limit the punitive damages award to the Title VII statutory cap of $300,000.

### 1. Instructing the jury on both pretext and mixed motive theories is not reversible error.

Teva argues we should not have instructed the jury on both mixed motive *and* pretext theories with respect to Mr. Middlebrooks's claim of national origin discrimination. Teva contends the decisions of our Court of Appeals in *Armbruster v. Unisys Corp.*[132] and *Giffiths v. Cigna*[133] require us to charge the jury on *either* a mixed motive theory or pretext theory of discrimination, but not both. Teva also argues we could not have given a mixed motive charge in any event because Mr. Middlebrooks did not adduce direct evidence of discrimination.

Teva prevailed on the discrimination claims but now argues our error prejudiced it by confusing the jury. Teva points to the jury's verdict sheet finding Teva did not discriminate against Mr. Middlebrooks based on national origin, but then awarded damages for intentional discrimination. It argues we must grant it a new trial to remedy prejudicial error.

We disagree with Teva on both the law and the facts. Mr. Middlebrooks alleged both a pretext and mixed motive theory of national origin discrimination under Title VII by pleading, in his second amended complaint, "national origin was a motivating and/or determinative factor in connection with Defendants' discriminatory treatment of Plaintiff."[134] As Teva does not appear to contest, "[a] Title VII plaintiff may make a claim for discrimination under either the pretext theory set forth in *McDonnell Douglas Corp. v. Green* . . . or the mixed-motive theory set forth in *Price Waterhouse v. Hopkins* . . . under which a plaintiff may show that an employment decision was made based on both legitimate and illegitimate reasons."[135] As explained by our

Court of Appeals in *Connelly*, the difference between these theories "is in the degree of causation that must be shown: in a 'mixed-motive' case, the plaintiff must ultimately prove that [his] protected status was a 'motivating' factor, whereas in a non-mixed-motive or 'pretext' case, the plaintiff must ultimately prove that [his] status was a 'determinative' factor."[136]

At our charging conference, Teva objected to including both a mixed motive and pretext question on the jury's verdict sheet and charging the jury on both theories.[137]  Teva argued there is no evidence to support a mixed motive charge.  We disagreed, finding evidence warranting a mixed motive instruction.  We instructed the jury on both theories, explaining the difference between the "motivating" and "determinative" during our jury charge while explaining the challenged questions on the verdict sheet to the jury:

> As you see in questions 1 and 2, if you look at them, okay, they are identical with a difference of one word, "determinative" in 1 and "motivating" in 2.  Okay?  I am going to tell you the difference there. …

> ["*Motivating*" *Instruction*]

> I am going to talk about the second one now, first. Mr. Middlebrooks must prove his national origin was a motivating factor in Teva's decision to terminate employment.  That's one way he can win this, if it's a motivating factor in Teva's decision to terminate his employment. To prevail on this claim Mr. Middlebrooks must prove both of the following by a preponderance: one, that Teva terminated him; two, that Mr. Middlebrooks'[s] national origin was a motivating factor – you see that word there – in Teva's decision. We are going to talk about that in a minute. Although Mr. Middlebrooks must prove Teva acted with the intent to discriminate, Mr. Middlebrooks is not required to prove Teva acted with a particular intent to violate his civil rights. So in showing Mr. Middlebrooks'[s] national origin was a motivating factor for Teva's action, Mr. Middlebrooks is not required to prove his national origin was the sole motivation or even the primary motivation for Teva's decision. Mr. Middlebrooks need only prove that his national origin played a motivating part in Teva's decision, even though other factors may have motivated Teva. In this instruction, I am using the word "motivating." I am going to tell you Mr. Middlebrooks'[s] national origin was a motivating factor if his national origin played a part or played a role in Teva's decision to terminate his employment. If you find that Teva's treatment of Mr. Middlebrooks was motivated by both discriminatory and lawful reasons, you then must decide whether Mr. Middlebrooks is entitled to damages.[138]

22

["*Determinative*" *Instruction*]

The alternative way that Mr. Middlebrooks can show national origin discrimination is the word "determinative." That's the first question. Mr. Middlebrooks must prove his national origin was a determinative factor in Teva's decision to terminate his employment. To prevail on this question, number 1, Mr. Middlebrooks must prove both of the following by a preponderance: 1, again, Teva terminated him; 2, Mr. Middlebrooks'[s] national origin was a determinative factor in Teva's decision. Same rule. Although Mr. Middlebrooks must prove Teva acted with the intent to discriminate, he is not required to prove Teva acted with a particular intent to violate his civil rights. He is not required to produce direct evidence of intent, such as statements admitting discrimination. Intentional discrimination may be inferred from the existence of other facts. You should weigh all evidence received in the case in deciding whether Teva intentionally discriminated against Mr. Middlebrooks. Now, Teva has given you a nondiscriminatory reason for its termination of Mr. Middlebrooks. If you believe Teva's stated reason and you find that termination would have occurred because of Teva's stated reason, regardless of Mr. Middlebrooks'[s] national origin, then you must find for Teva. If you disbelieve Teva's stated reason for its conduct, then you may, but need not, find Mr. Middlebrooks has proved intentional discrimination. In determining whether Teva's stated reason for its actions was a pretext or excuse of discrimination, you may not question Teva's business judgment. You cannot find intentional discrimination simply because you disagree with the business judgment of Teva or because you believe it's harsh or unreasonable. You are not to consider Teva's wisdom; however, you may consider whether Mr. Middlebrooks has proven Teva's reason is merely a cover-up for discrimination. Ultimately, under this alternative, the word "determinative," you must decide whether Mr. Middlebrooks has proven his national origin was a determinative factor in Teva's decision to terminate his employment. Okay. Determinative factor means that if not for Mr. Middlebrooks'[s] national origin, the termination would not have occurred.[139]

We explained the verdict sheet to the jury which contained two questions relating to Mr. Middlebrooks's claim of national origin discrimination: Question 1 asked "was Stephen Middlebrooks's national origin a determinative factor in Teva's decision to terminate him?" and Question 2 asked "was Stephen Middlebrooks's national origin a motivating factor in Teva's decision to terminate him?"[140] The jury answered "No" to Question 1 (determinative factor) and "Yes" to Question 2 (motivating factor) but found for Teva in its affirmative defense it would "have made the same decision to terminate Mr. Middlebrooks even in the absence of the

23

impermissible motivating factor."[141] Accordingly, the jury found *in favor of* Teva on Mr. Middlebrooks's claims of national origin discrimination.

Nevertheless, Teva seeks a new trial arguing instructing the jury on both pretext and mixed motive is reversible error and prejudiced it. Neither *Armbruster* nor *Griffiths* requires us to charge on one or the other theory, precluding us from charging on both theories of recovery. In *Griffiths*, our Court of Appeals found error where the district court *combined* pretext and mixed motive instructions into the same instruction.[142] Here, we included separate questions on the verdict sheet - one asking if Mr. Middlebrooks's national origin was a determinative factor in Teva's decision to terminate him, and another asking if Mr. Middlebrooks's national origin was a motivating factor in Teva's decision to terminate him.[143] We read *Connelly*, decided in the context of a motion to dismiss, as to allow "even at trial, [a plaintiff] 'may present his case under both theories,' provided that, prior to instructing the jury, the judge decides whether *one or both theories* applies."[144]

We found evidence both theories could apply based on the jury's evaluation of witness credibility. There is no error in giving both charges, and even if in error, Teva suffered no prejudice. The jury found in Teva's favor on the national origin discrimination claim. Nevertheless, Teva argues our instruction confused the jury, and thus prejudiced Teva, by its later finding of intentional discrimination in its award of back pay. Intent is an element of both retaliation and a retaliatory hostile work environment claim, and the jury found for Mr. Middlebrooks on those claims.[145]

Finally, we disagree with Teva's argument we erred by giving the mixed motive instruction because a mixed motive instruction requires direct evidence of discrimination, and Mr. Middlebrooks presented none. This argument fails because a mixed motive instruction does not require direct evidence of discrimination.[146] Rather, to obtain a mixed motive instruction, "a

plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.'"[147] Mr. Middlebrooks presented evidence national origin was a motivating factor for Teva's employment practices, including Mr. Aharoni's comments about the United States military, management's actions at the June 2015 meeting, testimony from several Teva employees regarding the preferential treatment Israeli employees received, sudden changes in Mr. Middlebrooks's working conditions after Mr. Aharoni became global facilities manager, and an awkward joke at a global Teva meeting.

### 2. We did not err by instructing the jury on punitive damages and by failing to include a separate question about "good faith" on the verdict sheet.

Teva next argues we erred in instructing the jury on punitive damages, an error compounded by our refusal to include a question on Teva's "good faith" defense on the verdict sheet. Teva's argument is essentially the same as its argument raised in its Rule 50(b) motion, and we deny Teva's Rule 59 motion for same reasons. We add the following to address Teva's argument *Kolstad's* good faith element should have been included on the verdict sheet.

Teva argues, in a footnote, our ruling to exclude a good faith question is based on the theory good faith is an affirmative defense. Teva argues the decision of our Court of Appeals in *Fornicoia v. Haemonetics Corp.* holds it is not proper to omit from a verdict sheet a pertinent question simply because it is an affirmative defense.[148] In *Fornicoia*, the Court of Appeals found error in the jury instructions for failing to properly instruct the jury, on a claim of supervisory liability, whether the plaintiff employee suffered a tangible employment action and the defendant employer's right to assert an affirmative defense if the plaintiff did not suffer a tangible employment action.[149] The Court of Appeals did not hold it is error to omit from a verdict sheet a question on an affirmative defense.

While our Court of Appeals has not determined whether the good faith defense is an affirmative defense,[150] several other courts of appeals treat it as an affirmative defense.[151] Additionally, the Model Jury Instructions of our Court of Appeals treat the good faith defense as an affirmative defense.[152] So have several district courts in this Circuit.[153] "Generally, the failure to include an affirmative defense on a verdict form is not an abuse of discretion where the form, read in light of the jury instructions, informed the jury that in finding the defendant liable they were implicitly rejecting the affirmative defense."[154] We instructed the jury with respect to the good faith defense, but we did not include a separate question on the verdict sheet asking if Teva displayed good faith compliance with Title VII. We did not err in our decision to treat the *Kolstad* good faith defense as an affirmative defense based on the robust caselaw doing the same.

We properly instructed the jury about the good faith defense.

> Even if you make a finding there has been an act of discrimination with malice o[r] reckless disregard of Mr. Middlebrooks'[s] rights, you cannot award punitive damages if Teva proved by a preponderance of the evidence that it made a good faith attempt to comply with the law by adopting policies and procedures designed to prevent retaliation for complaining about alleged discriminatory conduct.[155]

We derived this charge almost verbatim from our Court of Appeals' Model Jury Instructions.[156] We simply added the clause "retaliation for complaining about alleged discriminatory conduct" in the last sentence[157] to reflect the nature of the case, as we had determined Mr. Middlebrooks could earn punitive damages on only his claims of retaliation and retaliatory hostile work environment.[158]

Finally, Teva argues we used an inconsistent verdict sheet, as it included a question about an affirmative defense in the section handling national origin discrimination[159] but did not include a question about the good faith defense. Any error borne of inconsistency is harmless because we sufficiently instructed the jury of the good faith affirmative defense in our charge. Teva directs us

only to decisions from our Court of Appeals requiring us to instruct the jury on applicable affirmative defenses, but does not direct us to cases requiring us to include affirmative defenses as a question on the verdict form.[160]

### 3. The jury did not render inconsistent responses to questions regarding liability and damages.

Teva argues the jury rendered irreconcilably inconsistent responses when it awarded back pay on intentional discrimination in Questions Nos. 13 and 14 but found in Teva's favor on the national origin and age discrimination claims in Questions 1 through 4.

Under Federal Rule of Civil Procedure 49, the "court may require a jury to return only a special verdict in the form of a special written finding on each issue of fact."[161] "Rule 49 places the matter of submitting interrogatories to the jury entirely within the discretion of the trial judge."[162] "[A] verdict must be molded consistently with a jury's answers to special interrogatories when there is *any view* of the case which reconciles the various answers."[163] "Thus, a trial court is under a constitutional mandate to search for a view of the case that makes the jury's answers consistent."[164]

Although the jury found in favor of Teva on the Title VII and ADEA discrimination claims, the jury still found Teva intentionally discriminated against Mr. Middlebrooks on the retaliation claims. We did not ask, through Questions Nos. 13 and 14, the jury to award damages in connection with Mr. Middlebrooks's discrimination *claims*; rather, we asked the jury to award damages commensurate with what Mr. Middlebrooks would have received had he not been the subject of Teva's intentional discrimination.[165] Additionally, Questions Nos. 13 and 14 comport with our Court of Appeals' Model Jury Instructions on back pay damages.[166]

**4. Our separate questions regarding two different start dates for back pay are not confusing and the jury did not render irreconcilably inconsistent answers to them.**

Teva next argues it is entitled to a new trial because the jury's "inconsistent and illogical responses" to Questions Nos. 13 and 14 "reveal manifest confusion."

Question 13 on the verdict form asked the jury to determine the amount of back pay "[f]rom the time of termination until now" Mr. Middlebrooks would have received from Teva if Mr. Middlebrooks had not been the subject of Teva's intentional discrimination. Question 14 asked the jury the same question, but changed the start date for back pay "[f]rom the time of the denial of equity in 2015 until now." In response to Question 13, the jury awarded Mr. Middlebrooks $182,000 in back pay. In response to Question 14, the jury awarded Mr. Middlebrooks $332,000 in back pay.

Teva argues the two different starting points for back pay in Questions 13 and 14 are inherently confusing. It contends the start date in Question 14 – the denial of equity in 2015 – improperly asked the jury to award back pay for the entire final year of Mr. Middlebrooks's employment in 2015 to 2016 while he still continued to receive a salary and benefits from Teva. Teva argues the jury awarded $150,000 in equity in response to Question 14, three times the $50,000 amount of equity testified to by Mr. Middlebrooks. Teva further objects to Question 14 because Mr. Middlebrooks's claim for equity is based solely on his allegation of age discrimination; the verdict sheet did not ask whether Teva denied him equity in 2015 because of age; and the jury ultimately found Teva did not discriminate against Mr. Middlebrooks on the basis of age. Teva argues this shows there is no lawful basis to award equity and equity plus back pay beginning a year before termination. In a footnote, Teva argues even if an award of equity is

28

proper, Mr. Middlebrooks failed to provide evidence from which a jury could have calculated the value of equity.

Teva's counsel did not object to the wording of Questions 13 or 14 on the verdict sheet at our charging conference, objecting instead to allowing the jury to consider equity at all because of a lack of evidence. While Teva's failure to object to the language on verdict sheet before we discharged the jury may constitute a waiver, there is no merit to Teva's motion for a new trial based on an objection to Questions 13 and 14.

Questions 13 and 14 ask the same question but from different starting points. The jury reconciled these questions by awarding Mr. Middlebrooks $182,000 in Question No. 13 for lost back pay, then adding three years of lost equity totaling $150,000 in Question No. 14 based on Mr. Middlebrooks's testimony he received an average yearly equity award of $50,000 for a total back pay award of $332,000. The jury did not award back pay for the final year of Mr. Middlebrooks's termination; it awarded Mr. Middlebrooks equity for the years following his protected activity through the date of our trial—2015, 2016, and 2017. Our jury did not award equity for 2018 because Teva would have awarded it in 2019, when we had not conducted our trial. The jury's back pay award is consistent.

Teva argues the jury could not award Mr. Middlebrooks back pay based on equity because Mr. Middlebrooks based his claim for equity on age discrimination, and the jury rejected Mr. Middlebrooks's age discrimination claim. This argument fails because the jury based its equity award on the theory Mr. Middlebrooks lost equity after Teva fired him in retaliation for making complaints.[167]

Teva lastly argues the jury's award in Question 14 is based on "wild speculation or confusion about what it was being asked to calculate" and asks us to grant it a new trial to rectify

this error. It alternatively argues we should decline to enter judgment on the back pay amount.. We deny Teva's motion, finding Mr. Middlebrooks's testimony on the total compensation he received at Teva is sufficient for the jury to base its back pay award.[168]

### 5. Evidence supports the jury's compensatory damages award.

Teva argues the evidence does not support the jury's $200,000 compensatory damages award because there is no evidence Mr. Middlebrooks suffered emotional distress, pointing to Mr. Middlebrooks's testimony he did not seek professional care and he found a new job six months after termination. Relying on the opinions of our Court of Appeals in *Spence v. Bd. of Educ. of Christina Sch. Dist.*,[169] and *Gunby v. Pa. Elec. Co.*,[170] Teva argues Mr. Middlebrooks must prove a "reasonable probability, rather than a mere possibility" of emotional distress and, without corroborating medical evidence, there is no reasonable probability emotional harm occurred.

Mr. Middlebrooks may recover damages for emotional distress and humiliation under Title VII if he presents evidence of actual injury.[171] There must be evidence of a "reasonable probability, rather than a mere possibility, that damages due to emotional distress were in fact incurred as a result of" the challenged conduct.[172] Medical evidence is not required to corroborate a claim for emotional distress.[173] Our Court of Appeals has not ruled on whether a plaintiff's testimony is sufficient to support an award of emotional distress.[174] District courts in our circuit have found a plaintiff's testimony sufficient to uphold compensatory damages awards.[175]

Mr. Middlebrooks testified to his emotional distress resulting from the way Mr. Aharoni terminated him, including how he felt in being treated differently than other directors in the manner of termination; how he felt after being terminated; and his emotional distress before termination when subjected to a retaliatory hostile work environment. Mr. Middlebrooks points to case authority upholding jury awards for emotional distress based solely on plaintiff's testimony and

without medical evidence. After Teva ignored Mr. Middlebrooks's emails regarding his progress for months, Teva subjected Mr. Middlebrooks to an "extraordinarily difficult" six-hour meeting in October 2015 in which Mr. Aharoni criticized Mr. Middlebrooks's performance. When Teva terminated Mr. Middlebrooks in February 2016, it departed from its usual practice of having a "very quiet[]"meeting—instead, Mr. Middlebrooks's entire North Wales team could see the meeting in which Ms. Rodriguez and Mr. Aharoni terminated him. Mr. Middlebrooks testified he felt "horrible" and "devastated," and he "broke down" when his team came into his office after Teva terminated him. Teva terminated Mr. Middlebrooks on the last day of the month, meaning his family lost Teva's insurance plan right away. After his termination, Mr. Middlebrooks embarked on a "very stressful" job search which felt like a "roller coaster."

Mr. Middlebrooks's testimony is sufficient for the jury's award. The jury found Mr. Middlebrooks to be credible. We do not find a miscarriage of justice in allowing the jury's award of compensatory damages to stand.

## 6. Evidence supported the jury's front pay award.

Teva argues the evidence does not support the jury's award of seven years of front pay in the amount of $450,000. It argues the jury's award is based on speculation because Mr. Middlebrooks failed to provide data on his work or life expectancy; there is no basis for the jury's award of seven years front pay, a period so long as to be inherently speculative; failed to provide a foundation for his knowledge of his new employer, JLL's, practices with regard to annual pay increase and bonuses having only worked at JLL for just over a year; failed to provide testimony, expert or otherwise, regarding the value of lost equity, anticipated value of his 401(k) account or how much he currently contributes to it or intends to contribute to it over the next seven years; and failed to testify whether his anticipated $10,000 to $15,000 per year increase in health care

deductibles is *more* than he paid when employed by Teva or whether it is the total he will pay each year and failed to provide testimony as to health care costs generally. Teva characterizes Mr. Middlebrooks's testimony as "wildly speculative" and the jury's award of front pay based on his testimony is erroneous, based on guesswork and speculation.

Front pay may be awarded "where a victim of employment discrimination will experience a loss of future earnings because [he] cannot be placed in the position [he] was unlawfully denied."[176] Because work and life expectancy "are pertinent factors in calculating front pay ... such an award 'necessarily implicates a prediction about the future.'"[177] Our Court of Appeals instructs it will not refuse to award front pay "merely because some prediction is necessary" and leaves to our discretion "selecting a cut-off date for an equitable front pay remedy subject to the limitation that front pay only be awarded 'for a reasonable future period required for the victim to reestablish [his] rightful place in the job market.'"[178]

The trial evidence includes Mr. Middlebrooks worked at Teva for thirteen years with no performance issues and planned to stay at Teva until 2025 when he reached age 68, seven years from the time of trial. Mr. Middlebrooks testified, without rebuttal, to his total compensation of $300,000 while employed at Teva; base pay of approximately $192,000; a bonus of thirty percent of base; equity on average of $50,000 a year; health care costs, including insurance and prescription drug co-pays; a ten percent match to a 401(k) plan; and merit increases received while at Teva.[179] Mr. Middlebrooks testified to the differences between his total compensation while at Teva versus his total compensation he received in the year he worked for Wuxi Apptec and since his employment at JLL including his base pay, bonus, double the cost of health care, a three percent 401(k) match, and merit increase.[180] Mr. Middlebrooks testified to the compensation lost after taking a position at JLL: he is eligible for twenty percent bonus at JLL versus a thirty percent

bonus at Teva on a $192,000 base salary; he does not receive equity awards at JLL versus approximately $50,000 equity award at Teva; JLL's health insurance plan costs him between $10,000 and $15,000 more than Teva's per year; and its 401(k) plan only matches contributions up to three percent after the first year of employment versus ten percent at Teva.

The jury heard this evidence and calculated a front pay award. We do not find this amount speculative or unreasonable, finding similar awards upheld by courts in this circuit.[181]   Mr. Middlebrooks testified to his compensation while employed at Teva versus his compensation at JLL; the absence of expert testimony does not make his testimony speculative and our Court of Appeals does not require it.[182]   Due to the "speculative nature of future damages," a "[p]laintiff must merely prove his damages sufficiently to exclude unreasonable speculation."[183]   "[T]he risks associated with any remaining speculation in awarding front pay are upon the employer, because those risks "'must be borne by the wrongdoer, not the victim.'"[184]   "[A]bsent a conclusion that the jury engaged in 'unreasonable' or 'wild' speculation," we must let the front pay award stand.[185] We deny Teva's motion for a new trial on this ground.

### 7.   The Title VII damages cap applies to limit the punitive damages award to $300,000.

Teva argues if we do not order a new trial, we must still reduce the jury's $5 million punitive damages award and limit damages on both punitive and compensatory damages under Title VII's $300,000 statutory cap.

Mr. Middlebrooks argues we should uphold the punitive damages award because the jury based its award on *retaliation* under ADEA. Mr. Middlebrooks cites the EEOC's August 25, 2016 "Enforcement Guidance on Retaliation and Related Issues" Directive No. 915.004.[186]   With regard to compensatory and punitive damages for ADEA retaliation, the EEOC directs "[c]ompensatory and punitive damages are available for retaliation claims brought under the ADEA and [Equal Pay

Act], *even though such relief is not available for non-retaliation claims under those statutes*. Any compensatory and punitive damages obtained under the EPA and the ADEA are not subject to statutory caps."[187]   The EEOC cites the Fair Labor Standards Act ("FLSA") as authorizing compensatory and punitive damages for retaliation claims under both the Equal Pay Act and the ADEA.[188]

Mr. Middlebrooks urges us to follow the EEOC's guidance and uphold the punitive damages award for its finding of retaliation under ADEA.  We cannot find, and Mr. Middlebrooks does not offer, reasoning from a federal court applying EEOC's August 2016 Directive 915.004 in this context.  Our research found only one case considering the EEOC's guidance in the context of punitive damages in ADEA retaliation claims; a 2017 decision from the United States Court of Appeals for the Fifth Circuit which found the EEOC's guidance did not constitute an intervening change in the law to justify setting aside its precedent holding punitive damages are not available in ADEA actions, including claims for retaliation under ADEA.[189] Because we find no case following the EEOC's guidance as applied to ADEA retaliation claims or any case departing from disallowing punitive damages in ADEA retaliation claims, we decline to apply the EEOC guidance here to allow the $5 million punitive damages award on the basis of ADEA retaliation.[190]

Finding the punitive damages award is not available for the ADEA claim, we examine the award under Title VII.  Congress limits damages available in Title VII claims to the "sum of the amount of compensatory damages ... and the amount of punitive damages" capping damages at $300,000 for defendants who employ 500 or more employees in each of twenty or more calendar weeks in the current or preceding calendar year.[191]

Teva argues we must apply the statutory cap to the compensatory and punitive damages award, reducing the jury's $200,000 compensatory award and $5 million punitive award to a

34

combined total of $300,000. We must decide if we will include the $200,000 compensatory damages award under the damages cap because Congress directs us to net compensatory and punitive judgments.[192]  Mr. Middlebrooks argues if we find Title VII's statutory cap applies, we should apply it to the punitive damages only and not the compensatory damages arguing he is entitled to recover his full emotional distress because the jury could have made such an award under the PHRA, to which the federal damages cap does not apply. We agree, and apportion the compensatory damages award to the PHRA claim.

Our Court of Appeals considered this issue in *Gagliardo*, holding the plaintiff could recover damages under the PHRA.[193]  There, a jury awarded compensatory damages and punitive damages after the plaintiff sued under the Americans with Disabilities Act, which is subject to the federal cap, and the PHRA, which is not.[194]  The district court applied the cap only to the punitive damages, apportioning the compensatory damages to the PHRA claim.[195]  In affirming the district court's decision, our Court of Appeals held "[section] 1981a does not prevent a claimant from recovering greater damages under a state law claim that is virtually identical to a capped federal claim."[196]

Our Court of Appeals interprets the PHRA identically to the ADEA[197] and consistently with Title VII.[198]  The PHRA requires plaintiffs to file a complaint with the Pennsylvania Human Resources Commission like Title VII requires plaintiffs to file a complaint with the EEOC.[199]  Mr. Middlebrooks filed a dual charge of discrimination with the EEOC and PHRC, stating claims under both Title VII and the PHRA.

There is no reason to apportion the jury's compensatory damages award to Mr. Middlebrooks's federal claims.  We will apportion the compensatory damages award of $200,000

to Mr. Middlebrooks's PHRA claim and will not include the claim under the federal damages cap. We otherwise cap the punitive damages claim to $300,000 under § 1981a(b)(3)(D).

### C.  We grant Mr. Middlebrooks prejudgment interest on the backpay award at the IRS rate.

Mr. Middlebrooks moves to amend the judgment to include prejudgment interest on the jury's $332,000 back pay award from the denial of equity in 2015 to the time of trial.

In employment cases, we may award prejudgment interest in our discretion if it "helps to make victims of discrimination whole," serving to "compensate a plaintiff for the loss of the use of money that the plaintiff otherwise would have earned had he not been unjustly discharged."[200] There is a "strong presumption in favor of awarding prejudgment interest, except where the award would result in 'unusual inequities.'"[201] The prejudgment interest rate applied to an award of back pay is within our discretion.[202]

Mr. Middlebrooks asks we apply the IRS "overpayment rate" under 26 U.S.C. § 6621. Applying the IRS overpayment rate, Mr. Middlebrooks calculates prejudgment interest at $23,687 on the back pay award.  If we do not use the IRS overpayment rate, Mr. Middlebrooks argues, we should apply Pennsylvania's statutory rate of 6% which amounts here to $19,920.

Teva argues if we award prejudgment interest at all, it should be on the $182,000 back pay award, (the figure the jury awarded on back pay from termination until trial) and at the much lower Treasury yield, or "T-bill," rate under 28 U.S.C. § 1961.[203] Teva argues Mr. Middlebrooks provides no reason why we should deviate from the T-Bill rate, and we should not apply Pennsylvania's statutory rate because there is no evidence Middlebrooks used his annual salary for living expenses, a factor relied on by Judge Bartle in *Grieb v. JNP Foods, Inc.* in using the higher IRS overpayment rate.[204]

36

We grant Mr. Middlebrooks's motion and will apply the IRS overpayment rate in 26 U.S.C. § 6621. Mr. Middlebrooks testified for the six months he remained out of work, with no paycheck coming in, he and his wife used their retirement savings to make ends meet.[205] We find the higher rate is appropriate to restore Mr. Middlebrooks to his position if not for Teva's retaliation.[206] We also defer to the jury's findings as to retaliation and award of a substantial punitive damage. The jury did not believe Teva. It found Teva – particularly Mr. Aharoni – retaliated against Mr. Middlebrooks in a several month campaign to make his work life hostile because he complained about treatment towards him and those reporting to him. As good bosses should do, Mr. Middlebrooks took the heat for his team, raised complaints affecting him and his workers and, for reasons the jury did not find credible, Mr. Aharoni went after him. Having been very recently educated about illegal employment practices by Morgan Lewis LLP days earlier, Teva's retaliation campaign is capped by firing him on February 29, 2016 without health insurance the next day and forcing his family to use retirement funds to meet their obligations. They lost the benefit of these retirement funds while Mr. Middlebrooks needed to return to the job market.

## III.   Conclusion

We consider three post-trial motions filed in this employment action brought by Stephen Middlebrooks against his former employer Teva Pharmaceutical Industries Limited and Teva Pharmaceuticals USA, Inc. After a five-day trial, a jury returned a verdict in favor of Mr. Middlebrooks on his claims of retaliation and retaliatory hostile work environment. Teva moves for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) or, alternatively, for a new trial under Rule 59(a). Mr. Middlebrooks moves for prejudgment interest on his award of back pay. In the accompanying Order, we deny Teva's Rule 50(b) Motion in its entirety; deny Teva's Rule 59 Motion in all respects except for its request we apply Title VII's statutory cap of

$300,000 to the punitive damages award; and grant Mr. Middlebrooks's motion to award him $23,687 in prejudgment interest on the $332,000 back pay award calculated at the IRS overpayment rate under 26 U.S.C. § 6621.   Upon resolving the pending motion for attorney's fees, we will enter judgment against Teva consistent with this Memorandum.

---

[1] 42 U.S.C. §2000e, *et seq.*

[2] 29 U.S.C. § 621, *et seq.*

[3] 43 P.S. § 951, *et seq.*

[4] At trial, we granted Teva's Rule 50(a) Motion for judgment as a matter of law on Mr. Middlebrooks's hostile work environment claims finding Mr. Middlebrooks failed to adduce sufficient evidence of a severe or pervasive hostile work environment based on age or national origin from which a jury could reasonably find liability. ECF Doc. 130.  Consequently, the hostile work environment claims did not go to the jury.

[5] ECF Doc. No. 137.

[6] ECF Doc. No. 144.

[7] ECF Doc. No. 143.

[8] ECF Doc. No. 145.

[9] Notes of Testimony ("N.T.") 11/14/2018 at 5:17.

[10] *Id.* at 7:20–9:12.

[11] *Id.* at 9:13–19.

[12] *Id.* at 10-11.

[13] *Id.* at 11-12.

[14] *Id.* at 10:5–20.

[15] *Id.* at 24:21–25:1.

[16] *Id.* at 25:17.

[17] *Id.* at 25:17–24.

---

[18] *Id.* at 27:20–25.

[19] *Id.* at 28-29.

[20] *Id.* at 28:1–10.

[21] *Id.* at 30:2–9.

[22] *Id.* at 30:11–15.

[23] *Id.* at 31:5–9.  Mr. Duggan testified to his conversation with Mr. Aharoni regarding the reason why Mr. Duggan did not receive equity and Mr. Aharoni's statement in response.  *Id.* at 319-320.

[24] *Id.* at 31:20.

[25] *Id.* at 31:24–32:5.

[26] Ex. 34.

[27] N.T. 11/14/2018 at 56-57:2–11.

[28] *Id.* at 57.

[29] *Id.* at 46-47.

[30] *Id.* at 48-49.

[31] *Id.* at 49.

[32] *Id.* at 49-53; Exhibit 65.

[33] *Id.*

[34] *Id.*

[35] N.T. 11/14/2018 at 54-55:1-2.

[36] *Id.* at 52:18–53:14.

[37] *Id.* at 29:10–20.

[38] *Id.* at 29:16.

[39] *Id.* at 36:11–25.

[40] *Id.* at 39:1–9.

[41] *Id.* at 39:21–25.

[42] *Id.* at 283:11–16.

[43] *Id.* at 45:5–11.

[44] *Id.* at 278:10–280:8.

[45] *Id.* at 278:10–280:8.

[46] *Id.* at 35-36; 280-281; 317-318.

[47] N.T. 11/15/18 at 5:12–19.

[48] *Id.* at 7:1–9.

[49] N.T. 11/14/2018 at 355.

[50] *Id.* at 347-348.

[51] *Id.* at 46-47.

[52] *Id.* at 47.

[53] *Id.* at 47-48.

[54] *Id.* at 292-295.

[55] N.T. 11/15/2018 at 37-38.

[56] Ex. 67, 79.

[57] N.T. 11/15/2018 at 52-70.

[58] *Id.* at 70.

[59] *Id.* at 72.

[60] N.T. 11/14/2018 at 60.

[61] N.T. 11/15/2018 at 72.

[62] *Id.* at 86.

[63] N.T. 11/15/2018 at 239-40; Ex. 78.

[64] N.T. 11/14/2018 at 61:9–13.

[65] N.T. 11/15/2018 at 167; Ex. 83.

[66] N.T. 11/15/2018 at 169.

[67] N.T. 11/14/2018 at 62.

[68] *Id.*

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Id.* at 64-66; Ex. 92.

[73] N.T. 11/14/2018 at 64-65.

[74] *Id.* at 71.

[75] *Id.* at 65.

[76] *Id.* at 66–67.

[77] *Id.* at 72-75; Ex. 95.

[78] N.T. 11/14/2018 at 247–249.

[79] N.T. 11/14/2018 at 78-79; Ex. 96.

[80] N.T. 11/14/2018 at 78-79; Ex. 97.

[81] N.T. 11/14/2018 at 79.

[82] N.T. 11/14/2018 at 80-83; Ex. 107-109.

[83] N.T. 11/14/2018 at 84-85.

[84] *Id.* at 85.

[85] *Id.*

[86] *Id.* at 86-87.

[87] *Id.* at 91: Ex. 120.

[88] N.T. 11/14/2018 at 89; Ex. 128.

[89] N.T. 11/14/2018 at 90, 106.

[90] *Id.* at 107.

[91] *Id.*

[92] *Id.* at 108-109.

[93] *Id.* at 107.

[94] *Id.*

[95] *Id.*

[96] *Id.* at 92:15–18.

[97] *Id.* at 95.

[98] *Id.* at 96-97.

[99] *Id.* at 95:15–19.

[100] *Id.* at 95:20–25.

[101] *Id.* at 95–97.

[102] *Id.* at 97-98.

[103] *Id.* at 109:11–17.

[104] *Id.* at 97:9–98:4.

[105] *Id.* at 99:14–21.

[106] *Id.* at 100-101.

[107] *Id.* at 101:9–25.

[108] *Id.* at 102:1–24.

[109] *Id.* at 103.

[110] *Id.*

[111] *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).

[112] *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 211 (3d Cir. 2009).

[113] *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).

[114] *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 433 (3d Cir. 2009) (citation omitted).

[115] *Id.* (quoting *Marra v. Phila. Housing Auth.*, 497 F.3d 286, 300 (3d Cir. 2007)).

[116] *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006), *abrogated in part by Burlington N. & Santa Fe Ry. Co. v White*, 548 U.S. 53 (2006); *Hare v. Potter*, 220 F.App'x 120, 131-32 (3d Cir. 2007); *Clarkson v. Septa*, No. 14-2510, 2016 WL 1637279, at *10 (E.D. Pa. Apr. 25, 2016).

[117] *Jensen*, 435 F.3d at 449 (citations and footnotes omitted).

[118] *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 168 (3d Cir. 2013); *see also Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017) (determining whether an environment is hostile requires looking at the totality of the circumstances) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993))

[119] *Abuomar v. Dept. of Corrections*, No. 17-2751, 2018 WL 5778247, at *3 (3d Cir. Nov. 2, 2018) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).

[120] *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 214 n.12 (3d Cir. 2017) (quoting *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010) (emphasis omitted)).

[121] *See, e.g., Exantus v. Harbor Bar & Brasserie Rest.*, 386 F. App'x 352, 354 (3d Cir. 2010); *Nieves v. Acme Markets, Inc.*, 541 F. Supp. 2d 600, 606–07 (D. Del. 2008).

[122] 42 U.S.C. § 1981a(b)(1).

[123] *Ridley v. Costco Wholesale Corp.*, 217 F. App'x 130, 137 (3d Cir. 2007) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 545 (1999)).

[124] *Kolstad*, 527 U.S. at 545 (1999) (internal quotations omitted).

[125] *Id.* at 544-45.

[126] Charging Conference 11/15/2018 at 5 (ECF Doc. No. 142).

[127] ECF Doc. No. 142 at 5-7 (emphasis added).

43

[128] Fed. R. Civ. P. 59(a)(1)(A).

[129] *Blancha v. Raymark Indus.*, 972 F.2d 507, 512 (3d Cir. 1992) ("The decision to grant or deny a new trial is confided almost entirely to the discretion of the district court") (citing *Allied Chem. Corp. v. Daiflon, Inc.* 449 U.S. 33, 36 (1980)).

[130] *Snider v. Sterling Airways, Inc.*, No. 13-2949, 2017 WL 3873540, at *2 (E.D. Pa. Sept. 5, 2017) (citations omitted).

[131] *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 386 (3d Cir. 2016) (quoting *Springer v. Henry*, 435 F.3d 268, 274 (3d Cir. 2006)).

[132] 32 F.3d 768 (3d Cir. 1994), *abrogated on other grounds by Showalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231 (3d Cir. 1999).

[133] 988 F.2d 457 (3d Cir. 1993), *overruled on other grounds by Miller v. CIGNA Corp.*, 47 F.3d 586 (3d Cir. 1995).

[134] ECF Doc. No. 10 at ¶ 63. Teva did not move for summary judgment on the mixed motive theory of discrimination.

[135] *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations omitted). *See also Armbruster*, 32 F.3d at 782 n. 17 ("We do not mean to suggest that an employee must elect to proceed on either a pretext or a *Price Waterhouse* theory at trial. Rather, we think that an employee may present his case under both theories and the district court must then decide whether one or both theories properly apply at some point in the proceedings prior to instructing the jury.").

[136] *Connelly*, at 788 (citing *Makky v. Chertoff*, 541 F.3d 205, 214-20 (3d Cir. 2008)).

[137] ECF Doc. No. 142 at 31-33.

[138] N.T. 11/16/2018 at 177-78. We then instructed the jury on the "same decision" affirmative defense, instructing the jury "As shown in question 3, Mr. Middlebrooks is not entitled to damages under this theory if Teva proves by a preponderance of the evidence that it would have treated Mr. Middlebrooks the same even if Mr. Middlebrooks'[s] national origin had played no role in the employment decision." *Id.*

[139] *Id.* at 179-80.

[140] ECF Doc. No. 137.

[141] ECF Doc. No. 137 at ¶ 3.

[142] *Griffiths*, 988 F.2d at 472 ("[T]he court told the jury that it could consider the employer's explanations as 'a pretext or a sham and that in actuality, at least one of the motivating factors was retaliation against him, even though there may have been other valid reasons' for the

termination.").

[143] *See* ECF Doc. No. 137 at ¶¶ 1–2.

[144] *Connelly*, 809 F.3d at 788 (emphasis added) (internal quotations omitted).

[145] *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006) ("[t]he ultimate question in any retaliation case is an intent to retaliate *vel non*.") (quoting *Jensen*, 435 F.3d at 449 n.2).

[146] *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 92 (2003); *Egan v. Delaware River Port Auth.*, 851 F.3d 263, 274–75 (3d Cir. 2017); *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).

[147] *Makky*, 541 F.3d at 214 (quoting *Desert Palace*, 539 U.S. at 101).

[148] 131 F.App'x 867 (3d Cir. 2005).

[149] *Id.* at 870-71.

[150] *See Medcalf v. Trustees of Univ. of Pa.*, 71 F. App'x 924, 933 (3d Cir. 2003) ("[T]he Third Circuit has not addressed the issue of whether the good faith compliance standard set out in *Kolstad* is an affirmative defense for which the defendant bears the burden of proof, or whether the plaintiff must disprove the defendant's good faith compliance with Title VII by a preponderance of the evidence.").

[151] *See, e.g., E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1075 (6th Cir. 2015); *White v. BFI Waste Servs., LLC*, 198 F. App'x 283, 287 (4th Cir. 2006); *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 385 (2d Cir. 2001); *Romano v. U-Haul Int'l*, 233 F.3d 655, 670 (1st Cir. 2000); *Passantino v. Johnson & Johnson Consumer Prod., Inc.*, 212 F.3d 493, 516 (9th Cir. 2000); *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 188 F.3d 278, 286 (5th Cir. 1999).

[152] *See* Comment, Model Civ. Jury Instr. 3rd Cir. § 5.4.2 (2018).

[153] *U.S. Equal Employment Opportunity Comm'n v. Scott Med. Health Ctr., P.C.*, No. 16-225, 2017 WL 5493975, at *5 (W.D. Pa. Nov. 16, 2017); *U.S. Equal Employment Opportunity Comm'n v. Bob Evans Farms, LLC*, 275 F. Supp. 3d 635, 667 (W.D. Pa. 2017). *But see Colicchio v. Merck & Co.*, No. 08-3593, 2015 WL 12839170, at *1 (D.N.J. Jan. 30, 2015) (calling the good faith defense "not [an] affirmative defense[]").

[154] *Hilburn v. N.J. Dep't of Corr.*, No. 07-6064, 2012 WL 3133890, at *8 (D.N.J. July 31, 2012).

[155] N.T. 11/16/2018 at 194.

[156] *See* Model Civ. Jury Instr. 3rd Cir. § 5.4.2 (2018).

[157] *Compare* N.T. 11/16/2018 at 194 *with* Model Civ. Jury Instr. 3rd Cir. § 5.4.2 (2018).

[158] ECF Doc. No. 130.

[159] ECF Doc. No. 137 at ¶ 3.

[160] *Fornicoia v. Haemonetics Corp.*, 131 F. App'x 867, 871 (3d Cir. 2005) (finding error where the district court judge failed to charge the jury on the defendant's right to assert an affirmative defense).

[161] Fed. R. Civ. P. 49(a)(1).

[162] *Moyer v. Aetna Life Ins. Co.*, 126 F.2d 141, 145 (3d Cir. 1942); *see also Allstate Ins. Co. v. Hrin*, No. 05-158, 2006 WL 2540778, at *5 (E.D. Pa. Aug. 31, 2006) ("[D]istrict courts have broad discretion to formulate special interrogatories for submission to the jury.").

[163] *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 763 (3d Cir. 1990) (emphasis in original) (internal quotations omitted).

[164] *Id.* at 764 (internal quotations omitted).

[165] ECF Doc. No. 137 ¶¶ 13–14.

[166] *See* Model Civ. Jury Instr. 3rd Cir. § 5.4.3 (2018) ("You may award as actual damages an amount that reasonably compensates [plaintiff] for any lost wages and benefits, taking into consideration any increases in salary and benefits, including pension, that [plaintiff] would have received from [defendant] had [plaintiff] not been the subject of [defendant's] intentional discrimination.").

[167] ECF Doc. No. 137 at ¶¶ 6, 8.

[168] *See* Section 6, *infra*, for Mr. Middlebrooks's testimony on Teva's compensation to him.

[169] 806 F.2d 1198 (3d Cir. 1986).

[170] 840 F.2d 1108 (3d Cir. 1988).

[171] *Gunby*, 840 F.2d at 1121 (citations omitted).

[172] *Spence*, 806 F.2d at 1201.

[173] *Bolden v. Septa*, 21 F.3d 29, 34 and n.4 (3d Cir. 1994).

[174] *Gallagher v. Green*, No. 12-3840, 2016 WL 3213346, at *13 (E.D. Pa. June 10, 2016).

[175] *See, e.g.*, *Williams v. Care*, No. 14-6347, 2016 WL 4478810, at *5 (E.D. Pa. Aug. 25, 2016) ("Plaintiff may support an award for emotional distress based solely on her own testimony."); *Holt v. Pennsylvania*, No. 10-5510, 2015 WL 4944032, at *28 (E.D. Pa. Aug. 19, 2015) ("[w]e find that

[plaintiff's] testimony alone may support an award for emotional harm"), *aff'd in part, rev'd in part on other grounds and remanded*, 683 F. App'x 151 (3d Cir. 2017).

[176] *Donlin v. Philips Lighting N.Am. Corp.*, 581 F.3d 73, 86 (3d Cir. 2009).

[177] *Id.* at 87 (internal citations omitted).

[178] *Id.* (quoting *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 889-90 (3d Cir. 1984)).

[179] N.T. 11/14/2018 at 94-97.

[180] *Id.* at 99-104.

[181] *See Zielinski v. SPS Tech. LLC*, No. 10-3106, 2011 WL 5902214, at *8-*9 (E.D. Pa. Nov. 22, 2011) (collecting cases).

[182] *Maxfield v. Sinclair Int'l.*, 766 F.2d 788, 797 (3d Cir. 1985). *See also Branning v. Wayne Co.*, No. 15-1936, 2018 WL 2090807, at *3 (M.D. Pa. May 1, 2018) (plaintiff's testimony as to his annual salary and produced W2 forms sufficient to show front pay and jury does not require an expert to calculate future earnings based on past salaries and benefits) (collecting cases); *Cole v. Delaware Tech. & Cmty. Coll.*, 459 F. Supp. 2d 296, 310 (D. Del. 2006) (citing *Maxfield*, 766 F.2d at 797) ("[a] jury can reasonably calculate front pay, based on evidence of past earnings, and can reduce the award to present value without expert testimony").

[183] *Conway v. Hercules Inc.*, 831 F. Supp. 354, 358 (D. Del. 1993) (emphasis added) (internal quotation omitted).

[184] *Id.* (quoting *Bartek v. Urban Redevelopment Auth. of Pittsburgh*, 882 F.2d 739, 746 (3d Cir. 1989)).

[185] *Olabode v. Hecht Inc.*, No. 95-6221, No. 92-6952, 1997 WL 805187, at *12 (E.D. Pa. Dec. 30, 1997) (quoting *Marchese v. Goldsmith*, Nos. 92-6952, 92-6954, 1994 WL 263301, at *4 (E.D. Pa. June 13, 1994)).

[186] https://www.eeoc.gov/laws/guidance/retaliation-guidance.cfm. The EEOC explains its positions in the guideline "represent the Commission's well-considered guidance on its interpretation of the laws it enforces." *Id.* at 2.

[187] *Id.* at 59-60 (emphasis added).

[188] *Id.* at n. 186.

[189] *Vaughan v. Anderson Reg. Med. Ctr.*, 849 F.3d 588, 591-92 (5th Cir. 2017).

[190] The Honorable Terrence McVerry, our now retired colleague in the United States District Court for the Western District of Pennsylvania, addressed the issue of punitive damages in an ADEA

retaliation case, albeit before the EEOC's Directive 915.004.  Judge McVerry found although courts are split on the issue, he agreed with authority finding ADEA does not allow for punitive damages in ADEA retaliation claims.  *Karlo v. Pittsburgh Glass Works, LLC*, No. 10-1283, 2016 WL 69651, at *3 (W.D. Pa. Jan. 6, 2016) (collecting cases). *See also*, H. Eglit, 2 Age Discrimination § 8.111 (2d ed.) (Oct. 2018 Update).

[191] 42 U.S.C. § 1981a(b)(3)(D).  We attribute the punitive damages award to the Title VII claim only; the PHRA does not allow for punitive damages. *Gagliardo v. Connaught Labs., Inc.*, 311 F.3d 565, 570, n.3 (3d Cir. 2002) (citing *Hoy v. Angelone*, 691 A.2d 476, 483 (Pa. Super. 1997)).

[192] *See* 42 U.S.C. § 1981a(b)(3)(D).

[193] 311 F.3d at 570.

[194] *Id.*

[195] *Id.*

[196] *Id.*

[197] *See Willis v. UPMC Children's Hosp. of Pittsburgh,* 808 F.3d 638, 643 (3d Cir. 2015) ("Since this Court has determined that the interpretation of the PHRA is identical to that of federal anti-discrimination laws, including the ADEA, we present a single analysis for Willis's claims under both statutes.").

[198] *See Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 n.5 (3d Cir. 2006) ("We construe Title VII and the PHRA consistently."); *Larochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 677 (E.D. Pa. 2016) ("In the employment discrimination context, the analysis for adjudicating claims under the PHRA is identical to a Title VII analysis."), *clarified on denial of reconsideration*, No. 12-5567, 2016 WL 6135577 (E.D. Pa. Oct. 21, 2016).

[199] *See Koller v. Abington Mem'l Hosp.*, 251 F. Supp. 3d 861, 863–64 (E.D. Pa. 2017).

[200] *Booker v. Taylor Milk Co., Inc.*, 64 F.3d 860, 868 (3d Cir. 1995).

[201] *Id* (citation omitted).

[202] *Taxman v. Bd. of Educ. of Piscataway*, 91 F.3d 1547, 1566 (3d Cir. 1996); *Johnson v. Dependability Co., LLC*, No. 15-3355, 2016 WL 852038, at * 3 (E.D. Pa. Mar. 3, 2016) (citing *Diaz v. Saucon Valley Manor, Inc.*, No. 12-433, 2013 WL 4564300, at *2 (E.D. Pa. Aug. 27, 2013)).

[203] Title 28 U.S.C. § 1961(a) is the federal post-judgment interest rate district courts may apply in calculating prejudgment interest. *See Koch v. Mack Trucks, Inc.*, No. 16-4857, 2018 WL 2461921, at *9 (E.D. Pa. June 1, 2018).

---

[204] *Grieb v. JNP Foods, Inc.*, No. 15-1575, 2015 U.S. Dist. LEXIS 171631, *8-*9 (E.D. Pa. Dec. 23, 2015).

[205] N.T. 11/14/2018 at 102-103.

[206] *See Taxman*, 91 F.3d at 1566 (affirming trial court's application of IRS rate); *Security and Data Tech., Inc. v. Sch. Dist. of Phila.*, No. 12-2392, 2016 WL 7427758, at *21 (E.D. Pa. Dec. 20, 2016) (awarding prejudgment interest to plaintiff in action under 42 U.S.C. § 1981 at IRS overpayment rate); *Johnson v. Dependability Co., LLC*, No. 15-3355, 2016 WL 852038, at *3-*4 (E.D. Pa. Mar. 3, 2016) (awarding prejudgment interest as appropriate in ADA case at IRS overpayment rate); *Marra v. Phila. Housing Auth.*, 404 F.Supp. 2d 839 (E.D. Pa. 2005), 848 n.2 (awarding prejudgment interest on back pay award at IRS rate in Title VII and PHRA claims).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEPHEN MIDDLEBROOKS | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 17-412 |
| | : | |
| TEVA PHARMACEUTICALS USA, INC. | : | |
| | : | |

## ORDER

**AND NOW**, this 26th day of February 2019, upon considering Plaintiff's Motion for attorney's fees (ECF Doc. No. 153), Defendant's Opposition (ECF Doc. No. 157), Plaintiff's Reply (ECF Doc. No. 158), and for reasons in the accompanying Memorandum, it is **ORDERED** Plaintiff's Motion (ECF Doc. No. 153) is **GRANTED in part** and **DENIED in part** and, as reflected in the accompanying Judgment entered today, we award Plaintiff reasonable attorney's fees of $403,947.27, including $10,000 reimbursement to the Plaintiff for his out of pocket fees incurred before March 31, 2016, and reasonable costs of $51,445.73.

KEARNEY, J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEPHEN MIDDLEBROOKS | : | CIVIL ACTION |
| | : | |
| v. | : | NO.  17-412 |
| | : | |
| TEVA PHARMACEUTICALS USA, INC. | : | |

## MEMORANDUM

**KEARNEY, J.**                                                                 **February 26, 2019**

Congress motivates lawyers to represent employees claiming their employer discriminated or retaliated against them by allowing federal judges to award reasonable fees and costs to compensate the lawyers.  When, as today, the jury vindicates the employee's federal rights, we carefully consider the employee's post-trial motion seeking the former employer pay his attorneys' hourly fees and costs.  Proving an employer's discriminatory or retaliatory state of mind may be difficult if the employer controls both the performance reviews and many of the remaining employees.  But we must ensure the requested fee is based on a reasonable number of hours billed for the success obtained at trial and a reasonable hourly rate charged by trial or employment lawyers in this District.  We review time entries to confirm the lawyers worked for the employee's benefit.  Lawyers need to contemporaneously describe their billed time with enough specificity to allow a reasonableness finding.  We cannot award fees for time billed to emails or internal lawyer conferences with no subject matter or billed at "working on trial prep" for weeks.  We must also set a reasonable hourly rate based on the adduced market rate evidence.  We cannot find a reasonable rate based on the lawyer's, or our, *ipse dixit.*  After studying billing records now filed in support of a motion for attorney's fees after the employee won a significant verdict based on an employer's retaliatory conduct, but not on his discrimination claims, we enter the accompanying

Order granting in part the employee's motion for reasonable fees and costs based on competent evidence. We decline to enhance the attorney's fee beyond the reasonable hours and rates.

## I.     Background[1]

Senior executive Stephen Middlebrooks believed his former employer Teva[2] discriminated against him based on his age and American national origin; created a hostile work environment based on his age and national origin; retaliated against him for making complaints related to age and national origin; and, created a retaliatory hostile work environment for making complaints related to age and national origin discrimination.

### *Console Mattiacci filed EEOC charges based on an undisclosed hourly agreement.*

Mr. Middlebrooks appears to have first contacted Stephen G. Console, Esquire, founder of Console Mattiacci Law LLC, sometime before November 9, 2015. We do not know when Mr. Middlebrooks retained Console Mattiacci. We do not know the terms of representation. All we know is Firm Founder Console first billed time to Mr. Middlebrooks on November 9, 2015 when he spoke to his legal assistant about the case. Firm Founder Console now swears his law firm represented Mr. Middlebrooks on an hourly fee agreement of some sort. Represented by Console Mattiacci, Mr. Middlebrooks first pursued a remedy by filing a charge of discrimination with the Equal Employment Opportunity Commission and Pennsylvania Human Relations Commission on November 25, 2015. It appears Firm Founder Console assigned the matter to one his firm's associates, M. Susan Toth, Esquire.[3] Firm Founder Console, with over thirty-five years' experience, swears his normal hourly rate is $940.00. Attorney Toth, an associate attorney with eight to nine years' experience, billed Mr. Middlebrooks at her normal hourly rate of $340.00.

Teva fired Mr. Middlebrooks on February 29, 2016 while the EEOC and PHRA studied his charge of discrimination.

2

Firm Founder Console swears from November 2015 through March 2016, he and Ms. Toth represented Mr. Middlebrooks based on an undisclosed hourly fee agreement.[4]  Ms. Toth only billed for services through March 30, 2016.  Console Mattiacci filed a second charge with the EEOC and PHRA on March 23, 2016.

### *Console Mattiacci begins billing on an undisclosed contingency fee "arrangement."*

Console Mattiacci claims Mr. Middlebrooks hired it based on an undisclosed hourly basis. But as its invested hours exceeded $10,000, the firm agreed to still represent him but be paid at the end of the case if Mr. Middlebrooks won.[5]  Founder Console swears knowing "Mr. Middlebrooks would not be able to litigate this case with counsel if he had to continue to pay our fees as they accrued."[6]  After March 2016, Console Mattiacci began representing Mr. Middlebrooks on a "straight contingency fee arrangement."[7]  The firm did not show us a contingent fee agreement or "arrangement" as part of its burden to obtain fees today.  We have no idea what it means by a "straight contingency fee arrangement."  In a statutory fee shifting case, the attorney's recovery is contingent on a court awarding its reasonable hourly fees (a lodestar) only if the former employee succeeds; but, a contingency could also mean a percentage of the total recovery awarded to Mr. Middlebrooks, regardless of the invested time.  As we would not compare the lodestar to a percentage fee in this context and Founder Console swears the lawyers kept regular time records and the firm generates approximately $500,000 annually in hourly billings, we presume Console Mattiacci's use of the term "straight contingency fee" means the lodestar awarded today – and it is not also asking Mr. Middlebrooks to pay a "straight contingency" on the total recovery.

As it being paid now became contingent on a recovery, Console Mattiacci assigned one of its partners, Caren Gurmankin, Esquire, to be principally responsible for representing Mr.

Middlebrooks in May 2016.[8]  Attorney Gurmankin, with approximately ten years' experience, billed at her normal hourly rate of $530.00.

Investing 486.3 hours, Attorney Gurmankin principally represented Mr. Middlebrooks from the May 2016 drafting and submitting rebuttal papers with the EEOC, through the filing of this case, drafting both the initial complaint[9] and a second amended complaint, defeating Teva's motion to dismiss, extensive discovery including reviewing over 2,200 documents, deposing seven of Teva's witnesses, attending depositions taken by Teva's counsel, preparing oppositions to Teva's summary judgment motion, preparing proposed voir dire and jury instructions, drafting oppositions to Teva's motions *in limine*, preparing trial exhibits, and, most recently, drafting the post-trial briefs including the motion for attorney's fees before us today.  In many instances, we have no idea what Attorney Gurmankin did in emails or internal conferences.  For example, she reports dozens of emails or communications with "OC" but no description of what she did or identifying "OC."  Although her time records do not help other than provide us with a progress of her efforts, it appears partner-level Attorney Gurmankin managed this case up to the day before trial and then after the verdict.

### *Console Mattiacci's billing for final pre-trial and trial work.*

In early August 2018, the Clerk of Court reassigned this case to our docket following Chief Judge Stengel's departure.  We scheduled a telephone status and trial scheduling conference for August 8, 2018.  The day before our scheduling call, Laura C. Mattiacci, Esquire, a senior Member of Console Mattiacci with sixteen years' experience, entered her appearance to represent Mr. Middlebrooks.  She swears her normal hourly billing rate is $750.00.  We have no idea what Attorney Mattiacci knew about the case when she entered her appearance.  Console Mattiacci's business model manifest in this representation includes having one partner (Caren N. Gurmankin)

invest 486.3 hours at $530.00 an hour to do everything to get ready for trial and then another partner (Laura C. Mattiacci) billing $750.00 an hour to learn the case right before trial and then handle all aspects of the trial.  It is unclear when Console Mattiacci decided its senior trial Attorney Laura Mattiacci would be lead trial counsel, including whether this strategy existed when Attorneys Toth and then Gurmankin invested their hours.  Again, as we are unable to review a fee agreement, we do not know whether Mr. Middlebrooks agreed to this strategy.  We have only Attorney Mattiacci's declaration explaining, in her role as her firm's lead trial counsel, she did not, as is her general practice, actively participate in discovery, depositions, and motion practice but communicated with Firm Founder Console and Attorney Gurmankin regarding the status of the case.[10]

At our initial August 8, 2018 trial conference, we discussed issues regarding the deposition of Teva witnesses located in Israel and set trial to begin on November 13, 2018.  On September 25, 2018, Teva filed an emergency motion for leave to take the videotaped trial depositions of Teva witnesses in Israel.  On Thursday, September 27, 2018, we held a conference with counsel regarding Teva's emergency motion.  The same day, September 27, 2018, we ordered the parties to notice these videotaped trial depositions of the Israel witnesses no later than October 2, 2018.[11]

On October 2, 2018, Attorney Mattiacci began billing time at $750.00 an hour.  She now swears investing 374.5 hours at $750.00 an hour beginning October 2, 2018 through trial and with limited time (2.8 hours) after trial to date.  She moves for us to order Teva to pay her $750.00 an hour for 299 hours represented in forty entries for her services between October 2 and November 11, 2018 for time described only as "worked on trial prep."  For example, on Friday, November 2, 2018, she billed 8 hours and then another 9 hours on the same day as "worked on trial prep."  Facing our scrutiny, she now swears investing her time in reviewing documents[12]; preparing for

5

trial including an opening statement, closing argument, witness outlines and a trial deposition; research of evidentiary issues and jury instructions; and, trying the case for five days.

In mid-October 2018, a month before trial, Attorney Gurmankin needed to excuse herself from work.[13]  Facing a trial in a month, Firm Founder Console assigned associate Kevin Console, Esquire, with five years' experience, to act as associate trial counsel.[14]  Attorney Kevin Console billed time at his normal hourly rate of $340.00.  Attorney Kevin Console worked on the case for four days in October 2018 until Attorney Gurmankin's unexpected early return to work and resumed her role as trial co-counsel.[15]  Upon Attorney Gurmankin's earlier than expected return, Firm Founder Console reassigned Attorney Kevin Console from Mr. Middlebrooks's case to other cases.  On November 12, 2018, the day before we started trial, Attorney Gurmankin faced another conflict preventing her from trying the case with Attorney Mattiacci.[16]  Firm Founder Console again reassigned associate Attorney Kevin Console to serve as associate trial counsel.[17]  Attorney Kevin Console swears he invested 93.1 hours at $340.00 an hour.  He provides us with sixteen time entries, including 15.5 hours for trial on November 12 (the day before trial); 12.1 hours for trial on November 13 (first trial day); two entries of 10.5 hours for trial on November 14 (for a total of 21 hours billed on the second trial day); 17.2 hours for trial and detailed efforts on November 15 (third trial day); 12.2 hours for trial on November 16 (fourth trial day); and, 6.1 hours on November 19 (awaiting jury verdict).

We proceeded to trial with Attorney Mattiacci acting as lead trial counsel and Attorney Kevin Console as associate trial counsel.  In September 2018, Console Mattiacci assigned Ortal Mendelawe as a law clerk to research issues on motions in limine and trial concerns.  Out of law school the same number of years as Attorney Kevin Console (albeit in Israel), she invested 97

hours at $120 an hour. As a licensed attorney in Israel and now in New York, Console Mattiacci provided her research and drafting services at a significant discount.

### *Mr. Middlebrooks succeeds on retaliation claims but not discrimination claims.*

At trial, we granted Teva's Rule 50(a) Motion for judgment as a matter of law on Mr. Middlebrooks's hostile work environment claims finding he failed to adduce sufficient evidence of a severe or pervasive hostile work environment based on age or national origin from which a jury could reasonably find liability.[18]

Following trial, the jury returned a verdict in favor of Teva on Mr. Middlebrooks's claims of national origin and age discrimination but found in favor of Mr. Middlebrooks on his retaliation and retaliatory hostile work environment claims. The jury awarded Mr. Middlebrooks compensatory damages of $200,000; back pay of $332,000; front pay of $450,000; punitive damages of $5,000,000; and, for purposes of liquidated damages under ADEA, found Teva acted willfully in that it knew or showed reckless disregard for whether the law prohibits termination because of age or retaliation for complaining about age.[19]

Teva filed post-trial motions for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and for a new trial under Rule 59(a). We denied Teva's motions, but reduced the jury's $5 million punitive damages award to $300,000 based on Title VII's statutory cap.[20]

## II.    Analysis

Mr. Middlebrooks now moves for attorney's fees and costs under the fee-shifting statutes at issue. He seeks reimbursement of attorney's fees in the amount of $639,778; a contingency fee enhancement of $319,889; costs of $51,723.89; and post-judgment interest.[21] Teva responds we should either eliminate or reduce attorney's fees to a reasonable rate and number of hours, eliminate or reduce fees and costs, and deny a contingency fee enhancement.[22]

Mr. Middlebrooks proceeded on three theories of liability. Each allow an award of a reasonable attorney's fee if successful. Under Title VII, "the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee ...."[23] Similarly, an award of attorney's fees is discretionary under the PHRA. Under the ADEA, which incorporates Section 216(b) of the Fair Labor Standards Act, the court "shall, in addition to any judgment awarded to the plaintiff ..., allow a reasonable attorney's fee ... and costs."[24]

In civil rights cases, we employ the "lodestar" formula to calculate attorney's fees by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate, which is presumed to be a reasonable fee.[25] Mr. Middlebrooks, as the party seeking attorney's fees, "has the burden to prove that [his] request ... is reasonable" by "submit[ting] evidence supporting the hours worked and rates claimed."[26] "[T]he party opposing the fee award then has the burden to challenge, by affidavit or brief with sufficient specificity to give fee applicants notice, the reasonableness of the requested fee."[27] We have "a positive and affirmative function in the fee fixing process, not merely a passive role" and "[i]n calculating the hours reasonably expended, [we] should 'review the time charged, decide whether the hours set out were reasonably expended for each of particular purposes described and then exclude those that are 'excessive, redundant, or otherwise unnecessary.'"[28] In calculating the lodestar, we may not award less in fees than requested unless the opposing party makes specific objections to the fee request.[29]

Our discretion in awarding attorney's fees in fee-shifting statutes "includes the ability to deny a fee request altogether when, under the circumstances, the amount requested is 'outrageously excessive.'"[30] Time entries must "be specific enough to allow the district court to determine if the hours claims are unreasonable for the work performed."[31] Our Court of Appeals defines the requisite degree of specificity required of a party seeking attorney's fees as "some fairly definite

information as to the hours devoted to various general activities, e.g., pretrial discovery, settlement negotiations, and the hours spent by various classes of attorneys, e.g., senior partners, junior partners, associates.  However, it is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney."[32]

Time entries such as "miscellaneous research, telephone conversations, and conferences concerning facts, evidence, and witnesses" are sufficiently specific.[33]  Our Court of Appeals found entries such as "att[entio]n to papers" and "att[entio]n to status" without indicating "what 'papers' or 'status'" to which the attorney attended, and entries such as "e-mails," "conference call," "correspondence" and "review papers" are insufficient to determine if the hours claimed are unreasonable for the work performed.[34]

We are permitted to award time for block billing – "the practice of recording multiple tasks in one, non-itemized entry" – "so long as 'there is a reasonable correlation between the various activities listed in the block and the time spent completing those tasks.'"[35]

### A.  We reduce Console Mattiacci's requested 1,130.4 hours for contingency work.[36]

Firm Founder Console swears his law firm represented Mr. Middlebrooks on a straight contingency fee arrangement beginning in March 2016.  The contingent fee arrangement is neither provided nor described to us.  From November 2015 through January 27, 2019, Mr. Console swears his firm invested 1,130.40 hours of work.[37]  We reduce the requested 1,130.4 hours to 983.33 hours.

While the submitted time records for the Console Mattiacci attorneys do not offer much description, the declarations in support of today's fee request provide slightly more detail:

- 51.4 hours by Firm Founder Console for overseeing the case through litigation including attending a settlement conference; formulating a settlement demand; reviewing correspondence and filings; attending jury selection; and formulating strategy with Attorneys Gurmankin, Mattiacci, and Kevin Console;[38]

9

- 486.3 hours by Attorney Gurmankin from May 2016 through post-trial motions. Her time includes taking the deposition of seven witnesses; defending the depositions of Mr. Middlebrooks and another witness, and attending three other depositions taken by Teva; reviewing over 4,300 pages of documents produced by Teva and over 2,200 documents produced by Mr. Middlebrooks; and successfully defeating Teva's Motion for summary judgment;[39]

- 374.5 hours by Attorney Mattiacci as lead trial counsel, almost all of which occurred between October through December 2018, including creating trial strategy; preparing direct and cross-examination of witnesses; analyzing trial exhibits; preparing opening and closing arguments; working on final preparations for trial; handling evidentiary issues at trial; and trying the case to a successful verdict;[40]

- 93.1 hours by Attorney Kevin Console in October and November 2018 including legal research on evidentiary issues and jury instructions; reviewing and summarizing deposition transcripts; reviewing and assisting in organizing trial exhibits; participating in strategy meetings; and helping prepare examinations of witnesses;[41]

- 28.1 hours by Attorney Toth, formerly of the firm; Firm Founder Console swears Attorney Toth acted as the primary attorney from November 2015 through May 2016 when she left the firm;[42] and,

- 97 hours by Ortal Mendelawe, a law clerk who assisted in research and drafting motions *in limine* and responses to motions *in limine* and performed legal research.[43]

Mr. Middlebrooks argues he is entitled to a fully compensated attorney's fee award because Console Mattiacci vindicated his statutorily protected rights against unlawful discrimination and retaliation by Teva, taking the case to trial in a difficult, hard-fought litigation. Console Mattiacci contends, with the exception of the four-month period it represented Mr. Middlebrooks on an hourly basis, it took Mr. Middlebrooks's case on a contingent basis making the commitment to take his case to trial "when likely few firms would or could." Mr. Middlebrooks's Motion is supported by Firm Founder Console's declaration, as well as the declarations of trial counsel Laura Mattiacci, Caren Gurmankin, Kevin Console, and the declarations of six employment attorneys in the Philadelphia area.

Mr. Middlebrooks argues Console Mattiacci worked a reasonable number of hours necessary to obtain the "resounding victory" and his attorneys "did what was necessary to win this case" and he should be fully compensated for the firm's efforts to "secure an excellent result" in this civil rights litigation. Ms. Mattiacci swears prevailing at trial "presented particular challenges" including the number of documents; number of witnesses; multiple adverse actions at issue; "many levels of cover-up employed by [Teva] to hide the discriminatory and retaliatory animus at play;" and the vigorous defense mounted by Teva, a "large and sophisticated employer," from the outset of the case.[44]

Teva objects to the hours worked as excessive and including redundant and unnecessary time. It asks we reduce the number of compensable hours. Teva claims the time records lack specificity, and Mr. Middlebrooks failed to meet his burden of showing the hours expended on the case are reasonable.

**1. We discount "work on trial prep" entries of Attorney Mattiacci by one-third as lacking a basis to find reasonableness.**

Teva objects to 299 hours billed by Attorney Mattiacci from October 2 through November 12, 2018 totaling $224,250.00 for unspecified work described only as "Work on trial prep."[45] On Friday, November 2, 2018, she billed 8 hours and then another 9 hours on the same day as "worked on trial prep." Teva objects these "Work on trial prep" entries are identical, vague, and provide only a general description without any detail sufficient to evaluate the reasonableness of Attorney Mattiacci's time entries. Although conceding Attorney Mattiacci's declaration provides some examples of her work, she provides no detail regarding how much time she spent on those tasks and includes tasks more junior attorneys or law clerks could have performed such as digesting depositions, reviewing and organizing documents, and conducting legal research. For these same

11

reasons, Teva objects to hours billed by Attorney Kevin Console attributed to "trial prep." For example, Attorney Kevin Console billed 10.5 hours in trial prep twice on the same day.

Teva objects to excessive and duplicative time Attorney Mattiacci billed to "work on trial prep," arguing it should not have taken 299 "hours of a highly experienced trial attorney's time" to prepare for trial. Teva argues we can conclude Attorney Mattiacci spent excessive and duplicative time learning about the case and reviewing documents Attorney Gurmankin had already become familiar. Teva argues we should take these excessive and duplicative efforts into consideration in reducing Attorneys Mattiacci's and Kevin Console's trial prep time, asking we reduce by half Attorney Mattiacci's time, if not eliminate it, and eliminate Attorney Kevin Console's time in its entirety because of his late substitution in the case to cover for Attorney Gurmankin.

On balance, relying upon the sworn declarations, we reduce Attorneys Mattiacci's time described as "worked on trial prep" by one-third. We cannot approve payment of legal fees for hundreds of hours in forty days for "work on trial prep" without some type of description in the contemporaneous time records. We know of no client who would agree to pay out of pocket for hundreds of hours of "worked on trial prep" with no description. Absent a fee agreement, we cannot find Mr. Middlebrooks approved of this billing entry. Console Mattiacci does not explain these entries. If it seeks attorney fees under federal law, it must provide appropriate billing. This is not a personal injury contingency matter where the time entries may not matter. We will not approve this billing strategy in a fee shifting case where we must decide the reasonableness of time.

We recognize Attorney Mattiacci prepared for trial. She needed to review substantial discovery and prepare for trial. She describes these efforts in a declaration filed with the motion

for fees.  Declarations filed ten weeks later now attempt to recast their contemporaneous time entries.  Attorneys Mattiacci and Kevin Console did not prepare their declarations. Attorney Gurmankin billed over ten hours for preparing these declarations in the week before filing motion for fees.  We wonder how Attorney Gurmankin could know what the other attorneys did on certain dates.  She did not.  Instead, the declarations summarize activities. These summaries are not enough to justify a complete reward when not tied to entries.  Console Mattiacci does not try to explain the double billing by Attorney Mattiacci on November 2 and Attorney Kevin Console on November 13.  This double billing is evidence of inadequate training in billing practices.  Mistakes happen in contemporaneous billing records, but we expect attorneys review bills before they send them to clients or file them in federal court.  These experienced attorneys presumably read the declarations before they signed them, and Attorneys Mattiacci and Attorney Kevin Console (to a lesser extent) somehow thought they could bill hundreds of hours without describing what they did.[46]  We cannot grasp how they could come to this conclusion unless it is borne of a belief a federal judge will rubber stamp their lodestar simply because their demonstrated trial skills allow them to present compelling facts (which they did not create) in a manner understandable to our properly-skeptical jury.

Our criticism of billing for this unreasonable time before trial does not affect our view of their trial work.  We witnessed the fruits of the hard work by Attorneys Mattiacci and Kevin Console at trial.  They persuaded the jury to find retaliation after finding no age or national origin discrimination.  We heard evidence Teva fought an earlier lawsuit brought by at least one witness, Ellen Cicak, based on discrimination and hostile work environment.  This earlier challenge offered the jury an insight into Teva's knowledge of the ongoing conduct.[47]  Console Mattiacci persuaded a jury to award $5,000,000 in punitive damages for retaliation.   They succeeded under any

measure on the retaliation claims. We know the amount of work necessary for trial counsel to prepare for trial. But we also expect experienced counsel knows they need to properly account for their efforts if they wish to be paid.

### 2. We discount entries for communications and telephone conferences without identifying the subject matter.

Teva objects to insufficient descriptions of email communications and telephone conferences lacking reference to the subject matter concerned. Teva objects to the majority of Attorney Gurmankin's entries consisting of reviewing and sending various email correspondence for which no topic is specified. Without a description of the subject matter of these communications, Teva argues we cannot assess the reasonableness of the work performed including whether a junior attorney could have performed the tasks or even if the tasks relate to Mr. Middlebrooks's case. Teva asks we either strike all time entries for email communications and telephone conferences with no subject or, at a minimum, substantially reduce the time because of insufficient description for all attorneys.

Console Mattiacci again bills time without giving us the ability to find their work effort is reasonable. Most of the emails and internal conferences have no subject. Many reference "OC" and do not identify "OC." With some fair inference, we presume Attorney Gurmankin is referring to "opposing counsel." We presume Teva would know the subject of communications with it and do not strike this time. But we have no basis for several others.

We will not include time on internal communications with no subject matter. We cannot find an email or internal conference is properly billed to this case when the billing professional does not take the time to describe the subject matter. And we cannot simply find the firm does not describe the subject matter; to the contrary, Firm Founder Console knows how to do it once in a while. On November 28, 2018, he billed .7 hours for "E-mails to/from attorneys regarding

14

affidavits" and on November 20, 2018, he billed .4 hours for "Internal conference with Kevin C. Console, Esquire regarding punitive damages."

We do not doubt the attorneys performed services.  But we cannot find the time billed is entirely reasonable without a description or a context from the other daily entries.  For example, we can fairly conclude Firm Founder Console's communications with his co-counsel during trial focused on the trial and we will not deduct those hours. We also will not deduct time billed to communications with the client as the disclosure of subject matter may risk waiver of the privilege. We will not require Teva to pay for the time entries which do not include a description for an internal communication without a surrounding context to inform the subject matter:

| Date | Atty | Deducted Time | Description |
|------|------|---------------|-------------|
| 1/25/2019 | CNG | (.2) | Emails to/from LCM |
| 1/24/2019 | CNG | (.4) | Email to/from SGC; internal conference with SGC |
| 1/22/2019 | CNG | (.4) | Email to/from LCM; email to RAD |
| 1/15/2019 | CNG | (.4) | Email from/to LCM; internal conference with SGC |
| 12/23/2018 | CNG | (.4) | Email to SGC |
| 11/28/2018 | CNG | (.2) | Internal conference with SGC |
| 11/11/2018 | CNG | (.4) | Email to LCM; email to DS/OTM |
| 11/9/2018 | CNG | (.1) | Emails from/to LCM |
| 11/8/2019 | CNG | (.6) | Emails to/from LCM; ICs with LCM |
| 11/7/2018 | CNG | (.5) | Email to/from LCM; internal conference with SGC/LCM |
| 11/6/2018 | CNG | (.5) | Internal conference with LCM |
| 11/5/2018 | CNG | (.2) | Emails to/from LCM |

| 11/4/2018 | CNG | (.4) | Emails from/to LCM |
| 11/3/2018 | CNG | (.4) | Emails to LCM |
| 10/31/2018 | CNG | (.4) | Emails to/from LCM |
| 10/30/2018 | CNG | (.4) | Emails from/to LCM |
| 10/29/2018 | CNG | (1.0) | ICs with LCM/OTM; emails to/from LCM |
| 10/25/2018 | CNG | (1.0) | Internal conference with OTM; emails from LCM |
| 10/23/2018 | CNG | (.5) | Internal conference with LCM |
| 10/22/2018 | CNG | (.5) | Internal conference with SGC; email to/from LCM |
| 10/15/2018 | CNG | (.2) | Emails to LCM |
| 10/12/2018 | CNG | (.7) | Email to LCM; internal conference with LCM |
| 10/10/2018 | CNG | (.4) | Emails to/from LCM |
| 10/9/2018 | CNG | (.9) | Emails to/from LCM; internal conference with LCM |
| 10/8/2018 | CNG | (.4) | Emails to/from LCM |
| 10/7/2018 | CNG | (.2) | Email to LCM |
| 10/5/2018 | CNG | (.4) | Emails to/from LCM |
| 10/3/2018 | CNG | (.9) | Emails to/from LCM; internal conference with SGC |
| 10/2/2018 | CNG | (.1) | Email to LCM |
| 9/28/2018 | CNG | (.1) | Email to LCM |
| 9/27/2018 | CNG | (.3) | Telephone conference with LCM; email to LCM |
| 9/26/2018 | CNG | (.2) | Emails to/from LCM |
| 9/25/2018 | CNG | (.2) | Email from/to LCM |
| 9/24/2018 | CNG | (.3) | Telephone conference with SGC/LCM |
| 9/23/2018 | CNG | (.3) | Emails to/from LCM; email from SGC |

| | | | |
|---|---|---|---|
| 9/20/2018 | CNG | (.3) | Email to LCM; telephone conference with LCM; email to OTM |
| 9/18/2018 | CNG | (.2) | Email to/from SGC |
| 9/4/2018 | CNG | (1.0) | Email to SGC; internal conference with SGC |
| 8/17/2018 | CNG | (.5) | Email to/from SGC; internal conference with SGC |
| 8/6/2018 | CNG | (.6) | Email to/from LCM; internal conference with SGC |
| 8/3/2018 | CNG | (.2) | Email to SGC |
| 6/5/2018 | CNG | (.4) | Internal conference with SGC |
| 6/4/2018 | CNG | (.2) | Internal conference with SGC |
| 6/3/2018 | CNG | (.3) | Email to SGC; telephone conference with SGC |
| 6/1/2018 | CNG | (.2) | Ems to SGC; draft email to SGC |
| 5/31/2018 | CNG | (.2) | Email to SGC |
| 12/11/2017 | CNG | (.2) | Internal conference with SGC |
| 9/29/2017 | CNG | (.1) | Internal conference with SGC |
| 9/27/2017 | CNG | (.2) | Internal conference with SGC |
| 9/11/2017 | CNG | (.2) | Email to/from SGC |
| 8/29/2017 | CNG | (.3) | Internal conferences with SGC |
| 8/28/2017 | CNG | (.1) | Email to SGC |
| 4/3/2017 | CNG | (.5) | Emails to SGC; Internal conferences with SGC |
| 2/7/2017 | CNG | (.1) | Email from SGC |
| 2/6/2017 | CNG | (.1) | Email to SGC |
| 12/9/2016 | CNG | (.2) | Email to/from SGC |
| 12/4/2016 | CNG | (.1) | Emails from/to SGC |
| 12/1/2016 | CNG | (.1) | Email to SGC |

| 1/17/2019 | KC | (.2) | Emails to/from CNG |
|---|---|---|---|
| 12/31/2018 | KC | (.2) | Telephone conference with CNG |
| 10/16/2018 | KC | (.2) | Emails to/from LCM and SGC |
| 12/3/2015 | MST | (.2) | Email to Stephen Console, Esquire |
| 12/1/2015 | MST | (.2) | Internal conference with Stephen G. Console, Esquire |
| 12/28/2018 | SGC | (.4) | Texts to/from Laura C. Mattiacci, Esquire; e-mails to/from Caren N. Gurmankin, Esquire |
| 12/12/2018 | SGC | (.6) | Telephone conference with Laura C. Mattiacci, Esquire; telephone conference with Laura C. Mattiacci, Esquire and Caren N. Gurmankin, Esquire |
| 11/6/2018 | SGC | (.8) | Internal conference with Laura C. Mattiacci, Esquire |
| 10/30/2018 | SGC | (.8) | E-mails to/from attorneys |
| 10/29/2018 | SGC | (.2) | Telephone conference with Laura C. Mattiacci, Esquire |
| 10/17/2018 | SGC | (1) | Internal conference with Kevin C. Console, Esquire; telephone conference with Laura C. Mattiacci, Esquire |
| 10/9/2018 | SGC | (.4) | E-mails to/from attorneys |
| 10/4/2018 | SGC | (.5) | Meeting with attorneys; internal conference with Laura C. Mattiacci, Esquire |
| 10/3/2018 | SGC | (1) | Internal conference with Caren N. Gurmankin, Esquire |
| 10/1/2018 | SGC | (.4) | E-mails to/from attorneys |
| 9/24/2018 | SGC | (.7) | Review e-mails; telephone conference with Caren N. Gurmankin, Esquire; telephone conference with Caren N. Gurmankin, Esquire and Laura C. Mattiacci, Esquire |
| 9/18/2018 | SGC | (.3) | E-mail to/from Caren N. Gurmankin, Esquire |
| 9/6/2018 | SGC | (.2) | Internal conference with Caren N. Gurmankin, Esquire |
| 9/4/2018 | SGC | (.4) | Email from Caren N. Gurmankin, Esquire; internal conference with Caren N. Gurmankin, Esquire |
| 8/17/2018 | SGC | (.4) | Internal conference with Caren N. Gurmankin, Esquire |
| 8/8/2018 | SGC | (.3) | Internal conference with Caren N. Gurmankin, Esquire |

| 8/6/2018 | SGC | (.2) | Internal conference with Caren N. Gurmankin, Esquire |
| 6/6/2018 | SGC | (.2) | E-mails to/from Caren N. Gurmankin, Esquire |
| 6/4/2018 | SGC | (.2) | Internal conference with Caren N. Gurmankin, Esquire |
| 6/3/2018 | SGC | (.5) | Review e-mail; telephone conference with Caren N. Gurmankin, Esquire |
| 6/1/2018 | SGC | (.5) | E-mail to/from Caren N. Gurmankin, Esquire |
| 3/6/2018 | SGC | (.2) | Internal conference with Caren N. Gurmankin, Esquire |
| 1/19/2018 | SGC | (1.8) | Telephone conference with Laura C. Mattiacci, Esquire (11/18); internal conference with Caren N. Gurmankin, Esquire |
| 9/11/2017 | SGC | (.4) | E-mails to/from Caren N. Gurmankin, Esquire |
| 8/29/2017 | SGC | (.3) | Internal conference with Caren N. Gurmankin, Esquire; review e-mails |
| 6/29/2017 | SGC | (.3) | E-mails to/from Caren N. Gurmankin, Esquire |
| 4/3/2017 | SGC | (.2) | E-mail from Caren N. Gurmankin, Esquire; internal conference with Caren N. Gurmankin, Esquire |
| 11/30/2016 | SGC | (.1) | Telephone conference with Caren N. Gurmankin, Esquire |
| 3/16/2016 | SGC | (.2) | E-mails to/from M. Susan Toth, Esquire |
| 3/11/2016 | SGC | (.2) | E-mails from/to M. Susan Toth, Esquire |
| 3/1/2016 | SGC | (.5) | Internal conference with M. Susan Toth, Esquire |
| 2/29/2016 | SGC | (.2) | Internal conference with M. Susan Toth, Esquire |
| 2/23/2016 | SGC | (.2) | E-mails to/from M. Susan Toth, Esquire |
| 2/17/2016 | SGC | (.1) | Internal conference with Nancy Glace, Legal Assistant |
| 1/22/2016 | SGC | (.5) | Internal conference with M. Susan Toth, Esquire |
| 1/5/2016 | SGC | (.2) | Internal conference with M. Susan Toth, Esquire |
| 12/18/2015 | SGC | (.2) | Internal conference with M. Susan Toth, Esquire |
| 12/16/2015 | SGC | (.2) | Internal conference with M. Susan Toth, Esquire |

| 12/1/2015 | SGC | (.2) | Internal conference with M. Susan Toth, Esquire |
| 11/9/2015 | SGC | (.1) | Internal conference with Nancy Glace, Legal Assistant; |

The failure to describe some form of subject to afford context for these internal communications requires we discount 16.1 hours from Firm Founder Console; 20.8 hours from Attorney Gurmankin; .4 hours from Attorney Toth; and, .6 hours from Attorney Kevin Console in addition to striking his double billing of 10.5 hours of time for one trial day.

### 3.  We overrule Teva's objection to block-billed time entries with descriptions.

Teva objects to block-billed time entries because they do not show how much time the attorney spent on individual tasks, making it impossible to evaluate the reasonableness of time spent on each task.  Teva objects to Ms. Gurmankin's time spent preparing for Mr. Aharoni's deposition on November 24 and November 26 through 30, 2017 totaling 26.5 hours as block-billed, and failing to break down the time spent on each task described in one billing entry.  Teva argues Mr. Middlebrooks fails to carry his burden of showing reasonableness of his attorneys' block-billed time, and asks we eliminate or reduce block-billed entries.

We disagree if the block-billed time is tied to a specific subject, such as preparing for a deposition.  We cannot second guess the amount of time specifically described in a bill.  Each lawyer needs the time she needs to be ready.  She has a professional obligation to be prepared. The challenged block-billing does not raise question of excessive or unnecessary billing. We overrule this objection.

### 4.  We overrule Teva's remaining challenges.

Teva additionally argues internal conferencing time are excessive and unnecessary and should be eliminated entirely.  Teva points to time billed by Firm Founder Console and Attorney

Toth for internal conferences and emails with legal assistant Nancy Glass on November 17, 2015;
February 4, 2016; February 8, 2016; and February 17, 2016.  Teva also seeks to eliminate Firm
Founder Console's "numerous conferences and emails" with Attorneys Mattiacci and Gurmankin
because they are partners in the Console Mattiacci firm and are "capable of handling matters on
their own without consultation with Stephen Console."

Teva argues we should further reduce the attorney's fees where more than one attorney
unnecessarily attended meetings and conferences, for example where both Attorney Gurmankin
and Firm Founder Console participated in a client meetings and telephone conferences and
conferences with the Court on December 12, 2016; September 29, 2017; June 3, 2018; and June
5, 2018.  Teva asks we eliminate Firm Founder Console's time because Attorney Gurmankin acted
as the primary attorney handling the matter.

Teva asks we eliminate Attorney Kevin Console's time waiting on jury deliberations on
November 19, 2018 as unnecessary to have both him and Attorney Mattiacci present during
deliberations.  Teva asks we eliminate all time by Firm Founder Console as unnecessary after
Attorney Toth left the firm in March 2016.  Teva argues Firm Partner Attorney Gurmankin then
accepted responsibility and later Attorney Mattiacci handled the trial, rendering Firm Founder
Console's time unnecessary.  Teva objects to Firm Founder Console's involvement after May
2016, arguing most of his time is attributed to internal conferences and emails which added nothing
to the prosecution of the case and appears to be incurred solely for the purpose of keeping him
aware of the case status.

Teva also objects to the time billed by Attorney Kevin Console who, after Attorney
Gurmankin billed over 486 hours, "was then required to get up to speed" because of a conflict with
Attorney Gurmankin's obligations.  Teva also objects to recovery of time billed by Attorney Toth

21

(who left the firm) and law clerk Mendelawe because they did not file separate declarations even though Firm Founder Console describes their efforts in detail and their time is confirmed in contemporaneous billing records.  In a note, Teva objects to .2 hours billed by a "DIG" on April 29, 2018 and June 1, 2018 claiming it is not aware of any "DIG" billing person.

We overrule each of these objections as stated.  Mr. Middlebrooks retained Console Mattiacci as a law firm.  Internal conferences, if properly described as to subject matter, are an important service in a law firm.  We would expect our surgeons, engineers and contractors to consult with other professionals when necessary; we will not second guess our trial lawyers on important decisions.  Mr. Middlebrooks has the right to the benefit of the experience of several skilled attorneys.  He would not want to pay for Firm Founder Console to participate in the day-to-day but he should expect Firm Founder Console would have continuing input.  Firm Founder Console has a duty to supervise cases where he signs the complaints and is counsel of record.  While we today do not credit hours without a description of the services provided, we will not second guess trial counsel's strategy.  We do not second guess Attorney Kevin Console's presence during jury deliberations; the jury may return with substantive questions and Mr. Middlebrooks is entitled to have the best thinking on these time-sensitive inquiries.  We also do not discount the time described by Attorney Toth and law clerk Mendelawe just because they did not file a declaration.  Firm Founder Console fully described their relatively minor roles in the case and their time records confirm their roles.  We also do not find a "DIG" in billing records.  We cannot discount time when we are not shown this challenged time entry of .2 by a "DIG."

Lawyers should be credited for their hard work, but they need to tell us what they did.  When they do not, we cannot find the amount of billed time is reasonable.  We appreciate giving credit for any time billed without specific description may encourage dishonest billing by

overinflating the time and hoping to be paid for half the time.  This is a valid concern, but not today.  We witnessed the effects of hard work in the courtroom.  Console Mattiacci and firms with similar billing practices will be better served (and paid) when they properly account for their efforts.

### B.  We set the reasonable hourly rate based on Community Legal Services' schedule slightly adjusted for 2019 and based on Teva's hourly rates.

Mr. Middlebrooks carries the burden to produce "satisfactory evidence in addition to the attorney's own affidavits that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."[48]   A "reasonable hourly rate" is generally calculated according to the prevailing market rates in the relevant community and our starting point is the attorney's usual billing rate.[49]   However, the attorney's usual billing rate is "not dispositive."[50]   When determining the prevailing market rate, we are directed by our Court of Appeals to "assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."[51]

Mr. Middlebrooks contends the hourly rates for the Console Mattiacci attorneys and law clerk are reasonable, arguing (a) Console Mattiacci's hourly rates reflected in the billing entries in its lodestar calculation are the same as the regular rates charged for services in non-contingent cases in 2018; (b) Console Mattiacci's rates are in line with the prevailing market rates for attorneys of similar experience, skill, and reputation, citing the declarations of six employment law attorneys in the Philadelphia area; (c) we should consider Firm Founder Console's declaration, based on his over thirty years' experience in employment law, attesting to the firm's rates as within the prevailing market rate for similar work performed by attorneys of comparable skill and experience; (d) Console Mattiacci's usual and customary rates are consistent with rates charged

23

by Philadelphia-based defense firms according to the 2013 National Law Journal Survey of Billing Rates; and (e) Console Mattiacci's usual and customary rates have been approved in other litigations in this District, the United States District Court for the Middle District of Pennsylvania, and in arbitration.[52]

Teva responds Console Mattiacci's rates are unreasonable. Teva objects to hourly rates of the Console Mattiacci firm as well above the prevailing market rate in the community. Teva objects to hourly rates of $940.00 per hour for Mr. Stephen Console; $750.00 per hour for Ms. Mattiacci; $530.00 per hour for Ms. Gurmankin; $340.00 per hour for Attorneys Kevin Console and Toth; and $120.00 per hour for Ms. Mendelawe. Teva additionally argues Mr. Middlebrooks's references to recognitions and publications by Console Mattiacci's attorneys should "hold no sway" because Teva's attorneys have credentials "of equal rate" and they do not charge the rates of Console Mattiacci.

Teva argues the reasonable hourly rate is the prevailing market rate in the community and points to the fee schedule established by Community Legal Services, Inc.[53] Teva argues, at a minimum, we must reduce the Console Mattiacci rates – which as to Firm Founder Console and Attorney Mattiacci run between $240.00 to $300.00 over the Community Legal Services rates and as to Attorneys Gurmankin and Kevin Console at $100.00 over the Community Legal Services rates. Teva suggests a schedule within the Community Legal Services rates, arguing a rate of $650.00 per hour for Firm Founder Console; $480.00 per hour for Attorney Mattiacci; $360.00 per hour for Attorney Gurmankin; and $255.00 per hour for Attorney Kevin Console.[54]

Mr. Middlebrooks replies we should not apply the Community Legal Services rates. He concedes some courts in this District apply the Community Legal Services rates where attorneys seeking fees are associated with Community Legal Services or where limited evidence is

24

submitted, but argues we have a different situation here. Mr. Middlebrooks argues courts reject the Community Legal Services where (1) the rate does not reflect the prevailing rate at the time of the petition; (2) the attorneys are unaffiliated with Community Legal Services; (3) the parties submit sufficient evidence of the prevailing market rates; and (4) the Community Legal Services rates do not take into account any specialized skills or experience attorneys bring to their practice. Mr. Middlebrooks emphasizes the third and fourth reasons, suggesting Console Mattiacci submitted sufficient evidence of the prevailing market rates and the firm's specialized skill and experience militate against applying the Community Legal Services rates, citing *Mitchell v. City of Philadelphia.*[55] In *Mitchell*, the district court declined to apply the Community Legal Services rate, instead awarding attorney's fees at the hourly rate requested by plaintiff finding such rate reasonable in light of counsel's education, experience, and reputation.[56] The court explained the four-year-old Community Legal Services rate schedule does not reflect current rates; the matter did not involve a Community Legal Services affiliated attorney; counsel provided sufficient evidence of prevailing market rates; and, plaintiff's attorney possessed specialized skill and experience not recognized in the Community Legal Services rates.[57]

*Mitchell* is distinguishable. Console Mattiacci must show the reasonableness of its billed rates. Returning to Microeconomics 101 in setting a reasonable market price, we may look to what a willing client would pay a willing lawyer. But Console Mattiacci does not give us their fee agreement for their willing client Mr. Middlebrooks. While it claims its rates are reasonable can be based on what people in Philadelphia are willing to pay, they offer no evidence including from Mr. Middlebrooks. We have no idea what Mr. Middlebrooks thought to be a reasonable hourly rate. He paid approximately $376.00 an hour for 26.6 hours of services but then could not continue to pay at this rate. Given Firm Founder Console's sworn observation as to Mr. Middlebrooks's

inability to pay after March 2016 at this rate, we cannot find he would pay the rates sought today even though he earns over $200,000 a year. We also cannot find these hourly rates are reasonable because Console Mattiacci generated $500,000 in revenue based on hourly rates. We have no context for those fees, including where the lawyers provided those services. We cannot recklessly leap to a find a reasonable fee in this District today because some undefined fraction of Console Mattiacci's annual revenue is drawn from hourly rates paid by someone for some case in some venue.

Absent or possibly supplementing an agreement between the contracting parties, we may look to the marketplace where Console Mattiacci provided these services. We can examine reasonableness affidavits of experienced trial and employment attorneys describing the reasonable rates for these types of cases in this District. Console Mattiacci offers comparator affidavits from six experienced employment lawyers. In almost identically verbatim statements, they each declare the Console Mattiacci rates are within the range of fees charged in this District. Teva objects because these employment lawyers are motivated to raise the reasonable rate for all employment lawyers. We disagree with Teva's reasons; we will not so cynically find experienced lawyers in this District would cavalierly disregard their professional reputations to falsely swear so Console Mattiacci can be paid more fees. Our problem centers on the comparator affidavits failing to offer their hourly rates. They conclude as to a "range" of reasonableness but fail to offer evidence. The primary evidence is their hourly rates. We have no evidence of another employment lawyer charging these rates. We appreciate Console Mattiacci may tout being the best employment lawyers and deserve a premium; their comparator affiants do not so swear and we do not measure the reasonableness of fees based on the attorney's own newspaper clippings or say-so.

Looking for more support, Console Mattiacci cites its approved rates in other cases and compares its rates to those charged by the world's largest law firms. The offered rates in other cases are dated at best and approving those rates lacks a basis of reasonableness for employment or trial counsel in this District at this time. The rates obtained by Console Mattiacci in class actions or in uncontested fee requests do not define reasonableness today.[58]

We are not persuaded by published hourly rates charged in 2013 by large law firms. We are reviewing reasonableness in this District for skilled trial lawyers (as to Attorney Mattiacci) and skilled employment lawyers for the others. Average hourly rates at large law firms often include lawyers who avoid courtrooms and find well-paid comfort in boardrooms, administrative, and patent hearings. The large law firms must also account for significant overhead not present, at least to the same extent, at Console Mattiacci. In further examining those large firm rates, we should look to the average partner rates; there is no basis to simply jump to the highest billing rate in a large law firm and set this rate as reasonable. We have no idea who pays those rates and why. If we look to the average hourly rates, they range between $530.00 to $640.00 an hour in 2013. Assuming inflation in the past five or six years, these rates are still far below Console Mattiacci's requests for both Firm Founder Console and Attorney Mattiacci. If we applied an average partner hourly rate at Console Mattiacci based on the three partners in this case, we would set a reasonable hourly rate at $740.00. But no one asks us to do so and this simple equation would not fairly value the partners' impact on the case as most of the billed time is appropriately billed by Attorney Gurmankin. Even if we weighted the hourly rate based on the number of partners' total billed hours, we would reach an average partner hourly rate of $643.42. Again, no one asks us to reach this measure of reasonableness as Teva challenges the reasonableness of the underlying data of hourly rates billed by the three partners.

27

We are left without evidence of reasonableness of Console Mattiacci's hourly rates.  But we have one limited exception: Teva paid its trial counsel $570.00 an hour and its associate trial counsel $400 an hour.  Other than this data detailing what a willing client paid counsel for this case, we lack evidence of Mr. Middlebrooks's agreement as to the fee or comparator affidavits disclosing 2018-19 hourly rates from similarly experienced attorneys practicing in this District or either party asking we set a blended hourly rate for partners based on the billed hours.

Absent credible evidence of reasonableness, we may look to rates provided by Community Legal Services, whose fee schedule "has been approvingly cited the Third Circuit as being well developed and has been found by [the Eastern District of Pennsylvania] to be a fair reflection of the prevailing market rates in Philadelphia."[59]  The Community Legal Services rate appears in this District on employment cases.  For example, in *Jones v. Pa. State Police*, the district court considered a fee petition after a jury found in favor of plaintiff on her hostile work environment claim.[60]  Plaintiff's attorney sought $750 per hour in attorney's fees.  The court found plaintiff's counsel failed to satisfy his burden of showing the $750 hourly rate is reasonable by providing only his own declaration.  The court applied a "dual hourly rate structure" for the attorney's trial and non-trial work, basing the hourly rate of trial work on the Community Legal Services rates.[61]

We apply the Community Legal Services hourly rates as evidence of the baseline for reasonableness in this District.  Community Legal Services, like Console Mattiacci today, seek attorney's fees based on an hourly rate.  Applying the high end of the range, those hourly rates in February 2017 are: $650.00 for Firm Founder Console; $510.00 for Attorney Mattiacci; $440.00 for Attorney Gurmankin; $340.00 for Attorney Toth; and $255.00 for Attorney Kevin Console.  Community Legal Services does not include a rate for law clerks, but provides a rate of $180 to $200 for attorneys with less than two years' experience; $90 to $145 for law students; $115-$140

28

for paralegals I and II; and $140 to $165 for senior and supervisory paralegals. Mr. Middlebrooks requests reimbursement of Ms. Mendelawe's time at the Console Mattiacci firm's 2018 law clerk rate of $120 per hour.[62]   The rate of $120 per hour sought for Ms. Mendelawe, who earned her law degree in Israel in 2013, an LL.M. from the University of Pennsylvania Law School in 2018, and is a member of the Bar of the State of New York, is well below the rate for attorneys with less than two years' experience, is within the rate for law students, and is reasonable.

We adopt these Community Legal Services rates with a ten dollar ($10) hourly increase to account for the 2019 billing with two exceptions: Attorney Mattiacci should be paid at the same $570.00 hourly rate as Teva's trial counsel as we know this is the market for trial counsel in this case and Attorney Kevin Console should be paid his requested $340.00 as Teva paid its associate attorney more than this requested number.

After balancing these factors considering little evidence except the hourly rates paid by Teva and those set by Community Legal Services[63], we set the reasonable hourly rates for Console Mattiacci's approved hours in this case at: $660.00 for Firm Founder Console; $570.00 for Attorney Mattiacci; $410.00 for Attorney Gurmankin; $340.00 for Attorneys Toth and Kevin Console; and, $120.00 for Law Clerk Mendelawe.

### C. We slightly discount the reasonable fees because Mr. Middlebrooks did not succeed on all seven interrelated claims at trial.

Teva next argues Mr. Middlebrooks's claims of "wild success" must be tempered by our dismissal of the age and national origin hostile work environment claims at the close of the evidence, the jury's finding in favor of Teva on the discrimination and hostile work environment claims based on national origin and age, and because we reduced the punitive damages award under the Title VII damages cap.  Teva contends the discrimination claims are "distinct from" the successful retaliation claims and Console Mattiacci did separate work for each claim.

29

The Supreme Court holds the degree of success is "the most critical factor" in determining an appropriate attorney's fee award.[64] "This factor is particularly crucial where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief."[65]  In this situation, we are directed by the Supreme Court to ask two questions: "First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?"[66]

The Court recognized a plaintiff in one case "may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories" while, in another case, such as civil rights cases, "plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories.  Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims.  Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation."[67] The Court recognized where a plaintiff obtained "excellent results, his attorney should recover a fully compensatory fee," normally encompassing "all hours reasonably expended on the litigation" and, "[i]n these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in his lawsuit…. Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee.  The result is what matters."[68]  To that end, the Court held "[w]here the plaintiff has failed to prevail on a claim that is distinct in all respects from this successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee" but "[w]here

a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised."[69]

Teva asks we apply an "across the board reduction" of Console Mattiacci's fees of at least twenty-five percent to account for Mr. Middlebrooks's partial success, and suggests a reduction of fifty percent is appropriate based on Mr. Middlebrooks's success on his retaliation claims but not his discrimination claims. Teva likens Mr. Middlebrooks's unsuccessful discrimination claims to *Jodlowska v. Soar Corp.*, a 2015 decision from this District where the court reduced attorney's fees attributed to unsuccessful claims.[70]  In *Jodlowska*, plaintiff brought claims under Title VII and the PHRA alleging a hostile work environment, race and gender discrimination, retaliation, and a claim for wrongful discharge under Pennsylvania law.[71]  Claims of wrongful discharge under Pennsylvania law were dismissed at the summary judgment stage and, at trial, the court granted defendant's motion for judgment as a matter of law on plaintiff's claim of race discrimination; only claims of hostile work environment, gender discrimination, and retaliation went to the jury. The jury found in favor of plaintiff on the hostile work environment and retaliation claims and in favor of defendant on the gender discrimination claim.[72]  The court disallowed time attributed to discovery on the unsuccessful race discrimination claim and applied a ten percent across-the-board reduction on the fees to account for the unsuccessful claims as "reasonable and appropriate taking into account the full measure of relief plaintiff ultimately obtained at trial."[73]  Teva also relies on *Watcher v. Pottsville Area Emergency Med. Serv., Inc.*[74]  In *Watcher*, the district court reduced the lodestar amount by fifty percent to account for plaintiff's "limited success" in proving age discrimination under ADEA and the PHRA but failing to prove sex discrimination under Title VII and the PHRA.[75]

31

Mr. Middlebrooks replies the jury awarded him all damages to which he is entitled on the retaliation and retaliatory hostile work environment claims and the result would not have changed even if the jury found in his favor on the age and national origin discrimination claims.  Mr. Middlebrooks argues both discrimination and retaliation claims required him to demonstrate pretext, and we should look at the result.  Citing *Hensley*, Mr. Middlebrooks argues "the result is what matters" and, here, he achieved excellent results.  Mr. Middlebrooks also cites *McGuffey v. Brinks, Inc.* where our colleague Judge Brody found the employee's ADEA and PHRA claims of discrimination and retaliation dismissed on summary judgment "closely related" to plaintiff's successful retaliation claim.[76]  Answering the first *Hensley* question, Judge Brody found the successful and unsuccessful claims "all involved similar legal theories under the ADEA and PHRA," the "hours expended researching those laws and arguing those theories normally were devoted generally to all ADEA and PHRA claims," and the claims "involved a common core of facts" because the defendant employer offered the same explanation for its challenged conduct.[77]  Applying the second *Hensley* question, Judge Brody found plaintiff's success incomplete because the jury did not find defendant liable for age discrimination, but recognized the jury awarded plaintiff a $170,000 award on his retaliation claim.[78]  To compensate for "limited success," Judge Brody applied a ten percent reduction to the lodestar.[79]

Applying the first of *Hensley's* two questions, we ask whether Mr. Middlebrooks's unsuccessful discrimination claims are "unrelated" to the successful retaliation claims.  Teva argues the discrimination claims are distinct from the retaliation claims.  We disagree.  The claims are sufficiently related and involve a common core of facts.  Although the jury did not find for Mr. Middlebrooks on his age and national origin discrimination claims, it found Teva retaliated against him for the complaints he made regarding discrimination based on age and national origin.  Even

32

if the discrimination claims were not in the case, Mr. Middlebrooks had to develop at trial the factual context of his complaints to Teva regarding perceived age and national origin discrimination. Teva asserted an identical defense to both claims.  From the time of summary judgment through trial, Teva asserted Mr. Middlebrooks's performance problems as the reason for his termination in defense of both the retaliation and discrimination claims.  These factors lead to the conclusion the unsuccessful discrimination claims are related to the successful retaliation claims.

The second *Hensley* question asks whether Mr. Middlebrooks achieved a level of success making the hours reasonably expended a satisfactory basis for making a fee award.  Here, the jury awarded damages to Mr. Middlebrooks on his retaliation claims.  Mr. Middlebrooks did not succeed on every claim.  Our verdict slip required responses to whether Teva discriminated separate from questions on whether Teva retaliated or created a retaliatory hostile work environment.   With counsel's consent, we only offered one compensatory damages question should the jury find Teva discriminated and/or retaliated.    No party asked for a separate damages question for each claim.  We cannot speculate as to whether, had he succeeded on his national origin discrimination claim, a jury would have awarded him more damages.  It certainly could have done so as the national origin discrimination occurred first; by definition, the retaliation occurred for complaints about national origin discrimination.    The jury did not find Teva discriminated based on national origin.  The jury instead found Teva retaliated and created a retaliatory hostile work environment.   Mr. Middlebrooks is correct as most of his alleged compensatory harm is addressed by the jury verdict and the same effort would likely have been necessary even if he did not pursue the national origin discrimination claim. But if *Hensley* is to

33

have meaning, we must deduct some percentage of the requested hourly fees because Mr. Middlebrooks did not win every claim.

We find this is a relatively minor discount in this context given the interrelated proofs. In balancing these concerns, we deduct four percent (4%) from the reasonable fee to account for Mr. Middlebrooks not winning all his claims at trial.

### D.  We decline to award a contingency fee enhancement.

Plaintiff seeks a contingency fee enhancement of $319,889, amounting to fifty percent of the claimed lodestar before our analysis.   Mr. Middlebrooks concedes a contingency fee enhancement on his federal claims is precluded under the Supreme Court's decision in *City of Burlington v. Dague*. [80]  Instead, he seeks a contingency fee enhancement on his successful PHRA claims under Pennsylvania Rule of Civil Procedure 1717.  Pennsylvania Rule of Civil Procedure 1717 provides: "In all cases where the court is authorized under applicable law to fix the amount of counsel fees it shall consider, among other things, the following factors: (1) the time and effort reasonably expended by the attorney in the litigation; (2) the quality of the services rendered; (3) the results achieved and benefits conferred upon the class or upon the public; (4) the magnitude, complexity and uniqueness of the litigation; and *(5) whether the receipt of a fee was contingent on success*."[81]

Mr. Middlebrooks relies primarily on two cases to support his argument we should apply a contingency fee enhancement; the decision of our Court of Appeals in *Polselli v. Nationwide Mut. Fire Ins. Co.* [82] and the New Jersey Supreme Court's decision in *Rendine v. Pantzer*.[83]

In *Polselli*, plaintiff prevailed against her insurer on a claim under Pennsylvania's bad faith statute.  The district court awarded an enhancement to the lodestar upon finding plaintiff's counsel faced "a substantial risk of a minimal recovery and [an] extensive number of hours risked ... with

no guarantee of renumeration," increasing the lodestar amount by sixty percent.[84]  On appeal, our Court of Appeals addressed "whether, and under what circumstances, a court may enhance a fee under Pennsylvania law to reflect the contingent risk of nonpayment assumed by the plaintiff's attorney in accepting the case on a contingent-fee basis."[85]  With no precedent from the Pennsylvania courts, our Court of Appeals predicted the Pennsylvania Supreme Court "would permit a trial court to enhance the lodestar amount to account for a particular case's contingent risk only to the extent that those factors creating the risk are not already taken into account when calculating the lodestar amount."[86]

The court additionally predicted the Pennsylvania Supreme Court "would conclude that a contingency enhancement would not apply in every case" and would allow an enhancement to the lodestar "to account for a particular case's contingent risk only to the extent that those factors creating the risk are not already taken into account when calculating the lodestar amount."[87] The Court of Appeals directed we "exercise caution" in considering an enhancement "so as not to skew the calculation of a reasonable rate by double counting" for example, "if the complexity of a case is reflected in the high number of hours researching the complex issues or in the relatively high regular hourly rate of the attorney, complexity does not justify a contingency enhancement."[88] We are also directed to consider "whether the attorney was able to mitigate the risk of nonpayment" for example, an attorney who enters into a contingency fee agreement "has significantly mitigated the continued risk" because the attorney "obtains the prospect of compensation under the agreement substantially in excess of the lodestar amount."[89] We are also cautioned we "must not … deviate from [our] ultimate responsibility – the calculation of a 'reasonable' fee."[90]  To the extent factors creating a contingent risk in a particular case are mitigated or already taken into

account when calculating the lodestar amount, a contingency enhancement is not reasonable and should not be awarded.[91]

After *Polselli*, the Pennsylvania Superior Court "embraced the reasoning" of *Polselli* holding a "contingency enhancement on top of the lodestar is appropriate only if the lodestar does not reflect counsel's contingent risk."[92]   Courts should analyze multiple factors in considering whether to apply a contingency enhancement.   These factors include, but are not limited to, the degree of success, the deterrent effect of the verdict, the potential public benefit, and the potential inadequacy of a private fee agreement, whether an award would promote the purposes of the statute at issue, the relationship between the damages sought and those recovered.   Further, in a contingent-fee agreement, a court may consider the contingency in determining the enhanced amount but the agreement cannot create an "artificial ceiling based on the percentage agreed upon between attorney and client."[93]

In *Rendine*, cited in *Polselli*, the New Jersey Supreme Court permitted a contingency enhancement to prevailing parties under the New Jersey Law Against Discrimination. The New Jersey Supreme Court reasoned "a counsel fee awarded under a fee-shifting statute cannot be 'reasonable' unless the lodestar, calculated as if the attorney's compensation were guaranteed irrespective of result, is adjusted to reflect the actual risk that the attorney will not receive payment if the suit does not succeed."[94]   The New Jersey Supreme Court held contingency enhancements in fee-shifting cases "ordinarily should range" between five and fifty-five percent of the lodestar fee, with the enhancement in "typical contingency cases ranging" between twenty and thirty-five percent of the lodestar.   *Rendine* pertained solely to claims under New Jersey statutory law.

Mr. Middlebrooks additionally relies on *Barker v. Hostetter* to support his claim for a contingency fee enhancement.[95]   In *Barker*, the court awarded a contingency fee enhancement on

a Pennsylvania Unfair Trade Practices and Consumer Protection Law claim, applying Pennsylvania Rule 1717 and finding plaintiffs' counsel entitled to be fairly compensated for the risk in undertaking the matter on a contingent fee basis; investment of considerable time and expense in case; the complexity of the case; and the achievement of substantial benefits for clients that may not have been able to vindicate rights absent counsel's willingness to take the case on a contingent basis.[96]

Mr. Middlebrooks does not provide us, and we could not find, authority from a Pennsylvania court or Pennsylvania district court or our Court of Appeals applying a contingency fee enhancement to a PHRA claim. Only one case appears to address the issue, *Stewart v. Weis Markets, Inc.*, a 1995 decision from the United States District Court for the Middle District of Pennsylvania.[97] In *Stewart*, plaintiff alleged employment discrimination in violation of Title VII and the PHRA. After a finding in plaintiff's favor, the court found plaintiff entitled to recover counsel feels under Title VII and the PHRA and considered plaintiff's counsel's request for a contingency multiplier. The court concluded the Supreme Court's decision in *Dague* precluded a contingent fee enhancement on her Title VII claims, but questioned whether such an award is available under the PHRA.[98] Recognizing an award of fees is authorized by the PHRA, the court found "[s]cant authority exists, however, on how such an award is to be calculated and what may be included" finding "no authority from the Pennsylvania courts either condoning or disapproving the use of a contingent fee multiplier."[99] Absent guidance from the Pennsylvania courts, the district court "look[ed] to the general premise that Title VII and the PHRA serve the same purpose, and are, if reasonable, to be construed *in pari materia*. In light of that, we conclude that if this issue were to come before it, the Pennsylvania Supreme Court would conclude for much the same

reasons as were stated by the United States Supreme Court in [*Dague*], that use of a multiplier is not appropriate in this context."[100]

Relying on *Polselli, Rendine*, and *Barker*, Mr. Middlebrooks argues Pennsylvania Rule of Civil Procedure 1717 "dictates" a contingency fee enhancement should be awarded on his successful PHRA claim. Mr. Console swears Mr. Middlebrooks would not have been able to litigate this case with counsel if he had to pay fees as accrued through litigation, and if Mr. Middlebrooks did not succeed in the litigation, the Console Mattiacci firm would not have earned any fee.

Teva argues Mr. Middlebrooks is not entitled to a fee award on his PHRA claim in the first place because there is no presumption of fees under the PHRA; the Pennsylvania Supreme Court would not apply a contingency fee enhancement under the PHRA; and even if such an enhancement applied, it is not appropriate here. Teva argues *Polselli* is distinguishable because its holding is limited only to bad faith claims under Pennsylvania's bad faith statute and in determining whether to award a contingency fee enhancement, we should consider an attorney's ability to mitigate the risk of non-payment through a contingency fee agreement. Teva argues the Console Mattiacci firm mitigated its risk of non-payment through a contingency fee agreement; Mr. Middlebrooks's salary made the risk of non-payment minimal; and the recovery obtained in the litigation (although reduced on the punitive damages claim) mitigates the contingent risk in light of the prospect of compensation under the agreement substantially in excess of the lodestar amount.

We decline to award a contingency fee enhancement. We have no contingent fee agreement to determine which part of the lodestar figure is attributable to the PHRA claims. We do not know the percentage the Console Mattiacci firm is recovering on the total award and, consequently,

cannot determine whether the lodestar plus a contingency fee enhancement, even if awarded, is more or less than the fee the firm is entitled under a contingent fee agreement, a factor in determining whether to award an enhancement. We also cannot find, and Console Mattiacci does not provide us, with case authority applying a contingency fee enhancement to a PHRA claim. The sentinel case, *Polselli*, applies a contingency fee enhancement to a Pennsylvania statutory bad faith insurance claim and *Barker* applied an enhancement under Pennsylvania's Unfair Trade Practices and Consumer Protection Law. We find pervasive the reasoning of *Stewart v. Weis Markets, Inc.* and similarly decline to apply a contingency fee enhancement to a PHRA claim.

**D. We award reasonable costs.**

Mr. Middlebrooks seeks costs as mandatory under ADEA and as the prevailing party he is entitled to reimbursement of his reasonable and appropriate costs of $51,723.90 through December 28, 2018. "Successful civil rights litigants are entitled to reimbursement of 'costs' connected with litigating their claim as long as the costs are reasonably and necessarily incurred."[101] Costs such as travel and parking expenses are recoverable in civil rights cases so long as they are reasonable and necessary to the litigation.[102] The cost of meals may be reimbursed if supported by adequate documentation and are reasonable.[103]

Teva appears to concede Mr. Middlebrooks is entitled to costs, but argues the costs must be reduced (1) because they are excessive and include non-reimbursable items; and (2) to account for Mr. Middlebrooks's partial success in correlation to the corresponding reduction in attorney's fees. Teva specifically objects to attorneys' travel expenses of $1,634; meals and drinks of $675; and courier fees of $140 as part of counsel's out-of-pocket and "overhead" costs not recoverable. Even if recoverable, Teva objects as unreasonable to Attorney Mattiacci's Black Cab rides for travel to and from the court house during trial at $69 each way; a charge of almost $400 for

transportation to and from the court house for paralegal Dan Shanks; and $320 in meals and drinks during trial as well as for other meals for the trial team and client; and use of an express courier service where regular mail would have been sufficient.   We disagree with Teva on the travel to/from the courthouse for trial, courier fees and travel expenses.   We agree with Teva on the charges for meals on non-trial days of April 4, November 3, 6, 8 and 20, 2018 and deduct $278.16 from the billed costs.   We agree with Judge Bartle in *Blagrave*, "[t]here is simply no reason that a client or the defendant should be forced to reimburse attorneys for the costs of an ordinary, workday lunch when the attorneys could have had to purchase those lunches in any event."[104]   In *Becker*, our colleague Judge Robreno excluded meal expenses as undocumented and, even if documented with receipts, "expresse[d] reservations as to whether it is proper to charge the defendant for lunch and dinner costs, which are incurred during a trial by counsel from the local area."[105]

Teva also objects to paying costs relating to the video deposition of Nir Aharoni totaling $10,310 as excessive, arguing counsel "could have travelled to Israel for his deposition" and conducted the deposition in person for less than the cost claimed, particularly when compared to the deposition cost of witness Ilanit Shtrouchler whose video deposition cost $2,808.   Teva asks we cut the cost of Mr. Aharoni's video deposition by fifty percent.   Mr. Middlebrooks responds Mr. Aharoni's deposition occurred over a two-day period totaling 286 pages as compared to the single day deposition of Ms. Shtrouchler totaling 155 pages.[106]   On September 27, 2018, we granted Teva's emergency motion to allow it to preserve trial testimony of witnesses in Israel but ordered the parties to equally share the reasonable costs for the court reporter, videographer, and translation services.[107]   Both parties decided to remain in Pennsylvania and remotely depose the

witnesses. These are reasonable costs. Teva must now pay Mr. Middlebrooks's share of the costs for the court reporter, videographer and translation service.

Teva objects to a double charge for a process server for a subpoena served on Dr. Gary Best, arguing one fee should be eliminated. Mr. Middlebrooks responds the charges reflect a first attempted service on Dr. Best believed to be located in New Jersey, and a second attempt, and re-service, upon Dr. Best when Mr. Middlebrooks learned Dr. Best moved to Florida. Mr. Middlebrooks introduced the video deposition of Dr. Best at trial. This is a reasonable out-of-pocket cost.

Teva also argues other services should be "clarified before they are ordered to be paid," specifically $5,500 for information technology support during trial; an agreement to equally share in the cost of information technology and audio-visual services at trial for which Teva has not received an invoice; and fees paid to the court reporter for transcripts. Mr. Middlebrooks responds the payment to the court reporter is in addition to the initial $5,000 retainer, referring to his itemized costs.[108] As for the costs of information technology support, Mr. Middlebrooks concedes he has not yet sent an invoice to Teva for half the amount, but he is entitled to full reimbursement of the cost under ADEA. We agree.

Teva lastly argues we should apply the same reduction warranted under *Hensley* to the reasonable costs for lack of a complete victory. We disagree. Unlike attorney's fees, we lack any credible basis to discount out-of-pocket expenses simply because the jury did not return a verdict in Mr. Middlebrooks's favor for age and national origin discrimination.

### III.    Conclusion

Console Mattiacci persuaded the jury to vindicate Mr. Middlebrooks's federal rights as a Teva senior employee. It won significant damages against a well-funded and motivated employer

in a hard-fought litigation.  It met its obligations as a private attorney general in enforcing federal

rights in the workplace. Under Congress's mandate, Mr. Middlebrooks is entitled to recovery of

his reasonable attorney's fees and costs.  After carefully parsing through a thicket of billing records

which do not offer a model of time recording for attorneys, we can find a reasonable number of

hours based on adequate descriptions of services at a reasonable hourly rate in this District today.

In the accompanying Order, we grant Mr. Middlebrooks's motion in part and award him

reasonable attorney's fees of $403,947.27 and reasonable costs of $51,445.73.

---

[1] We provide a thorough recitation of the background in our February 4, 2019 Memorandum addressing the parties' post-trial motions. *See* ECF Doc. No. 154.

[2] Teva Pharmaceuticals Industries, Limited and Teva Pharmaceuticals USA, Inc. (collectively "Teva").  At trial, Teva agreed to be treated as one entity for purposes of satisfying a judgment.

[3] Console Mattiacci does not offer a chronology of services leaving us guessing as to a timeline of representation.

[4] We expect Console Mattiacci describes its hourly rates as a material term of its undisclosed retainer agreement. As it failed to produce this agreement, we cannot find Mr. Middlebrooks agreed to any hourly rate as being reasonable.

[5] S. Console Decl. at ¶ 29 (ECF Doc. No. 153-3).

[6] *Id.*

[7] *Id.*

[8] Firm Founder Console swears Attorney Gurmankin is the primary attorney working on the case from May 2016 through litigation and pre-trial preparations.  S. Console Decl. at ¶ 19 (ECF Doc. No. 153-3).

[9] On November 1, 2016, the EEOC issued a dismissal and Notice of Rights for both charges of discrimination.  After exhausting the administrative remedies, Firm Founder Console and Attorney Gurmankin signed the complaint in this Court on January 30, 2017.  Mr. Middlebrooks sued under Title VII, 42 U.S.C. §2000e, *et seq.,* the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.,* and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et seq.*

[10] L. Mattiacci Decl. at ¶ 12 (ECF Doc. No. 153-3).

---

[11] ECF Doc. No 68.

[12] L. Mattiacci's Decl. at ¶ 15 (ECF Doc. No. 153-3).  In undisclosed hours, she "reviewed": summary judgment filings, documents produced in discovery including the "hot" documents, deposition transcripts, trial exhibits, our summary judgment opinion, and Teva's motions *in limine*.

[13] S. Console Decl. at ¶ 21 (ECF Doc. No. 153-3).

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] ECF Doc. 130.

[19] ECF Doc. No. 137.

[20] We additionally granted Mr. Middlebrooks's motion for prejudgment interest on the back pay award.  *See* ECF Docs. No. 154, 156.

[21] ECF Doc. No. 153.  Mr. Middlebrooks is not now moving for attorney's fees or costs incurred after January 27, 2019, specifically reserving his right to supplement his Motion seeking reimbursement for work performed after January 27, 2019.

[22] ECF Doc. No. 157.

[23] 42 U.S.C. § 2000e-5(k).

[24] 29 U.S.C. § 216(b); 29 U.S.C. § 626(b).

[25] *Hensley v. Eckerhart*, 461 U.S 424, 433 (1983); *Rode v. Dellarciprete,* 892 F.2d 1177, 1183 (3d Cir. 1990) *(*citing *Blum v. Stetson*, 465 U.S. 886, 897 (1994)).

[26] *Clemens v. N.Y. Cent. Mut. Fire Ins. Co.*, 903 F.3d 396, 400 (3d Cir. 2018) (quoting *Rode,* 892 F.2d at 1183).

[27] *United States ex rel. Palmer v. C&D Technologies, Inc.*, 897 F.3d 128, 139 (3d Cir. 2018) (quoting *Rode*, 892 F.2d at 1183)).

[28] *Id.*

[29] *United States v. Eleven Vehicles, Their Equip. & Accessories*, 200 F.3d 203, 211-12 (3d Cir. 2000).

43

---

[30] *Clemens*, 903 F.3d at 398 (quoting *Brown v. Stackler*, 612 F.2d 1057, 1059 (7th Cir. 1980)).

[31] *Id.* at 401 (quoting *Washington v. Phila. Cty. Ct. of Com. Pl.*, 89 F.3d 1031, 1037 (3d Cir. 1996)).

[32] *Washington*, 89 F.3d at 1037–38 (quoting *Rode*, 892 F.2d at 1190).

[33] *Rode*, 892 F.2d at 1191 n.13; *see also McGuffey v. Brink's, Inc.*, 598 F. Supp. 2d 659, 671 (E.D. Pa. 2009) (finding challenge to 18.8 hours of billed time described as "Research," "Review research," "Research ADEA," or "Research ERISA" sufficient for the court to determine whether the costs claims were unreasonable for the work performed).

[34] *Tenalfy Eruv Ass'n, Inc. v. Borough of Tenafly*, 195 F.App'x 93, 100-01 (3d Cir. 2006) (quoting *Washington*, 89 F.3d at 1037)).

[35] *Pasternack v. Klein*, No. 14-2275, 2017 WL 4642283, at *3 (E.D. Pa. Oct. 17, 2017) (quoting *Hatchett v. City of Phila.*, No. 09-1708, 2010 WL 4054285, at *4 (E.D. Pa. Oct. 15, 2010)).

[36] From November 2015 through March 2016, Console Mattiacci represented Mr. Middlebrooks under an hourly fee agreement at the firm's standard hourly rates. Console Mattiacci did not provide the hourly fee agreement to us. Firm Founder Console swears Mr. Middlebrooks paid for 26.6 hours of service amounting to $10,000. This is an average hourly rate of $376 paid for services. Console Mattiacci seeks reimbursement of the $10,000 in hourly fees paid.

[37] S. Console Decl. at ¶ 30 (ECF Doc. No. 153-3).

[38] *Id.* at ¶ 17.

[39] C. Gurmankin Decl. at ¶ 16 (ECF Doc. No. 153-3).

[40] L. Mattiacci Decl. at ¶ 15 (ECF Doc. No. 153-3).

[41] K. Console Decl. at ¶ 12 (ECF Doc. No. 153-3).

[42] S. Console Decl. at ¶ 18 (ECF Doc. No. 153-3).

[43] *Id.* at ¶¶ 23-24.

[44] L. Mattiacci Decl. at ¶ 13 (ECF Doc. No. 153-3).

[45] Teva objects to 257 hours of Attorney Mattiacci's time, directing us to its Exhibit D collecting all of Attorney Mattiacci's time entries described as "Work on trial prep." Exhibit D shows a total of 299 hours bearing the objected to description, not 257 hours. *See* ECF Doc. No. 157-5.

[46] Attorney Kevin Console billed .4 hours for revising a draft declaration on January 17, 2019.

[47] N.T. E. Cicak, Nov. 15, 2018, pp. 21-23.

---

[48] *Blum*, 465 U.S. at 895 n.11.

[49] *Loughner v. Univ. of Pittsburgh*, 260 F.3d 173, 180 (3d Cir. 2001) (citing *Blum*, 465 U.S. at 895 and *Pub. Interest Grp. of N.J., Inc. v. Windall*, 51 F.3d 1179, 1185 (3d Cir. 1995)).

[50] *Pub. Int. Grp.*, 51 F.3d at 1185 (citations omitted).

[51] *Rode*, 892 F.2d at 1183 (citing *Student Pub. Interest Research Grp. of NJ, Inc. v. AT&T Bell Labs.*, 842 F.2d 1436, 1447 (3d Cir. 1988) and *Blum*, 465 U.S. at 895 n. 11).

[52] S. Console Decl. at ¶ 34 (ECF Doc. No. 153-3). Mr. Middlebrooks does not provide us with the decisions from two arbitration fee awards.

[53] Community Legal Services of Philadelphia published its range of hourly rates effective February 15, 2017.  Its rates "do not reflect any adjustment for contingency, and are based on Philadelphia law firm market survey data and increases in the Consumer Price Index."  *See* https://clsphila.org/about-cls/attorney-fees.

[54] ECF Doc. No. 157 at 4, n.2.

[55] No. 99-6306, 2010 WL 1370863 (E.D. Pa. Apr. 4, 2010).

[56] *Id.* at *15.

[57] *Id.*

[58] The cases cited by Mr. Middlebrooks where the district court awarded Console Mattiacci its full rates are distinguishable.  For example, *Sessions v. Owens-Illinois, Inc.* involved court approval of an ERISA class action settlement which is not an appropriate comparator and the decision of the district court does not show the hourly rates approved.  *See Sessions v. Owens-Illinois, Inc.*, No. 07-1669 (M.D. Pa. Oct. 23, 2014) (final order and judgment approving settlement and dismissing action with prejudice) (ECF Doc. No. 283).  In *Marthers v. Gonzalez*, Console Mattiacci only handled the initial stages of the litigation and Firm Founder Console billed at only $380 per hour.  *See Marthers v. Gonzales*, No. 05-3778 (E.D. Pa. Aug. 13, 2008) (memorandum granting in part and denying in part plaintiff's application for attorney fees, costs and prejudgment interest) (ECF Doc. No. 81). Cases from 2005 and 2007 are over ten years old and the parties did not contest the reasonableness of the rates.

[59] *Maldonado v. Houston*, 256 F.3d 181, 187 (3d Cir. 2001) (citation omitted).

[60] No. 16-4205, 2018 WL 2197226 (E.D. May 11, 2018), appeal docketed, No. 18-3803 (3d Cir. Dec. 31, 2018).

[61] *Id.* at *3-*4.  *See also Dowd v. Se. Pa. Transp. Auth.*, No. 04-294, 2006 WL 1371183, * (E.D. Pa. May 16, 2006) (in Title VII, PHRA, and §1981 action where jury found defendant

45

discriminated against plaintiff, court reduced attorney's fees of $350 per hour for trial counsel to $285 per hour within the range of Community Legal Services rate).

[62] *See* S. Console Decl. at ¶ 23 (ECF Doc. No. 153-3).

[63] While neither party asked, we query for future cases as to the extent a judge can vary from the rates set by Community Legal Services which we may use in a wide variety of statutory fee-shifting cases. Should we adapt when we face the unanticipated circumstances presented in representing Mr. Middlebrooks? We may consider the original nature (hourly v. contingent) of the lawyer's representation as it sets expectations when accepting the case; the level of lawyering required given the challenges posed by the facts, law and the employer's positions – all of which are outside the lawyer's control; and, our interest in modestly incentivizing talented lawyers to vindicate an employee's civil rights as compared to possibly more lucrative representations. Applying these factors to the baseline set by Community Legal Services in a wide variety of contexts, Console Mattiacci swears it contracted to provide services on an hourly fee basis (but does not tell us the hourly rate) and must face the time value of money in not being paid on an hourly basis when it began representing Mr. Middlebrooks. We must also address the heightened level of lawyering provided by Console Mattiacci in this difficult discrimination and retaliation case against a well-funded and motivated employer who appears to have disputed almost every issue, including today's requests. We must also recognize obtaining a retaliation verdict for a senior executive may pose significantly more work effort than other cases presented by clients represented by Community Legal Services. In balancing these factors, we may raise the hourly rate baseline set by Community Legal Services. But how much? We decline to guess lacking counsel's request, let alone input. We have no basis to set the percentage increase other than fiat as to reasonableness. We could find an increase in the hourly rate baseline is justified by the nature of this case. We could find a certain increase over the Community Legal Services baseline balances the need to find a reasonable rate for this case with our need to avoid setting a windfall for lawyers who do not otherwise offer the client's agreement to pay a certain rate or comparator affidavits confirming their higher hourly rates. But we lack a reasoned approach to how much of an increase. We instead add $10 an hour to account for the increase in rates since February 2017 on the Community Legal Services rates and will award Mr. Middlebrooks the same hourly rate as Teva paid its trial and associate trial counsel.

[64] *Hensley*, 461 U.S. at 434, 436.

[65] *Id.* at 434.

[66] *Id.*

[67] *Id.* at 435.

[68] *Id.* (footnote omitted).

[69] *Id.* at 440.

[70] No. 13-2845, 2015 WL 1255968 (E.D. Pa. Mar. 18, 2015).
[71] *Id.* at * 3.

46

[72] *Id.*

[73] *Id.*

[74] 559 F. Supp.2d 516 (M.D. Pa. 2008).

[75] *Id.* at 528.

[76] 598 F. Supp.2d 659, 673 (E.D. Pa. 2009).

[77] *Id.* at 674.

[78] *Id.*

[79] *Id.* at 675.

[80] 505 U.S. 557 (1992).  In *Dague*, the Court held "fee-shifting provisions in federal statutes do not permit enhancement of fees beyond the lodestar amount to reflect the fact that the prevailing party's attorneys were retained on a contingent-fee basis," specifically rejecting the argument a "reasonable fee" for attorneys retained on a contingency-fee basis "must go beyond the lodestar, to compensate for risk of loss and of consequent nonpayment." *Id.* at 562

[81] Pa. R.Civ.P. 1717 (emphasis added).

[82] 126 F.3d 524 (3d Cir. 1997).

[83] 661 A.2d 1202 (N.J. 1995).

[84] *Polselli*, 126 F.3d at 527-28.

[85] *Id.* at 527.

[86] *Id.* at 535.

[87] *Id.*

[88] *Id.*

[89] *Id.*

[90] *Id.* at 536.

[91] *Id.*

[92] *Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 978-79, 980 (Pa. Super. 2011) (citing *Birth Ctr. v. St. Paul Cos., Inc.*, 727 A.2d 1144 (Pa. Super. 1999) (*disapproved on other grounds, Mishoe v.*

*Erie Ins. Co.*, 824 A.2d 1153 (Pa. 2003)).

[93] *Braun*, 24 A.3d at 679 (citations omitted). *Braun* involved claims brought by a putative class of hourly employees of Wal-Mart alleging wage violations under Pennsylvania wage statutes and common law.

[94] *Rendine*, 661 A.2d at 1228.

[95] No. 13-5081, 2017 WL 3215415, at *4 (E.D. Pa. July 28, 2017).

[96] *Id.* at *4.

[97] 890 F. Supp. 382 (M.D. Pa. 1995).

[98] *Id.* at 399-400.

[99] *Id.* at 400.

[100] *Id.*

[101] *Becker v. ARCO Chemical Co.*, 15 F.Supp.2d 621, 635 (E.D. Pa. 1998) (citation omitted); *see also McGuffy*, 598 F. Supp.2d at 675 (citation omitted).

[102] *Petrunich v. Sun Bldg. Sys., Inc.*, 625 F.Supp. 199, 211 (MD. Pa. 2008) (awarding parking expenses); *Kratzer v. Wegman's Restaurant, LP*, No. 04-5889, 2005 WL 2847320, at * 2-*3 (E.D. Pa. Oct. 27, 2005) (awarding photocopying costs, filing fees, travel expenses for attorneys, and expert fees).

[103] *Becker*, 15 F. Supp.2d at 637.

[104] *Blagrave*, 2009 WL 440299, at *8.

[105] *Id.* (collecting cases). *See also Borrell v. Bloomsburg Univ.*, 207 F.Supp.3d 454, 523 n.58 (M.D. Pa. 2016) (excluding costs designated at "lunch" with no documentation to substantiate costs); *Blagrave v. Nutrition Mgmt. Servs. Co.*, No. 05-6790, 2009 WL 440299, at *8 (E.D. Pa. Feb. 20, 2009) (following *Becker*, excluded costs of lunch on "an ordinary workday when no travel is involved" and when "attorneys would have had to purchase those lunches in any event").

[106] ECF Doc. No. 158.

[107] ECF Doc. No. 68.

[108] *See* ECF Doc. No. 153-3 at 81.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **STEPHEN MIDDLEBROOKS** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 17-412** |
| | : | |
| **TEVA PHARMACEUTICALS USA,** | : | |
| **INC.** | : | |

## <u>JUDGMENT</u>

**AND NOW**, this 26th day of February 2019, having the reviewed the jury's November 19, 2018 Verdict (ECF Doc. No. 137), and considering our February 4, 2019 Orders addressing post-trial motions (ECF Doc. Nos. 155, 156), and today's Order addressing Plaintiff's Motion for recovery of reasonable attorneys' fees and costs, it is **ORDERED**:

1.      We enter **JUDGMENT** of **$2,092,634.27**, plus post-judgment interest, in favor of the Plaintiff Stephen Middlebrooks and against Defendant Teva Pharmaceuticals USA, Inc. consisting of compensatory and punitive damages, liquidated damages, back pay, front pay, pre-judgment interest and reasonable attorney's fees and costs consistent with our February 4, 2019 and February 26, 2019 Orders; and,

2.      The Clerk of Court shall close this case.

KEARNEY, J.